# 23-229

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

❖

HYUNHUY NAM,

*Plaintiff-Appellee,*

—against—

PERMANENT MISSION OF THE REPUBLIC OF KOREA TO THE UNITED NATIONS,

*Defendant-Appellant.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

### JOINT APPENDIX
### VOLUME I OF V
### (Pages A-1 to A-289)

---

JOSEPH BARBIERE
COLE SCHOTZ P.C.
Court Plaza North
25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000

ERIC S. LATZER
COLE SCHOTZ P.C.
1325 Avenue of the Americas,
    19th Floor
New York, New York 10019
(201) 525-6281

JOSHUA S. LIM
NICK DUBOIS
SEAN KWAK
KIM, CHO & LIM, LLC
460 Bergen Boulevard, Suite 305
Palisades Park, New Jersey 07650
(201) 585-7400

*Attorneys for Defendant-Appellant*

(*Counsel continued on inside cover*)

Yongjin Bae
Hang & Associates, PLLC
136-20 38th Avenue, Suite 10G
Flushing, New York 11354
(718) 353-8588

*Attorneys for Plaintiff-Appellee*

# TABLE OF CONTENTS

PAGE

District Court Docket Entries ............................................ A-1

Complaint, dated July 19, 2021 ....................................... A-11

Defendants' Notice of Motion to Dismiss, dated September 30, 2021 .... A-54

Defendants' Memorandum of Law in Support of Motion to Dismiss,
    dated September 30, 2021 ......................................... A-57

Declaration of Byungseok Yoo in Support of Defendants'
    Motion to Dismiss, dated August 25, 2021 ........................ A-79

    Exhibit 1 to Byungseok Declaration—
    Letter from the United States Department of State, Office
    of Foreign Missions, New York Regional Office, Concerning
    the Permanent Mission of the Republic of Korea's Tax-Exempt
    Status, dated June 12, 2002 ...................................... A-83

Declaration of Counsellor at the Mission in Support of Defendants'
    Motion to Dismiss, dated September 3, 2021 ...................... A-85

    Exhibit A to Foregoing Documents—
    Letter from the Ministry of Foreign Affairs for the Republic
    of Korea Concerning the Laws, Rules, and Regulations of the
    Republic of Korea, dated August 23, 2021 ....................... A-87

    Exhibit B to Foregoing Documents—
    The Settlement Agreement executed by and between Plaintiff
    and Defendant Jo, on behalf of Defendant Permanent Mission
    of the Republic of Korea to the United Nations,
    dated September 1, 2020, with Certified Translation ............... A-90

Declaration of Hyunhuy Nam in Opposition to Defendants'
    Motion to Dismiss, dated October 23, 2021 ...................... A-94

ii

PAGE

Exhibit A to Nam Declaration—
Permanent Mission's Employee Directory (Redacted) ............. A-106

Exhibit B to Nam Declaration—
Plaintiff's Time Records Revised by Minister Lee ................ A-107

Exhibit C to Nam Declaration—
Original Photograph Reflecting Defendant Chung
and the Shopping Item .......................................... A-110

Memorandum of Law in Opposition to Defendants'
Motion to Dismiss, dated October 25, 2021 ...................... A-112

Defendants' Reply Memorandum of Law in Further Support
of Motion to Dismiss, dated November 8, 2021 ................... A-132

Memorandum Opinion and Order of the Honorable Alison J. Nathan,
dated January 21, 2022 ......................................... A-150

Defendant Permanent Mission of the Republic of Korea to the United
Nations ('Mission")'s Answer, dated February 11, 2022 .......... A-162

Defendant Mission's Notice of Motion for Summary Judgment,
dated July 28, 2022 ............................................ A-192

Defendant Mission's Memorandum of Law in Support of Motion
for Summary Judgment Pursuant to FRCP 56,
dated July 28, 2022 ............................................ A-194

Declaration of Joshua S. Lim in Support of Defendant Mission's
Motion for Summary Judgment Pursuant to FRCP 56,
dated July 28, 2022 ............................................ A-228

Declaration of Counsellor at the Mission in Support of Defendant's
Motion for Summary Judgment Pursuant to FRCP 56,
dated July 28, 2022 ............................................ A-233

iii

                                                                    PAGE

Defendant Mission's FRCP 56.1 Statement of Material Facts,
    dated July 28, 2022 ............................................ A-234

Exhibit 1 to Foregoing Documents—
Complaint, dated July 19, 2021 ................................. A-246

Exhibit 2 to Foregoing Documents—
Transcript of the Deposition of Plaintiff,
taken on February 22, 2022 ..................................... A-290

Exhibit 3 to Foregoing Documents—
Transcript of the Deposition of the Counsellor
at the Mission, taken on April 4, 2022 ......................... A-326

Exhibit 4 to Foregoing Documents—
2016 Pledge Agreement Produced by Defendant
in this Matter as ROKPM0014.................................... A-359

Exhibit 5 to Foregoing Documents—
Certified Translation of Exhibit 4, Produced by Defendant
in this Matter as ROKPM0014-T, along with the
Certification of Translation ................................... A-361

Exhibit 6 to Foregoing Documents—
2017 Pledge Agreement Produced by Defendant
in this Matter as ROKPM0019.................................... A-364

Exhibit 7 to Foregoing Documents—
Certified Translation of Exhibit 6, Produced by Defendant
in this Matter as ROKPM0019-T, along with the
Certification of Translation.................................... A-366

Exhibit 8 to Foregoing Documents—
2018 Pledge Agreement Produced by Defendant
in this Matter as ROKPM0024.................................... A-369

Exhibit 9 to Foregoing Documents—
Certified Translation of Exhibit 8, Produced by Defendant
in this Matter as ROKPM0024-T, along with the
Certification of Translation ................................... A-371

iv

PAGE

Exhibit 10 to Foregoing Documents—
2019 Pledge Agreement Produced by Defendant
in this Matter as ROKPM0030................................... A-374

Exhibit 11 to Foregoing Documents—
Certified Translation of Exhibit 10, Produced by Defendant
in this Matter as ROKPM0030-T, along with the
Certification of Translation ..................................... A-376

Exhibit 12 to Foregoing Documents—
2020 Pledge Agreement Produced by Defendant
in this Matter as ROKPM0041................................... A-379

Exhibit 13 to Foregoing Documents—
Certified Translation of Exhibit 12, Produced by Defendant
in this Matter as ROKPM0041-T, along with the
Certification of Translation ..................................... A-381

Exhibit 14 to Foregoing Documents—
2021 Pledge Agreement Produced by Defendant
in this Matter as ROKPM0047................................... A-384

Exhibit 15 to Foregoing Documents—
Certified Translation of Exhibit 14, Produced by Defendant
in this Matter as ROKPM0047-T, along with the
Certification of Translation ..................................... A-386

Exhibit 16 to Foregoing Documents—
Result of the Background Check Performed for Plaintiff
Hyunhuy Nam in the Republic of Korea, along with a
Certified Translation thereof and the Certificate
of Translation ................................................. A-389

Exhibit 17 to Foregoing Documents—
2016 Employment Contract Produced by Defendant
in this Matter as ROKPM0010 through 0013 ..................... A-401

Exhibit 18 to Foregoing Documents—
Certified Translation of Exhibit 17, Produced by Defendant
in this Matter as ROKPM0010-T through 0013-T,
along with theCertification of Translation........................ A-406

v

PAGE

Exhibit 19 to Foregoing Documents—
2017 Employment Contract Produced by Defendant
in this Matter as ROKPM0015 through 0018 ..................... A-411

Exhibit 20 to Foregoing Documents—
Certified Translation of Exhibit 19, Produced by Defendant
in this Matter as ROKPM0015-T through 0018-T,
along with the Certification of Translation ........................ A-416

Exhibit 21 to Foregoing Documents—
2018 Employment contract Produced by Defendant
in this Matter as ROKPM0020 through 0023 ..................... A-422

Exhibit 22 to Foregoing Documents—
Certified Translation of Exhibit 21, Produced by Defendant
in this Matter as ROKPM0020-T through 0023-T,
along with the Certification of Translation ........................ A-427

Exhibit 23 to Foregoing Documents—
First 2019 Employment Contract Produced by Defendant
in this Matter as ROKPM0025 through 0029 ..................... A-433

Exhibit 24 to Foregoing Documents—
Certified Translation of Exhibit 23, Produced by Defendant
in this Matter as ROKPM0024-T through 0029-T,
along with the Certification of Translation ........................ A-439

Exhibit 25 to Foregoing Documents—
Second 2019 Employment Contract Produced by Defendant
in this Matter as ROKPM0031 through 0035 ..................... A-446

Exhibit 26 to Foregoing Documents—
Certified Translation of Exhibit 25, Produced by Defendant
in this Matter as ROKPM0031-T through 0035-T,
along with the Certification of Translation ........................ A-452

Exhibit 27 to Foregoing Documents—
2020 Employment Contract Produced by Defendant
in this Matter as ROKPM0036 through 0040 ..................... A-459

vi

PAGE

Exhibit 28 to Foregoing Documents—
Certified Translation of Exhibit 27, Produced by Defendant
in this Matter as ROKPM0036-T through 0040-T,
along with the Certification of Translation ........................ A-465

Exhibit 29 to Foregoing Documents—
2021 Employment Contract Produced by Defendant
in this Matter as ROKPM0042 through 0046 ..................... A-472

Exhibit 30 to Foregoing Documents—
Certified Translation of Exhibit 29, Produced by Defendant
in this Matter as ROKPM0042-T through 0046-T,
along with the Certification of Translation ........................ A-478

Exhibit 31 to Foregoing Documents—
Declaration of Counsellor at the Mission in Support of
Defendants' Motion to Dismiss, dated September 3, 2021,
with Exhibits A and B ........................................... A-485

Exhibit 32 to Foregoing Documents—
Declaration of Byungseok Yoo in Support of Defendants'
Motion to Dismiss, dated August 25, 2021, with Exhibit 1 ........ A-495

Exhibit 33 to Foregoing Documents—
Transcript of the Deposition of the Second Secretary
at the Mission, taken on April 4, 2022 ........................... A-502

Exhibit 34 to Foregoing Documents—
Print-out of a Webpage from "naver.com,"
the Full Web Address being the following:
https://terms.naver.com/entry.naver?docId=
5844054&cid=43667&categoryId=43667 ......................... A-515

Exhibit 35 to Foregoing Documents—
Certified Translation of Exhibit 34,
along with the Certification of Translation ........................ A-519

Exhibit 36 to Foregoing Documents—
Security Pass issued to Plaintiff Hyunhuy Nam for Access to the
Vicinity of the United Nations building during the high-level
week, issued in 2020 and set to expire on July 30, 2022 ........... A-524

vii

PAGE

Exhibit 37 to Foregoing Documents—
Certified Translation of The Settlement Agreement executed by
and between Plaintiff and Defendant Jo, on behalf of Defendant
Permanent Mission of the Republic of Korea to the United
Nations, dated September 1, 2020 ............................. A-526

Exhibit 38 to Foregoing Documents—
Memorandum Opinion and Order of the Honorable
Alison J. Nathan, dated January 21, 2022 (Dkt. # 61) ............. A-529

Plaintiff's Notice of Motion for Partial Summary Judgment,
dated July 8, 2022 ............................................ A-542

Memorandum of Law in Support of Plaintiff's Motion
for Partial Summary Judgment, dated July 28, 2022 .............. A-544

Proposed Order ................................................... A-562

Declaration of Hyunhuy Nam in Support of Motion
for Partial Summary Judgment, dated July 28, 2022 .............. A-563

Affirmation of Yongjin Bae in Support of Motion
for Partial Summary Judgment, dated July 28, 2022 .............. A-567

Rule 56.1 Statement of Undisputed Material Facts in Support
of Plaintiff Hyunhuy Nam's Motion for Partial Summary
Judgment, dated July 28, 2022................................... A-570

Exhibit A to Foregoing Documents—
Complaint, dated July 19, 2021 ................................. A-574

Exhibit B to Foregoing Documents—
Employment Contract 2016 (Marked as Defendants'
Exhibit 1, Produced for Deposition on Plaintiff) .................. A-617

Exhibit C to Foregoing Documents—
Employment Contract 2017 (Marked as Defendants'
Exhibit 2, Produced for Deposition on Plaintiff) .................. A-627

viii

PAGE

Exhibit D to Foregoing Documents—
Employment Contract 2018 (Marked as Defendants'
Exhibit 3, Produced for Deposition on Plaintiff) ................... A-637

Exhibit E to Foregoing Documents—
Employment Contract 2019 (Marked as Defendants'
Exhibit 4, Produced for Deposition on Plaintiff) ................... A-647

Exhibit F to Foregoing Documents—
Employment Contract 2020 (Marked as Defendants'
Exhibit 5, Produced for Deposition on Plaintiff) ................... A-669

Exhibit G to Foregoing Documents—
Employment Contract 2021 (Marked as Defendants'
Exhibit 6, Produced for Deposition on Plaintiff) ................... A-681

Exhibit H to Foregoing Documents—
Overtime Verification Ledger (Marked as Defendants'
Exhibit 8, Produced for Deposition on Plaintiff) ................... A-693

Exhibit I to Foregoing Documents—
Excerpts from Exhibit H with Translation ........................ A-753

Exhibit J to Foregoing Documents—
Excerpts of the Deposition Transcript of Counsellor
at the Mission ................................................. A-760

Defendant's Memorandum of Law in Opposition to Plaintiff's
Motion for Partial Summary Judgment,
dated August 29, 2022 .......................................... A-765

Defendant's Response to Plaintiff's FRCP 56.1 Statement
of Material Facts and Defendant's Counter-Statement
of Facts, dated August 29, 2022 ................................. A-791

Declaration of Joshua S. Lim in Support of Defendant's
Motion for Summary Judgment Pursuant to FRCP 56,
dated August 29, 2022 .......................................... A-803

ix

PAGE

Exhibit 3-2 to Lim Declaration—
Transcript of the Deposition of the Counsellor
at the Mission, taken on April 4, 2022 ........................... A-805

Exhibit 39 to Lim Declaration—
Defendant's Answer, filed February 11, 2022 .................... A-844

Exhibit 40 to Lim Declaration—
Declaration by Fran Yoon, dated August 26, 2022 ................ A-878

Exhibit 41 to Lim Declaration—
Articles 50, 53, and 56 of the ROK's Labor Standards Act,
obtained from: https://www.law.go.kr/법령/근로기준법,
last accessed August 26, 2022 at 4:09 PM ....................... A-880

Exhibit 42 to Lim Declaration—
Partial Translation of Exhibit 41 by Fran Yoon,
and Certification of Translation ................................. A-883

Memorandum of Law in Opposition to Defendant's Motion for
    Summary Judgment and in Further Support of Plaintiff's
    Partial Summary Judgment, dated August 29, 2022 .............. A-884

Defendant's Reply Memorandum of Law in Further Support
    of Defendant's Motion for Summary Judgment Pursuant
    to FRCP 56, dated September 19, 2022 ......................... A-903

Declaration of Joshua S. Lim in Support of Defendant's
    Motion for Summary Judgment Pursuant to FRCP 56,
    dated September 19, 2022 ...................................... A-921

Exhibit 43 to Lim Declaration—
Amended Complaint filed in *Mourmouni v. Permanent Mission
of the Republic of S. Sudan to the U.N.*, Case Number
1:20-cv-03603, on January 11, 2021,
retrieved through PACER ....................................... A-922

x

PAGE

Memorandum of Law in Reply to Defendant's Opposition
    to Plaintiff's Partial Summary Judgment,
        dated September 19, 2022 ........................................ A-939

Exhibit A to Memorandum—
Transcript of deposition of Counsellor at the Mission,
witness for Permanent Mission under Rule §30(b)(6)
of the F. R. C. P, 34:2-38:8 ...................................... A-952

Exhibit B to Memorandum—
Transcript of deposition of Nam. 18-19 ......................... A-957

Exhibit C to Memorandum—
Transcript of Deposition of Second Secretary at the Mission
at 19:18-22 ...................................................... A-961

Exhibit D to Memorandum—
Records 0061-75 ............................................... A-962

Declaration of YongJin Bae, dated September 19, 2022 .............. A-972

Order of the Honorable Jennifer L. Rochon, dated January 3, 2023 ..... A-975

Supplemental Damage Analysis Brief in Further Support
    of Plaintiff's Motion for Partial Summary Judgment,
        dated January 13, 2023 .......................................... A-976

Declaration of YongJin Bae, dated January 13, 2023 .................. A-987

Exhibit A to Bae Declaration—
Bates Stamped as ROKPM0051 ................................. A-989

Exhibit B to Bae Declaration—
Dkt #78-21, Dkt #78-33 ........................................ A-993

Exhibit C to Bae Declaration—
Dkt #79-15 .................................................... A-1078

Exhibit D to Bae Declaration—
Dkt #79-14 .................................................... A-1086

xi

PAGE

Defendant's Supplemental Memorandum of Law in Opposition
  to Plaintiff's Motion for Partial Summary Judgment,
    dated February 3, 2023 ........................................ A-1147

Declaration of Joshua S. Lim in Support of Defendant's
  Supplemental Brief in Opposition to Plaintiff's Motion
  for Partial Summary Judgment, dated February 3, 2023 .......... A-1160

    Exhibit 43 to Lim Declaration—
    Summary Document Based on Data Gleaned from
    Exhibits A through D submitted by Plaintiff on
    January 13, 2023 ............................................ A-1162

    Exhibit 44 to Lim Declaration—
    Summary Document Based on Data Gleaned from
    Exhibits A through D submitted by Plaintiff on
    January 13, 2023 ............................................ A-1206

Opinion and Order of the Honorable Jennifer L. Rochon,
    dated February 21, 2023 ..................................... A-1240

Defendant's Notice of Appeal, dated February 22, 2023 .............. A-1297

Memorandum and Order of the Honorable Jennifer L. Rochon,
    dated March 10, 2023 ........................................ A-1300

# A-1

STAYED,APPEAL,ECF

**U.S. District Court**
**Southern District of New York (Foley Square)**
**CIVIL DOCKET FOR CASE #: 1:21-cv-06165-JLR**

| | |
|---|---|
| Nam v. Permanent Mission of the Republic of Korea to the United Nations | Date Filed: 07/19/2021 |
| Assigned to: Judge Jennifer L. Rochon | Jury Demand: Both |
| Cause: 29:201 Fair Labor Standards Act | Nature of Suit: 710 Labor: Fair Standards |
| | Jurisdiction: Federal Question |

**Plaintiff**

**Hyunhuy Nam**                                           represented by   **Diana Y. Seo**
Seo Law Group, PLLC
136-68 Roosevelt Avenue
Suite 726
Flushing, NY 11354
718-500-3340
Email: diana@seolawgroup.com
*TERMINATED: 11/22/2021*
*LEAD ATTORNEY*

**Ge Qu**
Hang & Associates, PLLC
136-20 38th Avenue, Suite 10G
Flushing, NY 11354
718-353-8588
Fax: 718-353-6288
Email: rqu@hanglaw.com
*ATTORNEY TO BE NOTICED*

**Jian Hang**
Hang & Associates, PLLC
136-18 39th Avenue Suite 1003
Flushing, NY 11354
(718)-353-8588
Fax: (718)-353-6288
Email: jhang@hanglaw.com
*ATTORNEY TO BE NOTICED*

**Shan Zhu**
3511-B Farrington Street
Ste 335
Flushing, NY 11354
347-470-7008
Email: shan.zhulaw@gmail.com
*ATTORNEY TO BE NOTICED*

**Yongjin Bae**
HANG & ASSOCIATES, PLLC
136-20 38th ave
10g
Flushing, NY 11354
718-353-8588
Email: ybae@hanglaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Permanent Mission of the Republic of Korea to the**          represented by   **Joshua S. Lim**
**United Nations**                                                kim Cho & lim LLC
460 Bergen Blubard, Suite 201
Palisades Park, NJ 07650
(201) 585-7400
Fax: (201) 585-7422
Email: joshualim@kcllawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**A-2**

**Nicholas J DuBois**
Nicholas J. Dubois, ESQ.
57 Pleasant Valley Drive
Box 1180
McAfee, NJ 07428-1180
973-209-2929
Fax: 973-858-0404
Email: nickesq@gmail.com
*ATTORNEY TO BE NOTICED*

**Power J. Chen**
Kim, Cho & Lim, LLC
460 Bergen Blvd.
Suite 305
Palisades Park, NJ 07650
201-740-2953
Email: johnchen@kcllawfirm.com
*ATTORNEY TO BE NOTICED*

**Sean Seokchan Kwak**
Kim, Cho & Lim, LLC
460 Bergen Boulevard
Palisades Park, NJ 07650
(716)-704-3148
Email: seankwak@kcllawfirm.com
*ATTORNEY TO BE NOTICED*

**Defendant**
**Hyun Cho**                                    represented by **Joshua S. Lim**
*TERMINATED: 01/21/2022*                        (See above for address)
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

                                                **Nicholas J DuBois**
                                                (See above for address)
                                                *ATTORNEY TO BE NOTICED*

                                                **Power J. Chen**
                                                (See above for address)
                                                *ATTORNEY TO BE NOTICED*

                                                **Sean Seokchan Kwak**
                                                (See above for address)
                                                *ATTORNEY TO BE NOTICED*

**Defendant**
**Jinho Jo**                                    represented by **Joshua S. Lim**
*TERMINATED: 01/21/2022*                        (See above for address)
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

                                                **Nicholas J DuBois**
                                                (See above for address)
                                                *ATTORNEY TO BE NOTICED*

                                                **Power J. Chen**
                                                (See above for address)
                                                *ATTORNEY TO BE NOTICED*

                                                **Sean Seokchan Kwak**
                                                (See above for address)
                                                *ATTORNEY TO BE NOTICED*

**Defendant**
**Daeyong Chung**                               represented by **Joshua S. Lim**
*TERMINATED: 01/21/2022*                        (See above for address)
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

                                                **Nicholas J DuBois**
                                                (See above for address)

**A-3**

SDNY CM/ECF NextGen Version 1.6

*ATTORNEY TO BE NOTICED*

**Power J. Chen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sean Seokchan Kwak**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/19/2021 | 1 | **FILING ERROR - DEFICIENT PLEADING - FILED AGAINST PARTY ERROR -**COMPLAINT against All Defendants. (Filing Fee $ 402.00, Receipt Number ANYSDC-24813863)Document filed by Hyunhuy Nam..(Seo, Diana) Modified on 7/20/2021 (vf). (Entered: 07/19/2021) |
| 07/19/2021 | 2 | CIVIL COVER SHEET filed..(Seo, Diana) (Entered: 07/19/2021) |
| 07/19/2021 | 3 | REQUEST FOR ISSUANCE OF SUMMONS as to Permanent Mission of the Republic of Korea to the United Nations, re: 1 Complaint. Document filed by Hyunhuy Nam..(Seo, Diana) (Entered: 07/19/2021) |
| 07/19/2021 | 4 | REQUEST FOR ISSUANCE OF SUMMONS as to Hyun Cho, re: 1 Complaint. Document filed by Hyunhuy Nam..(Seo, Diana) (Entered: 07/19/2021) |
| 07/19/2021 | 5 | REQUEST FOR ISSUANCE OF SUMMONS as to Jinho Jo, re: 1 Complaint. Document filed by Hyunhuy Nam..(Seo, Diana) (Entered: 07/19/2021) |
| 07/19/2021 | 6 | REQUEST FOR ISSUANCE OF SUMMONS as to Daeyong Chung, re: 1 Complaint. Document filed by Hyunhuy Nam..(Seo, Diana) (Entered: 07/19/2021) |
| 07/20/2021 | | ***NOTICE TO ATTORNEY REGARDING DEFICIENT PLEADING. Notice to Attorney Diana Y. Seo to RE-FILE Document No. 1 Complaint. The filing is deficient for the following reason(s): the All Defendant radio button was selected. Re-file the pleading using the event type Complaint found under the event list Complaints and Other Initiating Documents - attach the correct signed PDF - select the individually named filer/filers - select the individually named party/parties the pleading is against. (vf) (Entered: 07/20/2021) |
| 07/20/2021 | | ***NOTICE TO ATTORNEY REGARDING CIVIL. CASE OPENING STATISTICAL ERROR CORRECTION: Notice to attorney Diana Y. Seo. The following case opening statistical information was erroneously selected/entered: Cause of Action code Blank; County code New York. The following correction(s) have been made to your case entry: the Cause of Action code has been modified to 29:201 Fair Labor Standards Act; the County code has been modified to XX Out of State. (vf) (Entered: 07/20/2021) |
| 07/20/2021 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Alison J. Nathan. Please download and review the Individual Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district-judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at https://nysd.uscourts.gov/rules/ecf-related-instructions..(vf) (Entered: 07/20/2021) |
| 07/20/2021 | | Magistrate Judge Sarah L. Cave is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018-06/AO-3.pdf. (vf) (Entered: 07/20/2021) |
| 07/20/2021 | | Case Designated ECF. (vf) (Entered: 07/20/2021) |
| 07/20/2021 | 7 | ELECTRONIC SUMMONS ISSUED as to Permanent Mission of the Republic of Korea to the United Nations. (vf) (Entered: 07/20/2021) |
| 07/20/2021 | 8 | ELECTRONIC SUMMONS ISSUED as to Hyun Cho. (vf) (Entered: 07/20/2021) |
| 07/20/2021 | 9 | ELECTRONIC SUMMONS ISSUED as to Jinho Jo. (vf) (Entered: 07/20/2021) |
| 07/20/2021 | 10 | ELECTRONIC SUMMONS ISSUED as to Daeyong Chung. (vf) (Entered: 07/20/2021) |
| 07/20/2021 | 11 | COMPLAINT against Hyun Cho, Daeyong Chung, Jinho Jo, Permanent Mission of the Republic of Korea to the United Nations. Document filed by Hyunhuy Nam..(Seo, Diana) (Entered: 07/20/2021) |
| 07/24/2021 | 12 | NOTICE OF APPEARANCE by Jian Hang on behalf of Hyunhuy Nam..(Hang, Jian) (Entered: 07/24/2021) |
| 08/17/2021 | 13 | NOTICE OF APPEARANCE by Joshua S. Lim on behalf of Hyun Cho, Daeyong Chung, Jinho Jo, Permanent Mission of the Republic of Korea to the United Nations..(Lim, Joshua S.) (Entered: 08/17/2021) |
| 08/17/2021 | 14 | NOTICE OF APPEARANCE by Sean Seokchan Kwak on behalf of Hyun Cho, Daeyong Chung, Jinho Jo, Permanent Mission of the Republic of Korea to the United Nations..(Kwak, Sean) (Entered: 08/17/2021) |
| 08/17/2021 | 15 | NOTICE OF APPEARANCE by Power J. Chen on behalf of Hyun Cho, Daeyong Chung, Jinho Jo, Permanent Mission of the Republic of Korea to the United Nations..(Chen, Power) (Entered: 08/17/2021) |
| 08/17/2021 | 16 | NOTICE OF APPEARANCE by Nicholas J DuBois on behalf of Hyun Cho, Daeyong Chung, Jinho Jo, Permanent Mission of the Republic of Korea to the United Nations..(DuBois, Nicholas) (Entered: 08/17/2021) |

| 08/17/2021 | 17 | LETTER MOTION for Extension of Time to File Answer *to the Complaint* addressed to Judge Alison J. Nathan from Power J. Chen, Esq. dated August 17, 2021. Document filed by Hyun Cho, Daeyong Chung, Jinho Jo, Permanent Mission of the Republic of Korea to the United Nations..(Chen, Power) (Entered: 08/17/2021) |
|---|---|---|
| 08/17/2021 | 18 | ORDER granting 17 Letter Motion for Extension of Time to Answer re 17 LETTER MOTION for Extension of Time to File Answer *to the Complaint* addressed to Judge Alison J. Nathan from Power J. Chen, Esq. dated August 17, 2021. SO ORDERED. Hyun Cho answer due 9/30/2021; Daeyong Chung answer due 9/30/2021; Jinho Jo answer due 9/30/2021; Permanent Mission of the Republic of Korea to the United Nations answer due 9/30/2021. (Signed by Judge Alison J. Nathan on 8/17/2021) (vfr) (Entered: 08/17/2021) |
| 09/08/2021 | 19 | ORDER: Initial Pretrial Conference set for 10/15/2021 at 03:15 PM before Judge Alison J. Nathan. Unless the Court states otherwise, the Court will not hold the upcoming initial pretrial conference in this case in person. The conference will proceed by telephone. The parties and members of the public may access the conference by dialing (888) 363-4749 and entering access code 9196964. Parties ordered to submit via ECF proposed case management plan and joint letter seven days before conference. (As further set forth in this Order.) SO ORDERED. (Signed by Judge Alison J. Nathan on 9/3/2021) (vfr) (Entered: 09/08/2021) |
| 09/27/2021 | 20 | LETTER MOTION for Conference *Pre-Motion* addressed to Judge Alison J. Nathan from Joshua S. Lim, Esq. dated September 27, 2021. Document filed by Hyun Cho, Daeyong Chung, Jinho Jo, Permanent Mission of the Republic of Korea to the United Nations. (Attachments: # 1 Exhibit A, # 2 Exhibit B).(Lim, Joshua S.) (Entered: 09/27/2021) |
| 09/29/2021 | 21 | ORDER terminating 20 Letter Motion for Conference re: 20 LETTER MOTION for Conference *Pre-Motion* addressed to Judge Alison J. Nathan from Joshua S. Lim, Esq. dated September 27, 2021. The Court will hear Defendants' request to file a pre-discovery motion at the initial pretrial conference scheduled for October 15, 2021, at 3:15 p.m. SO ORDERED. (Signed by Judge Alison J. Nathan on 9/29/2021) (vfr) (Entered: 09/29/2021) |
| 09/29/2021 | 22 | LETTER MOTION for Conference re: 21 Order on Motion for Conference, addressed to Judge Alison J. Nathan from Joshua S. Lim, Esq dated September 29, 2021. Document filed by Hyun Cho, Daeyong Chung, Jinho Jo, Permanent Mission of the Republic of Korea to the United Nations..(Lim, Joshua S.) (Entered: 09/29/2021) |
| 09/29/2021 | 23 | ORDER terminating 22 Letter Motion for Conference re: 22 LETTER MOTION for Conference re: 21 Order on Motion for Conference addressed to Judge Alison J. Nathan from Joshua S. Lim, Esq dated September 29, 2021. The Court has not altered the time for Defendants to file an answer or a pre-answer motion under the federal rules. Defendants should file an answer or motion to dismiss the complaint by September 30, 2021, as ordered by the Court. Dkt. No. 18. The Court will consider a request to file any additional motion at the conference on October 15. SO ORDERED. (Signed by Judge Alison J. Nathan on 9/29/2021) (vfr) (Entered: 09/29/2021) |
| 09/29/2021 | | Set/Reset Deadlines: Motions due by 9/30/2021. (vfr) (Entered: 09/29/2021) |
| 09/30/2021 | 24 | MOTION to Dismiss for Lack of Jurisdiction . Document filed by Hyun Cho, Daeyong Chung, Jinho Jo, Permanent Mission of the Republic of Korea to the United Nations. (Attachments: # 1 Certification of Service, # 2 Defendants' Memorandum of Law In Support, # 3 Declaration of Byunseok Yoo In Support, # 4 Declaration of Jinho Jo In Support, # 5 Exhibit 1, # 6 Exhibit A, # 7 Exhibit B).(Lim, Joshua S.) (Entered: 09/30/2021) |
| 10/06/2021 | 25 | LETTER addressed to Judge Alison J. Nathan from Plaintiff dated October 6, 2021 re: Plaintiff's intention to rely on the pleading. Document filed by Hyunhuy Nam..(Seo, Diana) (Entered: 10/06/2021) |
| 10/06/2021 | 26 | LETTER MOTION for Extension of Time *to File Plaintiff's Opposition to Defendants' Motion to Dismiss* addressed to Judge Alison J. Nathan from Plaintiff dated October 6, 2021. Document filed by Hyunhuy Nam..(Seo, Diana) (Entered: 10/06/2021) |
| 10/06/2021 | 27 | JOINT LETTER addressed to Judge Alison J. Nathan from Power J. Chen, Esq. dated October 6, 2021 re: Pre-Trial Conference. Document filed by Hyun Cho, Daeyong Chung, Jinho Jo, Permanent Mission of the Republic of Korea to the United Nations..(Chen, Power) (Entered: 10/06/2021) |
| 10/06/2021 | 28 | PROPOSED CASE MANAGEMENT PLAN. Document filed by Hyun Cho, Daeyong Chung, Jinho Jo, Permanent Mission of the Republic of Korea to the United Nations..(Chen, Power) (Entered: 10/06/2021) |
| 10/07/2021 | 29 | ORDER granting 26 Letter Motion for Extension of Time. SO ORDERED. (Signed by Judge Alison J. Nathan on 10/7/2021) (vfr) (Entered: 10/07/2021) |
| 10/07/2021 | | Set/Reset Deadlines: Responses due by 10/25/2021 (vfr) (Entered: 10/07/2021) |
| 10/07/2021 | 30 | CIVIL CASE MANAGEMENT PLAN AND SCHEDULING ORDER: All parties do not consent to conducting all further proceedings before a United States Magistrate Judge, including motions and trial pursuant to 28 U.S.C. § 636(c). Any motion to amend or to join additional parties shall be filed within 14 days from the date of this Order. Depositions shall be completed by January 5, 2022. All expert discovery, including disclosure of expert reports, production of underlying documents, and depositions shall be completed by March 29, 2022. This case is to be tried to a jury. Depositions due by 3/29/2022. Fact Discovery due by 2/12/2022. Expert Discovery due by 3/29/2022. Case Management Conference set for 4/15/2022 at 03:15 PM before Judge Alison J. Nathan. (Signed by Judge Alison J. Nathan on 10/7/2021) (vfr) (Entered: 10/07/2021) |
| 10/15/2021 | 31 | ORDER: A conference in this matter is scheduled for Friday, October 15, 2021 at 3:15 P.M. The conference may be accessed at that time by dialing (888) 363-4749 and entering access code 9196964#. All persons accessing the proceeding must mute their lines unless given permission to unmute. Any recording or rebroadcasting of any portion of the proceeding is strictly prohibited. Violations of this order can result in fines or other sanctions. SO ORDERED. (Signed by Judge Alison J. Nathan on 10/15/2021) (vfr) (Entered: 10/15/2021) |
| 10/15/2021 | | Minute Entry for proceedings held before Judge Alison J. Nathan: Initial Pretrial Conference held on 10/15/2021. (Court Reporter Carol Ganley) (kwi) (Entered: 10/18/2021) |

| 10/26/2021 | 32 | DECLARATION of Plaintiff Hyunhuy Nam in Opposition re: 24 MOTION to Dismiss for Lack of Jurisdiction .. Document filed by Hyunhuy Nam. (Attachments: # 1 Exhibit A_Employee Directory, # 2 Exhibit B_Revised Time Record, # 3 Exhibit C_Picture of the Shopping Item).(Seo, Diana) (Entered: 10/26/2021) |
| 10/26/2021 | 33 | MEMORANDUM OF LAW in Opposition re: 24 MOTION to Dismiss for Lack of Jurisdiction . . Document filed by Hyunhuy Nam..(Seo, Diana) (Entered: 10/26/2021) |
| 10/27/2021 | 34 | LETTER MOTION for Extension of Time to File Response/Reply as to 24 MOTION to Dismiss for Lack of Jurisdiction . addressed to Judge Alison J. Nathan from Sean S. Kwak, Esq. dated October 27, 2021. Document filed by Hyun Cho, Daeyong Chung, Jinho Jo, Permanent Mission of the Republic of Korea to the United Nations..(Kwak, Sean) (Entered: 10/27/2021) |
| 10/28/2021 | 35 | ORDER granting 34 Letter Motion for Extension of Time to File Response/Reply as to 24 MOTION to Dismiss for Lack of Jurisdiction, addressed to Judge Alison J. Nathan from Sean S. Kwak, Esq. dated October 27, 2021. SO ORDERED. Replies due by 11/9/2021. (Signed by Judge Alison J. Nathan on 10/28/2021) (va) (Entered: 10/28/2021) |
| 11/02/2021 | 36 | PROPOSED PROTECTIVE ORDER. Document filed by Hyun Cho, Daeyong Chung, Jinho Jo, Permanent Mission of the Republic of Korea to the United Nations..(Kwak, Sean) (Entered: 11/02/2021) |
| 11/05/2021 | 37 | STIPULATED CONFIDENTIALITY AGREEMENT AND PROTECTIVE ORDER...regarding procedures to be followed that shall govern the handling of confidential material...SO ORDERED. (Signed by Judge Alison J. Nathan on 11/5/2021) (jca) (Entered: 11/05/2021) |
| 11/05/2021 | 38 | REPLY MEMORANDUM OF LAW in Support re: 24 MOTION to Dismiss for Lack of Jurisdiction . . Document filed by Permanent Mission of the Republic of Korea to the United Nations..(Kwak, Sean) (Entered: 11/05/2021) |
| 11/05/2021 | 39 | LETTER MOTION for Leave to File Excess Pages *for Reply Memorandum of Law* addressed to Judge Alison J. Nathan from Sean S. Kwak, Esq. dated 11/5/2021. Document filed by Hyun Cho, Daeyong Chung, Jinho Jo, Permanent Mission of the Republic of Korea to the United Nations..(Kwak, Sean) (Entered: 11/05/2021) |
| 11/08/2021 | 40 | ORDER granting 39 Letter Motion for Leave to File Excess Pages. Defendants' request to file a 15- page reply brief is GRANTED. SO ORDERED. (Signed by Judge Alison J. Nathan on 11/8/2021) (vfr) (Entered: 11/08/2021) |
| 11/08/2021 | 41 | REPLY MEMORANDUM OF LAW in Support re: 24 MOTION to Dismiss for Lack of Jurisdiction . . Document filed by Hyun Cho, Daeyong Chung, Jinho Jo, Permanent Mission of the Republic of Korea to the United Nations..(Kwak, Sean) (Entered: 11/08/2021) |
| 11/19/2021 | 42 | MOTION for Diana Y. Seo to Withdraw as Attorney . Document filed by Hyunhuy Nam. (Attachments: # 1 Affidavit Attorney Declaration).(Seo, Diana) (Entered: 11/19/2021) |
| 11/22/2021 | 43 | MEMO ENDORSEMENT granting 42 Motion to Withdraw as Attorney. ENDORSEMENT: SO ORDERED. Attorney Diana Y. Seo terminated. (Signed by Judge Alison J. Nathan on 11/22/2021) (vfr) (Entered: 11/22/2021) |
| 12/02/2021 | 44 | NOTICE OF APPEARANCE by Yongjin Bae on behalf of Hyunhuy Nam..(Bae, Yongjin) (Entered: 12/02/2021) |
| 12/06/2021 | 45 | NOTICE OF APPEARANCE by Ge Qu on behalf of Hyunhuy Nam..(Qu, Ge) (Entered: 12/06/2021) |
| 12/09/2021 | 46 | FIRST LETTER MOTION for Extension of Time to Complete Discovery *and take deposition* addressed to Judge Alison J. Nathan from Hang & Associates, PLLC c/o Yongjin Bae, Esq. dated 12/9/2021. Document filed by Hyunhuy Nam..(Bae, Yongjin) (Entered: 12/09/2021) |
| 12/10/2021 | 47 | ORDER with respect to 46 Letter Motion for Extension of Time to Complete Discovery. The parties are ORDERED to meet and confer on Plaintiff's request and submit a joint letter to the Court by December 17, 2021. SO ORDERED. (Signed by Judge Alison J. Nathan on 12/10/2021) (mml) (Entered: 12/13/2021) |
| 12/13/2021 | 48 | MOTION to Stay *Discovery Pending Motion to Dismiss*. Document filed by Hyun Cho, Daeyong Chung, Jinho Jo, Permanent Mission of the Republic of Korea to the United Nations..(Kwak, Sean) (Entered: 12/13/2021) |
| 12/13/2021 | 49 | MOTION to Stay re: 48 MOTION to Stay *Discovery Pending Motion to Dismiss. Memorandum of Law In Support*. Document filed by Hyun Cho, Daeyong Chung, Jinho Jo, Permanent Mission of the Republic of Korea to the United Nations..(Kwak, Sean) (Entered: 12/13/2021) |
| 12/13/2021 | 50 | MOTION to Stay re: 48 MOTION to Stay *Discovery Pending Motion to Dismiss. Declaration of Byungseok Yoo*. Document filed by Hyun Cho, Daeyong Chung, Jinho Jo, Permanent Mission of the Republic of Korea to the United Nations. (Attachments: # 1 Exhibit).(Kwak, Sean) (Entered: 12/13/2021) |
| 12/13/2021 | 51 | MOTION to Stay re: 48 MOTION to Stay *Discovery Pending Motion to Dismiss. Declaration of Defendant Jinho Jo*. Document filed by Hyun Cho, Daeyong Chung, Jinho Jo, Permanent Mission of the Republic of Korea to the United Nations. (Attachments: # 1 Exhibit Letter from Republic of Korea Ministry of Foreign Affairs, # 2 Exhibit Settlement Agreement with translation).(Kwak, Sean) (Entered: 12/13/2021) |
| 12/13/2021 | 52 | MOTION to Stay re: 48 MOTION to Stay *Discovery Pending Motion to Dismiss. Declaration of Sean S. Kwak, Esq..*. Document filed by Hyun Cho, Daeyong Chung, Jinho Jo, Permanent Mission of the Republic of Korea to the United Nations. (Attachments: # 1 Exhibit C - Defendants' Motion to Dismiss, # 2 Exhibit D - Plaintiff's Opposition to Defendants' Motion to Dismiss, # 3 Exhibit E - Defendants' Reply in Motion to Dismiss, # 4 Exhibit F - Plaintiff's Documents Request to Defendant Mission, # 5 Exhibit G - Plaintiff's Documents Request to Defendant Daeyong Chung, # 6 Exhibit H - Plaintiff's Documents Request to Defendant Hyun Cho, # 7 Exhibit I - Plaintiff's Documents Request to Defendant Jinho Cho, # 8 Exhibit J - Plaintiff's Interrogatories to Defendant Mission, # 9 Exhibit K - Plaintiff's Interrogatories to Defendant Daeyong Chung, # 10 Exhibit L - Plaintiff's Interrogatories to Defendant Hyun Cho, # 11 Exhibit M - Plaintiff's Interrogatories to Defendant Jinho Jo).(Kwak, Sean) (Entered: 12/13/2021) |

| 12/13/2021 | 53 | JOINT LETTER addressed to Judge Alison J. Nathan from Sean S. Kwak, Esq. dated 12/13/2021 re: Extension of Discovery. Document filed by Hyun Cho, Daeyong Chung, Jinho Jo, Permanent Mission of the Republic of Korea to the United Nations.. (Kwak, Sean) (Entered: 12/13/2021) |
| --- | --- | --- |
| 12/15/2021 | 54 | MEMO ENDORSEMENT on re: 53 Joint Letter granting 46 Letter Motion for Extension of Time to Complete Discovery. ENDORSEMENT: The Court GRANTS Plaintiff's consent request to extend discovery by two months from January 5, 2022, to March 5, 2022. This resolves docket number 46. Plaintiff is ordered to file a response to Defendants' motion to stay discovery filed December 13, 2021, by December 22, 2021. SO ORDERED. Discovery due by 3/5/2022. (Signed by Judge Alison J. Nathan on 12/15/2021) (vfr) (Entered: 12/15/2021) |
| 12/15/2021 | | Set/Reset Deadlines: Responses due by 12/22/2021 (vfr) (Entered: 12/15/2021) |
| 12/22/2021 | 55 | REPLY MEMORANDUM OF LAW in Opposition re: 52 MOTION to Stay re: 48 MOTION to Stay *Discovery Pending Motion to Dismiss. Declaration of Sean S. Kwak, Esq.* . . Document filed by Hyunhuy Nam..(Bae, Yongjin) (Entered: 12/22/2021) |
| 12/27/2021 | 56 | ORDER denying 48 MOTION to Stay *Discovery Pending Motion to Dismiss*; denying 49 MOTION to Stay re: 48 MOTION to Stay *Discovery Pending Motion to Dismiss Memorandum of Law In Support*. On December 13, 2021, Defendants moved to stay discovery pending resolution of their motion to dismiss. Dkt. No. 48. Plaintiff filed an opposition on December 22, 2021. Dkt. No. 55. The Court DENIES Defendants' motion to stay. If Defendants believe Plaintiff's discovery requests exceed the scope of Rule 26 or the parties' protective order entered November 5, 2021, Dkt. No. 37, then Defendants may, after meeting and conferring with Plaintiff, file an objection. SO ORDERED. (Signed by Judge Alison J. Nathan on 12/27/2021) (vfr) (Entered: 12/27/2021) |
| 12/27/2021 | 57 | LETTER MOTION to Continue *filing Reply Papers* addressed to Judge Alison J. Nathan from Defendants dated December 27, 2021. Document filed by Hyun Cho, Daeyong Chung, Jinho Jo, Permanent Mission of the Republic of Korea to the United Nations..(Chen, Power) (Entered: 12/27/2021) |
| 12/27/2021 | 58 | REPLY MEMORANDUM OF LAW in Support re: 48 MOTION to Stay *Discovery Pending Motion to Dismiss*. . Document filed by Hyun Cho, Daeyong Chung, Jinho Jo, Permanent Mission of the Republic of Korea to the United Nations..(Chen, Power) (Entered: 12/27/2021) |
| 12/27/2021 | 59 | ORDER granting 57 Letter Motion to Continue. SO ORDERED. (Signed by Judge Alison J. Nathan on 12/27/2021) (vfr) (Entered: 12/27/2021) |
| 01/04/2022 | 60 | ORDER denying 50 Motion to Stay; denying 51 Motion to Stay; denying 52 Motion to Stay. On December 27, 2021, with leave of the Court, Dkt. No. 59, Defendants filed a reply, Dkt. No. 58. After careful consideration of Defendants' reply, the Court concludes that Defendants have not satisfied their burden of demonstrating good cause to stay discovery pending their motion to dismiss. See Mirra v. Jordan, No. 15-CV-4100 (AT) (KNF), 2016 WL 889559, at *2 (S.D.N.Y. Mar. 1, 2016); O'Sullivan v. Deutsche Bank AG, No. 17-CIV-8709 (LTS) (GWG), 2018 WL 1989585, at *4 (S.D.N.Y. Apr. 26, 2018) ("Courts consider: (1) the breadth of discovery sought, (2) any prejudice that would result, and (3) the strength of the motion." (cleaned up)). Most importantly, the Court finds that Plaintiff may be prejudiced by a stay of discovery because of the risk that material witnesses may leave the United States as part of the ordinary rotation of the Mission's staff. Dkt. No. 55 at 7. This consequence goes beyond the typical delay that is an "inherent part of every stay." In re Initial Pub. Offering Sec. Litig., 236 F. Supp. 2d 286, 287 (S.D.N.Y. 2002); cf. Mirra, 2016 WL 889559, at *3 (finding prejudice to plaintiff where there was a risk of "witnesses' memories... fading with time"). As to the other two factors, though the Court has not decided the merits of the pending motion to dismiss, the Court does not conclude that Defendants have made a "strong showing" that Plaintiff's claims are unmeritorious. Mira, 2016 WL 889559, at *2. As to Defendants' arguments about the burdens and timeliness of Plaintiff's discovery requests, the Court concludes that these concerns do not necessitate a stay of discovery. "If Defendants believe Plaintiff's discovery requests exceed the scope of Rule 26 or the parties' protective order entered November 5, 2021, Dkt. No. 37, then Defendants may, after meeting and conferring with Plaintiff, file an objection." Dkt. No. 56. This resolves docket numbers 49, 50, 51, and 52. SO ORDERED. (Signed by Judge Alison J. Nathan on 1/4/2022) (vfr) (Entered: 01/04/2022) |
| 01/05/2022 | | ***DELETED DOCUMENT. Deleted document number 61 Civil Cover Sheet. The document was incorrectly filed in this case. (lb) (Entered: 01/06/2022) |
| 01/21/2022 | 61 | MEMORANDUM OPINION AND ORDER re: 24 MOTION to Dismiss for Lack of Jurisdiction filed by Jinho Jo, Permanent Mission of the Republic of Korea to the United Nations, Hyun Cho, Daeyong Chung. For the foregoing reasons, Defendants' motion to dismiss is GRANTED IN PART AND DENIED IN PART. The Court dismisses Individual Defendants Cho, Jo, and Chung from the action and denies the motion to dismiss claims against the Permanent Mission. As previously ordered, the Court will hold a case management conference on April 15, 2022, at 3:15 p.m. This resolves docket number 24. SO ORDERED. Jinho Jo, Hyun Cho and Daeyong Chung terminated. (Signed by Judge Alison J. Nathan on 1/21/2022) (vfr) (Entered: 01/21/2022) |
| 02/02/2022 | 62 | PROPOSED STIPULATION AND ORDER. Document filed by Permanent Mission of the Republic of Korea to the United Nations..(Kwak, Sean) (Entered: 02/02/2022) |
| 02/11/2022 | 63 | ANSWER to 11 Complaint with JURY DEMAND. Document filed by Permanent Mission of the Republic of Korea to the United Nations..(Kwak, Sean) (Entered: 02/11/2022) |
| 02/15/2022 | 64 | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU -** PROPOSED ORDER. Document filed by Permanent Mission of the Republic of Korea to the United Nations..(Kwak, Sean) **Proposed Order to be reviewed by Clerk's Office staff.** Modified on 2/15/2022 (dt). (Entered: 02/15/2022) |
| 02/15/2022 | | ***NOTICE TO ATTORNEY TO RE-FILE DOCUMENT - EVENT TYPE ERROR. Notice to Attorney Kwak, Sean to RE-FILE Document 64 Proposed Order. Use the event type Proposed Stipulation and Order found under the event list Proposed Orders. (dt) (Entered: 02/15/2022) |

# A-7

| 02/15/2022 | 65 | PROPOSED STIPULATION AND ORDER. Document filed by Permanent Mission of the Republic of Korea to the United Nations..(Kwak, Sean) (Entered: 02/15/2022) |
|---|---|---|
| 02/16/2022 | 66 | STIPULATION AND ORDER TO AMEND THE CAPTION: IT IS HEREBY STIPULATED, CONSENTED AND AGREED by and between the undersigned, attorneys for the parties to the above-captioned proceeding, that the individual defendants dismissed from this action shall be removed from the caption in this action, and that the new caption shall be as follows: (As further set forth herein.) AND IT IS SO ORDERED on this 16 day of February, 2022. (Signed by Judge Alison J. Nathan on 2/16/2022) (va) (Entered: 02/17/2022) |
| 02/24/2022 | 67 | SECOND LETTER MOTION for Extension of Time to Complete Discovery *by 30 days* addressed to Judge Alison J. Nathan from Sean S. Kwak, Esq. dated February 24, 2022. Document filed by Permanent Mission of the Republic of Korea to the United Nations..(Kwak, Sean) (Entered: 02/24/2022) |
| 02/24/2022 | 68 | ORDER granting 67 Letter Motion for Extension of Time to Complete Discovery. SO ORDERED. Deposition due by 4/4/2022. (Signed by Judge Alison J. Nathan on 2/24/2022) (ate) (Entered: 02/24/2022) |
| 02/24/2022 | | Set/Reset Deadlines: Expert Discovery due by 6/28/2022. Fact Discovery due by 5/12/2022. (ate) (Entered: 02/24/2022) |
| 03/15/2022 | 69 | LETTER addressed to Judge Alison J. Nathan from Joshua S. Lim, Esq. dated March 15, 2022 re: Express Invocation of Immunities Under VCDR. Document filed by Permanent Mission of the Republic of Korea to the United Nations..(Lim, Joshua S.) (Entered: 03/15/2022) |
| 03/16/2022 | 70 | NOTICE OF APPEARANCE by Shan Zhu on behalf of Hyunhuy Nam..(Zhu, Shan) (Entered: 03/16/2022) |
| 04/06/2022 | | NOTICE OF CASE REASSIGNMENT to Judge Ronnie Abrams. Judge Alison J. Nathan is no longer assigned to the case. (laq) (Entered: 04/06/2022) |
| 04/12/2022 | 71 | ORDER: This case was recently reassigned to me from Judge Nathan. By Orders dated October 7, 2021 and January 21, 2022, Judge Nathan scheduled a post-fact discovery conference for April 15, 2022. See Dkts. 30, 61. On February 24, 2022, Judge Nathan granted the parties' request to extend the discovery deadlines, with all fact discovery to be completed by May 12, 2022, and all expert discovery to be completed by June 28, 2022. See Dkt. 68. The Court hereby adjourns the post-fact discovery conference to May 20, 2022 at 10:30 a.m. Unless the parties request otherwise, the Court will hold this conference by telephone. The parties shall use the following dial-in information to call in to the conference: Call-in Number: (888)363-4749; Access Code: 1015508. This conference line is open to the public. No later than one week in advance of the conference, the parties are to submit a joint letter updating the Court on the status of the case, including but not limited to whether either party intends to file a dispositive motion and what efforts the parties have made to settle the action. SO ORDERED. ( Telephone Conference set for 5/20/2022 at 10:30 AM before Judge Ronnie Abrams.) (Signed by Judge Ronnie Abrams on 4/12/2022) (vfr) (Entered: 04/12/2022) |
| 05/13/2022 | 72 | STATUS REPORT. *Joint Letter* Document filed by Permanent Mission of the Republic of Korea to the United Nations..(Kwak, Sean) (Entered: 05/13/2022) |
| 05/20/2022 | | Minute Entry for proceedings held before Judge Ronnie Abrams: Telephone Conference held on 5/20/2022. (arc) (Entered: 05/20/2022) |
| 05/23/2022 | 73 | MEMO ENDORSEMENT on re: 72 Status Report filed by Permanent Mission of the Republic of Korea to the United Nations, ENDORSEMENT: Application granted. As discussed at the May 20, 2022 status conference, no later than June 28, 2022, the parties shall submit a joint letter updating the Court on the status of the case, including but not limited to whether either party intends to file a dispositive motion and what efforts the parties have made to settle the action. A post-discovery conference is hereby scheduled for July 8, 2022 at 10:45 a.m. Unless the parties request otherwise, this conference will be held via telephone. The parties shall use the following dial-in information to call in to the conference: Call-in Number: (888) 363-4749; Access Code: 1015508. SO ORDERED. (Signed by Judge Ronnie Abrams on 5/23/2022) ( Telephone Conference set for 7/8/2022 at 10:45 AM before Judge Ronnie Abrams.) (ks) (Entered: 05/23/2022) |
| 06/27/2022 | 74 | LETTER addressed to Judge Ronnie Abrams dated June 27, 2022 re: Joint Status Update Letter. Document filed by Hyunhuy Nam..(Bae, Yongjin) (Entered: 06/27/2022) |
| 06/28/2022 | 75 | MEMO ENDORSEMENT on re: 74 Letter filed by Hyunhuy Nam. ENDORSEMENT: In light of the parties' intent to file summary judgment motions following the close of discovery, the post-discovery conference previously scheduled for July 8, 2022 is hereby adjourned sine die. SO ORDERED. (Signed by Judge Ronnie Abrams on 6/28/2022) (vfr) (Entered: 06/28/2022) |
| 07/19/2022 | 76 | LETTER MOTION for Leave to File Excess Pages addressed to Judge Ronnie Abrams from Joshua S. Lim dated July 19, 2022. Document filed by Permanent Mission of the Republic of Korea to the United Nations..(Lim, Joshua S.) (Entered: 07/19/2022) |
| 07/20/2022 | 77 | ORDER granting 76 Letter Motion for Leave to File Excess Pages. Application Granted. SO ORDERED. (Signed by Judge Ronnie Abrams on 7/20/2022) (ama) (Entered: 07/20/2022) |
| 07/28/2022 | 78 | MOTION for Summary Judgment . Document filed by Permanent Mission of the Republic of Korea to the United Nations. (Attachments: # 1 Supplement Memorandum of Law In Support of Motion for Summary Judgment, # 2 Affidavit Declaration of Joshua Lim, Esq., # 3 Affidavit Declaration of Counsellor at the Mission, # 4 Exhibit 1 - Complaint, # 5 Exhibit 2 - Plaintiff Dep. Tr., # 6 Exhibit 3 - Def Counsellor Dep. Tr., # 7 Exhibit 4 - 2016 Pledge Agreement, # 8 Exhibit 5 - 2016 Pledge Agreement (English), # 9 Exhibit 6 - 2017 Pledge Agreement, # 10 Exhibit 7 - 2017 Pledge Agreement (English), # 11 Exhibit 8 - 2018 Pledge Agreement, # 12 Exhibit 9 - 2018 Pledge Agreement (English), # 13 Exhibit 10 - 2019 Pledge Agreement, # 14 Exhibit 11 - 2019 Pledge Agreement (English), # 15 Exhibit 12 - 2020 Pledge Agreement, # 16 Exhibit 13 - 2020 Pledge Agreement (English), # 17 Exhibit 14 - 2021 Pledge Agreement, # 18 Exhibit 15 - 2021 Pledge Agreement, # 19 Exhibit 16 - Background Check, # 20 Exhibit 17 - 2016 Employment Contract, # 21 Exhibit 18 - 2016 Employment Contract (English), # 22 Exhibit 19 - 2017 Employment Contract, # 23 Exhibit 20 - 2017 Employment Contract (English), # 24 Exhibit |

| | | |
|---|---|---|
| | | 21 - 2018 Employment Contract, # 25 Exhibit 22 - 2018 Employment Contract (English), # 26 Exhibit 23 - 1st 2019 Employment Contract (English), # 27 Exhibit 24 - 1st 2019 Employment Contract (English), # 28 Exhibit 25 - 2nd 2019 Employment Contract, # 29 Exhibit 26 - 2nd 2019 Employment Contract (English), # 30 Exhibit 27 - 2020 Employment Contract, # 31 Exhibit 28 - 2020 Employment Contract, # 32 Exhibit 29 - 2021 Employment Contract, # 33 Exhibit 30 - 2021 Employment Contract, # 34 Exhibit 31 - Declaration of Counsellor at the Mission, 9.3.2021, # 35 Exhibit 32 - Declaration of the Head of Admin at the Mission, 8.25.2021, # 36 Exhibit 33 - Def Second Secretary Dep. Tr., # 37 Exhibit 34 - Naver Dictionary Uei-Jeon, # 38 Exhibit 35 - Naver Dictionary Uei-Jeon (English), # 39 Exhibit 36 - High-Level Week Pass, # 40 Exhibit 37 - Settlement Agreement, # 41 Exhibit 38 - 1.21.2022 Order on Motion to Dismiss)(Lim, Joshua S.) (Entered: 07/28/2022) |
| 07/28/2022 | 79 | MOTION for Summary Judgment ., MOTION for Partial Summary Judgment .( Responses due by 8/11/2022, Return Date set for 8/25/2022 at 11:00 AM.) Document filed by Hyunhuy Nam. (Attachments: # 1 Supplement Memorandum of Law, # 2 Affidavit Attorney Affirmation, # 3 Affidavit Declaration of Plaintiff, # 4 Affidavit Service, # 5 Supplement Rule 56 Statement, # 6 Text of Proposed Order Proposed Order, # 7 Exhibit Complaint, # 8 Exhibit 2016 Employment Contract, # 9 Exhibit 2017 Employment Contract, # 10 Exhibit 2018 Employment Contract, # 11 Exhibit 2019 Employment Contract, # 12 Exhibit 2020 Employment Contract, # 13 Exhibit 2021 Employment Contract, # 14 Exhibit Overtime Verification Ledger, # 15 Exhibit Excerpt from Overtime Verification Ledger, # 16 Exhibit Excerpt from Deposition of Jinho Jo)(Bae, Yongjin) (Entered: 07/28/2022) |
| 07/28/2022 | 80 | MOTION for Summary Judgment *(FRCP 56 Statement of Fact)*. Document filed by Permanent Mission of the Republic of Korea to the United Nations..(Lim, Joshua S.) (Entered: 07/28/2022) |
| 07/28/2022 | 81 | MOTION for Summary Judgment *(Certification of Service)*. Document filed by Permanent Mission of the Republic of Korea to the United Nations..(Lim, Joshua S.) (Entered: 07/28/2022) |
| 08/01/2022 | 82 | PROPOSED SCHEDULING ORDER. Document filed by Permanent Mission of the Republic of Korea to the United Nations. (Attachments: # 1 Supplement Letter)(Lim, Joshua S.) (Entered: 08/01/2022) |
| 08/02/2022 | 83 | ORDER SETTING FORTH BRIEFING SCHEDULE: IT IS ON THIS 2nd day of August 2022, ORDERED: - Plaintiff and Defendant shall each submit their respective opposition to the other party's motion for summary judgment by August 29, 2022; - Plaintiff and Defendant shall each submit their respective reply to the other party's foregoing opposition by September 19, 2022; IT IS SO ORDERED. ( Responses due by 8/29/2022, Replies due by 9/19/2022.) (Signed by Judge Ronnie Abrams on 8/2/2022) (ate) (Entered: 08/02/2022) |
| 08/03/2022 | 84 | LETTER addressed to Judge Ronnie Abrams from Joshua S. Lim dated August 3, 2022 re: Request for Guidance in Briefing for the Parties' Motions for Summary Judgment. Document filed by Permanent Mission of the Republic of Korea to the United Nations..(Lim, Joshua S.) (Entered: 08/03/2022) |
| 08/04/2022 | 85 | MEMO ENDORSEMENT on re: 84 Letter, filed by Permanent Mission of the Republic of Korea to the United Nations. ENDORSEMENT: Defendant's application to incorporate its moving papers into its opposition by reference is granted. SO ORDERED. (Signed by Judge Ronnie Abrams on 8/4/2022) (jca) (Entered: 08/04/2022) |
| 08/29/2022 | 86 | MEMORANDUM OF LAW in Opposition re: 79 MOTION for Summary Judgment . MOTION for Partial Summary Judgment . . Document filed by Permanent Mission of the Republic of Korea to the United Nations. (Attachments: # 1 Supplement Defendant's Response to Plaintiff's Statement of Fact and Defendant's Counter-Statement of Fact, # 2 Affidavit Declaration of Joshua S. Lim, # 3 Exhibit Ex. 3-2 Deposition Transcript of Counsellor at the Mission, # 4 Exhibit Ex. 39 Plaintiff's Answer, # 5 Exhibit Ex. 40 Declaration of Fran Yoon, # 6 Exhibit Ex. 41 ROK Labor Standards Act (Korean), # 7 Exhibit Ex. 42 ROK Labor Standards Act (English Translation) with Certificate of Translation, # 8 Affidavit Certificate of Service)(Kwak, Sean) (Entered: 08/29/2022) |
| 08/29/2022 | 87 | MEMORANDUM OF LAW in Opposition re: 78 MOTION for Summary Judgment ., 80 MOTION for Summary Judgment *(FRCP 56 Statement of Fact)*. Document filed by Hyunhuy Nam. (Attachments: # 1 Supplement Attorney Affirmation, # 2 Affidavit Plaintiff declaration, # 3 Supplement Rule 56.1 counter statment, # 4 Exhibit A. excerpt of Deposition Transcript on Plaintiff, # 5 Exhibit B. excerpt of Deposition Transcript on Defendant)(Bae, Yongjin) (Entered: 08/29/2022) |
| 09/01/2022 | 88 | CERTIFICATE OF SERVICE of memorandum in opposition to Defendant's motion for summary judgment served on Permanent Mission of the Republic of Korea to the United Nations on 8/31/2022. Service was accepted by Yongjin Bae, Esq.. Service was made by Mail. Document filed by Hyunhuy Nam..(Bae, Yongjin) (Entered: 09/01/2022) |
| 09/13/2022 | 89 | LETTER MOTION for Leave to File Excess Pages *for Defendant's Reply Memorandum of Law in Support of Defendant's Motion for Summary Judgment* addressed to Judge Ronnie Abrams from Joshua S. Lim, Esq., Counsel for Defendant dated 9/13/2022. Document filed by Permanent Mission of the Republic of Korea to the United Nations..(Lim, Joshua S.) (Entered: 09/13/2022) |
| 09/14/2022 | 90 | ORDER granting 89 Letter Motion for Leave to File Excess Pages. Application granted. SO ORDERED. (Signed by Judge Ronnie Abrams on 9/14/2022) (ate) (Entered: 09/14/2022) |
| 09/19/2022 | 91 | REPLY to Response to Motion re: 79 MOTION for Summary Judgment . MOTION for Partial Summary Judgment . . Document filed by Permanent Mission of the Republic of Korea to the United Nations. (Attachments: # 1 Affidavit Declaration of Joshua S. Lim, Esq., # 2 Exhibit Exhibit 43, # 3 Affidavit Certificate of Service)(Lim, Joshua S.) (Entered: 09/19/2022) |
| 09/19/2022 | 92 | REPLY MEMORANDUM OF LAW in Opposition re: 78 MOTION for Summary Judgment ., 80 MOTION for Summary Judgment *(FRCP 56 Statement of Fact)*. . Document filed by Hyunhuy Nam. (Attachments: # 1 Exhibit A. Excerpt of Deposition Transcript on Permanent Mission _Jo, # 2 Exhibit B. Excerpt of Deposition Transcript on Nam, # 3 Exhibit C. Excerpt of Deposition Transcript on Permanent Mission_Kim, # 4 Exhibit D. Overtime sheet verified with Permanent Mission, # 5 Affidavit Attorney Affirmation, # 6 Affidavit Certificate of Service)(Bae, Yongjin) (Entered: 09/19/2022) |
| 09/19/2022 | 93 | REPLY MEMORANDUM OF LAW in Opposition re: 80 MOTION for Summary Judgment *(FRCP 56 Statement of Fact)*., 78 MOTION for Summary Judgment . Document filed by Hyunhuy Nam..(Bae, Yongjin) (Entered: 09/19/2022) |

| 09/22/2022 | | NOTICE OF CASE REASSIGNMENT to Judge Jennifer L. Rochon. Judge Ronnie Abrams is no longer assigned to the case. (nb) (Entered: 09/22/2022) |
|---|---|---|
| 09/22/2022 | 94 | NOTICE OF REASSIGNMENT: This case has been reassigned to the undersigned. All counsel must familiarize themselves with the Court's Individual Rules, which are available at https://nysd.uscourts.gov/hon-jennifer-l-rochon. Unless and until the Court orders otherwise, all prior orders, dates, and deadlines shall remain in effect notwithstanding the case's reassignment. Any conference or oral argument before or directed by the Magistrate Judge will proceed as ordered. However, all previously-scheduled appearances or conferences before the District Court are hereby adjourned pending further notice from the Court. Additionally, within two weeks of the filing of this Order, the parties are hereby ORDERED to file on ECF a joint letter updating the Court on the status of the case. The joint letter shall not exceed four (4) pages, and shall provide the following information, to the extent it is relevant, in separate paragraphs: As further set forth in this order. SO ORDERED. (Signed by Judge Jennifer L. Rochon on 9/22/2022) (ks) (Entered: 09/22/2022) |
| 10/06/2022 | 95 | STATUS REPORT. *Joint Case Status* Document filed by Permanent Mission of the Republic of Korea to the United Nations.. (Lim, Joshua S.) (Entered: 10/06/2022) |
| 01/03/2023 | 96 | ORDER It is HEREBY ORDERED that, by January 13, 2023, Plaintiff shall submit further briefing, with citations to admissible evidence, setting forth the monetary damages he seeks under the Fair Labor Standards Act (FLSA) and the New York Labor Law (NYLL) pursuant to his partial motion for summary judgment (ECF No. 79), even if those damages are approximate. Plaintiff's brief shall include calculations of his regular rate, the required overtime rate, and any alleged underpayment. Plaintiff's brief shall be no more than 10 pages, exclusive of exhibits. Defendant shall file its response, if any, within the same page limits, by January 20, 2023. SO ORDERED. (Signed by Judge Jennifer L. Rochon on 1/3/2023) (jca) (Entered: 01/03/2023) |
| 01/13/2023 | 97 | MEMORANDUM OF LAW in Support re: 79 MOTION for Summary Judgment . MOTION for Partial Summary Judgment . . Document filed by Hyunhuy Nam. (Attachments: # 1 Affidavit Attorney Affirmation, # 2 Exhibit A. Payroll Records signed, # 3 Exhibit B. Employment Contracts, # 4 Exhibit C. Excerpt of Overtime Verification Ledger, # 5 Exhibit D. Full Overtime Verification Ledger).(Bae, Yongjin) (Entered: 01/13/2023) |
| 01/16/2023 | 98 | LETTER MOTION for Extension of Time to File Response/Reply as to 96 Order,, *with Plaintiff's consent,* addressed to Judge Jennifer L. Rochon from Sean S. Kwak, Esq., counsel for Defendant dated 1/16/2023. Document filed by Permanent Mission of the Republic of Korea to the United Nations..(Kwak, Sean) (Entered: 01/16/2023) |
| 01/17/2023 | 99 | ORDER granting 98 Letter Motion for Extension of Time to File Response/Reply re 98 LETTER MOTION for Extension of Time to File Response/Reply as to 96 Order,, *with Plaintiff's consent,* addressed to Judge Jennifer L. Rochon from Sean S. Kwak, Esq., counsel for Defendant dated 1/16/2023. The request is GRANTED. Defendant shall submit its supplemental briefing by February 3, 2023. SO ORDERED. (Signed by Judge Jennifer L. Rochon on 1/17/2023) (tg) (Entered: 01/17/2023) |
| 01/26/2023 | 100 | LETTER MOTION for Leave to File Excess Pages *for Defendant's Supplemental Brief due 2/3/2023* addressed to Judge Jennifer L. Rochon from Joshua S. Lim, Esq. dated 1/26/2023. Document filed by Permanent Mission of the Republic of Korea to the United Nations..(Lim, Joshua S.) (Entered: 01/26/2023) |
| 01/26/2023 | 101 | ORDER denying 100 Letter Motion for Leave to File Excess Pages. The request is DENIED, given that this is supplemental briefing to the substantial briefs already filed by the parties. SO ORDERED. (Signed by Judge Jennifer L. Rochon on 1/26/2023) (jca) (Entered: 01/26/2023) |
| 02/03/2023 | 102 | RESPONSE in Opposition to Motion re: 79 MOTION for Summary Judgment . MOTION for Partial Summary Judgment . *Supplemental Brief Regarding Approximate Damages in Opposition*. Document filed by Permanent Mission of the Republic of Korea to the United Nations. (Attachments: # 1 Affidavit Declaration of Joshua S. Lim, Esq., # 2 Exhibit Exhibit 43 - Approximate & Disputed Damage Calculation 1 , # 3 Exhibit Exhibit 44 - Approximate & Disputed Damage Calculation 2 ). (Lim, Joshua S.) (Entered: 02/03/2023) |
| 02/21/2023 | 103 | OPINION AND ORDER re: 80 MOTION for Summary Judgment *(FRCP 56 Statement of Fact)*. filed by Permanent Mission of the Republic of Korea to the United Nations, 79 MOTION for Summary Judgment . MOTION for Partial Summary Judgment . filed by Hyunhuy Nam, 78 MOTION for Summary Judgment . filed by Permanent Mission of the Republic of Korea to the United Nations, 81 MOTION for Summary Judgment *(Certification of Service)*. filed by Permanent Mission of the Republic of Korea to the United Nations. For the foregoing reasons, Defendant's motion for summary judgment that it is immune from suit under the FSIA and that Plaintiff's employment claims are barred by the settlement agreement between the parties is DENIED. Plaintiff's motion for partial summary judgment on Counts I and III for unpaid overtime under the FLSA and NYLL respectively is GRANTED. Plaintiff is award $138,990.33 in damages and $51,852.91 in prejudgment interest. Counts II, IV, V, and VI are DISMISSED. Counts VI to IX shall proceed to trial. Within 45 days, the parties shall submit a joint pretrial order and additional pretrial materials specified in this Court's Individual Rules. If at any time, the parties seek a referral to the S.D.N.Y.'s mediation program or to the Magistrate Judge for a settlement conference, the parties should contact the Court via a joint letter. The Clerk is respectfully requested to close the motions at ECF Nos. 78, 79, 80, 81. (Signed by Judge Jennifer L. Rochon on 2/21/2023) (jca) Transmission to Finance Unit (Cashiers) for processing. (Entered: 02/21/2023) |
| 02/22/2023 | 104 | NOTICE OF INTERLOCUTORY APPEAL from 103 Memorandum & Opinion,,,,,,, Document filed by Permanent Mission of the Republic of Korea to the United Nations. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(DuBois, Nicholas) (Entered: 02/22/2023) |
| 02/22/2023 | | Appeal Fee Due: for 104 Notice of Interlocutory Appeal,,$505.00 Appeal fee due by 3/8/2023..(nd) (Entered: 02/23/2023) |
| 02/23/2023 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 104 Notice of Interlocutory Appeal,,.(nd) (Entered: 02/23/2023) |
| 02/23/2023 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 104 Notice of Interlocutory Appeal, filed by Permanent Mission of the Republic of Korea to the United Nations were transmitted to the U.S. |

# A-10

| | | Court of Appeals..(nd) (Entered: 02/23/2023) |
|---|---|---|
| 02/28/2023 | 105 | LETTER MOTION to Stay re: 103 Memorandum & Opinion,,,,,, *re pretrial submission* addressed to Judge Jennifer L. Rochon from Joshua S. Lim, Esq. dated 2/28/2023. Document filed by Permanent Mission of the Republic of Korea to the United Nations..(Lim, Joshua S.) (Entered: 02/28/2023) |
| 02/28/2023 | 106 | USCA Appeal Fees received $ 505.00 receipt number 13085 on 2/28/2023 re: 104 Notice of Interlocutory Appeal, filed by Permanent Mission of the Republic of Korea to the United Nations. USCA Case No. 23-0229..(nd) (Entered: 03/01/2023) |
| 03/01/2023 | 107 | LETTER RESPONSE to Motion addressed to Judge Jennifer L. Rochon from Yongjin Bae, Esq. dated 3/1/2023 re: 105 LETTER MOTION to Stay re: 103 Memorandum & Opinion,,,,,, *re pretrial submission* addressed to Judge Jennifer L. Rochon from Joshua S. Lim, Esq. dated 2/28/2023. . Document filed by Hyunhuy Nam..(Bae, Yongjin) (Entered: 03/01/2023) |
| 03/02/2023 | 108 | FIRST REPLY MEMORANDUM OF LAW in Support re: 105 LETTER MOTION to Stay re: 103 Memorandum & Opinion,,,,,, *re pretrial submission* addressed to Judge Jennifer L. Rochon from Joshua S. Lim, Esq. dated 2/28/2023. . Document filed by Hyun Cho, Daeyong Chung, Jinho Jo, Permanent Mission of the Republic of Korea to the United Nations.. (Chen, Power) (Entered: 03/02/2023) |
| 03/10/2023 | 109 | MEMORANDUM AND ORDER granting 105 Letter Motion to Stay re: 105 LETTER MOTION to Stay re: 103 Memorandum & Opinion, *re pretrial submission* addressed to Judge Jennifer L. Rochon from Joshua S. Lim, Esq. dated 2/28/2023. For the foregoing reasons, Defendant's request to stay the case is GRANTED pending the consideration of Defendant's interlocutory appeal by the Second Circuit. The Clerk of Court is respectfully directed to terminate the motion pending at ECF No. 105. SO ORDERED. (Signed by Judge Jennifer L. Rochon on 3/10/2023) (jca) (Entered: 03/10/2023) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 04/07/2023 14:33:56 | | |
| **PACER Login:** | seokchan2 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:21-cv-06165-JLR |
| **Billable Pages:** | 15 | **Cost:** | 1.50 |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Hyunhuy Nam,<br><br>                              Plaintiff,<br><br>           - against -<br><br>Permanent Mission of the Republic of Korea to the United Nations; Hyun Cho; Jinho Jo; and Daeyong Chung,<br><br>                              Defendants. | Case No.<br><br>**COMPLAINT AND JURY**<br>**TRIAL DEMAND** |

Plaintiff Hyunhuy Nam (hereafter, "Plaintiff") by and through his attorneys, Hang & Associates, PLLC, upon his knowledge and belief, files this Complaint against Defendants Permanent Mission of the Republic of Korea to the United Nations; Hyun Cho; Jinho Jo; and Daeyong Chung (collectively referred to as "Defendants"), and states as follows: alleges as follows:

**PRELIMINARY STATEMENT**

1.      Plaintiff brings this action pursuant to Section 1605(a) of the Foreign Sovereign Immunities Act (hereafter referred to as "FSIA") to obtain damages for having been subjected to Defendants' unlawful employment practices arising out of commercial activity performed and carried on by Defendants in the United States. The commercial activity includes Defendants' employment of Plaintiff to work for Defendants as a Chauffeur.

2.      Plaintiff seeks overtime compensation, spread of hours premium, damages arising out of the failure to provide pay stubs and wage notifications owed to Plaintiff for work performed for Defendants under Fair Labor Standards Act (hereinafter referred to as "FLSA") and New York Labor Law (hereafter referred to as "NYLL"). Plaintiff also seeks damages for Defendants' discriminatory conduct based on Plaintiff's age in violation of New York State Human Rights Law

(hereafter referred to as "NYSHRL") and New York City Human Rights Law (hereafter referred to as "NYCHRL") during the course of Plaintiff's employment.

## THE PARTIES

3.      At all times herein mentioned, Plaintiff was and is an alien domiciled and residing in the County of Bergen, State of New Jersey.

4.      At all times material hereto, the Defendant Permanent Mission of the Republic of Korea to the United Nations (hereafter, the "Permanent Mission"), was at all time hereafter and still is foreign mission and/or consulate located at 335 East 45th Street, New York, NY 10017.

5.      Defendant Permanent Mission was and still is a foreign state as defined as in 28 U.S.C. §1603.

6.      Defendant Permanent Mission was and still is a political subdivision of foreign state or agency or instrumentally of a foreign state as defined in 28 U.S.C. §1603 (b).

7.      Defendant Permanent Mission was and still is an organ of a foreign state or subdivision thereof, or a majority of those shares or other ownership interest is owned by a foreign state or political subdivision thereof.

8.      Defendants Hyun Cho; Jinho Jo; and Daeyong Chung; (collectively, "Individual Defendants) are members of a mission as defined as in 28 U.S.C. §1351.

9.      Upon information and belief, Defendant Hyun Cho (hereafter, "Defendant Cho" or "Ambassador Cho") is a Korean national served and serves as Ambassador of Permanent Mission and resides in the County of New York within the 10021 zip code area.

10.      Throughout Plaintiff's employment with Defendant Permanent Mission, commenting on or around June 28, 2016 until approximately June 30, 2021, Defendant Cho was the highest-ranking supervisor at the Permanent Mission.

2

**A-13**

11. Upon information and belief, Defendant Permanent Mission's former and current Ministers and Counselors, including Defendants Jinho Jo and Dayong Chung, reported directly to Ambassador Cho.

12. Upon information and belief, Defendant Jinho Jo (hereafter, "Defendant Jo" or "Counselor Jo") is a Korean national served and serves as Counselor of Permanent and resides in the County of New York within the 10016 zip code area.

13. Upon information and belief, Defendant Jo was and remains Counselor, supervisor, and employee of the Permanent Mission. Defendant Jo has reported directly to Defendant Daeyong Chung, and Ambassador Cho, and was an immediate supervisor of the Permanent Mission staff, including Chauffeur.

14. Upon information and belief, Defendant Daeyong Chung (hereafter, "Defendant Chung" or "Minister Chung") is a Korean national served and serves as Minister of Permanent Mission and resides at 14 Homestead Road, Tenafly, New Jersey 07670.

15. Upon information and belief, Defendant Chung was and remains Minister, supervisor, and employee of the Permanent Mission since approximately November 2020 through the present. Through this time, Defendant Chung has reported directly to Ambassador Cho, worked as Ambassador Cho's "right-hand man," and remains Defendant Jo's immediate supervisor.

## **JURISDICTION AND VENUE**

16. Plaintiff, repeats, reintegrates and realleges each and every allegation herein above in Paragraphs number "1 though 15" inclusive, with the same force and effect as though more fully set forth herein at length.

17. This action is brought against Defendants, a foreign state and member of a mission, as defined in 28 U.S.C. §§1603(a) and 1351 pursuant the exceptions to the Foreign Sovereign

**A-14**

Immunities Act (hereafter referred to as the "FSIA") contained within 28 U.S.C. §§ 1602 and 1605 (a), and the Fair Labor Standards Act (hereafter referred to as the "FLSA"), 29 U.S.C. § 201 *et seq.*, 29 U.S.C. § 216(b), and 28 U.S.C. §§ 1331 and 1337.

18.     In addition, the Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, because those claims arise out of the same common nucleus of operative fact as the federal claim.

19.     Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b) and (f), because the events that give rise to this action occurred within this district.

20.     This action falls into one or more of the exceptions to the FSIA contained within 28 U.S.C. §§ 1602 and 1605(a).

21.     Defendants are not immune from the jurisdiction of the Courts of the United States in this action.

22.     Defendants are not immune from the jurisdiction of the Courts of the United States in this action pursuant to 28 U.S.C. §1602 as their commercial activities are concerned.

23.     Defendants are not immune from the jurisdiction of the Courts of the United States in this action pursuant to 28 U.S.C. 28 U.S.C. §1605 as this action is based upon commercial activity carried on in the United States by the foreign state or upon an act performed in the United Sates in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

24.     Defendants are not immune from the jurisdiction of the Courts of the United States in this action pursuant to 28 U.S.C. 28 U.S.C. §1605 as an employer of Plaintiff, who worked as

4

chauffeur to Defendants, was performing duties that were not governmental in nature and Defendants utilized Plaintiff's services to foster and/or to be engaged various commercial activities.

<u>**STATEMENT OF FACTS**</u>

25.    Plaintiff is a 61year-old male, who resides in the State of New Jersey as a Permanent Resident of the United States, and was a former employee of Defendants from around June 28, 2016 to June 30, 2021.

26.    Upon information and belief, Defendant Permanent Mission employed or employs approximately 65 employees.

27.    Upon information and belief, Defendant Permanent Mission's employees are comprised of approximately 28 "non-diplomatic staff," at least 6 of whom are Korean-American who are citizens or permanent residents of the United States.

28.    Upon information and belief, Permanent Mission is managed by a handful of Korean national "diplomatic staff."

29.    Upon information and belief, Defendants often hire a chauffer(s) as "non-diplomatic staff" to provide transportation for the "diplomatic staff" to perform their duties as a member of Permanent Mission and as a personal driver to assist the staff and/or their family members with their personal affairs such as shopping and even, driving a staff member and his female companion to a discreet rondeau at her apartment.

<u>**Defendants' Commercial Activity**</u>

30.    Upon information and belief, Hey Korean's Website[1] provides services to private

---

[1]Hey Korean is an online website that allows its users to post an advertisement under separate categories in the website (i.g., Job Openings, Real Estate, Buying/Selling, etc.) to a target the audience who click on the relevant categories(s) and type their needs in the website's search engine. (website:  https://www.heykorean.com., Last accessed July 2, 2021).

individuals and corporate entities to engage in various types of commercial activities such as sale of goods, real estate transactions, and hiring employees, just like a "K-pop version of Craigslist."

31.    Upon information and belief, Defendant Permanent Mission often utilizes Hey Korean's website to hire its employees such as chauffeur, bilingual research assistant, and administrative assistant.

32.    Upon information and belief, Defendant Permanent Mission posts its phone number (i.g.,    1-212-439-4025)    and    email    address(es)    (i.g.,    Bandal2182@gmail.com    and korea.mission.un2@gmail.com) to receive potential employees' resumes and inquiries relating to the job opportunities.

33.    Upon information and belief, Defendant Permanent Mission, through its diplomatic staff, conducts an interview of a potential employee inside Permanent Mission's building located at 335 East 45th Street, New York, NY 10017 once the potential employee reaches out to Defendant Permanent Mission via making a phone call or sending an email.

34.    Upon information and belief, Defendant Permanent Mission hires a chauffeur as a "non-diplomatic staff" to make deliveries and provide transportation on behalf of Permanent Mission and for certain diplomatic employee(s) who serves as a Minister at Permanent Mission.

35.    In around 2016, Plaintiff learned the Permanent Mission hiring advisement on Hey Korean's website to work as a chauffeur. Plaintiff reached out to Defendant Permanent Mission by telephone after learning of the job opportunity.

36.    Upon information and belief, Plaintiff had an interview with one of the Permanent Mission's diplomatic staff at the building and eventually employed by Defendants to work as a chauffeur.

37.     Although Plaintiff was hired as a chauffeur and performed his duties as a chauffeur, Defendants gave Plaintiff a job title as Chauffeur/Administrative Assistant.

38.     Defendants assigned Plaintiff to drive the Permanent Mission's vehicle, a Hyundai 2015 GN3 model sedan with Plate No. 0265WDD to provide transportation for its "diplomatic employees" including Individual Defendants.

39.     Upon information and belief, Permanent Mission owns/maintains/controls at least one residential property located at 14 Homestead Road, Tenafly, New Jersey 07670 also known as the "Official Residence."

40.     Upon information and belief, Permanent Mission provides the Official Residence to the staff who serves as a Minister.

41.     Throughout Plaintiff's employment, Plaintiff was primarily responsible for providing transportation for the Minister who resided in the Official Residence and Permanent Mission's Counselors, whenever Defendants required regardless of its/his/her/their purpose(s).

42.     Plaintiff regularly drove his own vehicle to the Official Residence, switched his car to the Permanent Mission's Hyundai sedan, and drove the Minister who resided in the Official Residence to the Permanent Mission.

43.     If no one requested for transportation upon arrival or any one of the Defendants requested Plaintiff to stand-by in the Permanent Mission's building, he had to temporarily stay in the Room 815 at the Permanent Mission, until any one of the Defendants gave him further instructions.

44.     At first, Permanent Mission requested Plaintiff primarily provide transportation for Bong-Woo Ko (hereafter, "Minister Ko") for his work performed on behalf of Permanent Mission as a Minister from approximately June 2016 to October 2017. During this period, Plaintiff's duties

7

included but were not limited to, driving Minister Ko from the Official Residence to Permanent Mission, providing transportation for him to attend meetings at restaurants, standing-by in the car near the meeting locations until he finished his business, and driving him back to Permanent Mission or his residence at the Official Residence.

45.     Upon information and belief, Minister Kyungyul Han (hereafter, "Minister Han") served as Minister at Permanent Mission and moved in to the Official Residence in or around October 2017, after Minister Ko returned back to Korea.

46.     Starting from around October 21, 2017, Permanent Mission required Plaintiff to primarily provide transportation for Minister Han until around May 22, 2018.

47.     Since Plaintiff started providing transportation for Minister Han, he utilized Plaintiff's service as a Permanent Mission's chauffeur and also his personal driver to run him and his family member(s)' personal errands, providing free transportation services for his daughters/spouse/ acquaintances and driving him and his female companion(s) to a discreet rondeau at her apartment.

48.     For instance, on or about October 21, 2017, Minister Han requested Plaintiff to drive him to Lynwood Plaza, a shopping mall located in Fort Lee and required him to stand by until he finished shopping at the mall and visiting a Lexus dealer on the way back to the Official Residence.

49.     For instance, on or about February 22, 2018, Minister Han requested Plaintiff to drive him to a restaurant, Casa Mono, and stand-by until he finished a meeting with a real-estate agent and requested Plaintiff to drop off the real-estate agent near the Chelsea Art building located in W. 25th Street.

**A-19**

50.     For instance, on or about March 27, 2018, Minister Han requested Plaintiff to drive him to a restaurant, Gaonnuri, located on 32nd street between 5th & Broadway in Manhattan and required Plaintiff to wait for him until he finished lunch with his female companion. After Minister Han finished lunch with the female companion, he directed Plaintiff to drive both of them to her apartment located on 11 Howard Street. While Plaintiff was driving them to her apartment, they were sitting in the back seat of the Hyundai sedan side-by-side and had continuous physical interaction until Plaintiff arrived at the location. Even after Plaintiff arrived at the location, Minister Han did not allow him to go home, but required Plaintiff to wait for him in the car until Minister Han returned back from his female companion's apartment because he needed to "check-out" her place.

51.     Additionally, on numerous occasions, Minister Han requested Plaintiff to pick-up/drop-off his daughters from/to her residence located at 867 Metropolitan Ave. Brooklyn, 11211 and a JFK airport terminal to/from the Official Residence to save his daughters' transportation expenses.

52.     Plaintiff complained to Permanent Mission and its staff members, including Ambassador Cho, regarding Minister Han's personal use of Plaintiff's service and the Permanent Mission's sedan requiring Plaintiff to work longer hours, despite that Minister Han personally owned an automobile and was able to drive. However, Defendants did not do anything to remedy the situation.

53.     Upon information and belief, Minister Han returned back to Korea on or around May 22, 2018. Since then, Plaintiff worked as a chauffeur for Permanent Mission and its other diplomatic staff members to perform his regular duties until a new Minister moved in to the Official Residence.

9

**A-20**

54.     Upon information and belief, Minister Jungjae Lee (hereafter, "Minister Lee") served as Minister at Permanent Mission and moved in to the Official Residence in or around July 2018, after Minister Han returned back to Korea.

55.     Starting from around July 30, 2018, Permanent Mission required Plaintiff to primarily provide transportation for Minister Lee until around April 27, 2020.

56.     Again, since Plaintiff started providing transportation for Minister Lee, he utilized Plaintiff's service as a Permanent Mission's chauffeur and also his personal driver to run his and his family member(s)'s personal errands, and providing free transportation services for his family members/friends/acquaintances to purchase luxury handbags, play golf, and watch Broadway shows.

57.     For instance, on or about August 1, 2018, Minister Lee requested Plaintiff to drive him and his family members to a Korean market located in Fort Lee to grocery shop and automobile dealers such as Lexus and Honda Dealers located in Englewood and Tenafly to purchase a private automobile.

58.     For instance, on or about October 16, 2018, Minister Lee requested Plaintiff to drive him and his wife to a hotel to meet their friends visiting the State from Los Angeles. Minister Lee required Plaintiff to drive to Roosevelt hotel to pick up their friends and drive them to a restaurant. Plaintiff was required to stand-by for 3-4 hours until they finished eating dinner and then, was required to drop-off Minister Lee's friends to the hotel before Plaintiff drove Minister Lee and his wife to the Official Residence at night after 11:00 pm on that day.

59.     For instance, on or about October 17, 2018 and October 22, 2018, Minister Lee requested Plaintiff to provide transportation for his acquaintances. On the way to work at Permanent Mission, Minister Lee requested Plaintiff to pick up his acquaintances near their hotel

or at a certain location. Then, Minister Lee directed Plaintiff to drop him off at Permanent Mission and required Plaintiff to provide transportation for his acquaintances to a golf course, restaurant, and grocery market by driving the Permanent Mission's Hyundai sedan. On those days, Minister Lee's acquaintances used Plaintiff's service as a personal driver/butler and the Permanent Mission's sedan as free transportation and required Plaintiff to stand-by in the sedan for hours while they were engaged in their personal business.

60.    On numerous occasions, Minister Lee requested Plaintiff to drive him along with his friends, sister-in-law, or acquiesces, to various hotels, restaurants, and shopping malls. Upon information and belief, the purpose for Minister Lee's use of Plaintiff's service and the Permanent Mission's sedan with his friends and acquiesces was to foster their commercial activities as well as for personal purposes .

61.    For instance, when Minister Lee requested Plaintiff to drive his wife and her friend, visiting him from Los Angeles, to a shopping mall and wait there until they finish shopping at the mall. After they returned back to the car with a luxury bag, Plaintiff was requested to drive to a location to pick up Minister Lee and his other friend. In the presence of Minister Lee and Plaintiff, Minister Lee's wife told the other friend that Minister Lee let he use tax exemption card to purchase the bag on behalf of his friend at a tax-free price to save her money.

62.    On numerous occasions, Minister Lee requested Plaintiff to pick-up/drop-off his daughters from/to Penn Station and a JFK airport terminal to/from the Official Residence (sometimes to a dentist for his daughter's brace) to save the transportation cost.

63.    On a few occasions, Minister Lee requested Plaintiff to provide transportation for his daughter's boyfriend and their other friends using the same sedan free of charge.

11

64.     Again, Plaintiff complained to Permanent Mission and its staff members, including Ambassador Cho, regarding Minister Lee's personal use of Plaintiff's service and the Permanent Mission's sedan requiring Plaintiff to work longer hours, despite that Minister Lee personally owned an automobile and was able to drive. However, Defendants did not provide any meaningful responses to Plaintiff. Instead, Ambassador Cho stated to Plaintiff that he could not do anything to remedy the situation since the Permanent Mission's staff members were controlled by a foreign government entity in Korea and Plaintiff's compensation was also paid by the same entity. Defendants, again, failed to remedy the situation.

65.     Upon information and belief, Minister Lee returned back to Korea on or around April 27, 2020. Since then, Plaintiff worked as a chauffeur for Permanent Mission and its other diplomatic staff member primarily, Counselor Jo until a new minister moved in to the Official Residence in November 2020.

66.     Starting from around November 2020 to June 30, 2021, Permanent Mission required Plaintiff to primarily provide transportation for Minister Chung until the end Plaintiff's employment with Defendants.

**Plaintiff's Work Schedule and Pay**

67.     Throughout Plaintiff's employment with Defendants, he worked approximately for 52 hours to 62 hours per week and received around $5,020.00 - $6,550.00 per month (calculated weekly rate at $1,158.46 - $1,511.54) in cash, regardless of how many hours he actually worked.

68.     From around June 28, 2016 to June 30, 2017,  Plaintiff stared his work as early as 6:10 am until as late as 12:30 am on the next day for four (4) to six (6) days per week generally, but not always, from Monday to  Friday (sometimes, Monday to Thursday and any day(s) on the weekend) and worked sixty-two (62) hours per week on average. During this period, Plaintiff

received approximately $5,020.00 per month. Accordingly, he essentially received approximately $1,158.46 per week or $18.68 per hour, despite that his actual hourly rate was $28.96 during this period.

69.     From around July 1, 2017 to June 30, 2018,  Plaintiff stared his work as early as 6:40 am until as late as 12:30 am on the next day for three (3) to six (6) days per week generally, but not always, from Monday to  Friday (sometimes, Monday to Thursday and any day(s) on the weekend) and worked fifty-eight (58) hours per week on average. During this period, Plaintiff received approximately $5,227.00 per month. Accordingly, he essentially received approximately $1,206.23 per week or $20.80 per hour despite that his actual hourly rate was $30.16 during this period.

70.     From around July 1, 2018 to June 30, 2019,  Plaintiff stared his work as early as 4:00 am until as late as 12:45 am on the next day for three (3) to seven (7) days per week generally, but not always, from Monday to  Friday (sometimes, Monday to Thursday and any day(s) on the weekend) and worked fifty-six (56) hours per week on average. During this period, Plaintiff received approximately $6,550.00 per month. Accordingly, he essentially received approximately $1,511.54 per week or $26.99 per hour despite that his actual hourly rate was $37.79 during this period.

71.     From around July 1, 2019 to June 30, 2020,  Plaintiff stared his work as early as 6:40 am until as late as 12:00 am on the next day for two (2) to seven (7) days per week generally, but not always, from Monday to  Friday (sometimes, Monday to Thursday and any day(s) on the weekend) and worked fifty-two (52) hours per week on average. During this period, Plaintiff received approximately $5,300.00 per month. Accordingly, he essentially received approximately

$1,223.08 per week or $23.52 per hour despite that his actual hourly rate was $30.58 during this period.

72.     From around July 1, 2020 to June 30, 2021,  Plaintiff stared his work as early as 6:40 am until as late as 12:20 am on the next day for two (2) to six (6) days per week generally, but not always, from Monday to  Friday (sometimes, Monday to Thursday and Saturday on the weekend) and worked fifty-three (53) hours per week on average. During this period, Plaintiff received approximately $5,300.00 per month. Accordingly, he essentially received approximately $1,223.08 per week or $23.08 per hour despite that his actual hourly rate was $30.58 during this period.

73.     Upon information and belief, Defendants failed to keep any records reflecting Plaintiff's working hours and the amount of pay nor did they require Plaintiff to record his working hours such as requiring him to punch-in and/or punch-out.

74.     Defendants did not compensate Plaintiff for overtime compensation according to state and federal laws.

75.     Plaintiff was not compensated for New York's "spread of hours" premium for shift that lasted longer than ten (10) hours.

76.     Defendants did not provide Plaintiff with a wage notices at the time of his hiring. Instead, Permanent Mission, through its staff member(s), required Plaintiff to sign an agreement written in Korean labeled as "Contract for Employing a Chauffeur *[English translation]*" (hereafter, the "Agreement"), on yearly basis in every July (or April only in 2021) throughout Plaintiff's employment.

77.     Although Plaintiff actually started working for Permanent Mission as a chauffeur on or around June 28, 2016, Permanent Mission required Plaintiff to sign the 1st Agreement on

July 1, 2016 subject to an automatic renewal of his employment on yearly basis. Permanent Mission signed the Agreement through its diplomatic staff members: On July 1, 2016 and July 1, 2017, Permanent Mission signed the Agreement through Minister Ko, on July 1, 2018 and July 1, 2019, Permanent Mission signed the Agreement through Minister Lee; On July 1, 2020, Permanent Mission signed the Agreement through Counselor Jo; On April 1, 2021, Permanent Mission signed the Agreement through Minister Chung.

78.     The content in the Agreements specified Plaintiff regular working hours as from 9:00 am to 6:00 pm with a "base" monthly compensation in the amount $1,900.00 (from 2016 through 2019) or $1,710 (in 2020 and 2021), in addition to other compensations under the name of housing allowance, health insurance, bonus, and severance pay. However, none of the Agreements reflected Plaintiff's actual working hours nor did it reflect the accurate amount of compensation Plaintiff actually received. Moreover, Plaintiff never received any severance pay even after termination of Plaintiff's employment with Defendants in June 2021 despite that Defendants utilized Plaintiff's service for 5 years.

79.     Specifically when Permanent Mission, through Minister Chung, required Plaintiff to sign the Agreement in 2021, Minister Chung advised Plaintiff that the Agreement was a "Down Contract." It reflected further reduced and inaccurate amount of the "base" monthly compensation in the amount of $1,710.00 instead of $1,900.00 because Plaintiff passed the "retirement" age of 60, but Defendants could not find a younger alternative chauffeur immediately due to the Covid pandemic. Regardless of the type(s) and content(s) of the Agreement(s), none of the documents reflected Plaintiff's actual working schedules and accurate rate of pay. Additionally, all of the Agreements reflected the sort of practices which the FLSA and NYLL were intended to prohibit such as limiting the amount of employee's overtime compensation regardless of his actual regular

15

hourly rate and the total number of overtime hours the employee could be paid regardless of how many overtime hours the employee actually worked.

80.     Throughout Plaintiff's employment with Defendants, Defendants paid Plaintiff in cash and did not provide Plaintiff with any paystub.

81.     Upon information and belief, Defendants delivered Plaintiff's compensation in cash to a staff who served as a Second Secretary at Permanent Mission. Throughout Plaintiff's employment, Plaintiff picked up the cash in the Second Secretary's office at Permanent Mission.

82.     Defendants committed the following alleged acts knowingly, intentionally and willfully.

83.     Defendants knew that the nonpayment of overtime and the "spread of hours" premium would economically injure Plaintiff by their violation of federal and state laws.

84.     While employed by Defendants, Plaintiff was not exempt under federal and state laws requiring employers to pay employees overtime.

85.     Plaintiff's workdays frequently lasted longer than 10 hours.

86.     Defendants did not pay Plaintiff's "spread of hours" premium for every day in which he worked over 10 hours.

87.     Defendants did not provide Plaintiff with accurate written notice about the terms and conditions of his employment upon hire in relation to his actual rate of pay, regular pay cycle, and rate of overtime pay.

**Age Discrimination and Hostile Environment**

88.     Plaintiff is a 61-year-old male and was 56 years of age when Plaintiff first started working for Defendants on June 28, 2016.

89.     Before Plaintiff turned the age of 60 in or around April 2020, Permanent Mission, through Minister Lee, first informed to Plaintiff that **"he needed to retire when he reached the age of 60."**

90.     As soon as Plaintiff turned 60-year-old on April 9, 2020, Minister Lee told him that **"he should get out because his age reached the Korean retirement age of 60"** and asked Plaintiff to resign until the expiry of his term as to serve Permanent Mission as a minister and returned back to Korea.

91.     Since April 9, 2020, Defendants Counselor Jo and Minister Chung continuously asked Plaintiff to resign because of Plaintiff's age and told Plaintiff that Defendants were unwilling to continue (or renew) Plaintiff's employment because he reached the "retirement age."

92.     Plaintiff verbally objected to the Defendants' forced and discriminatory termination and pleaded to the Defendants, including Ambassador Cho, to allow Plaintiff remain his position as a chauffeur and the compensation he was to receive.

93.     On or around July 1, 2020, Counselor Jo told Plaintiff that Permanent Mission was having hard time finding an alternative younger chauffeur due to the Covid pandemic. Defendants permitted Plaintiff to temporality stay until the pandemic situation eased so that they could find a suitable younger chauffeur.   Around that time and again, in the beginning of October 2020, Defendants advised Plaintiff that if Defendants decided to keep Plaintiff until the following year 2021, Plaintiff would be required to sign a "Down Contract" reflecting 20% reduction in monthly "base" pay because he already passed the retirement age.

94.     On or around September 1, 2020, Counselor Jo, acting at the direction of Permanent Mission, prepared a one-page document written in Korean labeled as "Agreement [*English translation*]" to prevent Plaintiff from brining a civil or criminal claim action relating to

termination of Plaintiff's employment with Defendants on June 30, 2021. Counselor Jo presented the document to Plaintiff and demanded him to sign. Under emotional and financial pressure, Plaintiff reluctantly capitulated to Counselor Jo's demand and signed the Agreement. At the moment Plaintiff signed the document, he felt that he had no choice but to agree with Counselor Jo to maintain his position as Plaintiff did not have any other financial resources specifically, during the pandemic.

95.     On or around April 1, 2021, Minister Chung, acting at the direction of Permanent Mission, presented the "Down Contract" reflecting the 20% reduction in monthly "base" pay to Plaintiff. Since none of the previous Agreements Defendants required Plaintiff annually to sign reflected Plaintiff's actual working schedule and his rate of pay, he signed the "Down Contract" reflecting the reduction, for the second time since July 1, 2020.

96.     Since Plaintiff turned 60 on April 9, 2020, Defendants Counselor Jo and Minister Chung continued to force Plaintiff to resign and his working conditions became intolerable even though Defendants forced Plaintiff to sign the "Down Contract(s)."

97.     For instance, starting from approximately the 4th day of Minister Chung's term as Minister at the Permanent Mission, he directly and indirectly forced Plaintiff to retire because of his age. Minister Chung frequently made negative and unreasonable comments to Plaintiff regarding his driving that Plaintiff drove too fast (although Plaintiff drove within the speed limit for the whole time) or Plaintiff changed the lane (although Plaintiff was required to change the lane to arrive at the location). On a few occasions, Minister Chung asked Plaintiff, "*where are you going after your retirement [with Defendants]*."

98.     Approximately in the beginning of May 2021, Ambassador Cho requested Plaintiff to come in to his office to investigate and penalize Plaintiff for reporting Ambassador Cho for

using the cook as his personal chef and mistreating his maid. The investigatory conversation lasted about 40 minutes. (i.g., who did Plaintiff tell, how did Plaintiff learn such facts, to whom did Plaintiff disclose such facts, etc.). Thereafter, Defendants did not give Plaintiff almost any work to do, but made him to just sit in the office at the Permanent Mission and do nothing.

99.     In or around June 2021, Plaintiff asked Minister Chung whether he could keep his position until the Permanent Mission found an alternative chauffeur. On the same day, Minister Chung responded to Plaintiff that he **"must leave"** by the end of June 2021 **"because he already passed the retirement age of 60"** and the Permanent Mission was not willing to keep a chauffeur over 60 years old.

100.     Since Plaintiff reached the Korean retirement age of 60, Defendants made it clear that they wanted Plaintiff to retire, and Plaintiff began feeling increasingly insecure, unappreciated, and unwelcome at work until Defendants actually terminated Plaintiff on June 30, 2021.

*Commercial Activity Exception Under 28 U.S.C. §1605*

101.     Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

102.     CPLR 1601 does not apply in the present case based upon the exception set forth in Section 1605 of the CPLR including but not limited to by reason of commercial activity that was not governmental in nature and the activity Plaintiff performed as a chauffeur, specifically for the Individual Defendants, is one which normally could be engaged in by any private party.

**STATEMENT OF CLAIM**

**COUNT I**
**[The Fair Labor Standard Act – Unpaid Overtime]**

103.    Plaintiff repeats and realleges all preceding paragraphs above as though fully set forth herein.

104.    Defendants willfully failed to pay Plaintiff overtime at a rate of at least one-and-a-half times her regular hourly rate for every hour Plaintiff worked above forty (40) hours in a work week. This failure violates the Fair Labor Standards Act, 29 U.S.C. § 207(a) and its implementing regulations.

105.    Defendants also violated the FLSA  by failing to properly keep records as required by statute,  29 U.S.C. § 211(c).

106.    Plaintiff is entitled to her unpaid wages, plus an additional equal amount in liquidated damages, as a consequence of Defendants' unlawful actions and omissions, in accordance with 29 U.S.C. § 216(b).

107.    Plaintiff is also entitled to costs of Court, pursuant to 29 U.S.C. § 216(b)

108.    Plaintiff seeks, and is entitled to, attorneys' fees incurred by his counsel, pursuant to 29 U.S.C. § 216(b).

## COUNT II
### [New York Labor Law – Unpaid Promised Wage]

109.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

110.    Defendants willfully failed to pay Plaintiff his wages weekly at the $28.96 – $37.79 hourly rates as he was promised, in violation of N.Y. Lab. Law § 191(a).

111.    Defendants' failure to pay the required wages as set forth above was willful within the meaning of NYLL §§ 198, 663, and 681.

112.    Plaintiff is entitled to his unpaid wages as mandated by NYLL, plus an additional 100 percent as liquidated damages, as a consequence of the Defendants' unlawful actions and omissions in accordance with NYLL §§ 198, 663, and 681.

113.    Plaintiff also seeks, and is entitled to, attorneys' fees incurred by his counsel, costs of Court, and interest.

## COUNT III
### [New York Labor Law – Unpaid Overtime]

114.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

115.    Defendants willfully failed to pay Plaintiff overtime at a rate of at least one-and-a-half times his regularly hourly rate for every hour he worked above forty (40) hours in a single work week.

116.    96. Defendants' failure to pay the required wages as set forth above was willful within the meaning of NYLL §§ 198, 663, and 681.

117.    97. Plaintiff is entitled to his unpaid wages mandated by NYLL, plus an additional 100 percent as liquidated damages, as a consequence of the Defendants' unlawful actions and omissions in accordance with NYLL §§ 198, 663, and 681.

118.    98. Plaintiff also seeks, and is entitled to, attorneys' fees incurred by his counsel, costs of Court, and interest.

## COUNT IV
### [New York Labor Law – Spread of Hours]

119.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

120.    Plaintiff regularly worked days in which the end of his work shift was more than ten (10) hours from the beginning of his work shift.

121.    Defendants, in violation of 12 N.Y.C.R.R. § 146-1.6, never paid Plaintiff an additional hour of pay at the minimum wage rate for every day in which the interval between the beginning and the end of Plaintiff's work day was more than ten (10) hours.

122.    Plaintiff is entitled to his unpaid spread of hour pay as mandated by NYLL, plus an additional 100 percent as liquidated damages, as a consequence of the Defendants' unlawful actions and omissions, in accordance with NYLL §§ 198, 663, and 681.

123.    Plaintiff also seeks, and is entitled to, attorneys' fees incurred by his counsel, costs of Court, and interest.

**COUNT V**
**[New York Labor Law – Wage Notice and Wage Statement Violations]**

124.    Plaintiff repeats and realleges all preceding paragraphs above as though fully set forth herein.

125.    Defendants failed to provide Plaintiff, at the time of his hiring or thereafter, accurate wage notices in English or Korean (Plaintiff's primary language) containing his rates of pay and other information as required by NYLL § 195(1).

126.    Defendants also failed to provide Plaintiff with accurate wage statements with every payment of wages which provided all of the information required under NYLL § 195(3).

127.    For Defendants' violation of NYLL § 195(1), Plaintiff is entitled to $50 for each work day in which this violation continued to occur, in an amount not to exceed $5,000, pursuant to NYLL §198(1-b).

128.    For Defendants' violation of NYLL § 195(3), Plaintiff is entitled to $250 for each work day in which this violation continued to occur, in an amount not to exceed $5,000, pursuant to NYLL §198(1-d).

129.    Plaintiff also seeks, and is entitled to, attorneys' fees incurred by her counsel, costs of Court, and interest.

### COUNT VI
### [Violation of the New York State Human Rights Law – Age Discrimination]

130.    Plaintiff repeats and realleges all preceding paragraphs above as though fully set forth herein.

131.    The NYSHRL provides that it shall be an unlawful discriminatory practice for an employer to discharge or discriminate against an employee because of his age. See, N.Y. Executive Law §296(1)(a).

132.    Plaintiff is qualified to work as an employee for Defendants and he has satisfactorily performed the duties required by the position he held at the Permanent Mission.

133.    Plaintiff is a 61-year-old male and was 56 years of age when Plaintiff first started working for Defendants on June 28, 2016.

134.    From June 28, 2016 to June 30, 2021, Plaintiff was employed by Defendant Permanent Mission located at 335 East 45th Street, New York, NY 10017, through its diplomatic staff to work as a chauffeur.

135.    Upon information and belief, individual Defendants Ambassador Cho, Counselor Jo, and Minister Chung serve as diplomatic staff at the Permanent Mission.

136.    Before Plaintiff turned the age of 60 in or around April 2020, Permanent Mission, through Minister Lee, first informed to Plaintiff that **"he needed to retire when he reached the age of 60."**

137.    As soon as Plaintiff turned 60-year-old on April 9, 2020, Minister Lee told him that **"he should get out because his age reached the Korean retirement age of 60"** and asked Plaintiff to resign until the expiry of his term as to serve Permanent Mission as a minister and returned back to Korea.

138.    Since April 9, 2020, Defendants Counselor Jo and Minister Chung continuously asked Plaintiff to resign because of Plaintiff's age and told Plaintiff that Defendants were unwilling to continue (or renew) Plaintiff's employment because he reached the "retirement age."

139.    On or around July 1, 2020 and again, in October 2020, Defendants Counselor Jo and Minister Chung advised Plaintiff that if Defendants decided to keep Plaintiff until the pandemic situation eased so that they could find a suitable younger chauffeur (i.e., until the following year 2021), Plaintiff would be required to sign a "Down Contract" reflecting 20% reduction in monthly "base" pay because he already passed the retirement age.

140.    On or around September 1, 2020, Counselor Jo, acting at the direction of Permanent Mission, prepared a one-page document written in Korean labeled as "Agreement [*English translation*]" to prevent Plaintiff from bring a civil or criminal claim action relating to termination of Plaintiff's employment with Defendants on June 30, 2021.   Counselor Jo presented the document to Plaintiff and demanded him to sign. Under emotional and financial pressure, Plaintiff reluctantly capitulated to Counselor Jo's demand and signed the Agreement. At the moment Plaintiff signed the document, he felt that he had no choice but to agree with Counselor

Jo to maintain his position as Plaintiff did not have any other financial resources specifically, during the pandemic.

141.    On or around April 1, 2021, Minister Chung, acting at the direction of Permanent Mission, presented the "Down Contract" reflecting the 20% reduction in monthly "base" pay to Plaintiff. Since none of the previous Agreements Defendants required Plaintiff annually to sign reflected Plaintiff's actual working schedule and his rate of pay, he signed the "Down Contract" reflecting the reduction, for the second time since July 1, 2020.

142.    Since Plaintiff turned 60 on April 9, 2020, Defendants Counselor Jo and Minister Chung continued to force Plaintiff to resign and his working conditions became intolerable even though Defendants forced Plaintiff to sign the "Down Contract(s)."

143.    For instance, starting from approximately the 4th day of Minister Chung's term as Minister at the Permanent Mission, he directly and indirectly forced Plaintiff to retire because of his age. Minister Chung frequently made negative and unreasonable comments to Plaintiff regarding his driving that Plaintiff drove too fast (although Plaintiff drove within the speed limit for the whole time) or Plaintiff changed the lane (although Plaintiff was required to change the lane to arrive at the location). On a few occasions, Minister Chung asked Plaintiff, "*where are you going after your retirement [with Defendants].*"

144.    Approximately in the beginning of May 2021, Ambassador Cho requested Plaintiff to come in to his office to investigate and penalize Plaintiff for reporting Ambassador Cho for using the cook as his personal chef and mistreating his maid. The investigatory conversation lasted about 40 minutes. (i.g., who did Plaintiff tell, how did Plaintiff learn such facts, to whom did Plaintiff disclose such facts, etc.). Thereafter, Defendants did not give Plaintiff almost any work to do, but made him to just sit in the office at the Permanent Mission and do nothing.

145.     In or around June 2021, Plaintiff asked Minister Chung whether he could keep his position until the Permanent Mission found an alternative chauffeur. On the same day, Minister Chung responded to Plaintiff that he **"must leave"** by the end of June 2021 **"because he already passed the retirement age of 60"** and the Permanent Mission was not willing to keep a chauffeur over 60 years old.

146.     Since Plaintiff reached the Korean retirement age of 60, Defendants made it clear that they wanted Plaintiff to retire, and Plaintiff began feeling increasingly insecure, unappreciated, and unwelcome at work until Defendants actually terminated Plaintiff on June 30, 2021.

147.     Plaintiff verbally objected to the Defendants' forced and discriminatory termination and pleaded to the Defendants, including Ambassador Cho, to allow Plaintiff remain his position as a chauffeur and the compensation he was to receive. However, Ambassador Cho failed to take adequate measure to remedy the discrimination and/or harassment suffered by Plaintiff.

148.     As Defendants Jo and Chung continuously pressured Plaintiff to retire, his stress about his situation grew. In almost every morning when Plaintiff got ready to go to work, he started feeling knots in his stomach in anticipating the start of his workday, and the sense of feeling unwanted, pushed aside, and on his way to being terminated.

149.     Defendants Jo and Chung's age-based discrimination and/or harassment caused Plaintiff substantial emotional distress and embarrassment.

150.     Defendants acted intentionally and with malice and/or reckless indifference to Plaintiff's legally protected rights, which supports an award of punitive damages.

151.     Moreover, Defendant Permanent Mission ratified and condoned the unlawful acts of its staff including, its Ministers and Counselors.

152.     But for Defendants' unlawful discriminatory actions herein alleged, Plaintiff would be employed as a chauffeur for the Permanent Mission.

153.     As a result of Defendants' unlawful employment practices Plaintiff has suffered extreme mental anguish, outrage severe anxiety, painful embarrassment among his friends and co-workers, and the loss of employment of the ordinary pleasures of everyday life.

154.     As a further result of Defendants' unlawful employment practices, Plaintiff has suffered and continue to suffer substantial damages, including back pay and reinstatement or front pay, other employment benefits, and damages for emotional pain and mental anguish in amounts to be determined at trial.

155.     By the acts and practices described above, including without limitation the disparate treatment, assignment of his duties to a younger employee, and the creation of a hostile work environment, Defendants discriminated against Plaintiff in the terms and conditions of his employment and terminated him in violation of the NYSHRL.

156.     Defendants' conduct was done in conscious disregard of and reckless indifference to Plaintiff's rights.

157.     Plaintiff therefore seeks compensatory damages, emotional and physical damages, reasonable attorneys' fees, the costs and disbursements of this action, punitive damages, interest, and any other damages permitted by law in an amount to be determined at trial.

**COUNT VII**
**[Violation of the New York State Human Rights Law - Hostile Work Environment]**

158.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein

159.     Plaintiff is qualified to work as an employee for Defendants and he has

satisfactorily performed the duties required by the position he held at the Permanent Mission.

160.    Plaintiff is a 61-year-old male and was 56 years of age when Plaintiff first started working for Defendants on June 28, 2016.

161.    From June 28, 2016 to June 30, 2021, Plaintiff was employed by Defendant Permanent Mission located at 335 East 45th Street, New York, NY 10017, through its diplomatic staff to work as a chauffeur.

162.    Upon information and belief, individual Defendants Ambassador Cho, Counselor Jo, and Minister Chung serve as diplomatic staff at the Permanent Mission.

163.    Before Plaintiff turned the age of 60 in or around April 2020, Permanent Mission, through Minister Lee, first informed to Plaintiff that **"he needed to retire when he reached the age of 60."**

164.    As soon as Plaintiff turned 60-year-old on April 9, 2020, Minister Lee told him that **"he should get out because his age reached the Korean retirement age of 60"** and asked Plaintiff to resign until the expiry of his term as to serve Permanent Mission as a minister and returned back to Korea.

165.    Since April 9, 2020, Defendants Counselor Jo and Minister Chung continuously asked Plaintiff to resign because of Plaintiff's age and told Plaintiff that Defendants were unwilling to continue (or renew) Plaintiff's employment because he reached the "retirement age."

166.    On or around July 1, 2020 and again, in October 2020, Defendants Counselor Jo and Minister Chung advised Plaintiff that if Defendants decided to keep Plaintiff until the pandemic situation eased so that they could find a suitable younger chauffeur (i.g., until the following year 2021), Plaintiff would be required to sign a "Down Contract" reflecting 20% reduction in monthly "base" pay because he already passed the retirement age.

167.    On or around September 1, 2020, Counselor Jo, acting at the direction of Permanent Mission, prepared a one-page document written in Korean labeled as "Agreement [*English translation*]" to prevent Plaintiff from brining a civil or criminal claim action relating to termination of Plaintiff's employment with Defendants on June 30, 2021.  Counselor Jo presented the document to Plaintiff and demanded him to sign. Under emotional and financial pressure, Plaintiff reluctantly capitulated to Counselor Jo's demand and signed the Agreement. At the moment Plaintiff signed the document, he felt that he had no choice but to agree with Counselor Jo to maintain his position as Plaintiff did not have any other financial resources specifically, during the pandemic.

168.    On or around April 1, 2021, Minister Chung, acting at the direction of Permanent Mission, presented the "Down Contract" reflecting the 20% reduction in monthly "base" pay to Plaintiff. Since none of the previous Agreements Defendants required Plaintiff annually to sign reflected Plaintiff's actual working schedule and his rate of pay, he signed the "Down Contract" reflecting the reduction, for the second time since July 1, 2020.

169.    Since Plaintiff turned 60 on April 9, 2020, Defendants Counselor Jo and Minister Chung continued to force Plaintiff to resign and his working conditions became intolerable even though Defendants forced Plaintiff to sign the "Down Contract(s)."

170.    For instance, starting from approximately the 4th day of Minister Chung's term as Minister at the Permanent Mission, he directly and indirectly forced Plaintiff to retire because of his age. Minister Chung frequently made negative and unreasonable comments to Plaintiff regarding his driving that Plaintiff drove too fast (although Plaintiff drove within the speed limit for the whole time) or Plaintiff changed the lane (although Plaintiff was required to change the

lane to arrive at the location). On a few occasions, Minister Chung asked Plaintiff, "*where are you going after your retirement [with Defendants]*."

171.    Approximately in the beginning of May 2021, Ambassador Cho requested Plaintiff to come in to his office to investigate and penalize Plaintiff for reporting Ambassador Cho for using the cook as his personal chef and mistreating his maid. The investigatory conversation lasted about 40 minutes. (i.g., who did Plaintiff tell, how did Plaintiff learn such facts, to whom did Plaintiff disclose such facts, etc.). Thereafter, Defendants did not give Plaintiff almost any work to do, but made him to just sit in the office at the Permanent Mission and do nothing.

172.    In or around June 2021, Plaintiff asked Minister Chung whether he could keep his position until the Permanent Mission found an alternative chauffeur. On the same day, Minister Chung responded to Plaintiff that he **"must leave"** by the end of June 2021 **"because he already passed the retirement age of 60"** and the Permanent Mission was not willing to keep a chauffeur over 60 years old.

173.    Since Plaintiff reached the Korean retirement age of 60, Defendants made it clear that they wanted Plaintiff to retire, and Plaintiff began feeling increasingly insecure, unappreciated, and unwelcome at work until Defendants actually terminated Plaintiff on June 30, 2021.

174.    Plaintiff verbally objected to the Defendants' forced and discriminatory termination and pleaded to the Defendants, including Ambassador Cho, to allow Plaintiff remain his position as a chauffeur and the compensation he was to receive. However, Ambassador Cho failed to take adequate measure to remedy the discrimination and/or harassment suffered by Plaintiff.

175.    As Defendants Jo and Chung continuously pressured Plaintiff to retire, his stress about his situation grew. In almost every morning when Plaintiff got ready to go to work, he started feeling knots in his stomach in anticipating the start of his workday, and the sense of feeling

unwanted, pushed aside, and on his way to being terminated.

176.    As Defendants Jo and Chung continuously pressured Plaintiff to retire, his stress about his situation grew. In almost every morning when Plaintiff got ready to go to work, he started feeling knots in his stomach in anticipating the start of his workday, and the sense of feeling unwanted, pushed aside, and on his way to being terminated.

177.    Upon information and belief, the Ministers and Counselors of the Permanent Mission made their personnel and other decisions in consultation with Defendant Cho, who served Ambassador of Permanent Mission.

178.    Individual Defendants served as an Ambassador, Minister and Counselor of Permanent Mission and directly supervised Plaintiff as well as the Permanent Mission's other staff.

179.    Defendant Permanent Mission and failed to take adequate measures to remedy the discrimination and/or harassment suffered by Plaintiff. Instead, Defendant Permanent Mission further discriminated against Plaintiff by requiring Plaintiff to work as a butler/personal driver of its staff members and their family members for increased working hours to assist them with performing various types of commercial activities.

180.    Defendants engaged in a course of unlawful conduct, as stated above, which created a hostile work environment in violation of the NYSHRL.

181.    As a direct and proximate result of Defendants' unlawful employment practices, Plaintiff suffered the indignity of discrimination, the invasion of his rights to be free from discrimination which has manifested in physical and emotional distress.

182.    As a further direct proximate result of Defendants' unlawful employment practices, Plaintiff suffered extreme mental anguish, outrage severe anxiety, painful embarrassment among his friends and co-workers, and the loss of employment of the ordinary pleasures of everyday life.

183.    Defendants' conduct was done in conscious disregard of Plaintiff's rights.

184.    Plaintiff therefore seeks compensatory damages, emotional and physical damages, reasonable attorneys' fees, the costs and disbursements of this action, punitive damages, interest, and any other damages permitted by law in an amount to be determined at trial.

**COUNT VIII**
**[Violation of the New York City Human Rights Law – Age Discrimination]**

185.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

186.    The NYCHRL provides that it shall be an unlawful discriminatory practice for an employer or agent thereof to, because of the actual or perceived age of any person, discriminate against such person in the terms and conditions of employment or terminate such person. See, NYC Administrative Code §8-107(a).

187.    Plaintiff is a "person" under the New York City Human Rights Law, §8-102(1).

188.    Defendants are an "employer or an employee or agent thereof" under the New York City Human Rights Law, §8-102 and §8-107(1)(a).

189.    Plaintiff is a 61-year-old male and was 56 years of age when Plaintiff first started working for Defendants on June 28, 2016.

190.    Plaintiff is qualified to work as an employee for Defendants and he has satisfactorily performed the duties required by the position he held at the Permanent Mission.

191.    Plaintiff is a 61-year-old male and was 56 years of age when Plaintiff first started working for Defendants on June 28, 2016.

192.    From June 28, 2016 to June 30, 2021, Plaintiff was employed by Defendant Permanent Mission located at 335 East 45th Street, New York, NY 10017, through its diplomatic

staff to work as a chauffeur.

193.    Upon information and belief, individual Defendants Ambassador Cho, Counselor Jo, and Minister Chung serve as diplomatic staff at the Permanent Mission.

194.    Before Plaintiff turned the age of 60 in or around April 2020, Permanent Mission, through Minister Lee, first informed to Plaintiff that **"he needed to retire when he reached the age of 60."**

195.    As soon as Plaintiff turned 60-year-old on April 9, 2020, Minister Lee told him that **"he should get out because his age reached the Korean retirement age of 60"** and asked Plaintiff to resign until the expiry of his term as to serve Permanent Mission as a minister and returned back to Korea.

196.    Since April 9, 2020, Defendants Counselor Jo and Minister Chung continuously asked Plaintiff to resign because of Plaintiff's age and told Plaintiff that Defendants were unwilling to continue (or renew) Plaintiff's employment because he reached the "retirement age."

197.    On or around July 1, 2020 and again, in October 2020, Defendants Counselor Jo and Minister Chung advised Plaintiff that if Defendants decided to keep Plaintiff until the pandemic situation eased so that they could find a suitable younger chauffeur (i.g., until the following year 2021), Plaintiff would be required to sign a "Down Contract" reflecting 20% reduction in monthly "base" pay because he already passed the retirement age.

198.    On or around September 1, 2020, Counselor Jo, acting at the direction of Permanent Mission, prepared a one-page document written in Korean labeled as "Agreement [*English translation*]" to prevent Plaintiff from brining a civil or criminal claim action relating to termination of Plaintiff's employment with Defendants on June 30, 2021.  Counselor Jo presented the document to Plaintiff and demanded him to sign. Under emotional and financial pressure,

Plaintiff reluctantly capitulated to Counselor Jo's demand and signed the Agreement. At the moment Plaintiff signed the document, he felt that he had no choice but to agree with Counselor Jo to maintain his position as Plaintiff did not have any other financial resources specifically, during the pandemic.

199.    On or around April 1, 2021, Minister Chung, acting at the direction of Permanent Mission, presented the "Down Contract" reflecting the 20% reduction in monthly "base" pay to Plaintiff. Since none of the previous Agreements Defendants required Plaintiff annually to sign reflected Plaintiff's actual working schedule and his rate of pay, he signed the "Down Contract" reflecting the reduction, for the second time since July 1, 2020.

200.    Since Plaintiff turned 60 on April 9, 2020, Defendants Counselor Jo and Minister Chung continued to force Plaintiff to resign and his working conditions became intolerable even though Defendants forced Plaintiff to sign the "Down Contract(s)."

201.    For instance, starting from approximately the 4th day of Minister Chung's term as Minister at the Permanent Mission, he directly and indirectly forced Plaintiff to retire because of his age. Minister Chung frequently made negative and unreasonable comments to Plaintiff regarding his driving that Plaintiff drove too fast (although Plaintiff drove within the speed limit for the whole time) or Plaintiff changed the lane (although Plaintiff was required to change the lane to arrive at the location). On a few occasions, Minister Chung asked Plaintiff, "*where are you going after your retirement [with Defendants].*"

202.    Approximately in the beginning of May 2021, Ambassador Cho requested Plaintiff to come in to his office to investigate and penalize Plaintiff for reporting Ambassador Cho for using the cook as his personal chef and mistreating his maid. The investigatory conversation lasted about 40 minutes. (i.e., who did Plaintiff tell, how did Plaintiff learn such facts, to whom did

Plaintiff disclose such facts, etc.). Thereafter, Defendants did not give Plaintiff almost any work to do, but made him to just sit in the office at the Permanent Mission and do nothing.

203.   In or around June 2021, Plaintiff asked Minister Chung whether he could keep his position until the Permanent Mission found an alternative chauffeur. On the same day, Minister Chung responded to Plaintiff that he **"must leave"** by the end of June 2021 **"because he already passed the retirement age of 60"** and the Permanent Mission was not willing to keep a chauffeur over 60 years old.

204.   Since Plaintiff reached the Korean retirement age of 60, Defendants made it clear that they wanted Plaintiff to retire, and Plaintiff began feeling increasingly insecure, unappreciated, and unwelcome at work until Defendants actually terminated Plaintiff on June 30, 2021.

205.   Plaintiff verbally objected to the Defendants' forced and discriminatory termination and pleaded to the Defendants, including Ambassador Cho, to allow Plaintiff remain his position as a chauffeur and the compensation he was to receive. However, Ambassador Cho failed to take adequate measure to remedy the discrimination and/or harassment suffered by Plaintiff.

206.   As Defendants Jo and Chung continuously pressured Plaintiff to retire, his stress about his situation grew. In almost every morning when Plaintiff got ready to go to work, he started feeling knots in his stomach in anticipating the start of his workday, and the sense of feeling unwanted, pushed aside, and on his way to being terminated.

207.   Defendants Jo and Chung's age-based discrimination and/or harassment caused Plaintiff substantial emotional distress and embarrassment.

208.   Defendants acted intentionally and with malice and/or reckless indifference to Plaintiff's legally protected rights, which supports an award of punitive damages.

**A-46**

209. Moreover, Defendant Permanent Mission ratified and condoned the unlawful acts of its staff including, its Ministers and Counselors.

210. But for Defendants' unlawful discriminatory actions herein alleged, Plaintiff would be employed as a chauffeur for the Permanent Mission.

211. As a result of Defendants' unlawful employment practices Plaintiff has suffered extreme mental anguish, outrage severe anxiety, painful embarrassment among his friends and co-workers, and the loss of employment of the ordinary pleasures of everyday life.

212. As a further result of Defendants' unlawful employment practices, Plaintiff has suffered and continue to suffer substantial damages, including back pay and reinstatement or front pay, other employment benefits, and damages for emotional pain and mental anguish in amounts to be determined at trial.

213. Defendants' conduct was done in conscious disregard of and reckless indifference to Plaintiff's rights.

214. Plaintiff therefore seeks compensatory damages, emotional and physical damages, reasonable attorneys' fees, the costs and disbursements of this action, punitive damages, interest, and any other damages permitted by law in an amount to be determined at trial.

**COUNT IX**
**[Violation of the New York City Human Rights Law - Hostile Work Environment]**

215. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

216. Defendants engaged in a course of unlawful conduct, as stated above, which created a hostile work environment in violation of the NYCHRL.

217.    Plaintiff is a 61-year-old male and was 56 years of age when Plaintiff first started working for Defendants on June 28, 2016.

218.    Plaintiff is qualified to work as an employee for Defendants and he has satisfactorily performed the duties required by the position he held at the Permanent Mission.

219.    Plaintiff is a 61-year-old male and was 56 years of age when Plaintiff first started working for Defendants on June 28, 2016.

220.    From June 28, 2016 to June 30, 2021, Plaintiff was employed by Defendant Permanent Mission located at 335 East 45th Street, New York, NY 10017, through its diplomatic staff to work as a chauffeur.

221.    Upon information and belief, individual Defendants Ambassador Cho, Counselor Jo, and Minister Chung serve as diplomatic staff at the Permanent Mission.

222.    Before Plaintiff turned the age of 60 in or around April 2020, Permanent Mission, through Minister Lee, first informed to Plaintiff that **"he needed to retire when he reached the age of 60."**

223.    As soon as Plaintiff turned 60-year-old on April 9, 2020, Minister Lee told him that **"he should get out because his age reached the Korean retirement age of 60"** and asked Plaintiff to resign until the expiry of his term as to serve Permanent Mission as a minister and returned back to Korea.

224.    Since April 9, 2020, Defendants Counselor Jo and Minister Chung continuously asked Plaintiff to resign because of Plaintiff's age and told Plaintiff that Defendants were unwilling to continue (or renew) Plaintiff's employment because he reached the "retirement age."

225.    On or around July 1, 2020 and again, in October 2020, Defendants Counselor Jo and Minister Chung advised Plaintiff that if Defendants decided to keep Plaintiff until the

pandemic situation eased so that they could find a suitable younger chauffeur (i.e., until the following year 2021), Plaintiff would be required to sign a "Down Contract" reflecting 20% reduction in monthly "base" pay because he already passed the retirement age.

226.    On or around September 1, 2020, Counselor Jo, acting at the direction of Permanent Mission, prepared a one-page document written in Korean labeled as "Agreement [*English translation*]" to prevent Plaintiff from brining a civil or criminal claim action relating to termination of Plaintiff's employment with Defendants on June 30, 2021.   Counselor Jo presented the document to Plaintiff and demanded him to sign. Under emotional and financial pressure, Plaintiff reluctantly capitulated to Counselor Jo's demand and signed the Agreement. At the moment Plaintiff signed the document, he felt that he had no choice but to agree with Counselor Jo to maintain his position as Plaintiff did not have any other financial resources specifically, during the pandemic.

227.    On or around April 1, 2021, Minister Chung, acting at the direction of Permanent Mission, presented the "Down Contract" reflecting the 20% reduction in monthly "base" pay to Plaintiff. Since none of the previous Agreements Defendants required Plaintiff annually to sign reflected Plaintiff's actual working schedule and his rate of pay, he signed the "Down Contract" reflecting the reduction, for the second time since July 1, 2020.

228.    Since Plaintiff turned 60 on April 9, 2020, Defendants Counselor Jo and Minister Chung continued to force Plaintiff to resign and his working conditions became intolerable even though Defendants forced Plaintiff to sign the "Down Contract(s)."

229.    For instance, starting from approximately the 4th day of Minister Chung's term as Minister at the Permanent Mission, he directly and indirectly forced Plaintiff to retire because of his age. Minister Chung frequently made negative and unreasonable comments to Plaintiff

regarding his driving that Plaintiff drove too fast (although Plaintiff drove within the speed limit for the whole time) or Plaintiff changed the lane (although Plaintiff was required to change the lane to arrive at the location). On a few occasions, Minister Chung asked Plaintiff, "*where are you going after your retirement [with Defendants]*."

230.    Approximately in the beginning of May 2021, Ambassador Cho requested Plaintiff to come in to his office to investigate and penalize Plaintiff for reporting Ambassador Cho for using the cook as his personal chef and mistreating his maid. The investigatory conversation lasted about 40 minutes. (i.e., who did Plaintiff tell, how did Plaintiff learn such facts, to whom did Plaintiff disclose such facts, etc.). Thereafter, Defendants did not give Plaintiff almost any work to do, but made him to just sit in the office at the Permanent Mission and do nothing.

231.    In or around June 2021, Plaintiff asked Minister Chung whether he could keep his position until the Permanent Mission found an alternative chauffeur. On the same day, Minister Chung responded to Plaintiff that he **"must leave"** by the end of June 2021 **"because he already passed the retirement age of 60"** and the Permanent Mission was not willing to keep a chauffeur over 60 years old.

232.    Since Plaintiff reached the Korean retirement age of 60, Defendants made it clear that they wanted Plaintiff to retire, and Plaintiff began feeling increasingly insecure, unappreciated, and unwelcome at work until Defendants actually terminated Plaintiff on June 30, 2021.

233.    Plaintiff verbally objected to the Defendants' forced and discriminatory termination and pleaded to the Defendants, including Ambassador Cho, to allow Plaintiff remain his position as a chauffeur and the compensation he was to receive. However, Ambassador Cho failed to take adequate measure to remedy the discrimination and/or harassment suffered by Plaintiff.

234.    As Defendants Jo and Chung continuously pressured Plaintiff to retire, his stress

about his situation grew. In almost every morning when Plaintiff got ready to go to work, he started feeling knots in his stomach in anticipating the start of his workday, and the sense of feeling unwanted, pushed aside, and on his way to being terminated.

235.    Upon information and belief, the Ministers and Counselors of the Permanent Mission made their personnel and other decisions in consultation with Defendant Cho, who served Ambassador of Permanent Mission.

236.    Individual Defendants served as an Ambassador, Minister and Counselor of Permanent Mission and directly supervised Plaintiff as well as the Permanent Mission's other staff.

237.    Defendant Permanent Mission and failed to take adequate measures to remedy the discrimination and/or harassment suffered by Plaintiff. Instead, Defendant Permanent Mission further discriminated against Plaintiff by requiring Plaintiff to work as a butler/personal driver of its staff members and their family members for increased working hours to assist them with performing various types of commercial activities.

238.    Defendants engaged in a course of unlawful conduct, as stated above, which created a hostile work environment in violation of the NYCHRL.

239.    As a direct and proximate result of Defendants' unlawful employment practices, Plaintiff suffered the indignity of discrimination, the invasion of his rights to be free from discrimination which has manifested in physical and emotional distress.

240.    As a further direct proximate result of Defendants' unlawful employment practices, Plaintiff suffered extreme mental anguish, outrage severe anxiety, painful embarrassment among his friends and co-workers, and the loss of employment of the ordinary pleasures of everyday life.

241.    Defendants' conduct was done in conscious disregard of Plaintiff's rights.

242.    Plaintiff therefore seeks compensatory damages, emotional and physical damages,

reasonable attorneys' fees, the costs and disbursements of this action, punitive damages, interest, and any other damages permitted by law in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendants, both jointly and severally as follows:

a) assuming jurisdiction over this action as this action falls into one or more of the exceptions to the FSIA;

b) declaring Defendants violated the FLSA, the NYLL, the New York Executive Law, and the New York City Human Rights Law;

c) permanently enjoining Defendants from further violations of the FLSA, NYLL, NYSHRL, and NYCHRL;

d) granting judgment to Plaintiff on his FLSA claims and awarding Plaintiff his unpaid wages and an equal amount in liquidated damages;

e) granting judgment to Plaintiff on his NYLL claims and awarding Plaintiff his unpaid wages, spread of hours compensation, applicable statutory damages, and liquidated damages as provided for by statute;

f) granting judgment to Plaintiff on his NYSHRL claims and awarding Plaintiff appropriate damages and fines and penalties as provided for by statute;

g) granting judgment to Plaintiff on his NYCHRL claims and awarding Plaintiff appropriate compensatory and punitive damages as provided for by statute;

h) awarding Plaintiff all damages sustained as a result of Defendants' conduct, including damages for emotional distress, embarrassment, and anguish;

i) awarding Plaintiff prejudgment and postjudgment interest as allowed by law;

j)   awarding Plaintiff his costs and reasonable attorneys' fees; and

k)   granting such further relief as the Court deems just and proper.

<u>**JURY TRIAL DEMAND**</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues.

Dated:  July 19, 2021                         HANG & ASSOCIATES, PLLC.

                                                 /S/ *DIANA SEO*
                                                 Diana Y. Seo, Esq.
                                                 136-20 38th Ave., Suite 10G
                                                 Flushing, New York 11354
                                                 Tel: 718.353.8588
                                                 dseo@hanglaw.com
                                                 *Attorneys for Plaintiff*

**CONSENT TO SUE UNDER**
**FEDERAL FAIR LABOR STANDARDS ACT**

I am an employee currently or formerly employed by _permanent Mission of the Republic of Korea to the united Nations_
and/or related entities. I consent to be a plaintiff in an action to collect unpaid wages. I agree that
I am bound by the terms of the Contingent Fee Retainer signed by the named plaintiff in this case.

_Hyunhuy Nam_

Full Legal Name (Print)

_[signature]_

Signature

_06/05/2021_

Date

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HYUNHUY NAM,<br><br>                              Plaintiff,<br><br>              v.<br><br>PERMANENT MISSION OF THE<br>REPUBLIC OF KOREA TO THE UNITED<br>NATIONS; HYUN CHO; JINHO JO; and<br>DAEYONG CHUNG,<br><br>                              Defendants. | Case No.: 1:21-cv-06165-AJN<br><br><br>CIVIL ACTION<br><br><br>NOTICE OF MOTION TO DISMISS<br>PURSUANT TO<br>FED. R. CIV. P. 12(b)(1) and 12(b)(6) |

        **PLEASE TAKE NOTICE** that Defendants, Permanent Mission of the Republic of Korea to

the United Nations, Hyun Cho, Jinho Jo, and Daeyong Chung, by and through their attorneys, Kim,

Cho & Lim, LLC, will move this Court, before the Honorable Alison J. Nathan, U.S.D.J., at 40

Foley Square, Courtroom 906, New York, New York 10007, for an Order dismissing the complaint

of Plaintiff Hyunhuy Nam pursuant to Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil

Procedure.

        **PLEASE TAKE FURTHER NOTICE** that Defendants will rely upon the

contemporaneously filed supporting Memorandum of Law and Declarations, with accompanying

exhibits, if any, in support of their motion.

        **PLEASE TAKE FURTHER NOTICE** that opposition papers, if any, shall be filed in

accordance with the Federal Rules of Civil Procedure, the Court's scheduling order or individual

practices.

                                        Respectfully submitted,

Dated: September 30, 2021                    /s/ Joshua S. Lim_____
                                        Joshua S. Lim, Esq.

                                                                                                        1

**Kim, Cho & Lim, LLC**
163-10 Northern Boulevard, Suite 202
Flushing, New York 11358-2652
T: 718-539-7400
F: 201-585-7422
joshualim@kcllawfirm.com
*Attorneys for Defendants*

**CERTIFICATION OF SERVICE**

The undersigned hereby certifies that on September 30, 2021, a true and correct copy of this notice of motion for Defendants' Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), together with the accompanying Memorandum of Law, Declaration of Joshua S. Lim, Esq., Declaration of Jinho Jo, Declaration of Byunseok Yoon, and exhibits thereto, if any, were served on Plaintiff Hyunhuy Nam, in care of his attorney, Diana Seo, Esq., of Hang & Associates, PLLC, at the following address(es) via PACER, regular mail, and email:

> Hyunhuy Nam
> c/o Diana Seo, Esq.
> Hang & Associates, PLLC
> 136-20 38th Avenue, Suite 10G
> Flushing, New York 11354
> dseo@hanglaw.com

Dated: September 30, 2021          _____/s/ Joshua S. Lim_____
                                                  Joshua S. Lim, Esq.

## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HYUNHUY NAM,<br><br>              Plaintiff,<br><br>      v.<br><br>PERMANENT MISSION OF THE REPUBLIC OF KOREA TO THE UNITED NATIONS; HYUN CHO; JINHO JO; and DAEYONG CHUNG,<br><br>              Defendants. | Case No.: 1:21-cv-06165-AJN<br><br><br>CIVIL ACTION |

---

### DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS PURSUANT TO RULE 12(b)(1) AND 12 (b)(6)

---

On the brief:   Joshua S. Lim, Esq.
                  Nicholas J. DuBois, Esq.
                  Sean S. Kwak, Esq.
                  Power J. Chen, Esq.

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ....................................................................................... ii

INDEX OF APPENDICES .......................................................................................... iv

I. PRELIMINARY STATEMENT ....................................................................... 1

II. RELEVANT FACTS ......................................................................................... 2

III. STANDARD FOR RELIEF .............................................................................. 4

   A. Standard for Dismissal under Fed. R. Civ. P. 12(b)(1) ............................... 4

   B. Standard Under the Foreign Sovereign Immunities Act and Vienna Convention ........... 4

IV. LEGAL ARGUMENT ....................................................................................... 6

   A. The Court Lacks Subject-Matter Jurisdiction ............................................. 6

     i. The Mission and Diplomats Are Entitled to, and Have Not Waived, Immunity ............. 7

     ii. Defendants DO NOT Meet the Criteria for Exception under the FSIA ...................... 8

     iii. The Mission and Diplomats Maintain Immunity; ...................................... 11

     Chauffeuring Is a Governmental Function .......................................... 11

   B. Parties' Settlement Agreement Forms an Independent Basis to Dismiss Suit .............. 14

V. CONCLUSION ................................................................................................ 17

## TABLE OF AUTHORITIES

**Cases**

Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428 (1989) ............................... 6

Ashcroft v. Iqbal, 556 U.S. 662 (2009)................................................................................. 6

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007).................................................... 6

Butters v. Vance Int'l, Inc., 225 F.3d 462 (4th Cir. 2000)........................................... 12

Crum v. Kingdom of Saudi Arabia, 05-cv-275, 2005 WL 3752271 (E.D. Va. July 13, 2005) .... 12

Dewey v. PTT Telecom Netherlands, US, Inc., 94-cv-5983, 1995 WL 542447
(S.D.N.Y. Sept. 12, 1995)............................................................................................. 14

Difilippo v. Barclays Capital, Inc., 552 F. Supp. 2d 417 (S.D.N.Y. 2008) .................................. 14

El-Hadad v. United Arab Emirates, 496 F.3d 658 (D.C. Cir. 2007)............................................. 12

Figueroa v. Ministry for Foreign Affairs of Sweden, 222 F.Supp.3d 304
(S.D.N.Y. 2016) ............................................................................................. 7, 11, 12, 13

Harrison v. Republic of Sudan, 838 F.3d 86, 94 (2d Cir. 2016)...................................................... 6

Hijazi v. Permanent Mission of Saudi Arabi to U.N., 689 F.Supp.2d 669 (S.D.N.Y.) ............... 11

Human Rights in China v. Bank of China, No. 02-cv-4361 (NRB), 2005 WL 1278542
(S.D.N.Y. May 27, 2005).................................................................................................. 10

Hummel v. AstraZeneca LP, 575 F. Supp. 2d 568 (S.D.N.Y. 2008)...................................... 14, 16

Kato v. Ishihara, 360 F.3d 106 (2d Cir. 2004) ........................................................................ 7, 11

Kim v. Korea Trade Promotion-Investment Agency, 51 F.Supp.3d 279
(S.D.N.Y. 2014) ......................................................................................................... 3, 7, 9, 11

Kowalchuk v. Stroup, 61 A.D.3d 118 (App. Div. 1st Dept. 2009)............................................. 14

Laramee v. Jewish Guild for the Blind, 72 F.Supp.2d 357 (S.D.N.Y.1999) ............................... 16

Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc., 354 F.Supp.2d 293 (S.D.N.Y. 2004) .... 14

Moers v. Moers, 229 N.Y. 294 (1920).......................................................................................... 14

OBB Personenverkehr AG v. Sachs, 577 U.S. 27 (2015)........................................................ 6, 9

Rukoro v. Federal Rep. of Germany, 976 F.3d 218 (2d Cir. 2020), cert. denied sub nom. Rukoro v. Germany, --- U.S. ---, No. 20-1454, 2021 WL 2301990 (U.S. June 7, 2021) ........... 5, 9

Saudi Arabia v. Nelson, 507 U.S. 349 (1993) .............................................................................. 6

Simel v. JP Morgan Chase, 05-cv-9750, 2007 WL 809689 (S.D.N.Y. Mar. 19, 2007) .............. 14

Skluth v. United Merchs. & Mfrs., Inc., 559 N.Y.S.2d 280 (App. Div. 1st Dep't 1990)....... 14, 16

Smith v. Socialist People's Libyan Arab Jamahiriva, 101 F.3d 239 (2d Cir. 1996)...................... 9

Swarna v. Al-Awadi, 622 F.3d 123 (2d Cir. 2010)...................................................................... 13

Volk v. Liggett Group Inc., 96-cv-1921, 1997 WL 107458 (S.D.N.Y. Mar. 11, 1997).............. 14

**Statutes**

28 U.S. Code § 1603(b) ............................................................................................................ 11

28 U.S.C. § 1603(a) .................................................................................................................. 10

28 U.S.C. § 1603(e) .................................................................................................................... 8

28 U.S.C. § 1604...................................................................................................................... 7, 10

28 U.S.C. § 1605(a)(2)............................................................................................................. 8, 12

28 U.S.C. §§ 1602, et seq........................................................................................................... 1

**Other Authorities**

23 U.S.T. 3227 ....................................................................................................................... 1, 8, 9

**Treatises**

14 Wright, Miller & Cooper, *Federal Practice and Procedure* § 3662 (2d ed. 1985)................. 10

<u>**INDEX OF APPENDICES**</u>

| Exhibit | Description |
|---------|-------------|
| A | Letter from the Ministry of Foreign Affairs for the Republic of Korea concerning the laws, rules, and regulations of the Republic of Korea |
| B | The Settlement Agreement executed by and between Plaintiff and Defendant Jo, on behalf of Defendant Permanent Mission of the Republic of Korea to the United Nations |
| 1 | Letter from the United States Department of State – Office of Foreign Missions, New York Regional Office, concerning the Permanent Mission of the Republic of Korea's tax-exempt status. |

The Permanent Mission of the Republic of Korea to the United Nations (hereinafter, the "Mission") and three of its diplomats, Hyon Cho, Jinho Jo, and Daeyong Chung (collectively, "Diplomats") (Diplomats and Mission, collectively, "Defendants"), by and through their counsel, the law offices of Kim, Cho & Lim, LLC, hereby respectfully submit this memorandum of law in support of their motion for to dismiss the Complaint pursuant to Rule 12(b)(1) and 12(b)(6).

## I.   **PRELIMINARY STATEMENT**

The instant lawsuit, which plaintiff Hyunhuy Nam ("Nam" or "Plaintiff") couches in terms of a conventional labor dispute, is not susceptible to the jurisdiction of this Court pursuant to any exception under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602, to -11, or universally accepted principles of international law under the United Nations Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227 (entered into force in the United States Dec. 13, 1972) (the "VCDR"), and no waiver applies. Even were a FSIA or VCDR exception or waiver to apply, the Defendants further submit that no viable claim has been stated for a violation of domestic federal or state discrimination or labor law.

In this action, Plaintiff asserts nine causes of action against the Mission and Diplomats: one cause of action under the federal Fair Labor Standards Act of 1938 (the "FLSA"), 29 U.S.C. § 203, to -262 (Count I); four under various sections of New York Labor Law ("NYLL") §§ 1 to -1200; (Counts II-V); and two causes of action under each of the New York State Human Rights Law (the "NYSHRL"), N.Y. Exec. Law §§ 290, to -297, and New York City Human Rights Law (the "NYCHRL"), N.Y.C. Admin. Code § 8-101 et seq. (Counts VI-IX).

In a tacit concession to Defendants' sovereign immunities, much of Nam's Complaint is devoted to asserting that by hiring Plaintiff as a chauffeur, the Mission engaged in "commercial" activity; and that (predominantly upon "information and belief") Defendants thereby engaged in

1

commercial activity. This is an effort to invoke the very narrow commercial exception under the FSIA. In so doing, Plaintiff conflates the Defendants' consular functions with those of commercial actors. Indeed, the subtext of the Complaint appears to use the litigation privilege as a sword, not a shield, and to besmirch, defame and denigrate the character of the Diplomat-defendants.

Despite Plaintiff's efforts, the Complaint must be dismissed on two simple grounds: 1) the Court lacks subject matter jurisdiction over the matter because the Mission and Diplomats are instrumentalities of a foreign sovereign state, did not waive their sovereign immunity, and do not fall under any of the exceptions under the FSIA; and 2) Plaintiff duly released the Defendants from his employment-related claims.

## II.   **RELEVANT FACTS**

The Mission is a constituent part of the Government of the Republic of Korea (the "ROK" or "South Korea"), responsible for South Korean diplomatic interests at the United Nations since joining in September of 1991, as successor to the 1951 Observer Mission of the Republic of Korea to the United Nations. That the Mission is an instrumentality of a sovereign state is not in dispute. *See* Compl. (DE-1) at ¶¶ 3-7, 17.[1] Plaintiff is a South Korean national, living in New Jersey as a permanent U.S. resident. *Id.* ¶ 25. Nam had been employed as a chauffeur for the Mission for about five years until June of 2021, *id.* ¶¶ 10, 25, which is similarly undisputed. As such, Nam was an administrative staff member of the Republic of Korea working in aid of its diplomatic, not commercial interests.

All aspects of employment at the Mission – from the amount of compensation to the duration, retirement, severance, etc. – are regulated by the Government of the Republic of Korea,

---

[1] "Indeed, it is hard to imagine a purer embodiment of a foreign state than that state's permanent mission to the United Nations." *Gray v. Permanent Mission of People's Rep. of Congo to U.N.*, 443 F. Supp. 816, 820 (S.D.N.Y.), *aff'd*, 580 F.2d 1044 (2d Cir. 1978).

more particularly the Ministry of Foreign Affairs (similar to how U.S. diplomats and foreign service officers have the terms of their employment controls by the U.S. Department of State). *See* Declaration of Jinho Jo ("Jo Decl."), Ex. A; Declaration of Byungseok Yoo ("Yoo Decl."), ¶¶ 3-9.[2] Approximately forty employees serve at the Mission under the principles, rules, and laws in force in ROK, where a one-year written contract of employment is required by the government regulation. Plaintiff grounds much of his Complaint on being asked to retire (or reduce his workload) upon reaching the age of sixty. *See* Compl. ¶¶ 89-100, 136-43, 144-47, and Counts VII-IX. But sixty is the normal retirement age in South Korea—a fact noted by Second Circuit Judge Richard J. Sullivan while still a trial judge in this District. *See Kim v. Korea Trade Promotion-Investment Agency* ("KOTRA"), 51 F.Supp.3d 279, 282 (S.D.N.Y. 2014) (plaintiff, a former marketing consultant, was asked to resign at age 60 "like most people in Korea do") (granting motion to dismiss all claims for lack of subject matter jurisdiction based on sovereign immunity). While retirement at age 60 is unquestionably the norm in the ROK, Defendants actually extended Plaintiff's employment, at his request, for another year due to the extraordinary circumstances posed by the Coronavirus pandemic, and as consideration for the Plaintiff's release of his employment-related claims. *See* Jo Decl., Exs. A and B.

The foregoing is formally submitted in the form of a sworn declaration accompanied by an English translation of the Ministry's employment rules in a manner appropriate for the Court's consideration. *See Id*., Ex. A. Moreover, while barely mentioned in Plaintiff's lengthy Complaint, perhaps intentionally, Nam and the Mission also entered a voluntary settlement agreement concerning his employment. *See Id*., Ex. B; Compl. ¶ 94.

---

[2] "In resolving a motion to dismiss for lack of subject matter jurisdiction […] a district court […] may refer to evidence outside the pleadings. *See Kamen v. American Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir.1986)." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

III.     **STANDARD FOR RELIEF**

A.  **Standard for Dismissal under Fed. R. Civ. P. 12(b)(1)**

Courts properly dismiss actions pursuant to Rule 12(b)(1) where the

> court lacks the statutory or constitutional power to adjudicate
> it. *See* Fed.R.Civ.P. 12(b)(1). In resolving a motion to dismiss for
> lack of subject matter jurisdiction under Rule 12(b)(1), a district
> court […] may refer to evidence outside the pleadings. A plaintiff
> asserting subject matter jurisdiction has the burden of proving by a
> preponderance of the evidence that it exists.

*Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citing *Kamen*, 791 F.2d at 1011;

*Malik v. Meissner*, 82 F.3d 560, 652 (2d Cir. 1996)) (internal citations omitted). The instant

Plaintiff cannot meet this burden.

B.  **Standard Under the Foreign Sovereign Immunities Act and Vienna Convention**

"Subject to existing international agreements to which the United States is a party at the

time of enactment of [the FSIA,] a foreign state shall be immune from the jurisdiction of the courts

of the United States and of the States except as provided in sections 1605 to 1607[3] of this chapter."

28 U.S.C. § 1604.  Congress permitted a very limited exception for actual commercial activity by

a foreign sovereign, not applicable here but within which stricture Plaintiff strains to jam his claims:

> (a) A foreign state shall not be immune from the jurisdiction of
> courts of the United States or of the States in any case—
> * * *
> (2) in which the action is <u>based upon a commercial activity carried
> on in the United States by the foreign state</u>; or upon an act performed
> in the United States in connection with a commercial activity of the
> foreign state elsewhere; or upon an act outside the territory of the
> United States in connection with a commercial activity of the
> foreign state elsewhere and that act causes a direct effect in the
> United States[.]

---

[3] 28 U.S. Code § 1607 concerns counterclaims asserted against the foreign state and is not applicable here.

4

28 U.S.C. § 1605(a)(2) (emphasis added). Plaintiff pleads several isolated occurrences of chauffeuring Diplomats, Mission staff, family and guests to locales alleged to be for nondiplomatic purposes.  However, Plaintiff fails to recognize that "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." *Rukoro v. Federal Rep. of Germany*, 976 F.3d 218, 226 (2d Cir. 2020) (quoting 28 U.S.C. § 1603(d)), *cert. denied sub nom. Rukoro v. Germany*, --- U.S. ---, No. 20-1454, 2021 WL 2301990 (U.S. June 7, 2021).  To maneuver into the commercial exception, the Complaint absurdly alleges, in effect, that the Mission was running a taxi service with Plaintiff as its cabbie. *See e.g.,* Compl., ¶ 34.  Case law makes clear the Defendant Mission and Diplomats comported themselves in the conventional, generally accepted practice of such envoy's use of a dedicated driver.

Significantly, the FSIA's drafters, in the "Definitions" section, went out of their way to heighten the standard for showing exemption from its protections pursuant the FSIA by defining not only the term "commercial activity" but specifically "commercial activity carried on in the United States by a foreign state" which they define as "commercial activity carried on by [a foreign] state and <u>having substantial contact with the United States</u>.'" 28 U.S.C. § 1603(e) (emphasis added) *see also* 28 U.S.C. § 1603(d) (separately defining "a 'commercial activity'"). While Plaintiff would have this Court believe that "commercial activity" in the context of the FSIA is used colloquially, this clearly is not the case.

The VCDR provides that:

> 1. A diplomatic agent shall enjoy immunity from the criminal jurisdiction of the receiving State. He shall also enjoy immunity from its civil and administrative jurisdiction, except in the case of: [...] (c) An action relating to any professional or commercial activity exercised by the diplomatic agent in the receiving State <u>outside his official functions</u>.

5

VCDR, Art. 31.1(c) (emphasis added).[4]

### C.   Standard for Dismissal under Fed. R. Civ. P. 12(b)(6)

For a complaint to state a claim, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ibid*. A complaint must therefore contain more than "'naked assertion[s]' devoid of 'further factual enhancement.'" *Ibid*. (quoting *Twombly*, 550 U.S. at 557) (alteration in original). Pleadings that contain "no more than conclusions [...] are not entitled to the assumption of truth" otherwise applicable to complaints in the context of motions to dismiss. *Id*. at 679.

### IV.   LEGAL ARGUMENT

### A.   The Court Lacks Subject-Matter Jurisdiction

The sole basis for jurisdiction over any foreign state in the federal or state courts of the United States is the FSIA. *See Harrison v. Republic of Sudan*, 838 F.3d 86, 94 (2d Cir. 2016) (citing *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989)). Indeed, instrumentalities of the ROK such as the Mission are "'presumptively immune' from the jurisdiction of United States courts' unless one of the [FSIA]'s express exceptions to sovereign immunity applies." *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 31 (2015) (emphasis added) (quoting *Saudi Arabia v. Nelson,* 507 U.S. 349, 355 (1993)). Under the VCDR, "[a] diplomatic agent shall […] enjoy immunity from its civil and administrative jurisdiction" except in "an action relating to any professional or commercial activity exercised by the diplomatic agent in the receiving State outside his official functions." VCDR, Art. 31.1(c) (emphasis added).

---

[4] The remaining exceptions involve real property and succession/executorships.

It is important to note that Nam, like the Mission's other personnel, works under South Korean employment rules and guidelines, with which the Mission asserts it is in conformance. Imposition of the domestic labor law of a host country would, of course, seriously infringe upon and impair the normal diplomatic balance honored by member states. Defendants respectfully postulate that the United States would understandably object were ROK to override American norms of civil service by ousting embassy personnel in Seoul once they reached sixty years of age "like most people in Korea do". *KOTRA*, 51 F.Supp.3d at 282; *see, e.g.*, *Figueroa v. Ministry for Foreign Affairs of Sweden*, 222 F.Supp.3d 304, 312 (S.D.N.Y. 2016) (Koeltl, J.) ("assessment of an employee's status as a civil servant . . . should focus on the contemporary norms associated with civil service in the sovereign country at issue") (citing *Kato v. Ishihara*, 360 F.3d 106, 112 (2d Cir. 2004)[5]); *see also* 14 Wright, Miller & Cooper, *Federal Practice and Procedure* § 3662, at 393 (2d ed. 1985) (the FSIA was "not[ ] intended to alter either diplomatic or consular immunity"). Notably, Plaintiff is not without recourse. His claims, if any, can – and should – be brought in the ROK, the proper forum for any alleged claims against that foreign sovereign state.

### i.   The Mission and Diplomats Are Entitled to, and Have Not Waived, Immunity

The FSIA provides that "foreign state[s] shall be immune from the jurisdiction of the courts of the United States and of the States[.]" 28 U.S.C. § 1604. "A 'foreign state' […] includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). The FSIA further defines an "agency or instrumentality of a foreign state" as any entity:

> (1) which is a separate legal person, corporate or otherwise, and
> (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

---

[5] *Kato* holds that in this Circuit, "the category of 'civil service' should be interpreted to include the broad range of civil service employment relationships used by countries *other than the United States*." *Ibid.* (emphasis added).

(3) which is neither a citizen of a State of the United States as defined in section 1332 (c) and (e) of this title,[6] nor created under the laws of any third country.

28 U.S.C. § 1603(b). Here, the Mission is a 1) separate legal entity, which 2) is an organ/political subdivision of a foreign state (ROK), and 3) is not a citizen of a State of the United States nor created under the laws of a third country. It is undisputed and indisputable that the Mission and Diplomats are "diplomatic agents"[7] under the VCDR.

Therefore, the Mission and Diplomats are all afforded sovereign immunity, unless they have waived such immunity or fall into one of the exceptions provided for under the FSIA. Plaintiff does not and cannot earnestly plead Defendants waived their sovereign immunity. *See generally,* Compl. Neither the ROK nor its Mission waived or implied a waiver of sovereign immunity by the customary diplomatic practice of hiring a national or resident in the host country, who is familiar with the locale, to transport diplomatic staff and their families safely to their activities.

### ii.  Defendants DO NOT Meet the Criteria for Exception under the FSIA

Plaintiff seeks to fit within FSIA's commercial activity exception by irrelevant, sometimes, scurrilous allegations of driving officials, their family members, and colleagues to stores or restaurants, and being required to await their return. The Complaint alleges that Plaintiff "was primarily responsible for providing transportation for the Minister who resided in the Official Residence and Permanent Mission's Counselors, whenever Defendants required underline regardless of its/his/her/their purpose(s)", *Id.* at ¶ 40 (emphasis added), implying that a personal or partly personal purpose turns the transport into a commercial transaction. But again, "[t]he commercial

---

[6] These concern citizenship of corporations and insurers and the inclusion of the U.S. Territories, the District of Columbia, and the Commonwealth of Puerto Rico as "States". 28 U.S. Code §1332(c) and (e).

[7] "A "diplomatic agent" is the head of the mission or a member of the diplomatic staff of the mission[.]" VCDR, Art.1(e).

8

character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." *Rukoro*, 976 F.3d at 226 (quoting 28 U.S.C. § 1603(d)). *Rukoro* reiterated that "[c]ourts must 'zero[ ] in on the core of [the] suit: the . . . sovereign acts that actually injured [plaintiff]." *Id.* at 227 (citing *Sachs*, 577 U.S. at 28) (alterations in original).

Critically, Plaintiff misses the mark entirely as the FSIA exception applies in a specific manner where the action is based upon a "commercial activity carried on in the United States by the foreign state[,]" 28 U.S.C. § 1605(a)(2), a term specifically defined in § 1603(e). It is insufficient to merely allege "commercial activity"; a plaintiff must also meet the heightened standard that such activity had "<u>substantial contact</u> with the United States." *Id.* § 1603(e) (emphasis added). Here, Plaintiff fails to plead any facts showing "substantial contact with the United States" because, frankly, there are none.

Plaintiff alleges in a conclusory manner that his driving included "commercial activity that was not governmental in nature" and that "activity Plaintiff performed as a chauffeur, specifically for the [Diplomats], is one which normally could be engaged in by any private party." Compl. ¶ 102. Even assuming *arguendo* that a commercial entity could provide equivalent transport to a diplomatic mission, this does not render its employee's exclusive service to a diplomatic mission a commercial function. In the Second Circuit, the "implied waiver provision of Section 1605(a)(1) must be construed narrowly. *See KOTRA*, 51 F.Supp.3d at 284 (quoting *Smith v. Socialist People's Libyan Arab Jamahiriva*, 101 F.3d 239, 343 (2d Cir. 1996)).

Indeed, despite repeated effort, Plaintiff fails to plausibly infuse any activity by the Mission or Diplomats with commercial intendment. For example, the Complaint further attempts to create a commercial context by alleging the Mission used "www.heykorean.com" for hiring certain

9

employees. This website is described by Nam as "just like a 'K-pop version of Craigslist'" that "engage[s] in various types of commercial activities such as sale of goods, real estate transactions, and hiring employees," Compl. ¶¶ 30-31. Assuming *arguendo*, on a motion to dismiss that it is true Defendants used a commercial website to find potential candidates: first, Plaintiff's action is not "based upon" the Mission's use of a webpage, and second, any "commercial activity" was on the part of the host service, not the Defendants. Under Plaintiff's expansive logic, a diplomat could waive sovereign immunity by such "commercial activity" as buying coffee at Dunkin' Donuts. In other words, Defendants' use of a commercial service to find a chauffeur is not tantamount to commercial activity for purposes of sovereign immunity.  It has been held that a "waiver will not be implied absent strong evidence of the sovereign's intent", which intent is wholly absent here. *See KOTRA*, 51 F.Supp.3d at 284[8] (quoting *Human Rights in China v. Bank of China,* No. 02-cv-4361 (NRB), 2005 WL 1278542, at *6 (S.D.N.Y. May 27, 2005) (alteration in original) (internal quotation omitted)).

Plaintiff fails to set forth any factual allegation for finding the narrow exceptions to sovereign immunity; his conclusory allegation that this action is based on "commercial activity" or, more specifically, "commercial activity carried on in the United States by the foreign state" are similarly devoid of any factual allegation that might invoke the exception. Plaintiff's failure to establish subject matter jurisdiction renders the Complaint fatally defective, and this Court must dismiss it, with prejudice. *See Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 507 (2d Cir.1994) ("The burden of proving jurisdiction is on the party asserting it.").

---

[8] *KOTRA* analyzes the Second Circuit's distinction in <u>Kato</u> between the "quintessential . . . government function" of promoting commerce as opposed to a sovereign waivably *engaging* in commerce. *Id.* at 288-89 & n.3 (quoting *Kato,* 360 F.3d at 112) (noting that all losses KOTRA generates are borne by the Korean government, and any incidental profit generated by fees are not shared by any private person or entity).

### iii.  The Mission and Diplomats Maintain Immunity; Chauffeuring Is a Governmental Function

Defendants further maintain Nam was one of the "members of the service staff", which is defined as "members of the staff of the mission in the domestic service of the mission" under the VCDR, Art. I(g). Plaintiff's duties were also "sufficiently intertwined with" the Mission's activities on behalf of the ROK government that "the employment relationship itself was part of the government function", thereby preserving sovereign immunity. *KOTRA*, 51 F.Supp.3d at 289 n.4 (quoting *Hijazi v. Permanent Mission of Saudi Arabia to U.N.*, 689 F.Supp.4d 669, 675 (S.D.N.Y.), *aff'd*, 403 Fed. Appx. 631 (2d Cir. 2010)). Plaintiff's driving activities were wholly limited to that in service of the Mission, its Diplomats, staff, and their families; the Defendants did not market or sell Nam's driving services to the public, a situation that might be construed as engaging in commerce and a potential waiver. *See Kato*, 360 F.2d at 112.

Notably, the issue of whether a permanent mission to the United Nations waives sovereign immunity by advertising for and hiring a local resident as a chauffeur was directly addressed by this Court in *Figueroa*. There, the Swedish mission (for the sake of clarity, the "SM") "advertised that it was seeking to hire an Office Clerk/Chauffeur" having "duties includ[ing] driving the [SM] car 'upon request,' 'minor repairs and maintenance,' and other 'routine clerical duties. . . . The [SM] held itself out as an Equal Opportunity Employer and did not require that an applicant speak Swedish." 222 F.Supp.3d at 308. Applying the first of two *Kato* inquiries, the *Figueroa* court found that "the activity to which the plaintiff's employment was directed is <u>undoubtedly governmental.</u>" *Id.* at 313 (emphasis added). As to the second *Kato* inquiry, "whether the plaintiff's employment relationship was sufficiently intertwined with that activity to provide that the employment relationship itself was part of the governmental function", *Hijazi*, 689 F.Supp.2d at 674-75, the *Figueroa* court held that "the plaintiff's transportation responsibilities as a chauffeur at the [SM]

were sufficiently intertwined with the diplomatic function of the [SM] such that the employment itself was part of the defendants' sovereign function." *Id.* at 315. This decisional authority alone is dispositive of the case at bar.

In *Figueroa*, in the plaintiff's capacity as a chauffeur, the plaintiff was responsible for "chauffeuring the Swedish Ambassador and the Ambassador's family, Swedish diplomats and their families, and members of the Royal Family of Sweden. *Id.* at 308.

> [SM's] employment of the plaintiff as a full-time chauffeur for the [SM] entrusted the plaintiff with the safe transport of Swedish dignitaries, an activity integral to effecting the governmental function of the [SM]. A sovereign's decisions on how best to address the safety concerns of government officials are peculiarly sovereign because the failure to protect or safeguard a sovereign representative, such as an ambassador or a titular head of state, can have extremely adverse consequences for the sovereign nation.

*Id.* at 315 (citing *Butters v. Vance Int'l, Inc.*, 225 F.3d 462, 465 (4th Cir. 2000) ("noting the Ambassador's 'schedule sometimes required that [the plaintiff] sit in the Embassy car for up to eighteen hours at a time' in order to aid the Ambassador" and "that the plaintiff spent approximately 80% of his time as a chauffeur")). *Figueroa* also relied on "an essentially identical case" from the Eastern District of Virginia that "likewise concluded that an embassy's employment of a full-time limousine driver was not subject to the commercial activity exception." *Ibid.* (citing *Crum v. Kingdom of Saudi Arabia*, 05-cv-275, 2005 WL 3752271, at *4 (E.D. Va. July 13, 2005) (holding that "[a]n embassy's decision to hire a limousine driver to transport embassy officials, their families and guests, and meet its everyday needs does not amount to engaging in 'trade and traffic or commerce.'"); also citing *El-Hadad v. United Arab Emirates*, 496 F.3d 658, 664 n.2 (D.C. Cir. 2007) (internally citing *Crum* with approval)).

Still further, *Figueroa* gave weight, "while not outcome determinative, [to] the existence of a Swedish statutory scheme for the [SM]'s employees . . . in support of the conclusion that the

plaintiff's employment [as an office clerk/chauffeur] was intertwined with the governmental

function of the [SM]." 222 F.Supp.3d at 316 (citation omitted).[9] The South Korean diplomatic

employment bylaws and guidelines referenced herein are analogous to the statutory scheme

considered in *Figueroa* and further support a finding that Plaintiff was an integral part of the

Mission's function. *See* Ex. A.

 Immunity under the VCDR was similarly considered in the Second Circuit and to a similar

conclusion:

> Under Article 31(1) [of the VCDR], a diplomat enjoys absolute
> immunity save for three exceptions in civil cases, one of which is
> for an "action relating to any professional or commercial activity
> exercised by the diplomatic agent in the receiving State outside his
> official functions." Vienna Convention art. 31(1)(c). The <u>Tabion</u>
> court agreed with the U.S. Department of State that the term
> "commercial activity" in Article 31(1)(c), as modified by its latter
> phrase "outside his official functions," "focuses on the pursuit of
> trade or business activity; <u>it does not encompass contractual
> relationship for goods and services incidental to the daily life of the
> diplomat and family in the receiving State.</u>"

*Swarna v. Al-Awadi*, 622 F.3d 123, 138-39 (2d Cir. 2010) (emphasis added) (quoting *Tabion v.*

*Mufti,* 73 F.3d 535, 538-39 (4th Cir.1996)) (internal quotation marks omitted).

 Therefore, under the recent holdings of *Figueroa*, *Swarna*, and the cases cited therein, no

waiver of sovereign immunity inheres in the employment of Nam as a chauffeur for the Mission

or Defendants' alleged conduct. For the foregoing reasons, there is no subject-matter jurisdiction

over the foreign sovereign. Plaintiff fails to state a claim upon which relief may be granted because

FSIA and VCDR immunity have not been waived and no exception applies. The Mission and

Diplomats respectfully submit that, there being no other basis for waiver, Plaintiff's Complaint

must be dismissed with prejudice for want of subject-matter jurisdiction over a foreign sovereign.

---

[9] The *Figueroa* court did find a limited waiver under a separate tolling and confidentiality agreement between the parties, because a "tolling agreement is plainly not the product of an act peculiar to a sovereign." *Id.* at 317.

### B. **Parties' Settlement Agreement Forms an Independent Basis to Dismiss Suit**

Prior to initiating this action, Plaintiff already released all claims, including his claims under the NYLL, NYCHRL, and NYSHRL by signing a settlement agreement with the Mission in return for his employment being extended through June 2021. The law is well settled on this issue. "Agreements that purportedly release employers from liability for claims arising under the New York Labor Law overtime requirements are generally valid and enforceable […] Courts have repeatedly upheld the validity of broadly-worded releases with respect to claims brought pursuant to New York employment statutes." *Hummel v. AstraZeneca LP*, 575 F. Supp. 2d 568, 570 (S.D.N.Y. 2008) (citing *Simel v. JP Morgan Chase*, 05-cv-9750, 2007 WL 809689, at *4-5 (S.D.N.Y. Mar. 19, 2007); *Difilippo v. Barclays Capital, Inc.*, 552 F. Supp. 2d 417, 426 (S.D.N.Y. 2008); *Dewey v. PTT Telecom Netherlands, US, Inc.*, 94-cv-5983, 1995 WL 542447, at *2-3 (S.D.N.Y. Sept. 12, 1995); *Skluth v. United Merchs. & Mfrs., Inc.*, 559 N.Y.S.2d 280, 281-82 (1st Dept. 1990); *Volk v. Liggett Group Inc.*, 96-cv-1921, 1997 WL 107458, at *4-6 (S.D.N.Y. Mar. 11, 1997); *but see Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc.*, 354 F.Supp.2d 293, 298 (S.D.N.Y. 2004) (refusing to enforce a non-specific release that failed to identify any particular universe of claims)).

"To establish the existence of an enforceable agreement, [the proponent] must establish an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound (22 N.Y. Jur.2d, *Contracts* § 9). That meeting of the minds must include agreement on all essential terms (id. at § 31)". *Kowalchuk v. Stroup*, 61 A.D.3d 118, 121 (App. Div. 1st Dept. 2009) (parenthetical in original). "[T]he consideration for a bilateral contract […] in which promises are exchanged [ ] consists of the acts mutually promised" *Id.* at 125 (citing *Moers v. Moers*, 229 N.Y. 294, 301 (1920) (internal citation to 1 *Williston on Contracts*, § 103(f)).

14

Here, Plaintiff acknowledges that he signed such valid and enforceable contract for the release of the claims brought herein. Compl., ¶ 94, *see* Ex. B.  Pursuant to the ROK rules and regulations, "[t]he retirement age is 60." *See* Ex. 1. As such, Plaintiff should have retired in June of 2020, but he pleaded with the Mission for an extension, saying he would have no income and job prospects due to the COVID-19 pandemic. The Mission then, for humanitarian reasons, agreed to exceptionally extend Plaintiff's employment, (of course with the permission of the government in Korea), but on the condition that Plaintiff sign the release attached as Exhibit B. By presenting the release and promising to extend his employment through June 2021, Defendants made an offer; by signing, Plaintiff accepted that offer. The consideration here includes the release and the extension of Plaintiff's employment during the COVID-19 Pandemic beyond the normal retirement age. Importantly, the parties specifically agreed that Plaintiff will release his claims concerning his employment. A translation of the release, originally written in Korean is as follows:

> The above two sides submit this agreement because they have agreed not to raise civil and criminal claims in the future with respect to the termination of the employment relationship of the local employee (Hyunhuy Nam) as of June 30, 2021.

*See* Jo Decl., Ex. B.[10]  Regardless of the emotional and financial circumstances to which Plaintiff was purportedly subject, Plaintiff did exhibit mutual assent to be bound by the terms of this release.[11] The parties have a valid and enforceable contract for Plaintiff's release of claims asserted in this action, independent of Defendants' immunity.

---

[10] As explained in the foregoing sections of this memorandum, this release form, too, is pursuant to the laws and regulations of ROK, and Defendants have no discretion or authority to modify the same.

[11] Defendants wish to note that Plaintiff has refused, and is still refusing, to accept his severance pay provided by the government regulation--- an act undoubtedly coached by his counsel-- in order to leave room for arguing the release is invalid for lack of consideration. Plaintiff should not be allowed to benefit from his own bad faith interference with Defendants' performance of the contract.

15

The language of the release is permissibly broad, and certainly covers claims relating to Plaintiff's employment and the termination thereof. Hence, Plaintiff's release of his claims under the NYLL, NYSHRL, and NYCHRL is valid and enforceable in favor of Defendants.

Plaintiff's only avenue for invalidating this agreement would arise under contract law. "Courts applying New York law will enforce valid releases that are clear and unambiguous on their face and which were knowingly and voluntarily entered into and were not 'the product of fraud, duress, or undue influence.'" *Hummel*, 575 F. Supp. 2d at 570 (citing *Skluth*, 559 N.Y.S.2d at 282; *Laramee v. Jewish Guild for the Blind*, 72 F.Supp.2d 357, 359 (S.D.N.Y.1999)). This is not applicable here. Plaintiff Nam alleges only that he was "under emotional and financial pressure" and that he "had no choice but to agree" during the pandemic. Compl., ¶ 94. However, Plaintiff alleges no facts plausibly inferring any circumstances amounting to "fraud, duress, or undue influence" but, rather, acknowledges that he knowingly and voluntarily, and upon giving painstaking and due consideration of his foreseeable circumstances, agreed to and did sign the release.

By Plaintiff's own admission, he duly released Defendants from his employment-related claims - if any – in return for the extension of his employment until June 2021, which he would otherwise not have been entitled to, and hence, his claims under the New York Labor Law, New York State Human Rights Law, and New York City Human Rights Law must be dismissed with prejudice. Additionally, it should further be noted that Plaintiff was paid in cash because the Mission is exempt from Federal, State, and local taxes in accordance with the Foreign Missions Act. 22 U.S.C. § 4301; *See* Yoo Decl., Ex. 1.

Notwithstanding the foregoing settled law and the absence of sufficient, plausible facts alleged in Plaintiff's favor, Plaintiff argues that the settlement and release of his claims must be

16

# A-78

disregarded by this Court. But the fact remains, and Plaintiff himself admits, that he duly released Defendants from his employment-related claims and hence, his claims under the New York Labor Law, New York State Human Rights Law, and New York City Human Rights Law must be dismissed with prejudice.

V.   **<u>CONCLUSION</u>**

For the foregoing reasons, it is respectfully requested that the Court grant Defendants' motion to dismiss in its entirety and dismiss the Complaint, and each of the claims asserted therein, with prejudice.

Dated: September 30, 2021                    Respectfully submitted,

<u>/s/ Joshua S. Lim</u>
Joshua S. Lim
**Kim, Cho & Lim, LLC**
163-10 Northern Boulevard, Suite 202
Flushing, New York 11358-2652
(t)  718-539-7400
(f): 201.585.7422
joshualim@kcllawfirm.com
*Attorneys for Defendants*

17

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HYUNHUY NAM, | |
| Plaintiff, | Case No.: 1:21-cv-06165-AJN |
| v. | **DECLARATION OF BYUNGSEOK YOO** |
| PERMANENT MISSION OF THE REPUBLIC OF KOREA TO THE UNITED NATIONS, HYUN CHO, JINHO JO, and DAEYONG CHUNG, | **IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AND FOR SANCTIONS** |
| Defendants. | |

Byungseok Yoo, of full age, hereby respectfully makes the following declaration pursuant to 28 U.S.C. § 1746(1):

1.      The undersigned is the duly appointed Head of Administration of the Permanent Mission of the Republic of Korea to the United Nations (the "Mission") in New York City.

2.      This Declaration is made upon personal knowledge, official files and records of the Mission, and information and belief, in support of the within motion to dismiss and for sanctions made on behalf of the defendant Mission and three of its diplomats: Hyun Cho, Jinho Jo, and Daeyong Chung (collectively "Defendants").

3.      All administrative employees of the Mission, including Nam and the undersigned, operate under guidelines established for overseas consular and diplomatic personnel by the Republic of Korea ("ROK" or "South Korea"), by its Ministry of Foreign Affairs (the "Ministry").

4.      All matters including compensation, benefits, amount of severance, and termination (retirement), without limitation, of administrative employees of the Mission are subject to these guidelines.

1

5.      No one at the Mission, regardless of rank, has authority or discretion to vary any of the provisions of the guidelines established by South Korea for its administrative employees.

6.      The ROK Government regards the guidelines to be internal, diplomatic material that cannot be disclosed to the public.  However, it is recognized that certain provisions are relevant to this litigation and Defendants' motion, so limited disclosure by the undersigned has been authorized by the ROK Government for this purpose.

7.      The official guidelines are written in the Korean language.  For the Court's consideration, the Mission respectfully presents below an approved, English translation of relevant portions of the guidelines by the Ministry for ROK's overseas missions generally:

**The guidelines for the operation of administrative employees at overseas Missions, stipulated by the Ministry of Foreign Affairs, are as follows:**

**Article 10 (Employment contract)**

(1) The Mission shall conclude an employment contract in writing with the person whose employment has been confirmed, in accordance with Appendix No.1 document, and deliver a copy of the contract to the administrative staff.

**Article 58 (Resignation)**

(1) If an administrative employee falls under any of the following, resignation shall be processed:
    1. If they submit a resignation letter and wish to resign
    2. In case of death
    3. If they have reached the retirement age
    4. If the employment contract duration expires
    5. If their dismissal is determined

**Article 62 (Retirement age)**

(1) The retirement age is 60.

**Article 64 (Severance pay)**

(1) If an administrative employee who has worked for more than 1 year

2

# A-81

resigns, the Mission shall pay an average wage of 30 days for one year of continuous service as the severance pay.

*The calculation of severance pay:

Severance pay =
{ [ (base pay for three months before resignation + discretionary bonus for the past 1 year) / (number of days worked in the 3 months before resignation) ] x 30 } X (total days of work / 365)

8.    With regard to the Mission specifically, the Ministry established the following regulations:

**The guidelines for the operation of administrative employees at the U.N. Mission, stipulated by the Ministry of Foreign Affairs, are as follows:**

**Article 3 (Employment contract)**

(1) The recruitment of an administrative employee is completed when the administrative employee, under the mutual agreement with the head of the Mission, signs the employment contract, as specified in Attachment No.1 document.

(2) The duration of the employment contract shall be one year from the date of signing the contract, and, if it is deemed necessary to continue working, the contract may be extended on a yearly basis.

**Article 6 (Remuneration)**

G (사). Severance pay

(1) If a Korean administrative employee who has worked for more than 1 year resigns, the Mission shall pay an average wage of 30 days for one year of continuous service as the severance pay.

A (가). Calculation of severance pay

{ [ (base pay for three months before resignation + discretionary bonus for the past 1 year) / (number of days worked in the 3 months before resignation) ] x 30 } X (total days of work / 365)

**Article 7 (Resignation)**

(1) If an administrative employee falls under any of the following, resignation shall be processed:

3

    1. If they submit a resignation letter and wish to resign
    2. In case of death
    3. If they have reached the retirement age
    4. If the employment contract duration expires
    5. If their dismissal is determined

**Article 8 (Retirement age)**

    (1) The retirement age is 60.

9.    All such guidelines are assiduously observed by the Mission, including in the case of Mr. Nam during the term of his employment.

10.    The Mission is not required to issue employees an IRS form W-2 Wage and Tax Statement because the Mission is "exempt from paying Federal, state and local tax." *See* Letter from Office of Foreign Missions, U.S. Dept. of State, dated June 12, 2002 (citing Foreign Missions Act, 22 U.S.C. § 4301), a true copy of which is annexed hereto as **Exhibit "1"**.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and accurate.

Executed on: 25 August 2021

BYUNGSEOK YOO

LANDRIT ALIBEGU
Notary Public - State of New York
NO. 01AL6399921
Qualified in Richmond County
My Commission Expires Nov 4, 2023

4

# EXHIBIT 1



United States Department of State

**Office of Foreign Missions**
**New York Regional Office**

June 12, 2002

To Whom It May Concern:

In 1982, the United States Congress passed the Foreign Missions Act (22 USC 4301) under which foreign missions, diplomats, and certain other categories of persons, living or traveling in the United States on official business for their government, are granted and exemption from the payment of all State and local restaurant, sales, lodging and similar use taxes.

The Permanent Mission of the Republic of Korea to the United Nations is such a foreign mission and, as such, is exempt from Federal, state and local tax.

If you have any questions, please feel free to call me at 212-826-4500.

Sincerely,

James B. Bond
Regional Director

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

HYUNHUY NAM,

                                    Plaintiff,                    Case No.: 1:21-cv-06165-AJN

                    v.

                                                                  **DECLARATION OF JINHO JO**
                                                                  **IN SUPPORT OF DEFENDANTS'**
PERMANENT MISSION OF THE REPUBLIC OF              **MOTION FOR SANCTIONS**
KOREA TO THE UNITED NATIONS; HYUN CHO;           **PURSUANT TO FED. R. CIV. P 11**
JINHO JO; and DAEYONG CHUNG,

                                    Defendants.

I, Jinho Jo, make the following declaration pursuant to 28 U.S.C. § 1746:

1.  I am a Counsellor at Defendant Permanent Mission of the Republic of Korea to the United Nations (the "Entity") and therefore am fully familiar with the facts and circumstances set forth herein.

2.  I submit this Declaration in support of Defendants' motion to dismiss the complaint of plaintiff Hyunhuy Nam ("Plaintiff").

3.  I am a custodian of the records of the Entity.

4.  These said records are kept by the Entity, in the regular course of conduct, and it is the regular practice of the Entity, for an employee or representative with knowledge of the act, event, transaction, condition, fact and/or document recorded, to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter.

1

5.   It is the Entity's regular course of conduct to make such records.

6.   To the best of my knowledge, after a reasonable inquiry, the records attached hereto are true and correct copies of the original that are in the custody of the Entity.

7.   Attached hereto as Exhibit A is a true and correct copy of an official letter by the Ministry of Foreign Affairs of the Republic of Korea, dated August 23, 2021.

8.   Attached hereto as Exhibit B is a true and correct copies of the settlement agreement between the Permanent Mission of the Republic of Korea to the United Nations (the "Mission") and Plaintiff from the Entity's records.

9.   Since the date of the execution of the settlement agreement annexed hereto as Exhibit B, the Entity has made efforts to make payment of the severance pay, which was promised in return for Plaintiff's release of his employment-related claims. But Plaintiff continued to delay and state that he is not available to receive the funds.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on September 3, 2021

Jinho Jo

EXHIBIT

A

# A-88



MINISTRY OF FOREIGN AFFAIRS
REPUBLIC OF KOREA

Case 23-229, Document 51, 06/05/2023, 3525094, Page101 of 302

To whom it may concern,

**In the Ministry of Foreign Affairs' guidelines on administrative employees, the clauses related to their employment contract, retirement, retirement age, and severance pay are as follows:**

### Article 10 (Employment contract)

(1) The Mission shall conclude an employment contract in writing with the person whose employment has been confirmed, in accordance with Appendix No.1 document, and deliver a copy of the contract to the administrative staff.

### Article 58 (Resignation)

(1) If an administrative employee falls under any of the following, resignation shall be processed:

1. If they submit a resignation letter and wish to resign
2. In case of death
3. If they have reached the retirement age
4. If the employment contract duration expires
5. If their dismissal is determined

### Article 62 (Retirement age)

(1) The retirement age is 60.

### Article 64 (Severance pay)

(1) If an administrative employee who has worked for more than 1 year resigns, the Mission shall pay an average wage of 30 days for one year of continuous service as the severance pay.

*The calculation of severance pay:

Severance pay =
{ [ (base pay for three months before resignation + discretionary bonus for the past 1 year) / (number of days worked in the 3 months before resignation) ] x 30 } X (total days of work / 365)

1

# A-89



MINISTRY OF FOREIGN AFFAIRS
REPUBLIC OF KOREA

Case 23-229, Document 51, 06/05/2023, 3525094, Page102 of 302

Sincerely,

2021. 08. 23.

Title: Director of Overseas Missions Division

Name: Daesup Chung

Sign: 

[Official Seal]

2

EXHIBIT

B

# 합   의   서

고용(대리인) 주소 : 330 E 38 St, NYC, NY (10016 )
성명 : 조진호

피고용인 주소 : 128 W central Blvd palisades park. NJ.
성명 : 남현희

## - 합의 내용 -

상기 양측은 현지고용원(남현희)의 고용 관계가 2021.6.30.부로 종료
된다는 것에 대하여 차후에 민형사상 이의를 제기하지 않기로 합의하였
기에 이 합의서를 제출합니다

2020년 9월 1일

위 합의서 제출인        고용(대리인) 성명 : 조진호   조진호

피고용인 성명 : 남현희

S E T T L E M E N T   A G R E E M E

Employer (Representative)
Address: 330 E 38 S6, NYC, NY (10016)

Employee Address:
Name: Hyunhuy   128 w Central Blvd palisades park. NJ.

- Substance of the

The above two sides submit this agreement because they have agreed not to raise civil and criminal claims in the future with respect to the termination of the employment relationship of the local employee (Hyun-Hee Nam) as of June 30, 2021

September 1,

Parties to the

Employer (Representative) Name: Jinho

Employee Name: Hyunhuy



# Certification of Translation Accuracy

I, Fran S. Yoon, a professional interpreter and translator having no relation to the client hereby certify that:

1.  I am a Korean/English interpreter and translator with 20 years of experience.

2.  I am currently registered with the federal courts of New York and New Jersey.

3.  The attached document entitled <u>Settlement Agreement</u>, to the best of my knowledge, ability and belief, is a true and accurate translation of the original document.

Fran S. Yoon

September 30, 2021

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X

Hyunhuy Nam,                                            Case No. 1:21-cv-06165

                                    Plaintiff,

                    v.                                  **DECLARATION OF HYUNHUY**
                                                        **NAM IN OPPOSITION OF**
Permanent Mission of the Republic of Korea to the       **DEFENDANTS' MOTION TO**
United Nations; Hyun Cho; Jinho Jo; and Daeyong         **DISMISS**
Chung,

                                    Defendants.

-----------------------------------------------------------------X

I, Hyunhuy Nam, under the penalty of perjury, declare as follows:

1. My name is Hyunhuy Nam, and I am the plaintiff in the above-captioned case.

2. I am a resident of Bergen County, New Jersey.

3. From approximately June 28, 2016 to June 30, 2021, I was hired by Permanent Mission of the Republic of Korea to the United Nations (hereafter, "Permanent Mission") as a chauffeur to provide transportation for its diplomatic staff.

4. Before I worked for Permanent Mission and its diplomatic staff, I was searching for a job via Hey Korean's Website, just like many other Korean-language speaking job seekers did. Hey Korean's Website lists various job positions such as sales person, driver, and waiter in the Korean-language.

5. In or around March – April 2016, I learned of Permanent Mission's chauffeur position in the "driver-wanted" section in Hey Korean's Website. In the job posting, Permanent Mission offered a chauffeur/driver position, required English-Korean bilingual skill, and certain years of experience in driving. It provided contact information to submit the potential driver's resume.

6. According to Permanent Mission's specification, I emailed my resume to Permanent Mission. In the same email, I briefly described my qualifications that I have a Commercial Driver's

License and my10-years of driving experience as a commercial driver. In response to my email, the Permanent Mission Secretary, Mr. Hang-Suh Choi, reached out to me by sending me a reply email using the email address sw1575@hotmail.com. He conducted my job interview inside Permanent Mission's building located at 335 East 45th Street, New York, NY 10017.

7.  On approximately June 28, 2016, I was hired as a chauffeur, as one of Permanent Mission's non-diplomatic employees. Attached hereto as **Exhibit A** is a true and correct copy of Permanent Mission's Employee Directory.

8.  Permanent Mission provided me with an "official vehicle," a Hyundai sedan, and I was _supposed_ to drive its diplomatic employees. Permanent Mission also allowed me to use a small office in the building as my waiting area, since I was required to be on-call and stand-by close to its diplomatic staff who requested transportation as needed.

9.  Upon information and belief, Permanent Mission maintained different phone-numbers with Verizon on a family-plan, allowed certain employees to use the phone-line(s), and paid for the phone bills. Permanent Mission initially allowed me to use one of the phone-line(s) because I had to communicate with its diplomatic staff to be dispatched.

10. However, Permanent Mission disconnected the phone-line and stopped paying my phone bills after the former General Counselor, Mr. Young-Og Kim, caught Permanent Mission paying a non-diplomatic chauffer employee's phone bills. In or around May-June, 2018, Permanent Mission notified me that I was not eligible for using the phone-line, I was required to use my own phone, and paid the phone bill out of my own pocket to perform my duties as a chauffeur. I asked Mr. Kim to continue to use the Permanent Mission's phone line or in the alternative, reimburse my phone bills. Mr. Kim responded that "the phone line is one of the Verizon's family payment plan" and "allowing a non-diplomatic employee to use the line and/or paying his phone

bill was in violation of the policy." He also told me that he would be subject to "discipline" if Permanent Mission continued to do so. Later, I requested another Minister to provide me a phone to use while performing my duties as a chauffeur, but he told me that "they had a reason" why Permanent Mission was unable to let me use the family plan phone number.

11. On or about July 1, 2016, approximately 2 days *after* I began my employment with Permanent Mission, former Minister Bong-Woo Ko presented to me a document labeled "Contract for Employing a Chauffeur *[English translation]*" (hereafter, "Agreement") and required me to sign it. The document reflected Minister Bong-Woo Ko at Permanent Mission as an employer and myself as *his* employee under the Agreement. The Agreement also reflected my regular working hours to be 9:00 to 18:00 and the duration of the Agreement to be effective from July 1, 2016 to July 1, 2017, subject to 1-year renewal after the expiry of the effective date. Throughout my employment, Permanent Mission's Secretary delivered my compensation in cash at his office located in Permanent Mission's building.

12. On July 1, 2017, Minister Ko again presented me with another Agreement labeled "Contract for Employing a Chauffeur *[English translation]*" reflecting almost identical terms. Just like the previous Agreement, the document reflected Minister Bong-Woo Ko at Permanent Mission as an employer and myself as *his* employee under the Agreement, but the duration of the Agreement to be effective from July 1, 2017 to July 1, 2018, subject to the 1-year renewal.

13. Since I was employed by Permanent Mission on around June 28, 2016 and signed Minister Ko's Agreement on July 1, 2016, I provided transportation primarily for Minister Ko until August 2017. My duties included but were not limited to, driving Minister Ko from the Official Residence located at 14 Homestead Road, Tenafly, New Jersey 07670 to Permanent Mission, providing transportation for him to attend meetings at restaurants, standing-by in the car near

the meeting locations until he finished his business, and driving him back to Permanent Mission or his residence at the Official Residence until around the end of August 2017.

14. Since in or around October 2017, Permanent Mission required me to primarily provide transportation for another Minister Kyungyul Han until around May 2018. During that time, Minister Han used me as a Permanent Mission's chauffeur and also his personal driver to run him and his family members' personal errands, providing free transportation services for his family members and his friends using the Permanent Mission's sedan.

15. On February 20, 2018, Minister Han requested me to provide transportation for a belated "Valentine's Day Dinner" with his spouse. He directed me to pick-up his spouse at 1125 Lexington and drive them to the restaurant located at 14 Christopher Street to celebrate their belated Valentine's Day. Minister Han required me to wait in the sedan for an hour until they finished dinner. On that day, Minister Han utilized my service and Permanent Mission's sedan as his private transportation for approximately 4 hours from around 4:50 pm to 8:20 pm.

16. On February 22, 2018, Minister Han requested me to drive him to a restaurant, Casa Mono, and stand-by until he finished meeting with a real-estate agent. After their meeting, I had to drop off Minister Han's real-estate agent friend near the Chelsea Art building located in W. 25th Street.

17. On April 14, 2018, Minister Han utilized Permanent Mission's sedan and requested me to provide transportation for him and his spouse to attend the real-estate agent friend's son's wedding located at 558 Grand Concourse. While he and his spouse were attending the event, I had to stand-by for approximately 5 hours from 4:30 pm to 9:20 pm in the sedan parked on the street one-block away from wedding-event location.

18. On May 1, 2018, Minister Han requested me to drive him to Whiskey Town located at 29 E. 3rd Street, New York NY 10003 to hangout with his acquaintance who visited him from Seoul,

Korea before he returned. He requested me to stand-by for over an hour in the sedan until he finished meeting with his acquaintance. The next day, Minister Han asked me to drive him to Gemma to hangout with the same acquaintance again and made me wait in the car until he finished the meeting.

19. On numerous occasions, Minister Han utilized my service and Permanent Mission's sedan to drive his two daughters from/to Grand Central Station, JKF airport, and other social gathering places morning-and-night.

20. After Minister Han left Permanent Mission around the end of May 2018, I continued to work as a chauffeur for Permanent Mission and provided transportation for its diplomatic staff members as needed, until Minister Jungjae Lee moved in to the Official Residence. Minister Lee moved in to the Official Residence on or about July 30, 2018.

21. On or around July 1, 2018, one of Permanent Mission's diplomatic staff Mr. Byung-Ho Cha (phenetic name) requested me to sign another document, also labeled "Contract for Employing a Chauffeur *[English translation]*" containing almost identical terms as the other Agreements had. However, the 2018 document reflected Minister Jungjae Lee as an employer and myself as *his* employee although I had not seen him at Permanent Mission nor was I aware of his existence/involvement. Despite that, Mr. Cha requested me to sign the document, and I did so in order to keep my chauffer job at Permanent Mission.

22. On or around July 30, 2018, Minister Lee finally moved in to the Official Residence. Since then, I was primarily responsible for providing transportation for Minister Lee.

23. Since Minister Lee moved in the Official Residence, Permanent Mission required me to primarily provide transportation for him until around April 2020. Like the former Minister Han, Minister Lee utilized my service as a Permanent Mission's chauffeur and also his personal driver

to run his and his family members' personal errands, and providing free transportation services for his family members, friends, and acquaintances. Furthermore, Minister Lee also required me to drive his daughters' boyfriend and other friends and utilized my service and Permanent Mission's official vehicle as his private transportation. At Minister Lee's direction, I was used as his family members' and friends' personal shopper, wait-person, and tour guide.

24.  On October 17, 2018, I came to the Official Residence to pick up Permanent Mission's sedan and drive Minister Lee to Permanent Mission. On the way to Permanent Mission, Minister Lee requested me to stop at his friend's temporary residence at Knickerbocker Street located in Tenafly, NJ to pick up his friend named Mr. Jin-ju Koo (phonetic name) and his wife. After I picked up his friends, Minister Lee told me to drop him off at Permanent Mission and requested me to provide transportation for Mr. Koo's family using the official sedan as long as they needed. As I was instructed by Minister Lee, I had to drive Mr. Koo's family to Pelham Bay and Split Rock Golf Courses and was required to stand-by for over 5 hours in the sedan from approximately 10:40 am to 4:45 pm while they were playing golf. Thereafter, they kept utilizing Permeant Mission's transportation for their personal business until around 7:10 pm on that day.

25. On October 22, 2018, Minister Lee again requested me to pick up Mr. Koo's family and directed me to drive them to Royce Brook Golf Club. Minister Lee directed me to stand-by until he finished playing golf with the Koo's family. I had to stand-by from approximately 9:10 am to 3:40 pm near the golf course. When they got out of the golf course, Minister Lee instructed me to drop him off at Permanent Mission and provide transportation for the Koo family thereafter. Just like the other day, Mr. Koo and his family utilized Permanent Mission's chauffeuring service for the entire day until 6:30 pm.

26. On November 21, 2018, Minister Lee directed me to drive Permanent Mission's sedan to the 42th Street/Port Authority bus terminal to pick up his two daughters and her boyfriend from Boston.

27. On December 5, 2018, Minister Lee's wife utilized my service and Permanent Mission's sedan for over 2 hours to find the "perfect clams." Minister Lee required me to drive his wife from one supermarket to another to assist in shopping for clams. At first, Minister Lee's wife directed me to drive to Farm, the market located in Tenafly. She complained that Farm's clams were "too small" and told me to drive her to H-Mart in Fort Lee. At the H-Mart, she complained that H-Mark's clams were "too big" and requested me to drive her to Shoplite in Tenafly. *Again* at the Shoplite, she did not buy any clams because "none of the clams looked good." Minister Lee's wife directed me to drive back to the first supermarket and purchased the smaller claims that she complained about in the beginning.

28. On January 14, 2019 and January 15, 2019 Minister Lee utilized my service and Permanent Mission's sedan to assist his sister-in-law to complete one of her "bucket lists." While she was visiting New York from Korea, Minister Lee requested me to drive to Radio City Music Hall to provide transportation for his sister-in-law. Minister Lee requested me to stand-by near the music hall until his sister-in-law finished watching a show. After Minister Lee's sister-in-law hopped in the sedan, she said that watching all of the Broadway shows were one of her "bucket lists."

29. On February 21, 2019, Minister Lee requested me to drive his youngest *daughter's friend* from Springfield Summit to Morris Mall using the Permanent Mission's sedan.

30. On March 11, 2019, Minister Lee requested me to drive to the post office located in Tenafly for him to pick up his health supplements that he ordered from a store in Korea.

31. On May 9, 2019, I had to make an additional trip to the Official Residence in the sedan because Minister Lee's daughter left her sunglasses there.

32. On October 31, 2019, Minister Lee used my service and the sedan to provide transportation for his friend's family to purchase a luxury bag. Moreover, Minister Lee and his friend's family requested me to drive them to various places such as an Oyster Bar, Jazz Club, and hotel until 1:30 am the next day.

33. On January 10, 2020, Minister Lee told me to drive to JFK Terminal 4 to retrieve his daughter's lost I-Pad at Asiana Airline. At first, Minister Lee expressed his concern that he should not use my service and Permanent Mission's sedan to pick up his daughter's I-Pad at the airport, but he requested me to do so anyway. Minister Lee required me drive to the airport to retrieve the I-Paid. I spent more than 2 hours to drive to the airport, park the sedan, walk to the Asiana Airline's desk to retrieve the I-Pad, and returned to Permanent Mission. Even after I returned to Permeant Mission, I had to run his personal errands and driver his daughters to various places from 1:00 pm t0 4:300 pm. Minister Lee requested me to drive him to a restaurant located in Fort Lee to eat with his daughters; to take to his youngest daughter to her dentist; to stand-by near the dentist office until she finished; to drive his daughters to Ipic Theaters in Fort Lee; and to drive back to Permanent Mission thereafter.

34. On numerous occasions, Minister Lee requested me to drive his youngest daughter to Sylvan Dental Care located in New Jersey for his daughter's braces. I had to stand-by near the dentist's office until she finished her braces treatment.

35. Although I recorded my overtime hours in a time sheet, Minister Lee frequently required me to change the time to reflect reduced number of hours. He unilaterally picked the start and end

time(s) and requested me to revise my time sheet according to his direction. Attached hereto as **Exhibit B is** a true and correct copies of Plaintiff's time records revised by Minister Lee.

36. While Minister Lee was serving as Permanent Mission's Minister, he told me that I needed to retire when I reached the age of 60 before and after I turned the age of 60.  Before Minister Lee left Permanent Mission in April 2020, he again told me that I should get out of Permanent Mission because my age reached the Korean retirement age of 60.

37. After Minister Lee left Permanent Mission, I was required to provide transportation for Counselor Jinho Jo for most of the time, but I also drove other diplomatic staff members occasionally as needed.

38. On October 2020, Counselor Jo requested me to sign another document (back)dated July 1, 2020, reflecting Counselor Jo as an employer and myself as his employee from July 1, 2020 to June 30, 2021. Counselor Jo told me that Permanent Mission was having a hard time finding an alternative younger chauffeur due to the Covid pandemic and decided to keep me until the pandemic situation eased so that they could find a suitable younger chauffeur. Counselor Jo demanded me to sign the "Down Contract" reflecting 20% reduction in monthly "base" pay because I already passed the retirement age. Under emotional and financial pressure, I reluctantly capitulated to Counselor Jo's demand and signed Counselor Jo's backdated document. However, I did not enter into any agreement with Counselor Jo on that day.

39. Although Counselor Jo requested me to sign the Down Contract with him, Permanent Mission required me to provide transportation for Minister Daeyong Chung since he moved in to the Official Residence around November 2020.

40. On April 1, 2021, Minister Chung presented another "Down Contract." But this time, the document reflected Minister Chung as an employer and myself as his employee from April 1,

2021 to June 30, 2021. Although the time period specified in Minister Chung's Down Contract overlapped with Counselor Jo's Down Contract from April to June 2021, Minister Chung required me to sign his Down Contract as well.   Regardless of the type of documents, Agreements, and/or Contracts I was required to sign, I had to work as long as the Permanent Mission's Ministers and Counselor required and at any time the diplomatic staff, their family members, friends, acquaintance, and even children's friends needed free transportation, personal shopper, and/or tour guide.

41. Just like the other former Ministers Han and Lee, Minister Chung also utilized my service and the sedan for his personal use. On November 31, 2021, Minister Chung required me to drive his family members and their friends to a shopping mall. I was required to stand-by in the sedan until they finished shopping for a luxury bag in the Bottega store. Attached hereto as **Exhibit C** is a true and correct copies of the original photograph reflecting Defendant Chung and the shopping item.

42. Furthermore, Minister Chung requested me to drive him to the Apple stores for the sole purpose of buying gifts for children. On numerous occasions I drove to the Apple stores, located on 5th Avenue and near Grand Central Station, with Minister Chung and waited   near the stores until he returned to the sedan.

43. On few occasions since March 2021, Minister Chung asked me, "*where are you going after your retirement [with Defendants]."* Again, in or around June 2021, Minister Chung told me that I must leave by the end of June 2021 because I already passed the retirement age of 60.

44. Regardless of my effort, time, hard-work while I was serving the Ministers and Counselor to the best of my ability, Defendants made it clear that they wanted me to retire. Since in or before April 2020 when I almost reached the age of 60, I began feeling increasingly insecure,

unappreciated, and unwelcomed at work. Counselor Jo and Minister Chung continuously pressured me to retire although I verbally objected to their discriminatory termination. I pleaded to the Defendants, including Ambassador Cho, to continue to work as a chauffeur for Permanent Mission and its diplomatic staff. However, no one did anything to remedy the staff's discriminatory conduct nor did they allow me to keep my job. I was eventually terminated on June 30, 2021.

45. While I was working as Permanent Mission's chauffeur, I felt bitter and resentful when I was unable to provide transportation for the diplomatic member who actually needed transportation, but unable to utilize the Permanent Mission's because of the certain Ministers who used the transportation for their and their family's personal business. Specifically, the two Ministers, Lee and Chung, excessively used Permanent Mission's transportation to ease their family members', friends', and acquaintances' hassle, free of charge.

46. During my employment, Defendants did not pay me all the hours I worked. Even after I was terminated, they did not pay the severance pay that they promised to me during my employment. Instead, Permanent Mission's Secretary Mr. Tae-Ho Kim (phenetic name) called me after I was terminated and told me to come to Minister Chung's office at Permanent Mission and offered me $13,000.00 in cash placed in several envelopes to privately settle this case. I told them I could not accept the cash payment and did not take any of the envelopes.

47. A few days later, Mr. Kim again reached out to me by telephone and told me that Permanent Mission was trying to pay me $13,000.000 as my severance pay. But this time, he told me that he would send the payment by check to my residence. However, the check was never delivered, and I did not receive any payment from Defendants.

I, Hyunhuy Nam, declare under the penalty of perjury that the above statement is true and correct to the best of my knowledge.

Dated: Flushing, New York
      October 23 , 2021

_____
Hyunhuy Nam

Sworn to before me
this ___ day of October 2021

_____
Notary Public

QINYU FAN
NOTARY PUBLIC-STATE OF NEW YORK
No. 02FA6397297
Qualified in Queens County
My Commission Expires 09-03-2023



| DIPLOMATIC STAFF [35] | EXT. # | Room # | Direct # / Fax # | Cellular# | Home # | E-mail |
|---|---|---|---|---|---|---|
| Amb. **CHO** Hyun | | | | | | |
| Min. **CHUNG** Daeyong | | | | | | |
| Coun. **JO** Jinho | | | | | | |

| NON-DIPLOMATIC STAFF [28] | | | | | | |
|---|---|---|---|---|---|---|
| Mr. **NAM** Hyunhuy | | | | | | |

## 시간외근무 확인대장



| 날짜 | 근무자 | 초과근무 현황 | | | 초과근무 사 유 | 확인관 서 명 |
| --- | --- | --- | --- | --- | --- | --- |
| | | 시작시각 | 종료시각 | 초과시간 | | |
| 11/1 | 남연희 | 18:50 | 21:50 | -4:40 | 한밤근무 | |
| 11/4 | 남해터 | 07:20 | 23:20 | 7:00 | 3가, 죽.되고 | |
| 11/5 | 남연희 | 07:10 | 18:50 | 2:40 | 크메스타, 죽.되고 | |
| 11/6 | 남연희 | 07:30 | 19:40 | 3:10 | | |
| 11/7 | 남연희 | 07:10 | 23:30 | 8:20 | 크메어, 죽.되고 | |
| 11/8 | 남연희 | 07:10 | 16:10 | 0:00 | 죽.되고 | |
| 11/13 | 남연희 | 08:10 | 20:00 | 2:50 | 죽.되고 | |
| 11/14 | 남연희 | 06:50 | 22:10 | 6:20 | 3가, 크메어, 죽.되고 | |
| 11/15 | 남연희 | 07:10 | 19:40 | 3:30 | 죽.되고 | |
| 11/18 | 남연희 | 07:30 | 19:50 | 3:10 | 죽.되고 | |
| 11/19 | 남연희 | 07:50 | 21:00 | 4:30 | 크메스타, 죽.되고 | |
| 11/20 | 남연희 | 07:00 | 21:50 | 5:50 | 크메어, 죽.되고 | |
| 11/21 | 남연희 | 07:00 | 23:40 | 7:30 | 크메스타, 3가, 죽.되고 | |
| 11/22 | 남연희 | 07:00 | 23:30 | 7:30 | 3가, 죽.되고 | |
| 11/25 | 남연희 | 07:20 | 20:40 | 3:20 | 세시, 죽.되고 | |
| 11/26 | 남연희 | 07:00 | 08:00 | 1:00 | 죽고 | |
| 11/28 | 남연희 | | | -5:00 | 한밤근무고특근별 특무 | |

## 시간외근무 확인대장

2019 2월

| 날짜 | 근무자 | 초과근무 현황 | | | 초과근무 사유 | 확인관 서명 |
|------|--------|------|------|------|------|------|
| | | 시작시각 | 종료시각 | 초과시간 | | |
| 2/1 | 남현희 | 14:30 | 23:30 | 9:00 | 축잔자, 출.퇴근 | |
| 2/2 | 남현희 | 09:00 | 21:40 | 12:30 | 축잔자, 출.퇴근 | |
| 2/3 | 남현희 | 06:50 | 21:50 | 6:00 | 5야, 출.퇴근 | |
| 2/4 | 남현희 | 07:10 | 20:00 | 3:50 | 크레스트, 출.퇴근 | |
| 2/5 | 남현희 | 07:30 | 18:30 | 2:00 | 파라무스, 출.퇴근 | |
| 2/6 | | 휴무 | | -8:00 | 탄력근무 | |
| 2/7 | 남현희 | 08:20 | 23:20 | 6:00 | 나가, 포트리, 크레스트 | |
| 2/10 | 남현희 | 07:20 | 19:00 | 2:40 | 접약, 포트리, 출.퇴근 | |
| 2/11 | | 휴무 | | -8:00 | 탄력근무 | |
| 2/12 | 남현희 | 07:10 | 20:50 | 4:00 | 3가, 출.퇴근 | |
| 2/13 | 남현희 | 07:10 | 19:10 | 3:00 | 크레스트, 출.퇴근 | |
| 2/14 | 남현희 | 07:10 | 01:00 | 8:50 | 3가, 크레스트, 출.퇴근 | |
| 2/18 | 남현희 | | -8:00 | | (출근 탄력근무) | -8 +2 |
| 2/19 | 남현희 | 09:00 | 13:00 | 3:00 | 탄력근무 | |
| 2/20 | 남현희 | 07:10 | 19:10 | 3:00 | 테너플라이, 출.퇴근 | |
| 2/21 | 남현희 | 15:50 | 20:30 | -3:20 | 3가, 탄력근무 | |
| 2/24 | 남현희 | 07:10 | 19:30 | 3:20 | 출.퇴근 | |
| 2/25 | 남현희 | 07:30 | 20:10 | 3:40 | 최고, 출.퇴근 | |
| 2/26 | 남현희 | 07:30 | 20:10 | 3:40 | 출.퇴근 | |
| 2/27 | 남현희 | 07:30 | 23:10 | 6:40 | 크레스트, 출.퇴근 | |
| 2/28 | 남현희 | 07:10 | 15:10 | | 출.퇴근, 창내근무 | +3 |
| | | 15:10 | 18:10 | -3:00 | | -3 |
| | | Total | 54:00 | | | |

Case 23-229, Document 51, 06/05/2023, 3525094, Page122 of 302

## 시간외근무 확인대장

2019

| 날짜 | 근무자 | 초과근무 현황 | | | 초과근무<br>사 유 | 확인관<br>서 명 |
|---|---|---|---|---|---|---|
| | | 시작시각 | 종료시각 | 초과시간 | | |
| 1/3 | 남OO | 05:20 | 17:30 | 3:10 | 7 Ave, 출.회2 | ✓ |
| 1/7 | 남OO | 07:40 | 20:30 | 3:50 | 3층, 출.회2 | ✓ |
| 1/8 | 남OO | 07:40 | 20:45 | 4:05 | Mat, 664, 출.회2 | ✓ |
| 1/9 | 남OO | 07:40 | 19:05 | 2:25 | 출.회2 초나 | ✓ |
| 1/10 | 남OO | 07:35 | 19:45 | 3:20 | 출에사는, 출.회2 | ✓ |
| 1/10 | 남OO | 07:15 | 19:40 | 3:25 | 출.회2 초나눔 | ✓ |
| 1/14 | 남OO | 07:30 | 19:55 | 3:15 | 출.회2 길나눔 | ✓ |
| 1/15 | 남OO | 07:30 | 22:00 | 6:30 | 파기 출2, 출.회2 | ✓ |
| 1/16 | 남OO | 22:00 | 6:40 | | 출간의 出물 출.회2 | ✓ |
| 1/17 | 남OO | 06:30 | 22:00 | 6:30 | 결나 오는, 출.회2 | ✓ |
| 1/18 | 남OO | 07:20 | | | | |



Case 23-229, Document 51, 06/05/2023, 3525094, Page124 of 302

Case 1:21-cv-06106-AJN  Document 55-3  Filed 10/08/21  Page 2 of 2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

Hyunhuy Nam,                                                      Case No. 1:21-cv-06165

                                    Plaintiff,

                        v.

Permanent Mission of the Republic of Korea to the
United Nations; Hyun Cho; Jinho Jo; and Daeyong
Chung,

                                    Defendants.

-------------------------------------------------------------X


**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS**


Diana Y. Seo, Esq.
Hang & Associates, PLLC
136-20 38th Avenue, Ste 10G
Flushing, NY 11354

<u>**TABLE OF CONTENT**</u>

I.   PRELIMINARY STATEMENT ............................................................ 1

II.  SUMMARY OF FACTS............................................................... 1

III. ARGUMENT ..................................................................... 1

   **A. The Court Has Subject-Matter Jurisdiction Under the Foreign Sovereign
Immunities Act's Commercial Activity Exception and Defendants' Motion to Dismiss
Should be Denied**…………………………………………………………………………..3

      **a. The Court Has Subject-Matter Jurisdiction**……………………………..……3

   **B. Defendants Engaged in Commercial Activity by Hiring Plaintiff as a Chauffer,
Utilizing Plaintiff's Service to Perform Activities That Were Non-Governmental, and Using
Plaintiff In Furtherance of Conducting Commercial Activity**………………………………5

      **a. The Actual Duties Plaintiff Performed Could Surely Be Engaged by Any Private
Party and Were Not Governmental in Nature**………………………………….……5

      **b. Defendants Utilized Plaintiff's Service Together With Their Family Members,
Friends, Acquaintance, And Even Children's Friend, As Free Transportation,
Personal Shopper, And/Or Tour Guide**…………………………………………………..9

   **C. All of Plaintiff's Claims Should Survive Because Defendants' Alleged "Release"
Has No Effect on the Viability of the Claims As Plaintiff Is Seeking for Damages That Were
Occurred "During" His Employment**……………………………………..............................15

   **IV. CONCLUSION**……………………………………………………………..…17

**CASES**

APWU v. Potter, 343 F.3d 619, 623 (2d Cir. 2003) ............................................................ 4

*Argentine Republic v. Amerada Hess Shipping Corp*., 488 U.S. 428, 439 (1989) ......................... 3

Figueroa v. Comm'r of Soc. Sec., No. 12-cv-7129 (LGS) (SN), 2013 U.S. Dist. LEXIS 97543,

   2013 WL 3481317, at *2 (S.D.N.Y. July 11, 2013) .................................................................. 4

Holden v. Canadian Consulate, 92 F.3d 918, 96 Cal. Daily Op. Service 5954, 96 D.A.R. 9741, 68

Empl. Prac. Dec. (CCH) ¶ 44240, 71 Fair Empl. Prac. Cas. (BNA) 929, 1996 U.S. App.

LEXIS 20064 (9th Cir. 1996)………………………………………………………………..6

Iberia Underwriting Mgmt. v. P.T. Jamsostek, 600 F.3d 171, 177 (2d Cir. 2010)……………….9

Morrison v. Nat'l Austl. Bank Ltd., 547 F.3d 167, 170 (2d Cir. 2008) .......................................... 4

Mukaddam v. Permanent Mission of Saudi Arabia, 111 F. Supp. 2d 457 (S.D.N.Y. 2000)…….11

Kato v. Ishihara, 360 F.3d 106 (2d Cir. 2004)………………………………………………….5

Swarna v. Al-Awadi, 622 F.3d 123, 143 (2d Cir. 2010)…………………………………………9

Republic of Arg. v. Weltover, Inc., 504 U.S. 607, 112 S. Ct. 2160 (1992)……………………….9

**STATUTES**

28 U.S.C. § 1603(d) ......................................................................................................................... 8

28 U.S.C. § 1605(a)(1) and (2) ....................................................................................................... 3

28 U.S.C. § 1605(a)(2)...................................................................................................................... 5

U.S.C. § 1604.................................................................................................................................... 3

Plaintiff Hyunhuy Nam (hereafter, "Plaintiff"), by and through his counsel Hang & Associates, PLLC, hereby respectfully submits this memorandum of law in opposition to Defendants Permanent Mission of the Republic of Korea to the United Nations; Hyun Cho; Jinho Jo; and Daeyong Chung (collectively, "Defendants")'s motion to dismiss the Complaint under Fed. R. Civ. P. 12(b)(1) and 12(b)(6). For the reasons presented herein there are no grounds for dismissal of the action.

## I.    PRELIMINARY STATEMENT

This action arises out of Plaintiff's employment at Permanent Mission of the Republic of Korea to the United Nations (hereafter, "Permanent Mission") during the course of performing his duties as a chauffeur for Permanent Mission and for its diplomatic staff to provide transportation. Although Plaintiff was hired to work as a chauffeur for Permanent Mission and its staff, Permanent Mission permitted and its diplomatic staff utilized Plaintiff's service and Permanent Mission's automobile to engage in their personal businesses and providing free transportation for their family, friends, and acquaintances.

Defendants filed a motion to dismiss Plaintiff's Complaint. In their motion, Defendants overlooked the nature and scope of Plaintiff's duty, made unwarranted presumption of the (in)applicability of the exceptions under FSIA, and misleadingly stated that Plaintiff "duly released" Defendants from his "employment-related claims." (See, Dkt No. 24-2). Indeed, the duties Plaintiff performed for Defendants could surely be performed by a private citizen.

## II.    SUMMARY OF FACTS

In or about June 2016, Plaintiff was searching for employment via the Hey Korean's Website.  Hey Korean's Website lists various jobs, such as salesperson, driver,

1

and waiter, in the Korean-language.  While searching, Plaintiff found a listing for a chauffeur position in the "driver-wanted" section posted by the Permanent Mission of the Republic of Korea to the United Nations (hereafter, "Permanent Mission").  Plaintiff applied the position and was subsequently interviewed and hired by the Permanent Mission Secretary, Mr. Hang-Suh Choi.

From June 28, 2016, to June 30, 2021, Permanent Mission employed Plaintiff as a chauffeur to provide transportation for diplomatic staff.  Permanent Mission provided Plaintiff with an "official vehicle," a Hyundai sedan, for transporting diplomatic employees and a small office located within the Permanent Mission's building.  Additionally, Plaintiff was initially provided a phone for use during daily duties.  However, Permanent Mission unexpectedly and without reason disconnected Plaintiff's phone line around May-June 2018 and required Plaintiff to use his personal phone to perform his daily duties.  Subsequent requests for a business phone were denied.

Plaintiff officially began his work duties on or about July 1, 2016.  Two days later, Plaintiff was required to sing a "Contract for Employing a Chauffeur" setting forth working hours and other details for a one-year term of employment.  Plaintiff was required to renew the contract annually, though the listed "employer" changed with the Permanent Mission staff.

In October 2017, Plaintiff started receiving orders from Permanent mission staff to perform various personal errands for staff, drive for staff's friends and family after hours, and make trips unrelated to official Permanent Mission business.

Though Plaintiff recorded overtime hours and advised staff that such personal tasks were not within the scope of Plaintiff's duties, overtime was ignored and orders for personal tasks continued.  Certain Ministers even required Plaintiff to alter time records to eliminate overtime.  Plaintiff's employment concluded with being pushed to retire per the Korean retirement age of 60

years old.  In April 2020, Permanent Mission staff indicated that Plaintiff was approaching

the Korean retirement age and should consider retirement plans.  However, Plaintiff was

retained slightly longer due the covid pandemic.  By March 2021, Permanent Mission staff

made passive aggressive remarks indicating that Plaintiff should retire.  By June 2021,

Plaintiff was directly told he must retire because he had already passed the Korean

retirement age.  Plaintiff was involuntarily terminated on June 30, 2021.  All of Plaintiff's

duties and work activities took place within the United States.

### III.    ARGUMENT

**A.  The Court Has Subject-Matter Jurisdiction Under the Foreign Sovereign Immunities Act's Commercial Activity Exception and Defendants' Motion to Dismiss Should be Denied**

**a.  The Court Has Subject-Matter Jurisdiction**

 The Foreign Sovereign Immunities Act ("FSIA") provides "the sole basis for obtaining

jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping

Corp*., 488 U.S. 428, 439 (1989). Under FSIA, a foreign state "shall be immune from the

jurisdiction of the courts of the United States and of the States **except** as provided in sections

1605 to 1607 of this chapter." *Id*.; *See also*, U.S.C. § 1604. The two exceptions relevant to this

case are codified at 28 U.S.C. § 1605(a)(1) and (2):

A foreign state shall not be immune from the jurisdiction of courts of the United

States . . . in any case –

(1) in which the foreign state has waived its immunity either explicitly or

   by implication . . .

(2) in which the action is based upon a **commercial activity** carried on in

   the United States by the foreign state…. *Id.*

In Defendants' motion, they argued that this Court lacks subject matter jurisdiction of Plaintiff's Complaint because Defendants are presumptively immune from the jurisdiction of United States' Court. Defendants indeed, acknowledge that there are exceptions under FSIA, but failed to recognize the nature of Plaintiff's duty and incorrectly concluded that plaintiff duties were "sufficiently intertwined with" the Mission's activities on behalf of the ROK government. (*See,* Dkt No. 24-2). To the contrary, the FSIA expressly provides exceptions to its grant of immunity, including the commercial activity exception that specifically applies to the instant case.

While the court must generally "take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff," *Morrison v. Nat'l Austl. Bank Ltd*., 547 F.3d 167, 170 (2d Cir. 2008) (alteration in original) (citation and internal quotation marks omitted), jurisdiction "must be shown affirmatively, [and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it," id. (quoting *APWU v. Potter*, 343 F.3d 619, 623 (2d Cir. 2003)); *see also Figueroa v. Comm'r of Soc. Sec.,* No. 12-cv-7129 (LGS) (SN), 2013 U.S. Dist. LEXIS 97543, 2013 WL 3481317, at *2 (S.D.N.Y. July 11, 2013). "In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) a district court may consider evidence outside the pleadings." *Morrison v. Nat'l Austl. Bank Ltd*., 547 F.3d 167, 170 (2d Cir. 2008).

In this case, Defendants posted a hiring advertisement on Hey Korean's website to hire a chauffeur to work for Permanent Mission. (See, Dkt No.11_Compl. ¶35). After Plaintiff learned of Permanent Mission's chauffeur position, he wrote an email describing his qualifications that he has a Commercial Driver's License and the years of driving experience as a commercial driver when he forwarded his resume in the same email. (Nam Decl. ¶6). In response to Plaintiff's email,

4

the Permanent Mission Secretary contacted Plaintiff by sending him a reply email using a *Hotmail* email address. (Id.). After Permanent Mission's Secretary conducted an interview, Plaintiff was I was hired as a chauffeur, as one of Permanent Mission's non-diplomatic employees, and he was _supposed_ to drive Permanent Mission's diplomatic employees (Id.; Nam Decl. ¶¶7,8; Dkt No. 32_**Exhibit A).** However, the nature (as opposed to the purpose and the job title) of Plaintiff's actual employment and the duties Plaintiff performed were commercial, rather than governmental, This Court has jurisdiction over Plaintiff's Complaint under the FSIA's commercial activity exception.

**B.** **Defendants Engaged in Commercial Activity by Hiring Plaintiff as a Chauffer, Utilizing Plaintiff's Service to Perform Activities That Were Non-Governmental, and Using Plaintiff In Furtherance of Conducting Commercial Activity.**

Under the commercial activities exception, a foreign sovereign is not immune from suit in any case in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States. 28 U.S.C. § 1605(a)(2).

**a.** **The Actual Duties Plaintiff Performed Could Surely Be Engaged by Any Private Party and Were Not Governmental In Nature**

The FSIA's legislative history gives examples of what the Congress considered to be governmental, as opposed to commercial, activity. See, Kato v. Ishihara, 360 F.3d 106 (2d Cir. 2004) (governmental activity includes "the employment of diplomatic, civil service, or military personnel" while commercial activity includes "employment or engagement of laborers, clerical staff or public elations or marketing agents") (quoting H.R. Rep. No. 94-1487, at 16).

5

The Second Circuit's description of the commercial activity exception in Swarna is particularly instructive: [T]o determine the applicability of the commercial activity exception, "we ask not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives but rather whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in trade and traffic or commerce." 622 F.3d at 147 (quoting Anglo—*Iberia Underwriting Mgmt. v. P.T. Jamsostek*, 600 F.3d 171, 177 (2d Cir. 2010)); see also <u>Weltover</u>, 504 U.S. at 614-15 ("[A] contract to buy army boots or even bullets is a 'commercial' activity, because private companies can similarly use sales contracts to acquire goods ."); *see also, Holden v. Canadian Consulate*, 92 F.3d 918, 96 Cal. Daily Op. Service 5954, 96 D.A.R. 9741, 68 Empl. Prac. Dec. (CCH) ¶ 44240, 71 Fair Empl. Prac. Cas. (BNA) 929, 1996 U.S. App. LEXIS 20064 (9th Cir. 1996) ("For purposes of determining "commercial activity" under FSIA, foreign sovereign's employment of diplomatic, civil service or military personnel is governmental, and employment of other personnel is commercial.")

From approximately June 28, 2016 to June 30, 2021, Plaintiff was hired by Permanent Mission as a chauffeur to provide transportation for its diplomatic staff. (Nam Decl. ¶6). Plaintiff learned of Permanent Mission's chauffeur position in the "driver-wanted" section in Hey Korean's Website as the Website lists various job positions such as sales person, driver, and waiter in the Korean-language. (Nam Decl. ¶¶ 4,5). To work as a chauffeur/driver, Plaintiff sent an email to Permanent Mission briefly describing his qualifications that he possess a Commercial Driver's License and his10-years of driving experience as a commercial driver. (Nam Decl. ¶6).  The Permanent Mission Secretary reached out to Plaintiff by sending him a reply email using the email address sw1575@hotmail.com.(Id.).

**A-121**

On approximately June 28, 2016, Plaintiff was eventually hired by Permanent Mission as a chauffeur, as one of Permanent Mission's non-diplomatic employees after having an interview with the Permanent Mission's Secretary. (Id.; Nam Decl. ¶6 ). Plaintiff was _supposed_ to drive its diplomatic employees. (Nam Decl. ¶8 ).

On or about July 1, 2016, approximately 2 days _after_ Plaintiff began his employment with Permanent Mission, former Minister Bong-Woo Ko presented to him a document labeled "Contract for Employing a Chauffeur _[English translation]_" (hereafter, "Agreement") and required him to sign it. The document reflected Minister Bong-Woo Ko at Permanent Mission as an employer and Plaintiff as _his_ employee under the Agreement. The Agreement also reflected the duration of the Agreement to be effective from July 1, 2016 to July 1, 2017. (Nam Decl. ¶11 ).

On July 1, 2017, Minister Ko again presented Plaintiff with another Agreement labeled "Contract for Employing a Chauffeur _[English translation]_" reflecting almost identical terms. Just like the previous Agreement, the document reflected Minister Bong-Woo Ko at Permanent Mission as an employer and Plaintiff as _his_ employee under the Agreement, but the duration of the Agreement to be effective from July 1, 2017 to July 1, 2018. (Nam Decl. ¶12 ). Since Plaintiff was employed by Permanent Mission on around June 28, 2016 and signed Minister Ko's Agreement on July 1, 2016, Plaintiff provided transportation primarily for Minister Ko only until August 2017. Thereafter, in or around October 2017, Permanent Mission required Plaintiff to primarily provide transportation for another Minister Kyungyul Han until around May 2018. (Nam Decl. ¶¶13;14).

On or around July 1, 2018, one of Permanent Mission's diplomatic staff Mr. Byung-Ho Cha (phenetic name) requested Plaintniff to sign another document, also labeled "Contract for

7

Employing a Chauffeur *[English translation]*" containing almost identical terms as the other Agreements had. However, the 2018 document reflected Minister Jungjae Lee as an employer and Plaintiff as *his* employee, although Plaintiff had not seen him at Permanent Mission nor was he aware of Minister Lee's existence/involvement. (Nam Decl. ¶21). Plaintiff actually began providing transportation for Minister Lee since on or around July 30, 2018 until April 2020. (Nam Decl. ¶¶22,23).

On October 2020, Counselor Jo requested Plaintiff to sign another document (back)dated July 1, 2020, reflecting Counselor Jo as an employer and Himself as his employee from July 1, 2020 to June 30, 2021. Counselor Jo demanded Plaintiff to sign the backdated "Down Contract" reflecting 20% reduction in monthly "base" pay because Plaintiff already passed the retirement age. However, Plaintiff did not enter into any agreement with Counselor Jo on that day. (Nam Decl. ¶38).

Regardless of the type of documents, Agreements, and/or Contracts Plaintiff was required to sign, Plaintiff had to work as long as the Permanent Mission's Ministers and Counselor required and at any time the diplomatic staff, their family members, friends, acquaintance, and even children's friends needed free transportation, personal shopper, and/or tour guide. (Nam Decl. ¶40).

The work Plaintiff performed for Permanent Mission and its diplomatic staff pursuant to his employment relationship(s) constitutes commercial rather than governmental activity. The Southern District "look[ed] beyond defendant's assertion that plaintiff was hired by the Mission to carry out the diplomatic affairs of Saudi Arabia," but instead "focus[ed] on the Mission's specific act of entering into an employment contract with plaintiff to perform research, writing, and clerical duties on its behalf." *Mukaddam v. Permanent Mission of Saudi Arabia*, 111 F. Supp. 2d 457 (S.D.N.Y. 2000)

The Court asserted that "private parties do not maintain a staff to articulate or carry out foreign policy," and defendant erroneously focused upon "the purpose behind plaintiffs employment rather than the Mission's specific conduct of employing her to perform the aforementioned duties." Id. "Because it is clear that private parties in the United States enter into such contracts routinely, the Court finds that Plaintiff's employment with the Mission was commercial, as opposed to governmental, activity. Id.

Accordingly, Plaintiff's employment relationship(s) with Defendants' were non-governmental in nature because such relationship and activity are regularly engaged by any private parties.

**b.  Defendants Utilized Plaintiff's Service Together With Their Family Members, Friends, Acquaintance, And Even Children's Friend, As Free Transportation, Personal Shopper, And/Or Tour Guide**

The FSIA defines a "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d).

When Plaintiff was employed at Permanent Mission as a chauffeur on June 28, 2016, Plaintiff was *supposed* to drive its diplomatic employees and supposed to be on-call and stand-by close to its diplomatic staff who requested transportation as needed. (Nam Decl. ¶¶7,8). Despite that, Plaintiff had to work as long as the Permanent Mission's Ministers and Counselor required and at any time the diplomatic staff, their family members, friends, acquaintance, and even children's friends needed free transportation, personal shopper, and/or tour guide. (Nam Decl. ¶40).

9

*(1) During Minister Bong-Woo Ko's term*

Since Plaintiff was employed by Permanent Mission on around June 28, 2016, and, he provided transportation primarily for Minister Ko until August 2017. My duties included but were not limited to, driving Minister Ko from the Official Residence located at 14 Homestead Road, Tenafly, New Jersey 07670 to Permanent Mission, providing transportation for him to attend meetings at restaurants, standing-by in the car near the meeting locations until he finished his business until around the end of August 2017. (Nam Decl. ¶13).

*(2) During Minister Kyungyul Han's Term*

Since in or around October 2017, Permanent Mission required Plaintiff to primarily provide transportation for another Minister Kyungyul Han until around May 2018. During that time, Minister Han used Plaintiff as a Permanent Mission's chauffeur and also his personal driver to run him and his family members' personal errands, providing free transportation services for his family members and his friends using the Permanent Mission's sedan. (Nam Decl. ¶14).

The instances are provided as follows:

On February 20, 2018, Minister Han requested Plaintiff to provide transportation for a belated "Valentine's Day Dinner" with his spouse. He directed Plaintiff to pick-up his spouse at 1125 Lexington and drive them to the restaurant located at 14 Christopher Street to celebrate their belated Valentine's Day. Minister Han required Plaintiff to wait in the sedan for an hour until they finished dinner. On that day, Minister Han utilized my service and Permanent Mission's sedan as his private transportation for approximately 4 hours from around 4:50 pm to 8:20 pm. (Nam Decl. ¶15).

On February 22, 2018, Minister Han requested Plaintiff to drive him to a restaurant, Casa Mono, and stand-by until he finished meeting with a real-estate agent. After their meeting, I had to drop

10

off Minister Han's real-estate agent friend near the Chelsea Art building located in W. 25th Street. (Nam Decl. ¶16).

On April 14, 2018, Minister Han utilized Permanent Mission's sedan and requested Plaintiff to provide transportation for him and his spouse to attend the real-estate agent friend's son's wedding located at 558 Grand Concourse. While he and his spouse were attending the event, I had to stand-by for approximately 5 hours from 4:30 pm to 9:20 pm in the sedan parked on the street one-block away from wedding-event location. (Nam Decl. ¶17).

On May 1, 2018, Minister Han requested Plaintiff to drive him to Whiskey Town located at 29 E. 3rd Street, New York NY 10003 to hang out with his acquaintance who visited him from Seoul, Korea before he returned. He requested Plaintiff to stand-by for over an hour in the sedan until he finished meeting with his acquaintance. The next day, Minister Han asked Plaintiff to drive him to Gemma to hangout with the same acquaintance again and made Plaintiff wait in the car until he finished the meeting. (Nam Decl. ¶18). Moreover, on numerous occasions, Minister Han utilized my service and Permanent Mission's sedan to drive his two daughters from/to Grand Central Station, JKF airport, and other social gathering places morning-and-night. (Nam Decl. ¶19).

*(3) During Minister Jungjae Lee's Term*

Since on or July 30, 2018, Permanent Mission required Plaintiff to primarily provide transportation for Minister Jungjae Lee until around April 2020. Like the former Minister Han, Minister Lee utilized Plaintiff's service as a Permanent Mission's chauffeur and also Minister Lee's personal driver to run his and his family members' personal errands, and providing free transportation services for his family members, friends, and acquaintances. Furthermore, Minister Lee also required Plaintiff's to drive his daughters' boyfriend and other friends and

utilized Plaintiff's service and Permanent Mission's official vehicle as his private transportation. At Minister Lee's direction, Plaintiff was used as his family members' and friends' personal shopper, wait-person, and tour guide. (Nam Decl. ¶23).

The instances are provided as follows:

On October 17, 2018, Plaintiff came to the Official Residence to pick up Permanent Mission's sedan and drive Minister Lee to Permanent Mission. On the way to Permanent Mission, Minister Lee requested him to stop at Minister Lee's friend's temporary residence at Knickerbocker Street located in Tenafly, NJ to pick up his friend named Mr. Jin-ju Koo (phonetic name) and his wife. After Plaintiff picked up his friends, Minister Lee told Plaintiff to drop him off at Permanent Mission and requested him to provide transportation for Mr. Koo's family using the official sedan as long as they needed. As Plaintiff was instructed by Minister Lee, he had to drive Mr. Koo's family to Pelham Bay and Split Rock Golf Courses and was required to stand-by for over 5 hours in the sedan from approximately 10:40 am to 4:45 pm while they were playing golf. Thereafter, they kept utilizing Permeant Mission's transportation for their personal business until around 7:10 pm on that day. (Nam Decl. ¶24).

On October 22, 2018, Minister Lee again requested Plaintiff to pick up Mr. Koo's family and directed Plaintiff to drive them to Royce Brook Golf Club. Minister Lee directed Plaintiff to stand-by until he finished playing golf with the Koo's family. Plaintiff had to stand-by from approximately 9:10 am to 3:40 pm near the golf course. When they got out of the golf course, Minister Lee instructed Plaintiff to drop him off at Permanent Mission and provide transportation for the Koo family thereafter. Just like the other day, Mr. Koo and his family utilized Permanent Mission's chauffeuring service for the entire day until 6:30 pm. (Nam Decl. ¶25).

On November 21, 2018, Minister Lee directed Plaintiff to drive Permanent Mission's sedan to the 42th Street/Port Authority bus terminal to pick up his two daughters and her boyfriend from Boston. (Nam Decl. ¶26).

On December 5, 2018, Minister Lee's wife utilized Plaintiff's service and Permanent Mission's sedan for over 2 hours to find the "*perfect clams*." Minister Lee required Plaintiff to drive his wife from one supermarket to another to assist in shopping for clams. At first, Minister Lee's wife directed Plaintiff to drive to Farm, the market located in Tenafly. She complained that Farm's clams were "too small" and told Plaintiff to drive her to H-Mart in Fort Lee. At the H-Mart, she complained that H-Mark's clams were "too big" and requested Plaintiff to drive her to Shoplite in Tenafly. *Again* at the Shoplite, she did not buy any clams because "none of the clams looked good." Minister Lee's wife directed Plaintiff to drive back to the first supermarket and purchased the smaller claims that she complained about in the beginning. (Nam Decl. ¶27).

On January 14, 2019 and January 15, 2019 Minister Lee utilized Plaintiff service and Permanent Mission's sedan to assist his sister-in-law to complete one of her "bucket lists." While she was visiting New York from Korea, Minister Lee requested Plaintiff to drive to Radio City Music Hall to provide transportation for his sister-in-law. Minister Lee requested Plaintiff to stand-by near the music hall until his sister-in-law finished watching a show. After Minister Lee's sister-in-law hopped in the sedan, she said that watching all of the Broadway shows were one of her "bucket lists." (Nam Decl. ¶28).

On February 21, 2019, Minister Lee requested me to drive his youngest *daughter's friend* from Springfield Summit to Morris Mall using the Permanent Mission's sedan. (Nam Decl. ¶29).

On March 11, 2019, Minister Lee requested Plaintiff to drive to the post office located in Tenafly for him to pick up his health supplements that he ordered from a store in Korea. (Nam Decl. ¶30).

On May 9, 2019, Plaintiff had to make an additional trip to the Official Residence in the sedan because Minister Lee's daughter left her sunglasses there. (Nam Decl. ¶32).

On October 31, 2019, Minister Lee used Plaintiff's service and the sedan to provide transportation for his friend's family to purchase a luxury bag. Moreover, Minister Lee and his friend's family requested Plaintiff to drive them to various places such as an Oyster Bar, Jazz Club, and hotel until 1:30 am the next day. (Nam Decl. ¶32).

On January 10, 2020, Minister Lee told Plaintiff to drive to JFK Terminal 4 to retrieve his daughter's lost I-Pad at Asiana Airline. At first, Minister Lee expressed his concern that he should not use Plaintiff's service and Permanent Mission's sedan to pick up his daughter's I-Pad at the airport, but he requested Plaintiff to do so anyway. Minister Lee required Plaintiff drive to the airport to retrieve the I-Paid. Plaintiff spent more than 2 hours to drive to the airport, park the sedan, walk to the Asiana Airline's desk to retrieve the I-Pad, and returned to Permanent Mission. Even after Plaintiff returned to Permeant Mission, Plaintiff had to run Minister Lee's personal errands and driver his daughters to various places from 1:00 pm to 4:30 pm. Minister Lee requested Plaintiff to drive him to a restaurant located in Fort Lee to eat with his daughters; to take to his youngest daughter to her dentist; to stand-by near the dentist office until she finished; to drive his daughters to Ipic Theaters in Fort Lee; and to drive back to Permanent Mission thereafter. (Nam Decl. ¶33).

On numerous occasions, Minister Lee requested Plaintiff to drive his youngest daughter to Sylvan Dental Care located in New Jersey for his daughter's braces. I had to stand-by near the dentist's office until she finished her braces treatment. (Nam Decl. ¶34).

*(4) Underlined During Minister Daeyong Chung's Term*

Since around November 2020, Minister Daeyong Chung also utilized my service and the sedan for his personal use just like the other former Ministers Han and Lee. (Nam Decl. ¶¶39,41).

On November 31, 2021, Minister Chung required Plaintiff to drive Minister Chung's family members and their friends to a shopping mall. Plaintiff was required to stand-by in the sedan until they finished shopping for a luxury bag in the Bottega store. (Nam Decl. ¶41; Dkt No. 32_**Exhibit C**). Furthermore, Minister Chung requested Plaintiff to drive Minister Chung to the Apple stores for the <u>sole </u>purpose of buying gifts for children. On numerous occasions Plaintiff drove to the Apple stores, located on 5th Avenue and near Grand Central Station, with Minister Chung and waited   near the stores until he returned to the sedan. (Nam Decl. ¶42).

Although Defendants employed Plaintiff as a Chauffeur to work for Permanent Mission and its staff, Plaintiff's actual duties performed were personal in nature. As such, the Court should consider the nature of Plaintiff's duties, and the actual work he performed during his employment.

**C.   <u>All of Plaintiff's Claims Should Survive Because Defendants' Alleged "Release" Has No Effect on the Viability of the Claims As Plaintiff Is Seeking for Damages That Were Occurred "During" His Employment</u>**

In Defendants' motion, they stated, "[a] translation of the release, originally written in Korean is as follows: The above two sides submit this agreement because they have agreed not to raise civil and criminal claims in the future **with respect to the termination of the employment relationship** of the local employee (Hyunhuy Nam) as of June 30, 2021. Dkt No. 24-2.

15

However, Plaintiff did not bring his claims against Defendants with respect to the "**termination**" of the employment relationship with Defendants. Instead, Plaintiff brought this action against Defendant Permanent Mission and its members for, among other claims, his unpaid wages and Defendants' discriminatory conduct occurred **during** the employment.

**During** Plaintiff's employment, Defendants did not pay him all the hours he worked. Even after Plaintiff was terminated, Defendants did not pay the severance pay that they promised to Plaintiff during my employment. (Nam Decl. ¶46). While Plaintiff worked for Permanent Mission, Minister Lee told Plaintiff that he needed to retire when he reached the age of 60 before and after he turned the age of 60. (Nam Decl. ¶36). Before Minister Lee left Permanent Mission in April 2020, he again told me that I should get out of Permanent Mission because my age reached the Korean retirement age of 60. (Id.). **During** Plaintiff's employment, Permanent Mission's Counselor requested him to sign the "Down Contract" reflecting 20% reduction in monthly "base" pay because Plaintiff already passed the retirement age. (Nam Decl. ¶38). Under emotional and financial pressure, Plaintiff reluctantly capitulated to Permanent Mission's Counselor's demand and signed the backdated Down Contract, but Plaintiff signed the Contract dated July 1, 2021 on October 2020. (Id.). Additionally, on few occasions since March 2021, Minister Chung asked Plaintiff, "*where are you going after your retirement [with Defendants]."* Again, in or around June 2021, Minister Chung told Plaintiff that he must leave by the end of June 2021 because I already passed the retirement age of 60. (Nam Decl. ¶43).

Regardless of Plaintiff's effort, time, hard-work **while** Plaintiff was serving the Ministers and Counselor, Defendants made it clear that they wanted Plaintiff to retire. Since in or before April 2020 when Plaintiff almost reached the age of 60, he began feeling increasingly insecure, unappreciated, and unwelcomed at work. (Nam Decl. ¶44). Despite that, Counselor Jo and Minister

16

Chung continuously pressured Plaintiff to retire during his employment regardless of his objection. (Id.). As such, Defendants' alleged agreement and/or release is not relevant to the nature of Plaintiff's claims. Even if the Court finds that the release is valid, the terms in the release have no effect on the viability of Plaintiff claims and all of his claims under the NYLL, NYSHRL, and NYCHRL should survive.

## I.     CONCLUSION

For the reasons stated above, the Court has Subject-Matter Jurisdiction under the Foreign Sovereign Immunities Act's Commercial Activity Exception and Defendants' Motion to Dismiss should be denied in its entirety.  The Defendant failed to establish that the FSIA is applicable to this case, as an exception to its general immunity applies, and no other grounds for dismissal have been substantiated.  Accordingly, it is the Plaintiff's right to move forward with this case and furthers the interests of justice.

Dated: October 25, 2021
         Flushing, NY 11354

Hang & Associates, PLLC

By:____/s/ *Diana Seo*_____
 Diana Y. Seo, Esq.
136-20 38th Avenue, Ste 10G
Flushing, NY 11354
(718) 353-8588
*Attorneys for Plaintiff*

17

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HYUNHUY NAM, | Case No.: 1:21-cv-06165-AJN |
| Plaintiff, | |
| v. | CIVIL ACTION |
| PERMANENT MISSION OF THE REPUBLIC OF KOREA TO THE UNITED NATIONS; HYUN CHO; JINHO JO; and DAEYONG CHUNG, | |
| Defendants. | |

**PLAINTIFF'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF**
**MOTION TO DISMISS PURSUANT TO RULE 12(b)(1) AND 12 (b)(6)**

On the brief:   Joshua S. Lim, Esq.
                Nicholas J. DuBois, Esq.
                Sean S. Kwak, Esq.
                Power J. Chen, Esq.

**A-133**

## **TABLE OF CONTENTS**

TABLE OF CONTENTS...................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. ii

I.   INTRODUCTORY STATEMENT ..................................................................... 1

II.   LEGAL ARGUMENT ......................................................................................... 5

   A.   Plaintiff's Declaration Cannot Cure Defective Complaint. ............................... 5

   B.   Plaintiff's Selected Authorities Fail to Support a Commercial Exception...................... 7

   C.   Weight of Authorities Strongly Rejects a Drivers' Commercial Exception. ................... 9

   D.   The Parties' Settlement Agreement Is Effective to Bar Suit......................................... 11

III.   CONCLUSION................................................................................................... 13

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

Adler v. Aztech Chas. P. Young Co., 807 F. Supp. 1068 (S.D.N.Y. 1992) .................................... 5

Ancile Inv. Co. v. Archer Daniels Midland Co., 992 F. Supp. 2d 316 (S.D.N.Y. 2014) ............. 13

Bardales v. Consulate Gen. of Peru in N.Y., 490 F. Supp. 3d 696 (S.D.N.Y. 2020) ........ 9, 10, 11

Conley v. Gibson, 355 U.S. 41 (1957)................................................................................... 6

DeLuca v. AccessIT Grp., Inc., 695 F. Supp. 2d 54 (S.D.N.Y. 2010) ........................................ 6

Figueroa v. Ministry for Foreign Affairs of Sweden, 222 F. Supp. 3d 304 (S.D.N.Y. 2016) ...... 10

Goodman v. Port Auth. of N.Y. & N.J., 850 F.Supp.2d 363 (S.D.N.Y. 2012) ............................. 6

Hijazi v. Permanent Mission of Saudi Arabia to UN, 689 F. Supp. 2d 669, 674–75
(S.D.N.Y. 2010) .................................................................................................. 10, 11

Holden v. Canadian Consulate, 92 F.3d 918 (9th Cir. 1996)........................................... 7, 8

In re Oneida, Ltd., 400 B.R. 384 (Bankr. S.D.N.Y. 2009), aff'd sub nom.
Peter J. Solomon Co., L.P. v. Oneida Ltd., No. 09-cv-2229 (DC), 2010 WL 234827
(S.D.N.Y. Jan. 22, 2010)....................................................................................... 13

Kato v. Ishihara, 360 F.3d 106 (2d Cir. 2004)........................................................ 8, 10

Kramer v. Time Warner, Inc., 937 F.2d 767 (2d Cir. 1991)............................................. 5

Laba v. Carey, 29 N.Y.2d 302 (1971)................................................................. 13

Lipper Holdings, LLC v. Trident Holdings, LLC, 1 A.D.3d 170
(N.Y. 1st Dep't App. Div. 2003) ........................................................................ 13

McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184 (2d Cir. 2007)................................. 6

Morlee Sales Corp. v. Manufacturers Trust Co., 9 N.Y.2d 16 (1961).......................... 13

New York v. Mountain Tobacco Co., 55 F.Supp.3d 301 (E.D.N.Y. 2014).................................... 6

Ocean Transp., Inc. v. American Philippine Fiber Indus., 743 F.2d 85 (2d Cir. 1984)............... 13

Old Colony Trust Co. v. Omaha, 230 U.S. 100 (1913) ............................................... 13

Raleigh Assocs. v. Henry, 302 N.Y. 467 (1951) ........................................................................... 13

Slatt v. Slatt, 64 N.Y.2d 966 (1985) .............................................................................................. 13

Swarna v. Al-Awadi, 622 F.3d 123 (2d Cir. 2010)......................................................................... 8

Swierkiewicz v. Sorema, N.A., 534 U.S. 506 (2002) ...................................................................... 6

Telebrands Corp. v. Del Labs., Inc., 719 F.Supp.2d 283 (S.D.N.Y. 2010) ..................................... 6

**Statutes**

28 U.S.C. § 1603(e) ........................................................................................................................ 4

28 U.S.C. §§ 1602, et seq................................................................................................................ 1

**Other Authorities**

H. Rep. No. 94–1487, 94th Cong., 2d Sess.,
reprinted at 1976 U.S. Code Cong. & Ad. News 6604 .................................................................. 7

**Rules**

Fed. R. Civ. P. 44.1 ...................................................................................................................... 13

The Permanent Mission of the Republic of Korea to the United Nations (hereinafter, the "Mission") and three of its diplomats, Hyon Cho, Jinho Jo, and Daeyong Chung (collectively, "Diplomats") (Diplomats and Mission, collectively, "Defendants"), by and through their counsel, the law offices of Kim, Cho & Lim, LLC, hereby respectfully submit this reply memorandum of law in further support of their motion for to dismiss the Complaint pursuant to Rule 12(b)(1) and 12(b)(6). Defendants filed the moving papers on September 30, 2021 and Plaintiff filed his opposition papers on October 26, 2021.

## I.   INTRODUCTORY STATEMENT

The defendants Permanent Mission of the Republic of Korea to the United Nations (here-inafter, the "Mission") and three of its diplomats, Hyon Cho, Jinho Jo, and Daeyong Chung (col-lectively, "Diplomats") (Diplomats and Mission, collectively, "Defendants") moved under Rule 12 of the Federal Rules of Civil Procedure to dismiss (DE24) the Complaint dated July 19, 2021 (DE1) filed by the plaintiff Hyunhuy Nam ("Nam' or "Plaintiff") under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602, to -11, and other legal theories. Under Rule 15(a)(1), Plaintiff was free to amend his Complaint without leave and to supply any additional allegations he may deem necessary or advisable to support his causes of action, and administratively terminate Defendants' motion.

However, pursuant to this Court's individual practices, Plaintiff affirmatively forewent his opportunity to amend his Complaint. See Letter from Diana Seo to Court dated October 6, 2021 (DE26) (advising Plaintiff's intention to rely on his original pleading). On October 26th, Plaintiff submitted a 47-paragraph Declaration of Hyunhuy Nam in Opposition of [Sic] Defendants' Motion to Dismiss (DE32) ("Nam Decl.") dated October 23, 2021, with exhibits (DE32-1 to -3) supplementing the allegations of his Complaint; plus a Memorandum of Law in Opposition to

1

Defendants' Motion to Dismiss (DE33) ("Opp. Br."), dated Oct. 25, 2021, largely repeating those allegations and leaving most of Defendants' key authorities unaddressed, in particular those pertaining to chauffeurs hired to serve a particular diplomatic post. Plaintiff does concede having been assigned an "official vehicle" and small office. Nam Decl. ¶ 8.

Unfazed by the holdings of those authorities as to the nature of the job, not the title, Plaintiff submits as **Exhibit A** "a true and correct copy of Permanent [sic] Mission's Employee Directory." Nam Decl. ¶ 7. The document does not appear to be a business or public record under Fed. R. Evid. 803(6) or (8), nor authenticated under Rules 901(a), 902(3), or (12), so its admissibility is doubtful at best.

If allowed, the heavily redacted document bears no such title (despite Plaintiff's capitalization) and is not dated. It appears to be some kind of informal contact or telephone number list divided for convenience with the headings "Diplomatic Staff [35]" and "Non-Diplomatic Staff [28]" (brackets in original). Plaintiff ostensibly submits **Exhibit A** (DE32-1) to display Mr. Nam's line-entry below the latter heading to prove that "Plaintiff's actual employment and the duties Plaintiff performed were commercial, rather than governmental [,]" Opp. Br. at 5, with no further foundation. Where Plaintiff's contact information may appear on a cheat sheet is hardly dispositive of commercial activities.

Plaintiff's **Exhibit B** appears on the docket as "# 2 Exhibit B_Revised Time Record". The three pages are handwritten in Hangul and untranslated, so cannot be considered on that basis alone.[1] Plaintiff's Declaration asserts these reflect overtime hours that "Minister Lee" allegedly "required [Plaintiff] to change the time to reflect reduced number of hours." Nam Decl. ¶ 35. These

---

[1] See Sicom S.P.A. v. TRS Inc., 168 F. Supp. 3d 698, 709 (S.D.N.Y. 2016) ("[B]ear in mind that foreign-language documents . . . cannot be reviewed or relied on by the Court, even if otherwise properly authenticated in the declaration to which they are attached, unless they are accompanied by certified translations into English.")

documents are not expressly referenced in his brief, although there is an allusion to "Certain Ministers even requir[ing] Plaintiff to alter time records to eliminate overtime." Opp. Br. at 2. The implication that an employee's manager or supervisor cannot disapprove hours submitted appears inherently implausible but, in this context, not indicative of "commercial" activity.

This exhibit appears to have been offered to bolster Plaintiff's allegations of more than a dozen episodes scattered over a two-year period from February 20, 2018, through January 10, 2020, Nam. Decl. ¶¶ 15-18, 20-33, and on "numerous occasions", id. ¶¶ 19, 34, that he claims were personal, not diplomatic in nature. The brief reiterates these, including in the first person ("On February 21, 2019, Minister Lee requested me to drive . . . ."), Opp. Br. at 13 (emphasis added), making particular emphasis on Minister Lee's spouse's search for "perfect clams," from a farm market to H-Mart and ShopRite, ibid., Nam. Decl. ¶ 27, taking pains to specify which vendor's mollusks were too small or too large. Whether these bivalves were for a diplomatic dinner or other use, Plaintiff fails to enlighten the reader, but implies these were commercial clams.

The ostensible purpose of **Exhibit B** is to support Plaintiff's further attempts to denigrate and embarrass the dignitaries and Mission with and for whom he previously worked, in furtherance of coercing a quick and favorable settlement of this action. As set forth herein, however, there is already an enforceable settlement between these parties from which Plaintiff is trying to run away. Plaintiff's Declaration is both impermissible and inflammatory and should be stricken and sealed.

**Exhibit C** to Mr. Nam's Declaration appears to be Plaintiff's smoking-gun: two color photographs of a neon plastic bag emblazoned with the logo of Bottega Veneta (a Gucci leather goods subsidiary) inside another plastic bag beneath another photograph of a side-view mirror of an automobile and what is identified as Defendant Chung from the rear, as seen through an entrance door to a parking area. As Plaintiff explains the exhibit:

3

> On November 31, 2021, Minister Chung required me to drive his family
> members and their friends to a shopping mall. I was required to stand-by in
> the sedan until they finished shopping for a luxury bag in the Bottega store.

Nam Decl. ¶ 41. There are a number of problems with this evidence, including the common

practice of reusing heavy plastic sacks. For one, of course, the date "November 31" does not exist

in the Gregorian calendar.[2] Assuming Plaintiff meant November 30, 2021, at this writing that date

lies is in the future. Further assuming Minister Chung did, in fact, visit a Bottega outlet in some

relevant time frame, Plaintiff fails to set forth in what way that visit comprised commercial conduct

by the South Korean government, and whether the purpose was a diplomatic gift, other consular

function, or the nature of the purchase at all.

Plaintiff's opposition submission misses the point that UN missions and other diplomatic

emissaries in foreign countries must dine, shop, and otherwise attend to the ordinary needs of life

for themselves and their expatriate family members. In the diplomatic context, they customarily

entertain guests and give gifts. Plaintiff's implication is that any activity other than transport to or

from the mission or United Nations headquarters is automatically commercial and, thus, a waiver

of sovereign immunity. As set forth in Defendants' moving brief, authorities have held it is not,

and hiring a dedicated driver for diplomatic staff promotes safety, security, and, in the instant case,

the comfort of conversing in Korean.

Plaintiff fails to explain under applicable authorities what commercial purpose the Mission

was purportedly advancing, or in what way the alleged "commercial activity carried on by such

state [has] substantial contact with the United States.'" 28 U.S.C. § 1603(e) (emphasis added)

(defining the term "commercial activity carried on in the United States by a foreign state"). It is

unreasonable as well as implausible to accord Plaintiff an inference that the Republic of Korea was

---

[2]   "Thirty days hath September, April June and November . . ." in the familiar child's verse.

4

running a taxi service by having its employee-driver offer occasional transportation for family members and associates of its Mission. Even Plaintiff does not suggest the Mission charged or profited from such routine duties in its official vehicle.

Plaintiff's opposition concludes with an argument speciously attempting to limit the scope of the Settlement Agreement executed by Plaintiff and Defendants. This is discussed below. As with Nam's other arguments, no basis is presented to let this case move forward.

## II.  LEGAL ARGUMENT

### A.  Plaintiff's Declaration Cannot Cure Defective Complaint.

Plaintiff affirmatively forewent the opportunity to amend his Complaint (DE-1) as of right under Rule 15(a)(1) of the Federal Rules of Civil Procedure, within 21 days following the filing of Defendants' motion to dismiss (DE-24). See Letter from Diana Seo to Court dated Oct. 6, 2021 (DE-26) (stating Plaintiff's intention to rely on the pleading under individual practice). An amendment without leave would have afforded Plaintiff ample opportunity to add such additional factual allegations he may deem necessary to survive Defendants' motion. Plaintiff now endeavors to bolster his Complaint and address its deficiencies with a 47-paragraph affidavit. Affidavits are prohibited for the purpose of curing the inadequacies of a complaint following a Rule 12 motion to dismiss.

> It is well settled that even where a plaintiff submits affidavits "containing factual allegations that might suffice to state a claim, . . . those affidavits are inadmissible to cure the defect in a complaint when deciding a motion to dismiss."

Adler v. Aztech Chas. P. Young Co., 807 F. Supp. 1068, 1072 (S.D.N.Y. 1992) (quoting Kramer v. Time Warner, Inc., 937 F.2d 767, 773 (2d Cir. 1991)); Telebrands Corp. v. Del Labs., Inc., 719 F.Supp.2d 283, 290 (S.D.N.Y. 2010) ("[A]ffidavits are inadmissible to cure a defect in the complaint on a motion to dismiss."); Goodman v. Port Auth. of N.Y. & N.J., 850 F.Supp.2d 363,

380 (S.D.N.Y. 2012) ("[M]emoranda and supporting affidavits in opposition to a motion to dismiss cannot be used to cure a defective complaint."); see also New York v. Mountain Tobacco Co., 55 F.Supp.3d 301, 315 (E.D.N.Y. 2014) ("[O]n a motion to dismiss, . . a plaintiff may not supplement a deficient pleading through additional facts contained in affidavits.").

The reasoning is grounded in time-honored principles of notice and opportunity to prepare a defense. As explained by the Second Circuit,

> [a] complaint provides a defendant with "notice of what the plaintiff's claim is and the grounds upon which it rests." Having received such notice, a defendant may conduct his trial preparation accordingly and is not required, based on the plaintiff's subsequent conduct in litigation, to anticipate future claims that a plaintiff might intend to pursue.

McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 201–02 (2d Cir. 2007) (quoting Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 512-14 (2002)) (citing Conley v. Gibson, 355 U.S. 41, 47 (1957)). Plaintiff's newly offered **Exhibits A-C**, but "extrinsic documents may be considered as part of the pleadings [only] if they either are (1) attached to the complaint; (2) incorporated into the complaint by reference; or (3) integral to the complaint." DeLuca v. AccessIT Grp., Inc., 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010). None of these apply here. Accordingly, Plaintiff's Declaration in opposition should be stricken and disregarded by the Court on Defendant's motion to dismiss. The viability vel non of this action should rise or fall on the four corners of Plaintiff's Complaint alone.

Moreover, Nam's Declaration is patently designed to place the individual Defendants in a bad light, portraying respected diplomats as bon vivants, partying on the public purse of their homeland. His Declaration mimics the Complaint's effort to allege dalliances and worse. Plaintiff's doubling down on his smear campaign goes beyond ingratitude to the officials who admittedly extended his employment beyond Korea's time-honored retirement age during the pandemic. It is a veritable shakedown for cash to make the attacks stop.

Defendants respectfully beseeches the Court to seal, as well as strike Plaintiff's Declaration, and to redact those portions of his brief echoing the allegations in the Declaration.

**B.  Plaintiff's Selected Authorities Fail to Support a Commercial Exception.**

Plaintiff's opposition fails to address, much less distinguish, Defendants' cited authorities regarding similarly situated diplomatic stations confronting chauffeurs' complaints arising from their employment and driving duties. Plaintiff relies on inaccurate, inapplicable, or obsolete law to draw a distinction between strictly diplomatic personnel authorized to speak for their sending governments, and everyone else. For example, Plaintiff quotes Holden v. Canadian Consulate, 92 F.3d 918 (9th Cir. 1996), as follows:

> For purposes of determining "commercial activity" under FSIA, foreign sovereign's employment of diplomatic, civil service or military personnel is governmental, and employment of other personnel is commercial.

Opp. Br. at 6. There are at least two problems with Plaintiff's argument. First, the text reproduced within quotation marks appears nowhere in the decision.[3] Second, the Second Circuit has refused to follow Holden in this regard:

> We therefore decline to adopt the approach to the "civil service" language of the House Report of the FSIA, taken by the District Court, that relies on whether certain familiar indicia of "civil service" are present.

---

[3]   Defendants speculate that Plaintiff intended the following passage:
> We adopt the standard suggested by the legislative history, that is, employment of diplomatic, civil service or military personnel is governmental and the employment of other personnel is commercial. Because private parties cannot hire diplomatic, civil service or military personnel, such hiring is necessarily governmental.

Holden, 92 F.3d at 921 (referring to H. Rep. No. 94–1487, 94th Cong., 2d Sess. at 16, reprinted at 1976 U.S. Code Cong. & Ad. News 6604, 6615) (the "House Report").

7

Kato v. Ishihara, 360 F.3d 106, 114 (2d Cir. 2004) (citing Holden, 92 F.3d at 921) (other citations

omitted). In a further argument, Plaintiff points to this Circuit's decision in Swarna v. Al-Awadi,

622 F.3d 123 (2d Cir. 2010):

> The Second Circuit's description of the commercial activity
> exception in Swarna is particularly instructive: [T]o determine the
> applicability of the commercial activity exception, we ask not
> whether the foreign government is acting with a profit motive or
> instead with the aim of fulfilling uniquely sovereign objectives but
> rather whether the particular actions that the foreign state performs
> (whatever the motive behind them) are the type of actions by which
> a private party engages in trade and traffic or commerce.

Opp. Br. at 6 (citing Swarna, 622 F.3d at 147). Defendants agree Swarna is instructive but using

a converse analysis. Vishranthamma Swarna was employed as a domestic servant in the home of

the Third Secretary to the Permanent Mission of the State of Kuwait to the United Nations in New

York. Swarna, 622 F.3d at 128. The diplomat confiscated her passport and visa, placing them in

the Kuwaiti Mission. Ibid. Her duties occasionally involved cooking for Kuwaiti Mission guests

late into the night and teaching other Mission employees' domestics how to cook traditional

Kuwaiti dishes, including at the Mission. Id. at 129. It suffices to say Swarna suffered horrific

abuse at the hands of the Third Secretary and his wife. See id. at 128-30. At some point, the

diplomat and spouse left for abroad, and Swarna was able to escape, tell a "driver of her ordeal

and was taken to a temple where she could find refuge." Id. at 130. She then sued the individuals

and Kuwaiti Mission under the commercial activity exception given her nondiplomatic duties on

behalf of an official. See id. at 131.

Even in this extreme case, the Second Circuit "reject[ed] Swarna's claim that the

commercial activity exception applies to pierce Kuwait's sovereign immunity." Id. at 148. Her

occasional cooking and domestic services in support of Mission events, its employees, or their

servants were insufficient to support a waiver.

Conversely, in the instant case, Nam's duties were primarily in support of the diplomatic staff as a direct employee. His occasional forays to malls or restaurants limited to Mission staff, families or associates could not support a finding of commercial activity by their nature.

## C.  <u>Weight of Authorities Strongly Rejects a Drivers' Commercial Exception.</u>

Defendants will rely on their moving brief and its authorities regarding chauffeurs and similar support personnel, as Plaintiff has not refuted or shown them to be inapposite. By way of a further precedent, Defendants would cite to the recent decision regarding another diplomatic driver in <u>Bardales v. Consulate Gen. of Peru in N.Y.</u>, 490 F. Supp. 3d 696 (S.D.N.Y. 2020). The <u>Bardales</u> decision makes a well-reasoned application and overview of Second Circuit jurisprudence in this subject.

Juan Carlos Bardales was hired by the Consulate in 2013 "as part administrative customer service, and part personal assistant" to the former Consul General of Peru, Mario Teresa Merino Villaran de Hart ("Merino"), <u>id.</u> at 698, but alleged "that the majority of his time from 2013 to 2015 was spent chauffeuring or running errands for Merino and her family and friends", <u>id.</u> at 702. Bardales "complained that he was required to work extra hours without overtime pay, noting that he worked in excess of 40 hours a week" 60% of which was for Merino. <u>Id.</u> at 699. Bardales sued the Consulate as well as its Ambassador. In an echo of the case at bar,

> Bardales describes the work he performed for Merino as "personal" in nature. He alleges he drove her "to the gym, the supermarket and to clothing stores" and "chauffeur[ed]" her children, friends, and other relatives "when they were in New York City ... so they could enjoy various tourist attractions." Bardales alleges that approximately 60% of the individuals he chauffeured did not work on behalf of the Consulate.
>
> Bardales alleges he never received overtime pay, only a fixed monthly salary, despite exceeding the hours he was expected to work regularly. Bardales was never asked to "clock in" or to use any other formal method to account for his hours. By virtue of his

9

> chauffeuring work for Merino, Bardales additionally "incurred
> expenses including, but not limited to, parking, parking tickets, tolls
> and gas." To obtain reimbursement for these expenses, Defendants
> allegedly required Bardales to "sign a false receipt stating that the
> reimbursement was in fact for overtime pay."

Ibid. (alteration in original) (citations to record omitted). The Court found that where claims arise

from an employment relationship with a sovereign entity, the commercial activity exception could

only apply where the employment relationship was commercial in nature. Id. at 701 (citing

Figueroa v. Ministry for Foreign Affairs of Sweden, 222 F. Supp. 3d 304, 311 (S.D.N.Y. 2016)).

In further reliance on Figueroa, the Bardales court noted that Kato

> "require[s] two inquiries in employment cases: First, 'whether the
> activity to which the plaintiff's employment was directed is
> governmental'; and second, 'whether the plaintiff's employment
> relationship was sufficiently intertwined with that activity to provide
> that the employment relationship itself was part of the governmental
> function.'"

Id. at 702 (quoting Figueroa, 222 F. Supp. 3d at 313) (internal quotation to Hijazi v. Permanent

Mission of Saudi Arabia to UN, 689 F. Supp. 2d 669, 674–75 (S.D.N.Y. 2010)). The Bardales

court had little trouble under Kato and subsequent decisions that "the focus of the inquiry ought to

be on the employer's general actions[.]" Ibid. (quoting Hijazi, 689 F. Supp. 2d at 674 (emphasis

in Bardales); Under Kato, it considered whether the "activities in New York were typical of a

private party engaged in commerce." Ibid.  (quoting Kato, 360 F.3d at 111) It found "[t]he

employer's actions here were the operation of a consulate, plainly diplomatic, and therefore

governmental", and therefore immune. Ibid. (quotation omitted). That was notwithstanding that

> Bardales was not a diplomat or a policy advisor, whose work clearly
> is intertwined sufficiently with the Peruvian Consulate's
> governmental activities, but also, he was not a "purely clerical staff"
> member who more easily fall "within the commercial activity
> exception."

Ibid. (quoting Hijazi, 689 F. Supp. 2d at 675). The allegations and evidence did not show that "Bardales spent a significant amount of his time as a personal assistant/chauffeur, let alone a majority of his time, on these more personal tasks. . . . [and] a significant portion of these non-chauffeuring duties were intertwined with the Consulate's governmental function." Id. at 704-05. The Bardales court concluded that because the plaintiff spent extensive time driving officials to official destinations, together with certain customer-service work, "the employment relationship here was non-commercial in nature and thus, [] the Consulate is entitled to immunity under the FSIA." Id. at 705.

Finally, the Bardales court determined that the individual consular defendant was similarly immune. Because the work of a personal nature for the Ambassador was performed "pursuant to his contract with the Consulate . . . . Merino's consular function of managing Consulate employees is implicated here, and the wrongful payment-related actions she allegedly took, are in furtherance of this function. Accordingly, Merino is entitled to immunity" too. Id. at 707. If 60% of Bardales's time spent as a personal driver and tour guide as a "chauffer" does not waive sovereign immunity, Plaintiff Nam's dozen-plus trips, even if credited, paid by the Mission under the parties' contract fall woefully short of a waiver of sovereign immunity under the FSIA.

### D.  The Parties' Settlement Agreement Is Effective to Bar Suit.

Lastly, Plaintiff does not refute but attempts to engraft an exception upon the Settlement Agreement signed by him and the Mission. See Settlement Agreement dated Sept. 1, 2020, annexed as Exhibit B to the Declaration of Jinho Jo in Support of Defendants' Motion for Sanctions, dated Sept. 3, 2021 (DE 24-7). A simple, single-page document, it states that

> [t]he above two sides submit this agreement because they have agreed not to raise civil and criminal claims in the future with respect to the termination of the employment relationship of the local employee (Hyun-Hee Nam) as of June 30, 2021.

11

Id. Plaintiff now makes the novel argument that the Settlement Agreement is inapplicable because it purportedly pertains only to "the 'termination' of the employment relationship with Defendants"; i.e., not to any claims that "occurred during the employment", and that the Complaint pertains only to events occurring while Nam in the Mission's employ. Opp. Br. at 16-17 (emphasis omitted).

Plaintiff cites no legal authority to support this distinction without a difference, and Defendants decline to do so in his stead. The argument lacks merit on its face.

Certainly, retirement at or after age 60 pursuant to Korean custom pertains to the "termination" of Nam's employment, not to events "during" the course of it. This does not conclude the inquiry, however.

It is not disputed that the Settlement Agreement was executed by the parties, and that happened on the first of September of 2020, about ten months before the "termination" of Plaintiff's employment. So, is Plaintiff arguing is that the Mission offered Nam money for the right to still be sued for whatever happened before or "during" the nearly year remaining of his employment?

Assuming, arguendo, New York domestic law governs this contract, Plaintiff's dubious construction should fail under standard principles of construction.

> In adjudicating the rights of parties to a contract, courts may not fashion a new contract under the guise of contract construction rather, they are required to discern the intent of the parties, "'to the extent that [the parties] evidenced what they intended by what they wrote'".

Slatt v. Slatt, 64 N.Y.2d 966, 967 (1985) (citing Morlee Sales Corp. v. Manufacturers Trust Co., 9 N.Y.2d 16, 19 (1961)) (quoting Laba v. Carey, 29 N.Y.2d 302, 308 (1971) (internal quotation to Raleigh Assocs. v. Henry, 302 N.Y. 467, 473 (1951)). Plaintiff's interpretation of the Settlement Agreement would not only have the Court give effect to a new contract, but the resulting new

agreement's terms also would be absurd and in conflict with any reasonable expectations of the

Mission.

> Moreover, "[a] contract should not be interpreted to produce a result
> that is absurd, commercially unreasonable or contrary to the
> reasonable expectations of the parties." "The parties' interpretation
> of the contract in practice, prior to litigation, is compelling evidence
> of the parties' intent."

In re Oneida, Ltd., 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009) (quoting Lipper Holdings, LLC v.

Trident Holdings, LLC, 1 A.D.3d 170, 171 (N.Y. 1st Dep't App. Div. 2003) (internal citations

omitted) and Ocean Transp., Inc. v. American Philippine Fiber Indus., 743 F.2d 85, 91 (2d Cir.

1984) (internal quotation to Old Colony Trust Co. v. Omaha, 230 U.S. 100, 118 (1913)), aff'd sub

nom. Peter J. Solomon Co., L.P. v. Oneida Ltd., No. 09-cv-2229 (DC), 2010 WL 234827 (S.D.N.Y.

Jan. 22, 2010).

If Plaintiff contends this agreement is construed under South Korean law, and that such

law dictates his desired result, the argument still fails for want of notice. See Fed. R. Civ. P. 44.1

("A party who intends to raise an issue about a foreign country's law must give notice by a pleading

or other writing."). And "[c]ourts will dismiss claims resting on the application of foreign law

where the party advancing the claim fails to provide authority for their interpretation of the law."

Ancile Inv. Co. v. Archer Daniels Midland Co., 992 F. Supp. 2d 316, 321 (S.D.N.Y. 2014).

As such, Defendants respectfully submit that Plaintiff has advanced no argument sufficient

to vitiate the Settlement Agreement he freely signed.

### III. CONCLUSION

For the foregoing reasons, Defendants Permanent Mission of the Republic of Korea to the

United Nations, Hyon Cho, Jinho Jo, and Daeyong Chung respectfully request the Court grant

their motion to dismiss the Complaint in its entirety, with prejudice.

13

**A-149**

Dated: November 8, 2021

Respectfully submitted,

__/s/ Joshua S. Lim_____
Joshua S. Lim
**Kim, Cho & Lim, LLC**
163-10 Northern Boulevard, Suite 202
Flushing, New York 11358-2652
(t) 718.539.7400
(f): 201.585.7422
joshualim@kcllawfirm.com
*Attorneys for Defendants*

14

**A-150**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1/21/22

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

Hyunhuy Nam,

Plaintiff,

–v–

Permanent Mission of the Republic of Korea to the United
Nations, *et al.*,

Defendants.

---

21-cv-06165 (AJN)

MEMORANDUM
OPINION & ORDER

ALISON J. NATHAN, District Judge:

Plaintiff Hyunhuy Nam ("Nam") brings this action against his former employer alleging

violations of the Fair Labor Standards Act ("FLSA"), New York Labor Law ("NYLL"), the New

York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law

("NYCHRL"). Defendants Permanent Mission of the Republic of Korea to the United Nations

("Permanent Mission"), Hyun Cho, Jinho Jo, and Daeyong Chung (collectively, "Defendants")

are a foreign mission and its diplomatic staff. Compl. ¶¶ 4–15, Dkt. No. 11. Defendants move to

dismiss the complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter

jurisdiction, invoking the Vienna Convention on Diplomatic Relations ("VCDR") and the

Foreign Sovereign Immunities Act ("FSIA"). In the alternative, they move to dismiss under Rule

12(b)(6) because Nam previously released his claims against Defendants. For the reasons that

follow, that motion is GRANTED IN PART AND DENIED IN PART.

I.    BACKGROUND

A.  Factual Summary

1

The following facts are taken from Plaintiff's complaint. Nam is a 61-year-old permanent resident of the United States who lives in New Jersey. Compl. ¶ 25. Defendant Permanent Mission is a foreign consulate located in Manhattan. *Id.* ¶ 4. Defendant Hyun Cho ("Cho") serves as Ambassador of the Permanent Mission and Defendants Jinho Jo ("Jo") and Dayong Chung ("Chung") serve as Counselor and Minister respectively (collectively, "Individual Defendants"). *Id.* ¶¶ 4–15.

After responding to an online job advertisement placed by the Permanent Mission, Nam was hired by Defendants in 2016. *Id.* ¶¶ 35–36. Nam was responsible for driving members of the Permanent Mission staff and their families or guests in a vehicle owned by the Mission. *Id.* ¶¶ 38, 41, 47. Though Nam's official title was Chauffeur/Administrative Assistant, Nam states that he worked only as a chauffeur or driver for the Permanent Mission and its staff. *Id.* ¶ 37. Defendants characterize Nam as a "member[] of the staff of the mission in the domestic service of the mission." Defendants' Memorandum in Law in Support of Motion to Dismiss ("Defs. Br.") at 11 (quoting VCDR, art 1(g), Apr. 18, 1961, 23 U.S.T. 3227). Defendants do not proffer that Nam had any other responsibilities beyond that of a driver. Nam alleges that during his employment, Defendants underpaid him and pressured him to retire when he reached the age of 60. *See* Compl. ¶¶ 67–100. On September 1, 2020, Nam signed a "Settlement Agreement" with Jo. *Id.* ¶ 94. The agreement stated that Nam would "not . . . raise civil and criminal claims in the future with respect to the termination of the employment relationship . . . as of June 30, 2021." Translated Settlement Agreement at 3, Dkt. No. 24-7. Nam's employment was ultimately terminated on June 30, 2021. Compl. ¶ 100.

**B. Procedural History**

On July 20, 2021, Nam filed a complaint against Defendants alleging multiple violations of federal, state, and city employment law. Dkt. No. 11. As to his compensation, he brings claims of unpaid overtime under the FLSA and the NYLL as well as unpaid promised wage, unpaid spread-of-hours wages, and wage notice and wage statement violations under the NYLL. He also brings age discrimination and hostile work environment claims under both the NYSHRL and the NYCHRL.

On September 30, 2021, Defendants moved to dismiss the case pursuant to Rule 12(b)(1), arguing that they are shielded by sovereign immunity under the VCDR and the FSIA. Defs. Br. In the alternative, Defendants move to dismiss under Rule 12(b)(6), arguing that the signed settlement agreement between the parties precludes liability. *Id.* The motion is fully briefed. Defs. Br., Pl. Br., Dkt. No. 33, Defs. Reply, Dkt. No. 41.

On December 13, 2021, Defendants filed a motion to stay discovery pending resolution of their motion to dismiss.  Dkt. No. 48.  After full briefing, the Court denied that motion to stay. Dkt. Nos. 56, 60.

## II.   LEGAL STANDARD

When confronted with a motion to dismiss under both Rule 12(b)(1) and 12(b)(6), a court must first consider the Rule 12(b)(1) challenge because if it dismisses the complaint for lack of subject matter jurisdiction, "the accompanying defenses and objections become moot and do not need to be determined." *Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990) (citation omitted).

As to the Individual Defendants, diplomatic immunity is governed by the Vienna Convention on Diplomatic Relations. *Broidy Cap. Mgmt. v. Benomar*, 944 F.3d 436, 441 (2d Cir.

2019).[1] "Diplomatic agents," a term that includes "the head of the mission" and "member[s] of the diplomatic staff of the mission," receive broad immunity. *Id.* at 442 & n.3 (quoting VCDR, art. 1(e)). Only "limited exceptions" can abrogate that immunity. *Tachiona v. United States*, 386 F.3d 205, 215 (2d Cir. 2004). In this circuit, "the plaintiff must prove by a preponderance of the evidence that an exception to diplomatic immunity applies." *Broidy*, 944 F.3d at 443.

As to the Permanent Mission, "a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993). The FSIA is the only act that provides for exceptions from foreign sovereign immunity. *Pablo Star Ltd. v. Welsh Gov't*, 961 F.3d 555, 559 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 1069 (2021).

This case concerns the commercial-activity exception of the FSIA. That exception abrogates immunity when the controversy is "based upon a commercial activity carried on in the United States by the foreign state." 28 U.S.C. § 1605(a)(2). The Supreme Court instructs that "a state engages in commercial activity . . . where it exercises only those powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns." *Nelson*, 507

---

[1] Article 31 of the VCDR provides in relevant part:

> (1) A diplomatic agent shall enjoy immunity from the criminal jurisdiction of the receiving State. He shall also enjoy immunity from its civil and administrative jurisdiction, except in the case of:
> > (a) a real action relating to private immovable property situated in the territory of the receiving State, unless he holds it on behalf of the sending State for the purposes of the mission;
> > (b) an action relating to succession in which the diplomatic agent is involved as executor, administrator, heir or legatee as a private person and not on behalf of the sending State;
> > (c) an action relating to any professional or commercial activity exercised by the diplomatic agent in the receiving State outside his official functions.

U.S. at 360 (cleaned up). A foreign sovereign's motives are immaterial to this analysis. *Republic of Arg. v. Weltover, Inc.*, 504 U.S. 607, 614 (1992). "Instead, courts ask whether 'the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in 'trade and traffic or commerce.'" *Pablo Star Ltd. v. Welsh Gov't*, 378 F. Supp. 3d 300, 308 (S.D.N.Y. 2019), *aff'd*, 961 F.3d 555 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 1069 (2021) (quoting *Nelson*, 507 U.S. at 360–61).

A foreign state employer-employee relationship can be "commercial" depending upon the context. *Kato v. Ishihara*, 360 F.3d 106, 111 (2d Cir. 2004). "The question courts must ask when evaluating whether a particular employee is engaged in public acts or instead in commercial activity is 'whether [his] activities . . . were typical of a private party engaged in commerce.'" *Mourmouni v. Perm. Mission of Republic of S. Sudan to U.N.*, No. 20-CV-3603 (JPO), 2021 WL 4461829, at *2 (S.D.N.Y. Sept. 28, 2021) (quoting *Kato*, 360 F.3d at 111). "If there is 'nothing quintessentially governmental' about the employee's work . . . the commercial exception applies and U.S. courts may adjudicate the employee's claims." *Id.* (quoting *Pablo Star*, 961 F.3d at 564). If, however, the employee is a "civil servant" or a "*bona fide* public servant," their employment falls outside the scope of the commercial-activity exception. *Pablo Star*, 961 F.3d at 563–64.

This exception also requires that the commercial activity has "substantial contact with the United States." 28 U.S.C. § 1603(e). The exact contours of this standard are "poorly defined." *Pablo Star*, 961 F.3d at 563–64. But "it is clear that Congress intended a tighter nexus than the minimum contacts standard for due process." *Shapiro v. Republic of Bol.*, 930 F.2d 1013, 1019 (2d Cir. 1991).

Once the plaintiff makes an initial showing that an exception to sovereign immunity applies, the defendant "bears the burden of proving, by a preponderance of the evidence, that the alleged exception does not apply." *Pablo Star*, 961 F.3d at 559. In resolving this jurisdictional dispute, the court may not construe disputed issues of fact in favor of one party or another. *Id.*

Additionally, to survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Granting a motion to dismiss is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Id.* at 558. An affirmative defense of release may be raised under a Rule 12(b)(6) motion to dismiss provided that "all relevant facts are shown by the court's own records." *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005). The Court may consider only the allegations in the complaint, documents attached to the complaint as an exhibit or incorporated in it by reference, matters of which judicial notice may be taken, or "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)).

## III.   DISCUSSION

### A.  Individual Defendants are Entitled to Immunity

As Ambassador, Counselor, and Minister of the Permanent Mission, each of the Individual Defendants is entitled to immunity under the VCDR given their uncontested status as diplomatic agents. Defs. Br. at 7; *see Broidy*, 944 F.3d at 442. Nam, having failed to argue that an exception to the Individual Defendants' diplomatic immunity applies, has not proven by a preponderance of the evidence that an exception applies. Therefore, the Individual Defendants

6

are entitled to immunity and dismissed from the action. *See Mourmouni*, 2021 WL 4461829, at

*1.

**B. The Commercial-Activity Exception to Sovereign Immunity Applies to the Permanent Mission**

The remaining Defendant, the Permanent Mission, is not entitled to sovereign immunity

because the commercial-activity exception applies. Defendants dispute that Nam's "driving

activities" included errands or trips beyond those "in service of the Mission, its Diplomats, staff,

and their families." Defs. Br. at 11. But even assuming that Nam's work was limited in such a

manner does not place this employer-employee relationship outside the commercial-activity

exception. The hiring, employment, and termination of a chauffeur is not a "power[] peculiar to

sovereigns." *Nelson*, 507 U.S. at 360. Rather, "[e]very aspect of the [sovereign's] *conduct* that

forms the basis of [Nam's] claim could have been done by a private party for commercial gain."

*Pablo Star*, 961 F.3d at 564. The employment of a chauffeur is more analogous to the

employment of "laborers, [or] clerical staff"—which constitute commercial activity—than the

employment of "diplomatic, civil service, or military personnel"—which is quintessentially

governmental. *Kato*, 360 F.3d at 110 (quoting H.R. Rep. No. 94–1487, at 16 (1976), *reprinted in*

1976 U.S.C.C.A.N. 6604, 6615); *see also Zveiter v. Brazilian Nat. Superintendency of Merch.*

*Marine*, 833 F. Supp. 1089, 1093 (S.D.N.Y. 1993) (Sotomayor, J.) (reviewing the FSIA's

legislative history to conclude that the employment of a secretary by a foreign state is

commercial). The Court is mindful that foreign sovereigns may structure civil service differently

than the United States, but Defendants' characterization of Nam as a "member[] of the service

staff" cannot elevate him to the status of a *bona fide* public servant when, at present, Defendants

have not proffered that Nam had responsibilities beyond chauffeuring. Defs. Br. at 11; *Kato*, 360

F.3d at 114 (instructing that the FSIA "should be interpreted to include the broad range of civil

service employment relationships used by countries other than the United States."). The Court

concludes that Nam was not employed in a quintessentially governmental capacity.

That conclusion is consistent with a recent decision in this district that involved virtually

identical facts and claims. There, two chauffeurs alleged violations of the FLSA and the NYLL

against their employer, the Permanent Mission of the Republic of South Sudan and its Deputy

Permanent Representative. *Mourmouni*, 2021 WL 4461829, at *1. Defendants moved to dismiss

on sovereign-immunity grounds. *Id.* The court granted the motion as to the individual

representative but denied the motion as to the permanent mission, applying the commercial-

activity exception. *Id.* at *3. The court reasoned that the plaintiffs' work was not

"quintessentially governmental" because it was "limited to the [ordinary] tasks of driving the

Permanent Mission's staff and their families, delivering packages, and maintaining the

Permanent Mission's vehicles." *Id.* at *2–3. In that situation, "the work performed by a chauffeur

for a permanent mission 'is activity that could be, and in fact regularly is, performed by private-

sector businesses,' such as car services and corporations employing in-house executive

chauffeurs." *Id.* at *3 (quoting *Pablo Star*, 961 F.3d at 559). "There is no basis for granting a

foreign state immunity for its exploitation of chauffeurs whose work is important but no different

from work performed in the private sector." *Id.*

To be sure, several earlier decisions in this district have reached the opposite conclusion

on similar facts. *See, e.g.*, *Figueroa v. Ministry of Foreign Affs. of Swed.*, 222 F. Supp. 3d 304

(S.D.N.Y. 2016); *Bardales v. Consulate Gen. of Peru in N.Y.*, 490 F. Supp. 3d 696 (S.D.N.Y.

2020). But like the court in *Mourmouni*, this Court declines to follow those cases. In *Figueroa*,

for example, the court found that "transportation responsibilities as a chauffeur at the Mission

were sufficiently intertwined with the diplomatic function of the Mission such that the

8

employment itself was part of the defendants' sovereign function." *Figueroa*, 222 F. Supp. 3d at 315. But, as *Mourmouni* observed, that case is distinguishable on its "exceptional" facts because the chauffeur in question was responsible for driving members of Sweden's royal family. *Mourmouni*, 2021 WL 4461829, at *3 ("It is within reason to believe that driving literal royalty through New York City is materially distinguishable from the work of the average Uber or Lyft driver.").

More importantly, the *Figueroa* court did not have the benefit of the Second Circuit's reasoning in *Pablo Star* decided four years after. In *Pablo Star*, the Second Circuit clarified that a court's inquiry in applying the commercial-activity exception turns on the activity's "outward form" (in that case, the "unauthorized use of photographs on promotional websites") as opposed to the *purpose* of the sovereign's activity (in that case, promoting tourism to the foreign country). 961 F.3d at 564–65. That the unauthorized use of a photograph "was done by a government body pursuant to its statutory authority in order to promote tourism, rather than to make a profit, goes to the activity's *purpose* rather than its 'outward form.'" *Id.* at 564 (emphasis added). The reasoning in *Figueroa* hinged on the mission's purpose in employing a chauffeur ("the safe transport of Swedish dignitaries") as opposed to the conduct's outward form (the employment of a driver). 222 F. Supp. 3d at 315. This reliance on "a very broad characterization of the activity" incorrectly "conflate[s] the act with its purpose." *Pablo Star*, 961 F.3d at 562. Such a broad characterization elucidates the reasons for the sovereign's actions, but "not what it did to accomplish its goals." *Id.* at 562. Take, for example, the employment of a secretary. Even if the secretary is employed to further the mission of the foreign state, that employment would fall into the commercial-activity exception because "the foreign sovereign enters the marketplace and acts just as a private party would [to employ the secretary]." *Zveiter*, 833 F. Supp. at 1093.

The *Bardales* court relied heavily on the reasoning in *Figueroa* and concluded that a plaintiff's employment that included, but was not limited to, chauffeuring duties, was not commercial. *Bardales*, 490 F. Supp. 3d at 705. That plaintiff had responsibilities apart from chauffeuring, including "actually provid[ing] consular services, and serv[ing] as a direct representative of the Consulate," all of which, the court found, "went beyond . . . clerical tasks." *Id.* at 703. Thus, on its facts, *Bardales* is distinguishable because Nam alleges that he worked only as a chauffeur. To the extent that *Bardales* concluded that chauffeuring itself is quintessentially governmental in nature, this Court disagrees, finding it inconsistent with *Pablo Star*.[2]

Once a court determines that the conduct was commercial, it must also determine if the activity had "substantial contact with the United States." 28 U.S.C. § 1603(e). The court concludes that the conduct alleged in the complaint—including the hiring, employment, and termination of a driver over the span of approximately five years in New York and New Jersey— meets the standard for substantial contact. *See, e.g.*, *Everard Findlay Consulting, LLC v. Republic of Surin.*, 831 F. App'x 599, 601 (2d Cir. 2020) (finding substantial contact when many aspects of a contract were negotiated in, performed in, and targeted the United States); *Pablo Star*, 961 F.3d at 565 (finding substantial contact when "the Welsh Government played an active role in the United States in the development and distribution in New York of promotional materials").

---

[2] Defendants also rely on *Crum v. Kingdom of Saudi Arabia*, which concluded that employing a chauffeur did not fall into the commercial-activity exception. No. 05-275, 2005 WL 3752271 (E.D. Va. July 13, 2005). Given that this out-of-circuit case does not account for *Pablo Star*, the Court does not find this case persuasive and declines to follow it.

10

**A-160**

Defendants assert that applying the commercial-activity exception here would "seriously infringe upon and impair the normal diplomatic balance" between the United States and foreign countries. Defs. Br. at 7. This argument, even if true, does not override the FSIA and the binding interpretation of its provisions. Moreover, "[c]ourts around the world have permitted embassy and consulate chauffeurs to bring cases under the restrictive theory of state immunity that the FSIA codifies." *Mourmouni*, 2021 WL 4461829, at *3. This ruling will not disturb international norms when "foreign courts would already allow chauffeurs employed by a U.S. embassy or consulate to bring claims relating to unlawful labor conditions." *Id.*

### C. The Settlement Agreement Does Not Release the Remaining Defendants from Liability for the Claims At-Issue

Finally, the Court denies Defendants' motion to dismiss pursuant to Rule 12(b)(6). Defendants argue that the settlement agreement Nam signed was valid, enforceable, and bars all of his employment-related claims. Since such a reading of the agreement would contravene its plain language, the Court cannot interpret the settlement in that way.

The one-page settlement agreement bars Nam only from bringing claims "with respect to the *termination* of the employment relationship . . . as of June 30, 2021." Translated Settlement Agreement at 3 (emphasis added). But the claims Nam brought arise from conduct that occurred during the course of his employment—like his wages, hours, and an allegedly hostile work environment—not from his termination. Nam does not bring, for example, a claim of wrongful termination or any claim related to the events of June 30, 2021, which, by the plain language of the agreement, would be barred. This Court disagrees with Defendants' characterization of the settlement agreement as "permissibly broad" enough to sweep in all or any of Nam's claims when it refers only "to the termination of the employment relationship." Defs. Br. at 16; *see Termination*, Black's Law Dictionary (11th ed. 2019) ("The complete severance of an employer-

11

employee relationship."); *cf. McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir. 1997)

(defining a wrongful-termination claim based on the circumstances of a plaintiff's discharge by

the employer). Even assuming that the settlement agreement was validly executed and is

enforceable, its text does not preclude Nam's claims. Therefore, the Court denies Defendants'

motion to dismiss on this basis.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED IN PART AND

DENIED IN PART. The Court dismisses Individual Defendants Cho, Jo, and Chung from the

action and denies the motion to dismiss claims against the Permanent Mission.

As previously ordered, the Court will hold a case management conference on April 15,

2022, at 3:15 p.m.

This resolves docket number 24.


SO ORDERED.

Dated: January 21, 2022
       New York, New York

_____
       ALISON J. NATHAN
       United States District Judge

**A-162**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HYUNHUY NAM,<br><br>                              Plaintiff,<br><br>v.<br><br>PERMANENT MISSION OF THE REPUBLIC OF KOREA TO THE UNITED NATIONS; HYUN CHO; JINHO JO; and DAEYONG CHUNG,<br><br>                              Defendants. | Case No.: 1:21-cv-06165-AJN<br><br><br>CIVIL ACTION<br><br>**ANSWER** |

Defendant Permanent Mission of the Republic of Korea to the United Nations ("Mission"), by and through its attorneys, Kim, Cho & Lim, LLC, upon personal knowledge as to itself and upon information and belief as to other matters, answers the Complaint and allege as follows:

### PRELIMINARY STATEMENT

1.      Defendant admits only that Plaintiff purports to bring this action for certain alleged employment practices under the limitations and purported exceptions under the Foreign Sovereign Immunities Act ("FSIA"). Except as expressly admitted, Defendant denies the allegations set forth in the Complaint, ¶ 1.

2.      Defendant admits only that Plaintiff purports to bring this action for certain categories of damages under the Fair Labor Standards Act ("FLSA"), the New York Labor Law ("NYLL"), the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL"). Except as expressly admitted, Defendant denies the allegations set forth in the Complaint, ¶ 2.

1

## <u>THE PARTIES</u>

3.      Defendant admits only that Plaintiff was a citizen of the Republic of Korea during his alleged employment with Defendant. Except as expressly admitted, Defendant denies the allegations set forth in the Complaint, ¶ 3.

4.      Defendant admits the allegations set forth in the Complaint, ¶ 4.

5.      The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant admits the allegations set forth in the Complaint, ¶ 5.

6.      The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant admits the allegations set forth in the Complaint, ¶ 6.

7.      Defendant admits only that it is an organ of a foreign state or a subdivision thereof. Except as expressly admitted, Defendant denies the allegations set forth in the Complaint, ¶ 7.

8.      The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant admits the allegations set forth in the Complaint, ¶ 8.

9.      Defendant admits only that the individual Hyun Cho is a citizen of the Republic of Korea and currently the Ambassador at the Mission. Except as expressly admitted, Defendant denies the allegations set forth in the Complaint, ¶ 9.

10.     The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 10.

11.     Defendant denies the allegations set forth in the Complaint, ¶ 11.

12.     Defendant admits only that the individual Jinho Jo is a citizen of the Republic of Korea and currently a Counselor at the Mission. Except as expressly admitted, Defendant denies the allegations set forth in the Complaint, ¶ 12.

13.     Defendant denies the allegations set forth in the Complaint, ¶ 13.

14.     Defendant admits only that the individual Daeyong Chung is a citizen of the Republic of Korea and currently a Minister at the Mission. Except as expressly admitted, Defendant denies the allegations set forth in the Complaint, ¶ 14.

15.     Defendant denies the allegations set forth in the Complaint, ¶ 15.

## JURISDICTION AND VENUE

16.     Defendant repeats and re-alleges each and every response to paragraphs 1 through 15 of the Complaint as if set forth fully herein verbatim.

17.     Defendant admits only that Plaintiff purports to bring this action under the FSIA and the FLSA. Except as expressly admitted, Defendant denies the allegations set forth in the Complaint, ¶ 17.

18.     The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 18.

19.     The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 19.

20.     The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 20.

21.     The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 21.

22.     The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 22.

23.     The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 23.

24.     The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 24.

25.     Defendant denies the allegations set forth in the Complaint, ¶ 25.

26.     The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 26.

27.     The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 27.

28.     The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 28.

29.     Defendant denies the allegations set forth in the Complaint, ¶ 29.

**Defendant's Commercial Activity**

30.     Defendant denies the allegations set forth in the Complaint, ¶ 30.

31.     Defendant admits the allegations set forth in the Complaint, ¶ 31.

32.     Defendant denies the allegations set forth in the Complaint, ¶ 32.

33.     Defendant admits the allegations set forth in the Complaint, ¶ 33.

34.     The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 34.

35.     Defendant denies knowledge and information sufficient to form a basis as to the truth of the matter alleged in the Complaint, ¶ 35 and, as such, denies them.

36.     The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 34.

37.     Defendant denies the allegations set forth in the Complaint, ¶ 37.

38.     The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 38.

39.     Defendant denies the allegations set forth in the Complaint, ¶ 39.

40.     Defendant denies the allegations set forth in the Complaint, ¶ 40.

41.     Defendant denies the allegations set forth in the Complaint, ¶ 41.

42.     Defendant denies knowledge and information sufficient to form a basis as to the truth of the matter alleged in the Complaint, ¶ 42 and, as such, denies them.

43.     Defendant denies the allegations set forth in the Complaint, ¶ 43.

44.     Defendant denies knowledge and information sufficient to form a basis as to the truth of the matter alleged in the Complaint, ¶ 44 and, as such, denies them.

45.     Defendant admits the allegations set forth in the Complaint, ¶ 45.

46.     Defendant admits the allegations set forth in the Complaint, ¶ 46.

47.     Defendant denies knowledge and information sufficient to form a basis as to the truth of the matter alleged in the Complaint, ¶ 47 and, as such, denies them.

48.     Defendant denies knowledge and information sufficient to form a basis as to the truth of the matter alleged in the Complaint, ¶ 48 and, as such, denies them.

49.     Defendant denies knowledge and information sufficient to form a basis as to the truth of the matter alleged in the Complaint, ¶ 49 and, as such, denies them.

50.     Defendant denies knowledge and information sufficient to form a basis as to the truth of the matter alleged in the Complaint, ¶ 50 and, as such, denies them.

51.     Defendant denies knowledge and information sufficient to form a basis as to the truth of the matter alleged in the Complaint, ¶ 51 and, as such, denies them.

52.     Defendant denies the allegations set forth in the Complaint, ¶ 52.

53.     Defendant denies the allegations set forth in the Complaint, ¶ 53.

54.     Defendant admits the allegations set forth in the Complaint, ¶ 54.

55.     Defendant admits the allegations set forth in the Complaint, ¶ 55.

56.     Defendant denies knowledge and information sufficient to form a basis as to the truth of the matter alleged in the Complaint, ¶ 56 and, as such, denies them.

57.     Defendant denies knowledge and information sufficient to form a basis as to the truth of the matter alleged in the Complaint, ¶ 57 and, as such, denies them.

58.     Defendant denies knowledge and information sufficient to form a basis as to the truth of the matter alleged in the Complaint, ¶ 58 and, as such, denies them.

59.     Defendant denies knowledge and information sufficient to form a basis as to the truth of the matter alleged in the Complaint, ¶ 59 and, as such, denies them.

60.     Defendant denies knowledge and information sufficient to form a basis as to the truth of the matter alleged in the Complaint, ¶ 60 and, as such, denies them.

61.     Defendant denies knowledge and information sufficient to form a basis as to the truth of the matter alleged in the Complaint, ¶ 61 and, as such, denies them.

62.     Defendant denies knowledge and information sufficient to form a basis as to the truth of the matter alleged in the Complaint, ¶ 62 and, as such, denies them.

63.     Defendant denies knowledge and information sufficient to form a basis as to the truth of the matter alleged in the Complaint, ¶ 63 and, as such, denies them.

64.     Defendant denies the allegations set forth in the Complaint, ¶ 64.

65.     Defendant denies the allegations set forth in the Complaint, ¶ 65.

66.     Defendant admits the allegations set forth in the Complaint, ¶ 66.

**Plaintiff's Work Schedule and Pay**

67.     Defendant denies the allegations set forth in the Complaint, ¶ 67.

68.     Defendant denies the allegations set forth in the Complaint, ¶ 68.

69.     Defendant denies the allegations set forth in the Complaint, ¶ 69.

70.     Defendant denies the allegations set forth in the Complaint, ¶ 70.

71.     Defendant denies the allegations set forth in the Complaint, ¶ 71.

72.     Defendant denies the allegations set forth in the Complaint, ¶ 72.

73.     Defendant denies the allegations set forth in the Complaint, ¶ 73.

74.     The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 74.

75.     The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 75.

76.     The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 76.

77.     Defendant denies the allegations set forth in the Complaint, ¶ 77.

78.     Defendant denies the allegations set forth in the Complaint, ¶ 78.

79.     Defendant denies the allegations set forth in the Complaint, ¶ 79.

80.     Defendant denies the allegations set forth in the Complaint, ¶ 80.

81.     Defendant denies the allegations set forth in the Complaint, ¶ 81.

82.     The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 82.

83.     Defendant denies the allegations set forth in the Complaint, ¶ 83.

84.     The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 84.

85.     Defendant admits the allegations set forth in the Complaint, ¶ 85.

86.    The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 86.

87.    Defendant denies the allegations set forth in the Complaint, ¶ 87.

### Age Discrimination and Hostile Environment

88.    Defendant admits the allegations set forth in the Complaint, ¶ 88.

89.    Defendant denies knowledge and information sufficient to form a basis as to the truth of the matter alleged in the Complaint, ¶ 89 and, as such, denies them.

90.    Defendant denies knowledge and information sufficient to form a basis as to the truth of the matter alleged in the Complaint, ¶ 90 and, as such, denies them.

91.    Defendant denies the allegations set forth in the Complaint, ¶ 91.

92.    Defendant denies the allegations set forth in the Complaint, ¶ 92.

93.    Defendant denies the allegations set forth in the Complaint, ¶ 93.

94.    Defendant denies the allegations set forth in the Complaint, ¶ 94.

95.    Defendant denies the allegations set forth in the Complaint, ¶ 95.

96.    Defendant denies the allegations set forth in the Complaint, ¶ 96.

97.    Defendant denies the allegations set forth in the Complaint, ¶ 97.

98.    Defendant denies the allegations set forth in the Complaint, ¶ 98.

99.    Defendant denies the allegations set forth in the Complaint, ¶ 99.

100.    Defendant denies knowledge and information sufficient to form a basis as to the truth of the matter alleged in the Complaint, ¶ 100 and, as such, denies them.

### Commercial Activity Exception Under 28 U.S.C. § 1605

101.    Defendant repeats and re-alleges each and every response to paragraphs 1 through 100 as if set forth fully herein verbatim.

102.    The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 102.

**STATEMENT OF CLAIM**

**COUNT I**
**[The Fair Labor Standard Act – Unpaid Overtime]**

103.    Defendant repeats and re-alleges each and every response to paragraphs 1 through 102 as if set forth fully herein verbatim.

104.    The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 104.

105.    The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 105.

106.    The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 106.

107.    The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 107.

108.     The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 108.

<u>**COUNT II**</u>
**[The New York Labor Law – Unpaid Promised Wage]**

109.     Defendant repeats and re-alleges each and every response to paragraphs 1 through 108 as if set forth fully herein verbatim.

110.     The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 110.

111.     The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 111.

112.     The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 112.

113.     The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 113.

<u>**COUNT III**</u>
**[New York Labor Law – Unpaid Overtime]**

114.     Defendant repeats and re-alleges each and every response to paragraphs 1 through 113 as if set forth fully herein verbatim.

115.    The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 115.

116.    The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 116.

117.    The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 117.

118.    The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 118.

**<u>COUNT IV</u>**
**[New York Labor Law – Spread of Hours]**

119.    Defendant repeats and re-alleges each and every response to paragraphs 1 through 118 as if set forth fully herein verbatim.

120.    Defendant denies the allegations set forth in the Complaint, ¶ 120.

121.    The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 121.

122.    The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 122.

123.     The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 123.

## COUNT V
### [New York Labor Law – Wage Notice and Wage Statement Violations]

124.     Defendant repeats and re-alleges each and every response to paragraphs 1 through 123 as if set forth fully herein verbatim.

125.     The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 125.

126.     The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 126.

127.     The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 127.

128.     The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 128.

129.     The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 129.

## COUNT VI
### [Violation of the New York State Human Rights Law – Age Discrimination]

13

130.    Defendant repeats and re-alleges each and every response to paragraphs 1 through 129 as if set forth fully herein verbatim.

131.    The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 131.

132.    The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 132.

133.    Defendant admits the allegations set forth in the Complaint, ¶ 133.

134.    The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 134.

135.    Defendant denies the allegations set forth in the Complaint, ¶ 135.

136.    The allegations contained in this paragraph are identical to those contained in paragraph 89 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

137.    The allegations contained in this paragraph are identical to those contained in paragraph 90 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

138.    The allegations contained in this paragraph are identical to those contained in paragraph 91 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

139.    Defendant denies the allegations set forth in the Complaint, ¶ 139.

140.     The allegations contained in this paragraph are identical to those contained in paragraph 94 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

141.     The allegations contained in this paragraph are identical to those contained in paragraph 95 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

142.     The allegations contained in this paragraph are identical to those contained in paragraph 96 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

143.     The allegations contained in this paragraph are identical to those contained in paragraph 97 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

144.     The allegations contained in this paragraph are identical to those contained in paragraph 98 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

145.     The allegations contained in this paragraph are identical to those contained in paragraph 99 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

146.     The allegations contained in this paragraph are identical to those contained in paragraph 100 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

147.     Defendant denies the allegations set forth in the Complaint, ¶ 147.

148. Defendant denies knowledge and information sufficient to form a basis as to the truth of the matter alleged in the Complaint, ¶ 148 and, as such, denies them.

149. Defendant denies the allegations set forth in the Complaint, ¶ 149.

150. Defendant denies the allegations set forth in the Complaint, ¶ 150.

151. The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 151.

152. The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 152.

153. The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 153.

154. The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 154.

155. The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 155.

156. Defendant denies the allegations set forth in the Complaint, ¶ 156.

157. Defendant admits only that Plaintiff seeks certain remedies. Except as expressly admitted, Defendant denies the allegations set forth in the Complaint, ¶ 157.

<u>**COUNT VII**</u>
**[Violation of the New York State Human Rights Law – Hostile Work Environment]**

158.    Defendant repeats and re-alleges each and every response to paragraphs 1 through 157 as if set forth fully herein verbatim.

159.    The allegations contained in this paragraph are identical to those contained in paragraph 132 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

160.    The allegations contained in this paragraph are identical to those contained in paragraph 133 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

161.    The allegations contained in this paragraph are identical to those contained in paragraph 134 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

162.    The allegations contained in this paragraph are identical to those contained in paragraph 135 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

163.    The allegations contained in this paragraph are identical to those contained in paragraph 136 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

164.    The allegations contained in this paragraph are identical to those contained in paragraph 137 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

165.    The allegations contained in this paragraph are identical to those contained in paragraph 138 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

166.    The allegations contained in this paragraph are identical to those contained in paragraph 139 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

167.    The allegations contained in this paragraph are identical to those contained in paragraph 140 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

168.    The allegations contained in this paragraph are identical to those contained in paragraph 141 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

169.    The allegations contained in this paragraph are identical to those contained in paragraph 142 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

170.    The allegations contained in this paragraph are identical to those contained in paragraph 143 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

171.    The allegations contained in this paragraph are identical to those contained in paragraph 144 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

172.    The allegations contained in this paragraph are identical to those contained in paragraph 145 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

173.    The allegations contained in this paragraph are identical to those contained in paragraph 146 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

174.    The allegations contained in this paragraph are identical to those contained in paragraph 147 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

175.    The allegations contained in this paragraph are identical to those contained in paragraph 148 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

176.    The allegations contained in this paragraph are identical to those contained in paragraph 148 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

177.    Defendant denies the allegations set forth in the Complaint, ¶ 177.

178.    Defendant denies the allegations set forth in the Complaint, ¶ 178.

179.    The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 179.

180.    The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 180.

181.    Defendant denies the allegations set forth in the Complaint, ¶ 181.

182.    Defendant denies the allegations set forth in the Complaint, ¶ 182.

183.    Defendant denies the allegations set forth in the Complaint, ¶ 183.

184.    Defendant admits only that Plaintiff seeks certain remedies. Except as expressly

admitted, Defendant denies the allegations set forth in the Complaint, ¶ 184.

<u>COUNT VIII</u>
**[Violation of the New York City Human Rights Law – Age Discrimination]**

185.    Defendant repeats and re-alleges each and every response to paragraphs 1 through

184 as if set forth fully herein verbatim.

186.    The allegations set forth in this paragraph are legal conclusions to which no

response is required. To the extent a response is required, Defendant denies the allegations set

forth in the Complaint, ¶ 186.

187.    The allegations set forth in this paragraph are legal conclusions to which no

response is required. To the extent a response is required, Defendant denies the allegations set

forth in the Complaint, ¶ 187.

188.    The allegations set forth in this paragraph are legal conclusions to which no

response is required. To the extent a response is required, Defendant denies the allegations set

forth in the Complaint, ¶ 188.

189.    The allegations contained in this paragraph are identical to those contained in

paragraph 160 of the Complaint. As such, Plaintiff is referred to Defendant's response to that

paragraph.

190.    The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 198.

191.    The allegations contained in this paragraph are identical to those contained in paragraph 189 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

192.    The allegations contained in this paragraph are identical to those contained in paragraph 161 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

193.    The allegations contained in this paragraph are identical to those contained in paragraph 162 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

194.    The allegations contained in this paragraph are identical to those contained in paragraph 163 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

195.    The allegations contained in this paragraph are identical to those contained in paragraph 164 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

196.    The allegations contained in this paragraph are identical to those contained in paragraph 165 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

197.    The allegations contained in this paragraph are identical to those contained in paragraph 166 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

198.    The allegations contained in this paragraph are identical to those contained in paragraph 167 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

199.    The allegations contained in this paragraph are identical to those contained in paragraph 168 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

200.    The allegations contained in this paragraph are identical to those contained in paragraph 169 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

201.    The allegations contained in this paragraph are identical to those contained in paragraph 170 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

202.    The allegations contained in this paragraph are identical to those contained in paragraph 171 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

203.    The allegations contained in this paragraph are identical to those contained in paragraph 172 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

204.    The allegations contained in this paragraph are identical to those contained in paragraph 173 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

205.    The allegations contained in this paragraph are identical to those contained in paragraph 174 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

206.    The allegations contained in this paragraph are identical to those contained in paragraph 175 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

207.    The allegations contained in this paragraph are identical to those contained in paragraph 149 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

208.    The allegations contained in this paragraph are identical to those contained in paragraph 150 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

209.    The allegations contained in this paragraph are identical to those contained in paragraph 151 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

210.    The allegations contained in this paragraph are identical to those contained in paragraph 152 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

211.    Defendant denies the allegations set forth in the Complaint, ¶ 211.

212.    Defendant denies the allegations set forth in the Complaint, ¶ 212.

213.    Defendant denies the allegations set forth in the Complaint, ¶ 213.

214.    Defendant admits only that Plaintiff seeks certain remedies. Except as expressly admitted, Defendant denies the allegations set forth in the Complaint, ¶ 214.

<u>COUNT IX</u>
**[Violation of the New York City Human Rights Law – Hostile Work Environment]**

215.    Defendant repeats and re-alleges each and every response to paragraphs 1 through 214 as if set forth fully herein verbatim.

216.    The allegations set forth in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations set forth in the Complaint, ¶ 216.

217.    The allegations contained in this paragraph are identical to those contained in paragraph 191 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

218.    The allegations contained in this paragraph are identical to those contained in paragraph 190 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

219.    The allegations contained in this paragraph are identical to those contained in paragraph 217 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

220.    The allegations contained in this paragraph are identical to those contained in paragraph 192 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

221.    The allegations contained in this paragraph are identical to those contained in paragraph 193 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

222.    The allegations contained in this paragraph are identical to those contained in paragraph 194 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

223.    The allegations contained in this paragraph are identical to those contained in paragraph 195 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

224.    The allegations contained in this paragraph are identical to those contained in paragraph 196 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

225.    The allegations contained in this paragraph are identical to those contained in paragraph 197 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

226.    The allegations contained in this paragraph are identical to those contained in paragraph 198 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

227.    The allegations contained in this paragraph are identical to those contained in paragraph 199 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

228.    The allegations contained in this paragraph are identical to those contained in paragraph 200 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

229.    The allegations contained in this paragraph are identical to those contained in paragraph 201 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

230.    The allegations contained in this paragraph are identical to those contained in paragraph 202 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

231.    The allegations contained in this paragraph are identical to those contained in paragraph 203 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

232.    The allegations contained in this paragraph are identical to those contained in paragraph 204 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

233.    The allegations contained in this paragraph are identical to those contained in paragraph 205 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

234.    The allegations contained in this paragraph are identical to those contained in paragraph 206 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

235.    The allegations contained in this paragraph are identical to those contained in paragraph 177 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

236.    The allegations contained in this paragraph are identical to those contained in paragraph 178 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

237.    The allegations contained in this paragraph are identical to those contained in paragraph 179 of the Complaint. As such, Plaintiff is referred to Defendant's response to that paragraph.

238.    Defendant denies the allegations set forth in the Complaint, ¶ 238.

239.    Defendant denies the allegations set forth in the Complaint, ¶ 239.

240.    Defendant denies the allegations set forth in the Complaint, ¶ 240.

241.    Defendant denies the allegations set forth in the Complaint, ¶ 241.

242.    Defendant admits only that Plaintiff seeks certain remedies. Except as expressly admitted, Defendant denies the allegations set forth in the Complaint, ¶ 242.

**AFFIRMATIVE DEFENSES**

**FIRST AFFIRMATIVE DEFENSE**

The First Amended Complaint fails to state a claim upon which relief may be granted.

**SECOND AFFIRMATIVE DEFENSE**

Defendant is entitled to the full extent of immunity granted under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, *et seq.*, without applicability of any exceptions or waivers contained therein.

**THIRD AFFIRMATIVE DEFENSE**

The Court lacks personal jurisdiction over Defendant by the application of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, *et seq.*

### FOURTH AFFIRMATIVE DEFENSE

The Court lacks subject matter jurisdiction over Defendant by the application of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, *et seq.*

### FIFTH AFFIRMATIVE DEFENSE

The commercial activities exception under 28 U.S.C. § 1605 does not apply to the facts and circumstances presented in this action, namely the alleged employment relationship between Plaintiff and Defendant.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiff released his claims relating to the termination of his employment with Defendant by duly entering into a settlement agreement setting forth the terms of such release.

### SEVENTH AFFIRMATIVE DEFENSE

Defendant is not liable under any provisions of the New York Labor Law § 198 because it is not an employer as defined in NYLL § 190(3) (The term "employer" shall not include a governmental agency).

### EIGHTH AFFIRMATIVE DEFENSE

Defendant is not liable under any provisions of the New York Labor Law § 198 because it has made complete and timely payment of all wages and/or because it reasonably believed in good faith that it was not required to provide Plaintiff with the notice pursuant to § 195.

### NINTH AFFIRMATIVE DEFENSE

There is no ascertainable damage, harm, and/or loss sustained by Plaintiff due to any act and/or omission of Defendant.

### TENTH AFFIRMATIVE DEFENSE

Plaintiff lacks evidentiary support of the allegations asserted against Defendant.

### ELEVENTH AFFIRMATIVE DEFENSE

Defendant has acted in good faith and reasonably believed that it is not violating the laws under which Plaintiff brings this action or that those laws are not applicable to Defendant.

### TWELFTH AFFIRMATIVE DEFENSE

The activities on which Plaintiff bases his claim herein for overtime compensation consisted of traveling to and from the actual place of performance of, and of activities preliminary and postliminary to the principal activities of Plaintiff's employment. Thus, such activities were not compensable by either an express provision of any written or non-written contract, or by any custom or practice in effect at the time of such activities; or, if compensable by such contract, custom, or practice, such activities were not engaged in by Plaintiff during the portion of the day with respect to which they were so made compensable. Accordingly, if any employment-related

laws of the United States are applicable to Defendant, Defendant is relieved of any liability for the overtime compensation claimed by Plaintiff under the Portal-to-Portal Act, 29 U.S.C.A. § 254.

### THIRTEENTH AFFIRMATIVE DEFENSE

If it is determined that Plaintiff is entitled to any relief for overtime compensation pursuant to the Fair Labor Standards Act, the New York Labor Law, and their supporting regulations, or any other applicable law, Defendant contends that Plaintiff is limited to payment for overtime hours at the rate agreed upon pursuant to their contract or one and one-half times Plaintiff's regular hourly rate, whichever is lower.

### FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiff was properly compensated for his work, including for overtime, at the rate agreed upon between the parties. Defendant has at all times maintained and provided accurate records relating to Plaintiff's employment with Defendant, if any.

### FIFTEENTH AFFIRMATIVE DEFENSE

Defendant has a legitimate and non-discriminatory grounds upon which it instituted any acts which Plaintiff alleges was based on discriminatory grounds.

### SIXTEENTH AFFIRMATIVE DEFENSE

Plaintiff was paid above the minimum wage and, as such, is not entitled to any spread-of-hours premium under 12 NYCRR § 142-3.4. <u>Williams v. Tri-State Biodiesel, L.L.C.</u>, 13-cv-5041, 2015 U.S. Dist. LEXIS 7926, 2015 WL 305362 (S.D.N.Y. Jan. 23, 2015) ("recent case law has been nearly unanimous that the spread-of-hours requirement extends only to workers paid at the minimum wage level") (collecting cases).

### SEVENTEENTH AFFIRMATIVE DEFENSE

Defendant is exempt from the payment of payroll taxes pursuant to the Foreign Missions Act, 22 U.S.C. § 4301.

### RESERVATION AND NON-WAIVER

Defendant reserves and does not waive any additional defenses as may be revealed by information subsequently acquired in discovery or otherwise.

### <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Defendant demands judgment against Plaintiff:

    a.  Dismissing the Complaint in its entirety and with prejudice against Defendant;

    b.  Awarding Defendant the costs and disbursements of this action; and

c.  Granting Defendant such other and further relief as the Court deems just and

equitable.

Kim, Cho & Lim, LLC
*Attorneys for Defendant*

Dated: February 11, 2022          By:  _/s/ Joshua S. Lim_____
Joshua S. Lim, Esq.


**DESIGNATION OF TRIAL COUNSEL**

Joshua S. Lim, Esq., is hereby designated as trial counsel for Defendant.

Kim, Cho & Lim, LLC
*Attorneys for Defendant*

Dated: February 11, 2022          By:  _/s/ Joshua S. Lim_____
Joshua S. Lim, Esq.


**JURY DEMAND**

Defendant hereby demands a Trial by jury as to all issues so triable.

Kim, Cho & Lim, LLC
*Attorneys for Defendant*

Dated: February 11, 2022          By:  _/s/ Joshua S. Lim_____
Joshua S. Lim, Esq.

30

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HYUNHUY NAM, <br><br>             Plaintiff, <br><br>     v. <br><br> PERMANENT MISSION OF THE REPUBLIC OF KOREA TO THE UNITED NATIONS; <br><br>            Defendant. | Case No.: 1:21-cv-06165-RA <br><br><br> <ins>CIVIL ACTION</ins> <br><br> **NOTICE OF MOTION FOR SUMMARY JUDGMENT** |

     **PLEASE TAKE NOTICE** defendant Permanent Mission of the Republic of Korea to the United Nations ("Defendant"), by and through their attorneys, the law offices of Kim, Cho & Lim, LLC, will move this Honorable Court, before the Honorable Ronnie Abrams, U.S.D.J., at 40 Foley Square, Courtroom 1506, New York, New York 10007, for an Order granting summary judgment in favor of Defendant dismissing the complaint of plaintiff Hyunhuy Nam ("Plaintiff") pursuant to Rule 56 of the Federal Rules of Civil Procedure.

     **PLEASE TAKE FURTHER NOTICE** that Defendant will rely upon the contemporaneously filed supporting Memorandum of Law and Declarations, with accompanying exhibits, if any, in support of their motion.

     **PLEASE TAKE FURTHER NOTICE** that opposition papers, if any, shall be filed in accordance with the Federal Rules of Civil Procedure, local rules, and the Court's scheduling order or individual practices.

                          Respectfully submitted,

Dated: July 28, 2022                 <ins>*/s/ Joshua S. Lim*</ins>
                                Joshua S. Lim, Esq.
                                **Kim, Cho & Lim, LLC**

460 Bergen Boulevard, Suite 305
Palisades Park, New Jersey 07650
T: 201-585-7400
F: 201-585-7422
<u>joshualim@kcllawfirm.com</u>
*Attorneys for Defendant*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|   |   |
|---|---|
| HYUNHUY NAM, | Case No.: 1:21-cv-06165-RA |
| Plaintiff, |   |
| v. | CIVIL ACTION |
| PERMANENT MISSION OF THE REPUBLIC OF KOREA TO THE UNITED NATIONS; |   |
| Defendant. |   |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT PURSUANT TO FRCP 56**

Kim, Cho & Lim, LLC
163-10 Northern Boulevard, Suite 202
Flushing, New York 11358-2652
T: 718-539-7400
F: 201-585-7422

On the brief:   Joshua S. Lim, Esq.
                Nicholas J. DuBois, Esq.
                Sean S. Kwak, Esq.
                Power J. Chen, Esq.

## **TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... ii

I.    PRELIMINARY STATEMENT ............................................................................ 1

II.   RELEVANT PROCEDURAL HISTORY ............................................................ 2

III.  RELEVANT FACTS ............................................................................................. 3

   A.    **Introduction**................................................................................................**3**

   B.    **Application of ROK's Laws and Regulations**........................................**3**

   C.    **Plaintiff's Duties and Tasks; Exposure to Classified Information** ......**3**

   D.    **Security Measures Required of Plaintiff for High-Level Clearance**......**4**

   E.    **Safety as Another Primary Concern/Duties of Plaintiff** ......................**6**

   F.    **Plaintiff Was Assigned Diplomatic Duties under "Uei-Jeon" Protocol**......**7**

   G.    **Plaintiff's Retirement**................................................................................**8**

IV.  LEGAL ARGUMENT .......................................................................................... 8

   A.    **STANDARD FOR RELIEF** ........................................................................**8**

   B.    **APPLICABLE LAW – the Foreign Sovereign Immunities Act**..............**10**

   C.    **U.S. Courts Lack Personal and Subject-Matter Jurisdiction** .............**11**

      i.    The Mission and Diplomats Are Entitled to, and Have Not Waived, Immunity ....... 12

      ii.   Defendant DOES NOT Meet the Criteria for Exception under the FSIA ................. 13

      iii.  Plaintiff's Employment Lacks "Substantial Contact" with the United States........... 25

   D.    **Plaintiff's Claims Have Been Settled**......................................................**27**

V.   CONCLUSION ................................................................................................... 30

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ................................................. 9

Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428 (1989) ............................. 11

Bardales v. Consulate General of Peru in New York,
490 F.Supp.3d 696 (S.D.N.Y 2020).................................................................... 22, 23, 24

Butters v. Vance Int'l, Inc., 225 F.3d 462, 465 (4th Cir. 2000)........................................ 19, 21, 22

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ........................................................ 8

Crum v. Kingdom of Saudi Arabia, 2005 WL 3752271 (E.D. Va. Jul. 13, 2005) ................ 21, 22

Dewey v. PTT Telecom Netherlands, US, Inc., 94-cv-5983,
1995 WL 542447 (S.D.N.Y. Sept. 12, 1995)........................................................... 27

Difilippo v. Barclays Capital, Inc., 552 F. Supp. 2d 417 (S.D.N.Y. 2008) .................................. 27

Figueroa v. Ministry for Foreign Affairs of Sweden,
222 F.Supp.3d 304 (S.D.N.Y. 2016)........................................................................... passim

Harrison v. Republic of Sudan, 838 F.3d 86, 94 (2d Cir. 2016).................................................... 11

Hijazi v. Permanent Mission of Saudi Arabia to U.N.,
689 F. Supp. 2d 669 (S.D.N.Y. 2010), aff'd, 403 F.App'x 631 (2d Cir. 2010)........................... 14

Hummel v. AstraZeneca LP, 575 F. Supp. 2d 568 (S.D.N.Y. 2008)..................................... 27, 29

Kato v. Ishihara, 360 F.3d 106 (2d Cir. 2004) ........................................................ 12, 14

Kim v. Korea Trade Promotion-Investment Agency, 51 F.Supp.3d 279 (S.D.N.Y. 2014)...... 8, 12

Kowalchuk v. Stroup, 61 A.D.3d 118 (App. Div. 1st Dept. 2009)................................................. 27

Laramee v. Jewish Guild for the Blind, 72 F.Supp.2d 357 (S.D.N.Y.1999) ................................ 29

Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc., 354 F.Supp.2d 293 (S.D.N.Y. 2004) .... 27

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) ................................... 9

Moers v. Moers, 229 N.Y. 294 (1920)........................................................................... 27

Mourmouni v. Permanent Mission of Republic of S. Sudan to U.N.,
No. 20-cv-3603, 2021 WL 4461829 (S.D.N.Y. Sept. 28, 2021) ........................................ 2, 15, 24

OBB Personenverkehr AG v. Sachs, 577 U.S. 27 (2015)....................................................... 11, 14

Pablo Star Ltd. v. Welsh Gov't, 961 F.3d 555, 564 (2d Cir. 2020),
cert. denied, 141 S. Ct. 1069 (2021) ........................................................................... 14, 25

Rukoro v. Federal Rep. of Germany, 976 F.3d 218 (2d Cir. 2020), cert. denied sub nom.
Rukoro v. Germany, --- U.S. ---, No. 20-1454, 2021 WL 2301990 (U.S. June 7, 2021)....... 10, 14

Saudi Arabia v. Nelson, 507 U.S. 349 (1993) ................................................................ 11, 14, 19

Shapiro v. Republic of Bolivia, 930 F.2d 1013 (2d Cir. 1991)....................................................... 25

Simel v. JP Morgan Chase, 05-cv-9750, 2007 WL 809689 (S.D.N.Y. Mar. 19, 2007) .............. 27

Skluth v. United Merchs. & Mfrs., Inc., 559 N.Y.S.2d 280 (App. Div. 1st Dep't 1990)....... 27, 29

Volk v. Liggett Group Inc., 96-cv-1921, 1997 WL 107458 (S.D.N.Y. Mar. 11, 1997).............. 27

**Statutes**

28 U.S. Code § 1603(b) ..................................................................................................... 12

28 U.S.C. § 1603(a) ........................................................................................................... 12

28 U.S.C. § 1603(e) ...................................................................................................... 10, 24

28 U.S.C. § 1604.......................................................................................................... 9, 12

28 U.S.C. § 1605(a)(2)......................................................................................... 10, 21, 24

28 U.S.C. §§ 1602, et seq................................................................................................... 1

**Other Authorities**

23 U.S.T. 3227 .................................................................................................................. 1

**Rules**

Fed. R. Civ. P. 56(e) ......................................................................................................... 9

**Treatises**

14 Charles Alan Wright et al., Federal Practice and Procedure § 3662, at 393 (2d ed. 1985) ..... 11

The Permanent Mission of the Republic of Korea to the United Nations (hereinafter, the "Mission" or "Defendant"), by and through its counsel, the law offices of Kim, Cho & Lim, LLC, hereby respectfully submits this memorandum of law in support of its motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## I.    PRELIMINARY STATEMENT

The instant lawsuit, which plaintiff Hyunhuy Nam ("Nam" or "Plaintiff") couches in terms of a conventional labor dispute, is not susceptible to the jurisdiction of this Court pursuant to any exception provided by the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602, to -11, or universally accepted principles of international law under the United Nations Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227 (entered into force in the United States Dec. 13, 1972) (the "VCDR"), and no waiver applies.

In this action, Plaintiff asserts nine causes of action against the Mission: one cause of action under the federal Fair Labor Standards Act of 1938 ( "FLSA"), 29 U.S.C. §§ 203, to -262 (Count I); four under various sections of New York Labor Law ("NYLL") §§ 1 to -1200; (Counts II-V); and two causes of action under each: the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290, to -297; and New York City Human Rights Law ( "NYCHRL"), N.Y.C. Admin. Code § 8-101 et seq. (Counts VI-IX).

In a tacit concession to the Mission's sovereign immunity, much of Nam's Complaint is devoted to asserting that it engaged in "commercial" activity by hiring Plaintiff as a chauffeur, and that (predominantly upon "information and belief") Defendant thereby engaged in commercial activity. This is an effort to shoehorn this case into the FSIA's very narrow exception for commerce. In his effort, Plaintiff conflates Defendant's consular functions with those of commercial actors. In addition, the subtext of the Complaint appears to wield the litigation privilege as a sword, not a shield, to besmirch, defame and denigrate the character of the Mission's former diplomats.

1

Despite Plaintiff's efforts, the Complaint must be dismissed on two simple grounds. First, the Court lacks subject matter jurisdiction over this matter because the Mission is an instrumentality of a foreign sovereign state, did not waive its sovereign immunity, and does not fall under any of the exceptions specified by the FSIA.   Second, Plaintiff duly released the Defendant from any employment-related claims.

II.      **RELEVANT PROCEDURAL HISTORY**

Plaintiff filed this action on July 19, 2021, asserting various claims against the Mission and three (3) of its diplomats arising from his employment there. On September 30, 2021, Defendant and its diplomats moved to dismiss the action in its entirety pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) on grounds akin to those set forth herein. On January 21, 2022, the Honorable Allison J. Nathan, U.S.D.J. granted in part and denied in part that motion, dismissing all claims against the individual diplomats based on the VCDR. The parties thereafter stipulated to amend the caption to delete these dismissed dignitaries.

However, Judge Nathan's decision declined to dismiss Nam's remaining claims based on then-underdeveloped facts at the pre-answer stage and relying on an unpublished and non-binding decision in Mourmouni v. Permanent Mission of Republic of S. Sudan to U.N., No. 20-cv-3603, 2021 WL 4461829 (S.D.N.Y. Sept. 28, 2021), primarily reasoning that "Defendants have not proffered that Nam had responsibilities beyond chauffeuring." Ex. 38, p. 1. Through written discovery and several depositions, the parties have since developed facts of record demonstrating that Plaintiff's responsibilities and requisite qualifications encompassed much more than that of any ordinary chauffeur, thus falling outside the limited exception under the FSIA for "commercial activity".

2

III.   **RELEVANT FACTS**

**A.  Introduction**

The Mission is a constituent part of the Government of the Republic of Korea (the "ROK" or "South Korea") responsible for South Korean diplomatic interests at the United Nations since the ROK became a member of the United Nations in September of 1991 (as successor to the 1951 Observer Mission of the Republic of Korea to the U.N). That the Mission is an instrumentality of a sovereign state is not in dispute. Defendant's Statement of Material Facts ("DSMF"), ¶ 1. As such, Defendant is exempt from paying any federal, state, and local tax in the United States. Id., ¶¶ 48-49. Plaintiff is a South Korean national living in New Jersey as a permanent U.S. resident. Id. ¶ 2. Nam was employed as a chauffeur for the Mission for about five years until June of 2021. Id. ¶ 3.

**B.  Application of ROK's Laws and Regulations**

All aspects of employment at the Mission – from the amount of compensation to the duration, retirement and severance provisions – are determined by the laws of the Republic of Korea, more particularly the regulations promulgated by its Ministry of Foreign Affairs (similar to how U.S. diplomats' and foreign service officers' terms of employment are pursuant rules and regulations promulgated by the U.S. Department of State). Id., ¶¶ 32-38. These regulations include the hiring processes, employment conditions, work schedules, employment benefits, and terms of employment. Id., ¶¶ 34-37, 50.

**C.  Plaintiff's Duties and Tasks; Exposure to Classified Information**

Plaintiff was hired as the designated chauffeur for the Ministers at the Mission (the "Ministers") and was provided a designated vehicle that no other chauffeurs were permitted to drive. See id., ¶¶ 54-56. Plaintiff was consistently assigned to support the Ministers in managing

3

tasks relating to foreign affairs and working with the Minister and Counsellor as a "team." Id., ¶¶ 51-53.

The Ministers at the Mission are very important and high-level officials of the ROK government. Id., ¶ 48, 60. Accordingly, the Ministers' work requires high-level security clearance. Id., ¶ 59. The identity of individuals with whom the Ministers meet and any discussions the Ministers have with them are top secret and classified information under ROK law. Id., ¶¶ 24, 61. The transportation routes, destinations, and whereabouts of any high-level government officials are similarly treated as national secrets of South Korea and vital to the safety and well-being of their diplomats. Id., ¶¶ 63-64. In fact, even the list of such high-level officials visiting the United States is confidential. Id., ¶ 68.

Mr. Nam drove these high-level officials around, including the Ministers and other individuals such as the secretary of U.N. secretary-general and the national security advisor to the president of the ROK when such individuals visited the Mission as its guests. Id., ¶¶ 66-69. In the course of his employment, Plaintiff became privy to highly sensitive information including South Korea's aforesaid top-secret and/or classified information. Id., ¶¶ 62, 65. Given the inevitable exposure to such confidences, the responsibilities assigned to Plaintiff as the designated chauffeur for the Minister were unique among the Mission's drivers, as were the requirements for his post. Id., ¶ 57.

In sum, Plaintiff was responsible for serving the national interest of the ROK. Id., ¶ 23.

**D. <u>Security Measures Required of Plaintiff for High-Level Clearance</u>**

To protect the interests of the ROK and its confidential/classified information, additional measures were followed in Plaintiff's hiring process to ensure that such confidential/classified information would remain secure. Id., ¶¶ 4-10. First, the Minister personally interviewed Plaintiff. Id., ¶¶ 5-6. Plaintiff was then required to, and did consent and submit to, background checks for

security clearance in both the United States and the ROK. Id., ¶ 7. And with his consent, Defendant did perform a detailed background check for that purpose. Id., ¶ 8. Finally, the Minister made the final decision to hire Plaintiff. Id., ¶ 9.

Second, once Defendant decided to hire Plaintiff, Plaintiff was required to sign, and did sign, certain Pledge Agreements at the time of hire, and then annually throughout his term of employment. Id., ¶¶ 10, 15. Each Pledge Agreement provides:

> I[, Plaintiff,] hereby acknowledge that knowledge of all matters that I will acquire in the course of performing my duties as a chauffeur at the Permanent Mission of the Republic of Korea to the United Nations is deemed nationally classified information of the Republic of Korea, and I shall not divulge it to anyone.

Id., ¶ 11. Each Pledge Agreement was written in Korean. Id., ¶12. Plaintiff can read Korean. Id., ¶13. And Plaintiff was provided a copy of each Pledge Agreement. Id., ¶14. Plaintiff acknowledges that the foregoing pledge is "critically important" to the nature and duties of his post. Id., ¶ 17.

To further ensure Plaintiff's compliance, each Employment Contract required Plaintiff to submit to a polygraph test, if requested by the Mission. Id., ¶ 16. No other non-diplomatic staff member at the Mission is required to qualify for and/or subject to as high-level a security clearance as Plaintiff. Id., ¶ 18.

In addition to the Pledge Agreements, Plaintiff was still annually required to sign an Employment Contract at the time of hire which required, among other things, the Plaintiff to maintain secrecy and ensure confidentiality in the course of performing his duties and responsibilities. Id., ¶¶ 19-23. These Employment Contracts too were written in Korean, and a copy of each agreement was provided to Plaintiff. Id., ¶¶ 21-22. Pursuant to these Employment Contracts, Plaintiff was evaluated on, inter alia, his "ability to keep matters secret." Id., ¶ 25. Any failure to abide by the security guidelines or to maintain secrecy was grounds for immediate

5

termination, an act for which Plaintiff agreed to be punished under ROK law. Id., ¶¶ 26, 38. These

Pledge Agreements and Employment Contracts were designed to - and in fact did - remind Plaintiff

of how critical it was (and still is) to keep ROK's classified information secret. Id., ¶ 27. Further

evidencing its concern for security, the Employment Contract also required Plaintiff to inform

Defendant immediately of any changes in his status, including any marriage to a foreign national.

Id., ¶ 28.

Only with such tight security measures could Plaintiff be deemed reliable and qualified to

be entrusted with the duties of his post. Notably, Nam had advance access to the routes,

destinations, and whereabouts of the ROK's high-level government officials which is deemed the

ROK's national secret for such officials' safety. Id., ¶¶ 63-65. Plaintiff also worked in conjunction

with local law enforcement in compliance with the Mission's security protocol. Id., ¶ 69.

Every year (except 2020), the U.N. holds an event called the "high-level week." Id., ¶¶ 77,

79. This is an official occasion for high-level officials from each member-state of the U.N., such

as government cabinet members, to congregate and participate in-person at the General Assembly

of the United Nations. Id., ¶ 78. For obvious security reasons, the neighborhoods around the U.N.

headquarters in Manhattan are locked down during this period. Id., ¶ 80. But given the nature of

Plaintiff's duties and his high-level security clearance, Plaintiff was granted a pass for admission

through the security barricades around the U.N. headquarters. Id., ¶ 81.

**E. Safety as Another Primary Concern/Duties of Plaintiff**

While the security of information was considered paramount in Plaintiff's post, the safety

and well-being of his passengers were also a primary concern. Id., ¶ 72. This is expected as Plaintiff

was continually driving diplomats and high-level officials of both the ROK and other U.N.

member-states (when visiting as the Mission's invitees), as well as their respective family

members or guests. See Id., ¶ 74. This too, is another reason that the principal Minister interviewed

Plaintiff personally to ensure Plaintiff would be a discreet and reliable driver. Id., ¶¶ 7-9. Even

still, the Mission conducted a thorough background check on Plaintiff prior to his hiring. Id., ¶¶ 8,

12.

### F. **Plaintiff Was Assigned Diplomatic Duties under "Uei-Jeon" Protocol**

As set forth in the Employment Contracts, Plaintiff was assigned other duties in the Mission

described as "the administration of diplomatic protocol." Id., ¶ 75. That phrase in the Korean

language differs slightly in meaning from its English counterpart in that it is more expansive. The

term is pronounced "Uei-Jeon" in Korean, which is defined in an encyclopedia as follows:

> [This term] is a method of etiquette performed at various events
> organized with courtesy and refers to "the standard and procedures
> to make peace in the relationship between individuals." When
> manners are applied in regulating the relationship between
> individuals, it is called "etiquette" and when applied to formal
> relationship between national or international setting or between
> organizations, it is called [this term] or protocol. Today, [this term]
> is used not only in such events but its broad term also includes the
> Pledge of Allegiance and flag raising.

Id., ¶ 76. In fact, Plaintiff was required to adhere to Uei-Jeon protocol, including by participating

in motorcades when high-ranking government officials visited the United States and according

them the appropriate etiquette, deference, and other formalities. See id., ¶ 70. In other words,

Plaintiff was responsible for ensuring his charges were provided the most pleasant experience

possible in conjunction with maintaining their security. In connection with such security-related

duties, Plaintiff was provided advance notice of, for example, how a given motorcade would

proceed, classified information as to the routes, destinations, and whereabouts of high-ranking

government officials. Id., ¶¶ 65, 71.

Plaintiff explicitly acknowledges that he was "helping the national interest" of the ROK by

operating the official car of the Mission, and that he has not done anything contrary to the national

interest of the ROK. Id., ¶¶ 30-31.

7

**A-205**

G. **Plaintiff's Retirement**

Retirement at age 60 is unquestionably the norm[1] – and required by law in certain circumstances – in the ROK. Id., ¶¶ 39-40. In accordance with the established norm and ROK law, the Mission informed Plaintiff that he must retire when he turned 60. Id., ¶ 33. Notwithstanding the recognized retirement age, Plaintiff requested Defendant to extend his employment because his wife lost her job due to the COVID-19 pandemic. Id., ¶ 42. To grant such extension of employment beyond 60 years old, Defendant had to seek approval from the ROK government. Id., ¶ 43. Recognizing the extraordinary circumstance of the global pandemic, Defendant did seek and eventually obtain the approval and extended Plaintiff's employment until he was 61 years old. Id., ¶ 44.

In consideration therefor, Nam and the Mission signed a voluntary settlement agreement concerning his employment including its term and termination, whereby Plaintiff "agreed not to assert any claims with respect to [Plaintiff's] termination as [Plaintiff's] employment ends on June 2021." See id. ¶¶ 46, 82.

IV.    **LEGAL ARGUMENT**

A. **STANDARD FOR RELIEF**

A court may grant summary judgment pursuant to Fed. R. Civ. P. 56(c) "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "Summary Judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather an

---

[1] This fact was acknowledged by Second Circuit Judge Richard J. Sullivan while still a trial judge in this District. See Kim v. Korea Trade Promotion-Investment Agency ("KOTRA"), 51 F.Supp.3d 279, 282 (S.D.N.Y. 2014) (plaintiff, a former marketing consultant, was asked to resign at age 60 "like most people in Korea do") (granting motion to dismiss all claims for lack of subject matter jurisdiction based on sovereign immunity).

integral part of the Federal Rules as a whole which are designed to secure the just, speedy and inexpensive determination of every action." Ibid.

In determining whether a factual dispute warranting trial exists, the court must view the record evidence and the summary judgment submissions in the light most favorable to the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Issues of material fact are those "that might affect the outcome of the suit under the governing law." Id. at 248. An issue is genuine when it is "triable," that is, when reasonable minds could disagree on the result. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

Once the moving party establishes the absence of a genuine issue of material fact, the burden shifts to the non-moving party to "come forward with 'specific facts showing that there is a genuine issue for trial.'" Id. at 587 (quoting Fed. R. Civ. P. 56(e)). The non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." Id. at 586 (citations omitted). A party may not defeat a motion for summary judgment unless it sets forth specific facts, in a form that "would be admissible in evidence," establishing the existence of a genuine issue of material fact for trial. Fed. R. Civ. P. 56(e) (providing that in response to a summary judgment motion the "adverse party may not rest upon the mere allegations or denials of [its] pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial"). If the non-moving party's evidence is a mere scintilla or is not "significantly probative," the court may grant summary judgment. Liberty Lobby, 477 U.S. at 249–50. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita, 475 U.S. at 587 (internal quotation omitted).

The facts and law here demonstrate there is no triable issue of fact and, therefore, summary judgment should issue in favor of the Mission.

**B.   <u>APPLICABLE LAW – the Foreign Sovereign Immunities Act</u>**

"Subject to existing international agreements to which the United States is a party at the time of enactment of [the FSIA,] a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607[2] of this chapter." 28 U.S.C. § 1604. Congress permitted a very limited exception for actual commercial activity conducted by a foreign sovereign that is not applicable here:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—
> * * *
> (2) in which the action is <u>based upon a commercial activity carried on in the United States by the foreign state</u>; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States[.]

28 U.S.C. § 1605(a)(2) (emphasis added). Plaintiff pleads several isolated occurrences of chauffeuring diplomats, Mission staff, family, and guests to locations alleged to be for non-diplomatic purposes. However, Plaintiff fails to recognize that "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." <u>Rukoro v. Federal Rep. of Germany</u>, 976 F.3d 218, 226 (2d Cir. 2020) (quoting 28 U.S.C. § 1603(d)), <u>cert.</u> <u>denied</u> <u>sub</u> <u>nom.</u> <u>Rukoro v.</u> <u>Germany</u>, --- U.S. ---, No. 20-1454, 2021 WL 2301990 (U.S. June 7, 2021). To maneuver into the commercial exception, the Complaint absurdly alleges, in effect, that the Mission was running a taxi service with Plaintiff as its cabbie. <u>See e.g.</u>, Compl., ¶ 34. Case law makes clear that the

---

[2] 28 U.S.C. § 1607 concerns counterclaims asserted against the foreign state and is not applicable here.

10

Mission and its diplomats comported themselves in a conventional, generally accepted practice of such envoys' use of a dedicated driver. Nowhere is it alleged that the Mission charged its passengers a fare for transportation ancillary to the Mission's consular functions.

Significantly, the FSIA's drafters, in its "Definitions" section, went out of their way to heighten the standard for showing an exemption from FSIA protections by defining not only the term "commercial activity" but specifically "commercial activity carried on in the United States by a foreign state" (the standard set forth under 28 U.S.C. § 1605(a)(2)) which they define as "commercial activity carried on by [a foreign] state and <u>having substantial contact with the United States</u>." 28 U.S.C. § 1603(e) (emphasis added); <u>see also</u> 28 U.S.C. § 1603(d) (separately defining "a 'commercial activity'").

**C.  <u>U.S. Courts Lack Personal and Subject-Matter Jurisdiction</u>**

The sole basis for jurisdiction over any foreign state in the federal or state courts of the United States is the FSIA. <u>See</u> <u>Harrison v. Republic of Sudan</u>, 838 F.3d 86, 94 (2d Cir. 2016) (citing <u>Argentine Republic v. Amerada Hess Shipping Corp.</u>, 488 U.S. 428, 434 (1989)). Indeed, instrumentalities of the ROK such as the Mission are "'<u>presumptively immune</u> from the jurisdiction of United States courts' unless one of the [FSIA]'s express exceptions to sovereign immunity applies." <u>OBB Personenverkehr AG v. Sachs</u>, 577 U.S. 27, 31 (2015) (emphasis added) (quoting <u>Saudi Arabia v. Nelson</u>, 507 U.S. 349, 355 (1993)).

It is important to note that Nam, like other Mission personnel, worked under South Korean employment rules and guidelines, with which the Mission asserts it adopts and complies. DSMF, ¶¶ 32-41. Imposition of the domestic labor law of a host country would, of course, seriously

**A-209**

infringe upon and impair the normal diplomatic balance honored by member states. [3] Defendant respectfully postulates that the United States would understandably object were the ROK to override American norms of civil service by ousting embassy personnel in Seoul once they reached sixty years of age "like most people in Korea do." See KOTRA, 51 F.Supp.3d at 282; see, e.g., Figueroa v. Ministry for Foreign Affairs of Sweden, 222 F.Supp.3d 304, 312 (S.D.N.Y. 2016) (Koeltl, J.) ("assessment of an employee's status as a civil servant . . . should focus on the contemporary norms associated with civil service in the sovereign country at issue") (citing Kato v. Ishihara, 360 F.3d 106, 112 (2d Cir. 2004)[4]); see also 14 Charles Alan Wright et al., Federal Practice and Procedure § 3662, at 393 (2d ed. 1985) (the FSIA was "not[ ] intended to alter either diplomatic or consular immunity"). No evidence emerged in discovery to the effect that similar missions and consulates routinely utilize, for instance, Lyft® or Uber® to transport diplomatic and high-level officials by way of "contemporary norms".

Nevertheless, Plaintiff is not without recourse for his grievances. Plaintiff's claims, if any, can – and should – be brought in the ROK, the proper forum for any alleged remedy owed him from that foreign, sovereign state.

### i.    The Mission and Diplomats Are Entitled to, and Have Not Waived, Immunity

Again, the FSIA provides that "foreign state[s] shall be immune from the jurisdiction of the courts of the United States and of the States[.]" 28 U.S.C. § 1604 (emphasis added). "A 'foreign state' […] includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a).

---

[3] "Indeed, it is hard to imagine a purer embodiment of a foreign state than that state's permanent mission to the United Nations." Gray v. Permanent Mission of People's Rep. of Congo to U.N., 443 F.Supp. 816, 820 (S.D.N.Y.), aff'd, 580 F.2d 1044 (2d Cir. 1978).
[4] Kato holds that in this Circuit, "the category of 'civil service' should be interpreted to include the broad range of civil service employment relationships used by countries other than the United States." Ibid. (emphasis added).

The FSIA further defines an "agency or instrumentality of a foreign state" as any entity:

> (1) which is a separate legal person, corporate or otherwise, and
> (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
> (3) which is neither a citizen of a State of the United States as defined in section 1332 (c) and (e) of this title,[5] nor created under the laws of any third country.

28 U.S.C. § 1603(b). Here, the Mission is a 1) separate legal entity, which 2) is an organ/political subdivision of a foreign state (ROK), and 3) is not a citizen of a State of the United States nor created under the laws of a third country. It is undisputed and indisputable that the Mission is an instrumentality of the ROK. DSMF, ¶ 1.

Therefore, the Mission is accorded sovereign immunity, unless it waived such immunity or falls into one of the narrow exceptions provided by the FSIA. Plaintiff does not and cannot establish that the Mission waived its sovereign immunity. See generally, Compl. Neither the ROK nor its Mission waived or implied a waiver of sovereign immunity by the customary diplomatic practice of hiring a national or resident in the host country (who is familiar with the locale and conversant in the native language) to transport diplomatic staff and their families safely to their activities.

    **ii.**    **Defendant DOES NOT Meet the Criteria for Exception under the FSIA**

        **a.**  **Plaintiff's Duties Did Not Involve any "Commercial Activity"**

Plaintiff seeks to squeeze within FSIA's commercial activity exception by irrelevant, sometimes, scurrilous allegations of driving officials, their family members, and colleagues to

---

[5] These concern citizenship of corporations and insurers and the inclusion of the U.S. Territories, the District of Columbia, and the Commonwealth of Puerto Rico as "States". 28 U.S.C. §1332(c) and (e).

stores or restaurants, and being required to await their return.[6] But these alleged duties, even if true, do not amount to "commercial activities" because "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." Rukoro, 976 F.3d at 226 (quoting 28 U.S.C. § 1603(d)). Rukoro reiterated that "[c]ourts must 'zero[ ] in on the core of [the] suit: the . . . sovereign acts that actually injured [plaintiff]." Id. at 227 (citing Sachs, 577 U.S. at 28) (alterations in original). The Second Circuit in Pablo Star clarified the distinction:

> Whether an activity is deemed "commercial" under the FSIA depends on its "nature" rather than its "purpose," 28 U.S.C. § 1603(d), where "purpose" is "the reason why the foreign state engages in the activity" and "nature" is "the outward form of the conduct that the foreign state performs or agrees to perform,"

Pablo Star Ltd. v. Welsh Gov't, 961 F.3d 555, 564 (2d Cir. 2020) (quoting Nelson, 507 U.S. at 361), cert. denied, 141 S. Ct. 1069 (2021). Not inconsistent with the Pablo Star decision, this Court ruled in Hijazi by reiterating its ruling in Kato that "the focus of the inquiry ought to be the employer's general actions rather than the specific employment contract at issue." Hijazi v. Permanent Mission of Saudi Arabia to U.N., 689 F.Supp.2d 669, 674 (S.D.N.Y. 2010), aff'd, 403 F.App'x 631 (2d Cir. 2010) (citing Kato, 360 F.3d at 112).

Accordingly, the specific purpose or reasons Plaintiff argues he was caused to drive for the Mission – such as to shopping for groceries or gifts – are not the relevant issues here. Instead, the Court must look to the outward form of the relationship between Plaintiff and the Mission and its overarching motif. Indisputably, Plaintiff was employed as the designated chauffeur for the

---

[6] Even assuming Plaintiff's allegations of driving to stores and restaurants to be true, such duties were not per se for personal and non-diplomatic purposes. Ex. 3, 27:7- 28:9 ("Ministers have their own private vehicles… [T]he meetings and discussions with high level counterpart takes place not only outside, but also in the house. In such cases, in the preparation for such an important meeting, Mr. Nam was asked to purchase some gift for the counterpart Minister or he also did perform the task of shopping in case there is some meal preparation required for the purposes of foreign affairs… I've never heard of such personal use") (quoted subject to objections made during the deposition as to translation).

14

Ministers – high ranking governmental officials of ROK. His duties included driving a designated vehicle of the Mission, for the safety of the passengers – who were dignitaries of ROK and other U.N. member-states visiting as invitees of the Mission – and security of ROK's national secrets and classified information. DSMF, ¶¶ 54-68, 72-75. There is simply no rational way these can be construed as commercial activities.

Recently, the Honorable Paul Oetken, U.S.D.J. issued an unpublished opinion in Mourmouni, 2021 WL 4461829. Judge Nathan, while assigned to this action, heavily relied on the Mourmouni decision to deny, in part, Defendant's prior motion to dismiss. Judge Oetken, "as a general matter … disagree[d]" with the characterization that chauffeurs fall outside the category of the commercial exception. Id. at *2. He did note, however, that there are exceptions, such as the fact pattern in Figueroa, observing that the Figueroa chauffeur had responsibility for "chauffeuring the Swedish Ambassador and the Ambassador's family, Swedish diplomats and their families, and members of the Royal Family of Sweden", which sufficed to fall within that "exception." Id. at *3. In the decision Mourmouni distinguished, the Hon. John G. Koeltl, U.S.D.J., further explained:

> The defendants' employment of the plaintiff as a full-time chauffeur for the Mission entrusted the plaintiff with the safe transport of Swedish dignitaries, an activity integral to effecting the governmental function of the Mission. A sovereign's decision on how best to address the safety concerns of government officials are peculiarly sovereign because the failure to protect or safeguard a sovereign representative, such as an ambassador or a titular head of state, can have extremely adverse consequence for the sovereign nation.

and that "the activity to which the plaintiff's employment was directed is undoubtedly governmental." Figueroa, 222 F.Supp.3d at 313-15. Here, the Mission similarly entrusted Plaintiff with the safeguarding of ROK's dignitaries, as the "Mission" in Figueroa did to the plaintiff there. Moreover, the Mission further entrusted Plaintiff with its classified information and national

secrets relating to the national security of ROK, rendering his function even more sovereign in nature. The case at bar is a fact pattern virtually identical to that in Figueroa, minus the Royal Family and with additional concerns of national security.

Consistent with the highly classified and governmental nature of Plaintiff's employment at the Mission, the Minister personally conducted Plaintiff's interview and reviewed his file before deciding to employ him. Id., ¶¶ 5-9. Plaintiff was also subject to additional policies and procedures, including the execution of his yearly Employment Contracts and Pledge Agreements and compliance with the terms thereof, and was thus granted high-level security clearance. Id., ¶¶ 4-10. No other chauffeurs or drivers employed at the Mission were subject to any similar security clearance or requirement to sign additional agreements with similar provisions. Id., ¶ 18. Notably, each agreement emphasizes the importance of information security:

> [Plaintiff] shall not disclose, during his employment and after the termination thereof, any classified information and facts acquired during his employment.

Id., ¶ 20; and the Pledge Agreements further provide,

> I[, Plaintiff,] hereby acknowledge that knowledge of all matters that I will acquire in the course of performing my duties as a chauffeur at the Permanent Mission of the Republic of Korea to the United Nations is deemed nationally classified information of the Republic of Korea, and I shall not divulge it to anyone.

Id., ¶ 11. Plaintiff admits this:

> Q.    **In fact, during the course of employment at the Mission you're not allowed to tell anyone where the [M]inisters went, who the [M]inisters met and what they discussed in the car or outside of the car, correct?**
> A.    Correct**.**
> [….]
> Q.    **And you're not supposed to divulge any information that you learned or acquired during the course of your employment to anyone because this is a secret, correct?**
> A.    Correct.
> Q.    **And classified information, correct?**

16

**A-214**

> A.   Correct.

Ex. 2 (Transcript of deposition of Plaintiff), 50:4-9; 61:4-10.

Only with such pledges to maintain secrecy and abide by the security guidelines was Plaintiff granted a pass to enter the vicinity of the U.N. building in Manhattan each year[7] during the "high-level week" during which the head of each U.N. member-states gathered. Additionally, Plaintiff was entrusted with chauffeuring <u>ROK's national security advisor</u> and <u>the secretary to the U.N.'s Secretary General</u> (as guests of the Mission)—a task any Uber or Lyft driver could not perform for obvious security reasons, and the content of the discussions exchanged between such individuals and the Ministers is considered highly classified information. <u>Id.</u>, ¶¶ 61-69.

The rules and laws applied to and governed Plaintiff's employment are also indicative of its governmental nature. Throughout Plaintiff's tenure his schedules, employment conditions, and benefits, including the amount of stipend he received, calculation of severance pay, and other benefits, were entirely governed and dictated by the laws of South Korea as applicable to its public servants. <u>Id.</u>, ¶¶ 32-36. In case of a breach of confidentiality, Plaintiff even <u>agreed</u> to be subject to punishment under the laws of the ROK. <u>Id.</u>, ¶ 38. Tellingly, even Plaintiff's counsel argued that ROK's law on overtime applied in this matter. <u>Id.</u>, ¶ 33.[8]

While the purpose of every single trip Plaintiff made while employed at the Missions is not necessarily relevant, the overall and overarching goal of Plaintiff's employment is demonstrative

---

[7] With the exception of 2020, because the high-level week was canceled due to the COVID-19 pandemic.
[8] Q (by Plaintiff's counsel): In 2017, there was some change from South Korean law regarding working hours called capped 52 hours that applies to all organization in Korea?
….
Mr. Lim (Defense counsel): What do you mean by organization?
Mr. Bae (Plaintiff's counsel): Whether government or private entity. Missions shouldn't be applied (sic) at 52 hours. That's the reason why 52 hours capped.
Mr. Lim: There are exceptions, you know that, right? That law doesn't apply.
Mr. Bae: <u>But here it applies.</u>
Ex. 3, 76:8-20 (emphasis added).

by the governmental functions he served as a public servant of the ROK. His duties involved not only driving to a destination as a cab driver would, but also (1) maintaining the secrecy of information to which he had access – a matter that cannot be entrusted to an ordinary taxi or ride-share driver or foreign (from the perspective of ROK) nationals, (2) ensuring the safety of the Minister, his family, acquaintances, and other U.N. states' counterparts, as well as (3) performing "diplomatic protocol", "Uei-Jeon" in the native Korean language, which amounts to more than simply following a guideline. Id., ¶¶ 72-76.

Plaintiff's secret-keeping obligation lies at the core of the parties' relationship and relates directly to the trust that ROK had placed in its citizen to serve its national interest, as reinforced by Plaintiff's contractual obligation to do so. Id., ¶ 23. Plaintiff's duty to perform the "diplomatic protocol" is also a governmental function that Plaintiff was required to observe. As explained above, the connotation of this historically and culturally significant Korean term gets lost in translation but is expansively defined to encompass the manners or the decorum standardized in the Korean culture that any high-level officials of the Korean government visiting the United States would expect and appreciate, as well as the practices and behaviors that are the "norm" in the conservative and traditional "government" or "official" settings when interacting with foreign dignitaries. See id., ¶ 78.

Safety concerns were another major aspect of Plaintiff's duties. Any significant injury sustained by a dignitary of ROK in the United States would surely make headlines in all the major Korean newspapers. Worse yet, any casualty to a foreign official while visiting the Mission and while traveling in the Mission's vehicle may lead to an international incident. Before being offered such a critical post, Plaintiff was screened for his employment, family, and educational background through background check for security clearance and interviewed by the Minister himself to ensure

18

that he was a discreet and safe driver, and able to follow the Mission's security guidelines and protocols. Id., ¶¶ 4-17. To prevent any tampering, Plaintiff was assigned a designated vehicle solely for the Minister, and no other drivers at the Mission chauffeured the Minister or his guests; additionally, Plaintiff routinely inspected the said vehicle to ensure it was in good and safe condition. Id., ¶¶ 54-56, 73.

The U.S. District Court has held a sovereign's decision as to how best to protect its diplomats, dignitaries, and their family and guests are peculiar to sovereignty. See Figueroa, 222 F.Supp.3d at 315; see also Butters v. Vance Int'l, Inc., 225 F.3d 462, 465 (4th Cir. 2000). Its decision as to how best to protect its secrets and classified information, too, comfortably fall within the sovereignty's power to police its own interests that "has long been understood for the purposes of [the commercial activity exception] as peculiarly sovereign in nature." Nelson, 507 U.S. at 361.

For all the foregoing reasons, Defendant respectfully submits that the Court should find that the commercial activities exception does not apply to the Mission and, accordingly, that the Court lacks personal and subject matter jurisdiction over the Mission.

**b.  Comparison With and Distinction From Precedents Involving Chauffeurs**

### 1.  Figueroa v. Ministry of Foreign Affairs of Sweden (2016)

As discussed above, Figueroa is a case involving a fact pattern substantively identical to this matter. The matter before the court in Figueroa was a motion to dismiss pursuant to FRCP 12(b)(1), but the facts are clear. In both Figueroa and this matter, defendants are instrumentalities of a foreign sovereign state. Figueroa, 222 F.Supp.3d at 308; DSMF ¶ 1. The plaintiffs in both matters were hired as chauffeurs. Ibid.; DSMF ¶ 3.

In his capacity as a chauffeur, the Figueroa plaintiff transported the Swedish Ambassador and the Ambassador's family, Swedish diplomats and their families, and the Royal Family of Sweden. Id. at 315. He was entrusted with the safe transport of Swedish dignitaries. Here, Plaintiff

transported the South Korean Minister and the Minister's family, as well as other high-level government officials of ROK, such as the national security advisor to the president of ROK, as well as other high-ranking officers of the United Nations, such as the secretary to the secretary general of the U.N., while visiting the Mission. DSMF ¶¶ 66-69. The Mission likewise entrusted Plaintiff with the safe transport of the ROK's (and also other U.N. member nations') dignitaries.

In fact, Figueroa represents a lower standard than the facts at bar, as the plaintiff there was hired as an "Office Clerk" as well as a chauffeur. Figueroa, 222 F.Supp.3d at 308. Moreover, the grounds for the Figueroa plaintiff's claims involve, in part, his injuries sustained while assembling wardrobes purchased from IKEA®, with no relevance to his duties as a chauffeur. Id. at 309. Notwithstanding facts diverting the plaintiff's duties away from governmental tasks, the Figueroa court analyzed and focused on that plaintiff's governmental duties – chauffeuring the dignitaries – and ruled "[a] sovereign's decision on how best to address the safety concerns of government officials are peculiarly sovereign," finding no FSIA exception applies to the Swedish Mission. Id. at 315. The Figueroa court added that the plaintiff's "transportation responsibilities at the Mission were sufficiently intertwined with the diplomatic functions of the Mission such that the employment itself was part of the defendants' sovereign function." Ibid. Still further, Figueroa gave weight, "while not outcome determinative, [to] the existence of a Swedish statutory scheme for the [Swedish Mission]'s employees . . . in support of the conclusion that the plaintiff's employment [as an office clerk/chauffeur] was intertwined with the governmental function of the [Swedish Mission]." Id. at 316 (citation omitted).[9]

Here, Defendant presents additional undisputed facts to further support that Plaintiff's employment was indeed governmental in nature. First, as the Figueroa court made clear, the

---

[9] The Figueroa court did find a limited waiver under a separate tolling and confidentiality agreement between the parties, because a "tolling agreement is plainly not the product of an act peculiar to a sovereign." Id. at 317.

Mission's decisions on how best to address the safety concerns of its Minister, his family, and his diplomatic contacts are sovereign matters and undoubtedly governmental. Second, the Mission's decisions on how best to secure its national secrets and classified information, whether by hiring a South Korean national or by implementing multiple layers of security measures including the detailed background check by the ROK government prior to hire for security clearance and demand of a polygraph test by way of a pledge agreement, are also peculiar to a sovereign and undoubtably governmental. Third, the Mission assigned to Plaintiff the tasks of "diplomatic protocol" which, even more so than his chauffeuring duties are clearly governmental in nature. Lastly, the Mission complies with the diplomatic employment bylaws and guidelines referenced that the ROK's Ministry of Foreign Affairs promulgates and enforces (see e.g., Ex. 31, internal exhibit A). In view of the foregoing, Defendant respectfully submits the Court's ruling in this matter should be consistent with Figueroa and find no "commercial activity" exception under the FSIA applies here.

### 2.   Crum v. Kingdom of Saudi Arabia (2005)

Crum is an unpublished decision from the Eastern District of Virginia, cited in Figueroa as "an essentially identical case," wherein the court declined jurisdiction over a claim against the Saudi Arabian Embassy by its limousine driver. Crum v. Kingdom of Saudi Arabia, 2005 WL 3752271 (E.D. Va. Jul. 13, 2005). Though this unreported opinion is non-binding, it is persuasive, and its reasoning is consistent with that in Figueroa.

In reaching its decision, the Crum court relies upon another decision from the Fourth Circuit, Butters v. Vance International, involving a security agent's claim that the Saudi Arabian government's decision to hire her was a commercial activity. The Butters court found the "relevant act" to be the "foreign sovereign's decision as to how best to secure the safety of its leaders" and further found it to be "quintessentially an act 'peculiar to sovereigns'" 225 F.3d at 465. In turn, the Crum court ruled, simply and clearly: "being employed as a chauffeur for the Saudi Arabian

21

Embassy does not constitute a 'commercial activity.'" <u>Crum</u>, 2005 WL 3752271 at *3 (quoting 28

U.S.C. § 1605(a)(2)) (noting an employment decision directed at security is "not a commercial act

in which the state was acting in the manner of a private player within the market," and therefore

could not trigger the FSIA's commercial activity exception.") (quoting <u>Butters</u>, 225 F.3d at 465)

(internal quotation omitted).

Further consistent with the rulings in <u>Butters</u>, <u>Crum</u>, and <u>Figueroa</u>, the sole fact that the

Mission entrusted Plaintiff with safeguarding the security of the Ministers and their families, their

acquaintances, and their visitors and guests, alone suffices to exempt the Mission from the

"commercial activity" exception under the FSIA.

### 3.   Bardales v. Consulate General of Peru in New York (2020)

<u>Bardales</u> also involves a fact pattern similar to that of <u>Figueroa</u> and the instant matter.

<u>Bardales v. Consulate General of Peru in New York</u>, 490 F.Supp.3d 696 (S.D.N.Y 2020). As was

the case in <u>Figueroa</u>, the plaintiff in <u>Bardales</u> spent the majority of his time chauffeuring a high-

ranking diplomat, the Consul General of Peru – though arguably a "lower" position than the

Ambassador in <u>Figueroa</u>. <u>Id.</u> at 699. Also similar to the within matter, the <u>Bardales</u> plaintiff alleged

he spent some time chauffeuring the Consul General for personal matters, as Plaintiff alleges he

has done for ROK's Ministers' family and other acquaintances. <u>Id.</u> at 704.

Simply stated, <u>Bardales</u> relied on <u>Kato</u> and its progeny in focusing on the "bigger picture,"

ruling "there is no basis to segregate the portions of the plaintiff's employment that could be

characterized as purely clerical … because the commercial activity jurisdictional assessment must

be made with reference to the plaintiff's course of conduct with the defendants <u>as a whole</u>." <u>Ibid.</u>

(emphasis added) (citing <u>Figueroa</u>, 222 F.Supp.3d at 315). The <u>Bardales</u> court, in fact, analyzed

the list of "personal" matters proffered as evidence; finding that plaintiff:

22

> worked a total of 380 days during [his employment]. On 324 of those
> days, Bardales drove to exclusively official destinations. On only 56
> days did Bardales drive to destinations that were arguably personal.

Ibid. (internal citations to records omitted). That is about 17% of the Bardales plaintiff's workdays allegedly involving the Consul General's personal matters, which the Bardales Court found negligible. During discovery in this instant case, in support of his claim, Plaintiff produced what appears to be a "summary" of his personal "diary" recording his alleged driving for the Ministers' personal matters. See Ex. 33, 20:4-30:5. This purported "summary" shows he drove for the Ministers' "personal" matters 144 days[10] out of the five-year employment (approximately 1,200 days excluding holidays and weekends). Assuming *arguendo* his allegations are correct--which is not, the amount of time he allegedly spent driving for the Ministers' personal matters is only 12%, which the Court should likewise find to be negligible in determining whether Plaintiff's duties were governmental and non-commercial in nature. Given the *de minimis* percentage, it is clear that Defendant is not subject to the "commercial activities" exception under the FSIA.

> 4.  Mourmouni v. Permanent Mission of Republic of South Sudan to the
>     United Nations (2021)

Lastly, Mourmouni is the most recent case involving a chauffeur claiming inclusion under the "commercial activity" exception under the FSIA. Mourmouni, 2021 WL 4461829. As explained above, Judge Nathan heavily relied on this unpublished opinion in denying, in part, Defendant's FRCP 12(b)(1) and (6) motion to dismiss. While Defendant respectfully disagrees

---

[10] This is the number of days appearing on Plaintiff's purported summary of his "diary," discussed during the deposition of the Second Secretary of the Mission. See Ex. 33, 20:4-30:5. Both the diary and the purported summary have been designated as confidential because they contain what is deemed the ROK's national secret and/or classified information. Accordingly, there are not submitted herewith.

with Judge Oetken's significant deviation from the holdings of <u>Figueroa</u> and its progeny, <u>Mourmouni</u> is certainly distinguishable from the case at bar.[11]

Importantly, the <u>Figueroa</u>-line of cases involve chauffeurs for the Ambassador (<u>Figueroa</u>), the Consul General (<u>Bardales</u>), or other facts sufficient for the court to hold that the chauffeur-plaintiffs were involved in the safety of the diplomats (<u>Crum</u> and <u>Butters</u>), which are regarded as "undoubtedly governmental" and matters "peculiar to sovereigns." <u>See</u> <u>Figueroa</u>, 222 F.Supp.3d at 315; <u>see also</u> <u>Bardales</u>, 490 F.Supp.3d at 701. No such facts are present in the <u>Mourmouni</u> decision. <u>See</u> <u>generally</u>, <u>Mourmouni</u>, 2021 WL 4461829. Judge Oetken notes this distinction as well – describing <u>Figueroa</u> as an "exception"[12] – and concedes that <u>Figueroa</u> "may have been" correctly decided. <u>Id.</u> at *3. It is most respectfully submitted that the decision in <u>Mourmouni</u> is an outlier and/or confined to its unique and dissimilar facts.

Here, the "exceptional facts" exist that would group this matter with <u>Figueroa</u> even under the more expansive application of the "commercial activities" exception under <u>Mourmouni</u>. These facts substantially parallel those of <u>Figueroa</u> and, to the extent Plaintiff was not required to chauffeur the Royal Family as Mr. Figueroa was, Plaintiff's duties to maintain the ROK's national secrets and classified information, and further, his additional duties to perform the "diplomatic protocol", compensates for the same. As such, the Court should find that the "commercial activities" exception under the FSIA does not apply, even under <u>Mourmouni's</u> most liberal standard of applying said exception.

As detailed above, all precedents are consistent in their analysis that the employment of a chauffeur having the duties assigned to Plaintiff is governmental in nature. As such, Defendant

---

[11] Defendant maintains that the Court must adopt the more restrictive reading of the FSIA's commercial activity exception consistent with the holdings in <u>Figueroa</u> and <u>Bardales</u>, both published opinions, as opposed to the holding in <u>Mourmouni</u>, an unpublished opinion.

[12] Judge Oetken expressly notes that <u>Bardales</u> "lack its exceptional facts."

respectfully requests that the Court find Defendant is immune from suit in the United States to the extent it relates to Plaintiff's employment at the Mission and dismiss this action in its entirety.

###    iii.    Plaintiff's Employment Lacks "Substantial Contact" with the United States

The FSIA exception applies in a specific manner where the action is based upon a "commercial activity carried on in the United States by the foreign state[,]" 28 U.S.C. § 1605(a)(2), a term specifically defined in § 1603(e). It is insufficient to merely allege "commercial activity"; a plaintiff must also meet the heightened standard that such activity had "<u>substantial contact</u> with the United States." Id. § 1603(e) (emphasis added). "The exact contours of this standard are 'poorly defined.'" Ex. 38, Opin. (Nathan, J) (citing Pablo Star, 961 F.3d at 564) but "it is clear that Congress intended a tighter nexus than the 'minimum contacts' standard for due process." Pablo Star, 961 F.3d at 565 (citing Shapiro v. Republic of Bolivia, 930 F.2d 1013, 1019 (2d Cir. 1991)).

Here, Plaintiff cannot present any facts showing "substantial contact with the United States" because, frankly, there are none. Plaintiff's employment related solely to chauffeuring for the Ministers and their families and guests and did not involve any acts that would otherwise have any impact on the United States. For instance, Plaintiff's security-related duties could have been performed in a foreign land, whether it be South Korea or otherwise. The factors obviating the application of the commercial activity exception against the Mission, including the concerns for physical safety and information security, also do not amount to a "substantial contact with the United States." Plaintiff was responsible for the safeguarding of the diplomats of the ROK and to maintain the secrecy of ROK's classified information; these acts, at most, maintain the status quo and integrity of ROK's governmental infrastructure.

In contrast, in Pablo Star the Second Circuit found the Welsh Government did have the required substantial contact with the United States, and reasonably so. Id. at 566. There, the Welsh Government distributed copyrighted photographs and contacted private businesses to assist in the

25

same. Id. at 565. The Welsh Government provided an exhibition for display in American venues, and moreover, it was necessary that such acts be done within the United States. Id. at 566. The Pablo Star court further noted that the Welsh Government's conduct "reached beyond the confines of its consular office."

Here, concededly, Plaintiff's duties did take place outside the confines of the Korean embassy but were confined to designated official vehicles that only Plaintiff drove. DSMF ¶ 56. Moreover, Plaintiff's responsibility had no connection to the locale of its performance; as Plaintiff admits, he "just drove when [he] was asked to drive." Ex. 2, 94:2-3. There are no acts or transactions involving other U.S. private businesses or distribution of any information that affects the United States.[13] In fact, Plaintiff was specifically required not to disseminate any information, whether in the United States or elsewhere. DSMF ¶¶ 10-27. Plaintiff was even required to inform the Mission if he marries a non-ROK national, so the Mission may limit Plaintiff's duties if it decided necessary to. Id., ¶ 28.

Though not relevant to Plaintiff's employment duties and the nature thereof, Plaintiff alleges Defendant's use of "www.heykorean.com" for posting "help wanted" notices constitute a commercial activity. Ex. 1, ¶¶ 30-33. But this too does not rise to the level of "substantial contact" with the United States. The Mission's online presence had no connection with the United States, except to cause Plaintiff and perhaps other applicants to visit the Korean Embassy for an interview. If using an online portal would be deemed "substantial contact" with the U.S., a simple search on Google® would too be deemed one and that would simply read the "substantial contact" language out of the statute.

---

[13] Plaintiff does allege that he drove his passengers to car dealers, malls, and markets, but any transactions involved therein are the transactions between the Minister and/or his family member, not relevant to Plaintiff's chauffeuring.

26

Plaintiff fails to establish that Defendant engaged in any commercial activity with respect to Plaintiff's employment let alone that his duties had any "substantial contact" with the United States. For all the foregoing reasons, Defendant respectfully requests that the Court dismiss this action in its entirety for lack of personal and subject matter jurisdiction.

### D. Plaintiff's Claims Have Been Settled

Prior to initiating this action, Plaintiff already released all claims, including his claims under the NYLL, NYCHRL, and NYSHRL by signing a settlement agreement with the Mission in return for his employment being extended through June 2021. The law on this issue is well-settled. "Agreements that purportedly release employers from liability for claims arising under the New York Labor Law overtime requirements are generally valid and enforceable […] Courts have repeatedly upheld the validity of broadly-worded releases with respect to claims brought pursuant to New York employment statutes." Hummel v. AstraZeneca LP, 575 F.Supp. 2d 568, 570 (S.D.N.Y. 2008) (citing Simel v. JP Morgan Chase, 05-cv-9750, 2007 WL 809689, at *4-5 (S.D.N.Y. Mar. 19, 2007); Difilippo v. Barclays Capital, Inc., 552 F.Supp. 2d 417, 426 (S.D.N.Y. 2008); Dewey v. PTT Telecom Netherlands, US, Inc., 94-cv-5983, 1995 WL 542447, at *2-3 (S.D.N.Y. Sept. 12, 1995); Skluth v. United Merchs. & Mfrs., Inc., 559 N.Y.S.2d 280, 281-82 (1st Dept. 1990); Volk v. Liggett Group Inc., 96-cv-1921, 1997 WL 107458, at *4-6 (S.D.N.Y. Mar. 11, 1997); but see Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc., 354 F.Supp.2d 293, 298 (S.D.N.Y. 2004) (refusing to enforce a non-specific release that failed to identify any particular universe of claims)).

"To establish the existence of an enforceable agreement, [the proponent] must establish an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound (22 N.Y. Jur.2d, Contracts § 9). That meeting of the minds must include agreement on all essential terms (Id. at § 31)". Kowalchuk v. Stroup, 61 A.D.3d 118, 121 (App. Div. 1st Dept. 2009) (parenthetical

in original). "[T]he consideration for a bilateral contract […] in which promises are exchanged [ ] consists of the acts mutually promised" Id. at 125 (citing Moers v. Moers, 229 N.Y. 294, 301 (1920) (internal citation to 1 Williston on Contracts, § 103(f)).

Here, Plaintiff acknowledges that he signed such a valid and enforceable contract for the release of the claims brought herein. DSMF ¶ 45. Pursuant to the ROK's rules and regulations, "[t]he retirement age is 60." Id. ¶ 39. According to their terms, Plaintiff should have retired in June of 2020, but he pleaded with the Mission for an extension, citing the extraordinary circumstances of the global pandemic, which the Mission granted– but could do so only after obtaining the additional special approval of the government of ROK. Id. ¶¶ 43-44. However, such extension was conditioned on the Plaintiff's signing a settlement agreement including a release of his claims relating to his employment and more particularly the extended termination date of the same. Id. ¶¶ 45-46. By presenting the release and promising to extend his employment through June 2021, Defendant made an offer; by signing, Plaintiff accepted that offer. The consideration here includes the release and the extension of Plaintiff's employment beyond Korea's normal retirement age. Importantly, the parties specifically agreed that Plaintiff will release his claims concerning his employment. A translation of the release, originally written in Korean is as follows:

> The above two sides execute this agreement because they have agreed not to assert civil and criminal claims in the future with respect to the termination of the employment relationship of the local employee (Hyun-Hee Nam) as of June 30, 2021

Id. ¶¶ 46, 82. [14] Regardless of the emotional and financial circumstances Plaintiff alleges experiencing, Plaintiff did assent to be bound by the terms of this release. The parties have a valid

---

[14] As explained in the foregoing sections of this memorandum, this release form, too, is pursuant to the laws and regulations of the ROK, and Defendant has no discretion or authority to modify the same.

and enforceable contract for Plaintiff's release of claims asserted in this action, independent of Defendant's immunity.

The language of the release is permissibly broad, and certainly covers claims relating to Plaintiff's employment and the termination thereof. Hence, Plaintiff's release of his claims under the NYLL, NYSHRL, and NYCHRL is valid and enforceable in favor of Defendant.

Plaintiff's only avenue for invalidating this agreement would arise under contract law. "Courts applying New York law will enforce valid releases that are clear and unambiguous on their face and which were knowingly and voluntarily entered into and were not 'the product of fraud, duress, or undue influence.'" Hummel, 575 F.Supp.2d at 570 (citing Skluth, 559 N.Y.S.2d at 282; Laramee v. Jewish Guild for the Blind, 72 F.Supp.2d 357, 359 (S.D.N.Y.1999)). This is inapplicable here. Plaintiff alleges no facts that plausibly infer any circumstances amounting to "fraud, duress, or undue influence" but, rather the opposite; Plaintiff acknowledges that he knowingly and voluntarily, and upon giving painstaking and due consideration of his foreseeable circumstances, agreed to and did sign the release.

By Plaintiff's own admission, he duly released Defendant from his employment-related claims - if any – in return for the extension of his employment until June 2021, to which he would otherwise not have been entitled. Hence, his claims under the New York Labor Law, New York State Human Rights Law, and New York City Human Rights Law must all be dismissed with prejudice.

Notwithstanding the foregoing settled law and the absence of sufficient, plausible facts alleged in Plaintiff's favor, Judge Nathan denied Defendant's FRCP 12(b)(6) motion to dismiss based on this settlement agreement, narrowly construing the language thereof. Defendant respectfully resubmits to the Court that the language of the settlement agreement is sufficiently

**A-227**

and permissibly broad to cover Plaintiff's wage-related and discrimination-related claims as a matter of law. At the very minimum, however, Plaintiff's discrimination-related claims were released, as the settlement agreement specifically notes that he agreed "not to assert civil … claims in the future with respect to the termination of the employment relationship[.]" DSMF ¶ 83.

For the foregoing reason, in addition to or as an alternative to Defendant's immunity under the FSIA, Defendant respectfully submits Plaintiff's claims must be dismissed in their entirety for accord and satisfaction.

V.     **CONCLUSION**

For the foregoing reasons, it is respectfully requested the Court grant Defendant's motion for summary judgment and dismiss each of the claims asserted in the Complaint.

Respectfully submitted,

Dated: July 28, 2022                        _/s/ Joshua S. Lim_____
                                            Joshua S. Lim, Esq.
                                            **Kim, Cho & Lim, LLC**
                                            460 Bergen Boulevard, Suite 305
                                            Palisades Park, New Jersey 07650
                                            T: 201-585-7400
                                            F: 201-585-7422
                                            joshualim@kcllawfirm.com
                                            *Attorneys for Defendant*

30

**A-228**

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| HYUNHUY NAM,<br><br>                              Plaintiff,<br><br>                    v.<br><br>PERMANENT MISSION OF THE<br>REPUBLIC OF KOREA TO THE UNITED<br>NATIONS;<br><br>                              Defendant. | Case No.: 1:21-cv-06165-RA<br><br><u>CIVIL ACTION</u><br><br>**DECLARATION OF JOSHUA S. LIM, ESQ<br>IN SUPPORT OF DEFENDANT'S<br>MOTION FOR SUMMARY JUDGMENT<br>PURSUANT TO FRCP 56** |

Joshua S. Lim, Esq., of full age, hereby respectfully makes the following declaration pursuant to 28 U.S.C. § 1746(1):

1. The undersigned is a partner at the law offices of Kim, Cho & Lim, LLC, attorneys for defendant Permanent Mission of the Republic of Korea to the United Nations ("Mission" or "Defendant").

2. As such, the declarant is familiar with the facts stated herein.

3. Annexed hereto as Exhibit 1 is a true and correct copy of the complaint filed on July 19, 2021, as ECF Dkt. # 1.

4. Annexed hereto as Exhibit 2 is a true and correct copy of the transcript of the deposition of Plaintiff, taken on February 22, 2022.

5. Annexed hereto as Exhibit 3 is a true and correct copy of the transcript of the deposition of the Counsellor at the Mission, taken on April 4, 2022.

6. Annexed hereto as Exhibit 4 is a true and correct copy of the 2016 pledge agreement produced by Defendant in this matter as ROKPM0014.

7.  Annexed hereto as Exhibit 5 is a true and correct copy of a certified translation of Exhibit 4, produced by Defendant in this matter as ROKPM0014-T, along with the certification of translation.

8.  Annexed hereto as Exhibit 6 is a true and correct copy of the 2017 pledge agreement produced by Defendant in this matter as ROKPM0019.

9.  Annexed hereto as Exhibit 7 is a true and correct copy of a certified translation of Exhibit 6, produced by Defendant in this matter as ROKPM0019-T, along with the certification of translation.

10. Annexed hereto as Exhibit 8 is a true and correct copy of the 2018 pledge agreement produced by Defendant in this matter as ROKPM0024.

11. Annexed hereto as Exhibit 9 is a true and correct copy of a certified translation of Exhibit 8, produced by Defendant in this matter as ROKPM0024-T, along with the certification of translation.

12. Annexed hereto as Exhibit 10 is a true and correct copy of the 2019 pledge agreement produced by Defendant in this matter as ROKPM0030.

13. Annexed hereto as Exhibit 11 is a true and correct copy of a certified translation of Exhibit 10, produced by Defendant in this matter as ROKPM0030-T, along with the certification of translation.

14. Annexed hereto as Exhibit 12 is a true and correct copy of the 2020 pledge agreement produced by Defendant in this matter as ROKPM0041.

15. Annexed hereto as Exhibit 13 is a true and correct copy of a certified translation of Exhibit 12, produced by Defendant in this matter as ROKPM0041-T, along with the certification of translation.

16. Annexed hereto as Exhibit 14 is a true and correct copy of the 2021 pledge agreement produced by Defendant in this matter as ROKPM0047.

17. Annexed hereto as Exhibit 15 is a true and correct copy of a certified translation of Exhibit 14, produced by Defendant in this matter as ROKPM0047-T, along with the certification of translation.

18. Annexed hereto as Exhibit 17 is a true and correct copy of the 2016 employment contract produced by Defendant in this matter as ROKPM0010 through 0013.

19. Annexed hereto as Exhibit 18 is a true and correct copy of a certified translation of Exhibit 17, produced by Defendant in this matter as ROKPM0010-T through 0013-T, along with the certification of translation.

20. Annexed hereto as Exhibit 19 is a true and correct copy of the 2017 employment contract produced by Defendant in this matter as ROKPM0015 through 0018.

21. Annexed hereto as Exhibit 20 is a true and correct copy of a certified translation of Exhibit 19, produced by Defendant in this matter as ROKPM0015-T through 0018-T, along with the certification of translation.

22. Annexed hereto as Exhibit 21 is a true and correct copy of the 2018 employment contract produced by Defendant in this matter as ROKPM0020 through 0023.

23. Annexed hereto as Exhibit 22 is a true and correct copy of a certified translation of Exhibit 21, produced by Defendant in this matter as ROKPM0020-T through 0023-T, along with the certification of translation.

24. Annexed hereto as Exhibit 23 is a true and correct copy of the a first 2019 employment contract produced by Defendant in this matter as ROKPM0025 through 0029.

25. Annexed hereto as Exhibit 24 is a true and correct copy of a certified translation of Exhibit 23, produced by Defendant in this matter as ROKPM0024-T through 0029-T, along with the certification of translation.

26. Annexed hereto as Exhibit 25 is a true and correct copy of the a second 2019 employment contract produced by Defendant in this matter as ROKPM0031 through 0035.

27. Annexed hereto as Exhibit 26 is a true and correct copy of a certified translation of Exhibit 25, produced by Defendant in this matter as ROKPM0031-T through 0035-T, along with the certification of translation.

28. Annexed hereto as Exhibit 27 is a true and correct copy of the 2020 employment contract produced by Defendant in this matter as ROKPM0036 through 0040.

29. Annexed hereto as Exhibit 28 is a true and correct copy of a certified translation of Exhibit 27, produced by Defendant in this matter as ROKPM0036-T through 0040-T, along with the certification of translation.

30. Annexed hereto as Exhibit 29 is a true and correct copy of the 2021 employment contract produced by Defendant in this matter as ROKPM0042 through 0046.

31. Annexed hereto as Exhibit 30 is a true and correct copy of a certified translation of Exhibit 29, produced by Defendant in this matter as ROKPM0042-T through 0046-T, along with the certification of translation.

32. Annexed hereto as Exhibit 31 is a true and correct copy of the Declaration of the Counsellor at the Mission, dated September 3, 2021, and its internal exhibits A and B

33. Annexed hereto as Exhibit 32 is a true and correct copy of Declaration of the Head of Administration of the Mission, dated August 25, 2021, and its internal exhibit 1.

34. Annexed hereto as Exhibit 33 is a true and correct copy of the transcript of the deposition of the Second Secretary at the Mission, taken on April 4, 2022.

35. Annexed hereto as Exhibit 34 is a true and correct copy of a print-out of a webpage from "naver.com," the full web address being the following, last accessed on February 16, 2022:

https://terms.naver.com/entry.naver?docId=5844054&cid=43667&categoryId=43667

36. Annexed hereto as Exhibit 35 is a true and correct copy of a certified translation of Exhibit 34, along with the certification of translation.

37. Annexed hereto as Exhibit 37 is a true and correct copy of a certified translation of internal exhibit B of Exhibit 31, along with the certificate of translation.

38. Annexed hereto as Exhibit 38 is a true and correct copy of the memorandum opinion and order entered in this action by Hon. Alison J. Nathan, U.S.D.J. on January 21, 2022, filed on ECF as Dkt. # 61.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on July 28, 2022

_/s/ Joshua S. Lim_____
Joshua S. Lim, Esq.
**Kim, Cho & Lim, LLC**
460 Bergen Boulevard, Suite 305
Palisades Park, New Jersey 07650
T: 201-585-7400
F: 201-585-7422
joshualim@kcllawfirm.com
*Attorneys for Defendant*

38

**A-233**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HYUNHUY NAM, | Case No.: 1:21-cv-06165-RA |
| Plaintiff, | |
| | CIVIL ACTION |
| v. | |
| | **DECLARATION OF JINHO JO** |
| PERMANENT MISSION OF THE | **IN SUPPORT OF DEFENDANT'S** |
| REPUBLIC OF KOREA TO THE UNITED | **MOTION FOR SUMMARY JUDGMENT** |
| NATIONS; | **PURSUANT TO FRCP 56** |
| Defendant. | |

I, Jinho Jo, make the following declaration pursuant to 28 U.S.C. § 1746:

1.  I am a Counselor at Defendant Permanent Mission of the Republic of Korea to the United Nations ("Mission") and therefore am fully familiar with the facts and circumstances set forth herein.

2.  I submit this declaration in support of the Mission's motion for summary judgment.

3.  Annexed hereto as Exhibit 16 is a true and correct copy of the result of the background check performed for Plaintiff Hyunhuy Nam in the Republic of Korea, along with a certified translation thereof and the certificate of translation.

4.  Annexed hereto as Exhibit 36 is a true and correct copy of a security pass issued to Plaintiff Hyunhuy Nam for access to the vicinity of the United Nations building during the high-level week, issued in 2020 and set to expire on July 30, 2022.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on July 28, 2022.

Jinho Jo

**A-234**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

|  |  |
|---|---|
| HYUNHUY NAM,<br><br>                    Plaintiff,<br><br>          v.<br><br>PERMANENT MISSION OF THE<br>REPUBLIC OF KOREA TO THE UNITED<br>NATIONS;<br><br>                    Defendants. | Case No.: 1:21-cv-06165-RA<br><br><br>CIVIL ACTION<br><br><br>DEFENDANT'S FRCP 56.1<br>STATEMENT OF MATERIAL FACTS |

**PARTIES**

1.      Defendant, Permanent Mission of the Republic of Korea to the United Nations ("Mission"), is an instrumentality of a sovereign state. Ex. 1 (Complaint), ¶¶ 3-7, 17.

2.      Plaintiff is a national of the Republic of Korea ("ROK" or "South Korea"), living in New Jersey as a permanent resident of the United States. Ex. 1, ¶ 25; Ex. 2 (Transcript, Deposition of Plaintiff, Feb. 22, 2022), 17:3-9.

3.      Plaintiff was employed by the Mission from June 28, 2016, through June 30, 2021, as a chauffeur for the Ministers of South Korea. Ex. 1, ¶¶ 134; Ex. 2, 44:23-45:1, 96:1-3.

**BACKGROUND CHECK FOR SECURITY CLEARANCE PRIOR TO HIRE**

4.      Plaintiff's position required a "very important security issue," the parties went through additional procedures for necessary security clearance in connection with the Plaintiff's hire. Ex. 3 (Transcript, Deposition of Counsellor at the Mission, Apr. 4, 2022), 41:6-22.

5.      The Minister of the Mission at the time of Plaintiff's hire personally conducted Plaintiff's interview. Ex. 3, 39:5-9.

1

6.      The Minister interviewed the Plaintiff to ensure that Plaintiff is a safe and reliable driver. Ex. 2, 20:19-25, 17:25-18:20.

7.      Prior to hire, Defendant required the Plaintiff to , and did consent and submit to background checks for security clearance both in the United States and in South Korea. Ex. 2, 43:14-44:22; Ex. 3, 23:4-5.

8.      With the Plaintiff's consent, the South Korean government performed detailed background check for security clearance.  Ex. 16 (background check dated Apr. 20, 2016).

9.      The Minister personally made the final decision to hire the Plaintiff. Ex. 3, 42:2-14.

**PLAINTIFF REQUIRED TO SIGN PLEDGE AGREEMENT EVERY YEAR**

10.     Since Plaintiff's job responsibilities required a high-level security clearance, Plaintiff was required to sign a pledge agreement each year during his employment. Ex. 3, 23:2-10, 52:24-53:11; Exs. 4-5 (Pledge Agreement dated July 1, 2016); Exs. 6-7 (July 1, 2017); Exs. 8-9 (July 1, 2018); Exs. 10-11 (July 1, 2019); Exs. 12-13 (July 1, 2020); Exs. 14-15 (Apr. 1, 2021).1

11.     Each of the pledge agreements provides:

> I[, Plaintiff,] hereby acknowledge that knowledge of all matters that I will acquire in the course of performing my duties as a chauffeur at the Permanent Mission of the Republic of Korea to the United Nations is deemed nationally classified information of the Republic of Korea, and I shall not divulge it to anyone.

Exs. 4-15, Ex. 2, 57:1-13.

12.     The pledge agreements are written in Korean. Exs. 4-15.

13.     Plaintiff can read Korean. Ex. 2:25:20-22.

14.     Plaintiff retained a copy of each pledge agreement. Ex. 2, 30:1-9 (2016) 28:19-25 (2017), 33:1-3 (2018), 38:21-39:2 (2019), 40:1-3 (2020), and 42:20-22 (2021).

---

[1] The odd-numbered exhibits from Exhibits 5-15 are the certified translated copies of the even-numbered exhibits from Exhibits 4-14.

15.   Plaintiff knowingly, voluntarily, and without coercion, signed each pledge agreement for five years. Ex. 2, 23:22-24:9 (2016), 30:14-31:10 (2017), 34:10-14 (2018), 37:7-18 (2019), 40:4-17 (2020), 41:21-42:2 (2021); Exs. 4-15.

16.   The pledge agreements provide that Plaintiff should submit himself to a polygraph test, whenever necessary. Ex. 2, 74:3-11, 77:4-9, 80:8-12; Ex. 4, Ex. 6, Ex. 8, Ex. 10, Ex. 12, Ex. 14 .

17.   Plaintiff knew that all the pledge agreements were "critically important" to his performing his job. Ex. 2, 57:14-17, 56:10-13.

18.   No other non-diplomatic staff of Defendant was subject to such high-level security clearance to which Plaintiff was subject. Ex. 3, 53:9-11, 57:15-18; see Ex. 2**,** 97:13-18.

**PLAINTIFF REQUIRED TO SIGN EMPLOYMENT CONTRACT ANNUALLY**

19.   In addition to the pledge agreements, Plaintiff also signed an employment contract on a yearly basis. Exs. 17-18 (Employment Contract, dated July 1, 2016), Exs. 19-20 (July 1, 2017), Exs. 21-22 (July 1, 2018), Exs. 23-24 (July 1, 2019 (first)), Exs. 25-26 (July 1, 2019 (second)), Exs. 27-28 (July 1, 2020), and Exs. 29-30 (Apr. 1, 2021).

20.   Each employment contract Plaintiff signed includes a clause that provides Plaintiff:

[s]hall not disclose, during his employment and after the termination thereof, any classified information and facts acquired during his employment.

Exs. 17-30, § 2(6).

21.   The employment contacts are written in Korean. Exs. 17-30; see also Ex. 2, 28:16-18 (2017), 33:9-10 (2018), 41:19-42:25 (2021).

3

22.   Plaintiff retained a copy of each employment contract after signing each one. Ex. 2, 30:1-9 (2016) 28:19-25 (2017), 33:1-3 (2018), 38:21-39:2 (2019), 40:1-3 (2020), 42:20-22 (2021).

23.   Plaintiff knowingly, voluntarily, and without coercion, signed each employment contract. Ex. 2, 22:9-23:21 (2016); 27:9-28:18 (2017), 31:11-33:10 (2018), 35:10-36:1 (2019-initial), 37:19-38:23 (2019-amended), 39:3-40:3 (2020), 40:18-41:20 (2021); Exs. 17-30.

24.   According to the agreements, Plaintiff was prohibited from disclosing to anyone "where the [M]inisters went, who the [M]inisters met and what they discussed in the car or outside of the car." Ex. 2, 50:4-12.

25.   The agreements provide that Plaintiff's performance was evaluated on four categories: (a) diligence, (b) responsibility, (c) ability to perform his job, and (d) ability to keep matters secret – top secret. Ex. 2, 62:5-20, 73:10-19; Exs. 17-22, § 7(5); Exs. 23-30, § 7(8). [2]

26.   The agreements provide that Plaintiff's "[f]ailure to abide by the security guidelines" was a ground for the immediate termination of Plaintiff's employment. Ex. 2, 62:25-63:4, 73:20-74:2; Exs. 17-22, § 7(7); Exs. 23-30, § 7(9).

27.   Again and again[,] every contract [Plaintiff] signed reminded [Plaintiff] of how important it was for [Plaintiff] to keep the classified information secret. Ex. 2, 75:13-17, 76:25-77-3.

28.   The agreements provide that Plaintiff was required to inform Defendant of any changes in identification status, including marriage with a foreign national. Ex. 2, 79:22-25; Exs. 29-30, §5(7).

---

[2] The even-numbered exhibits from Exhibits 18-30 are the certified translated copies of the odd-numbered exhibits from Exhibits 17-29.

29.    The employment contracts further provide that Plaintiff "[s]hall not engage in any act of any kind which may be contrary to the national interest of the Republic of Korea." Exs. 17-30, § 2(5); and Ex. 2, 49:5-9, 60:4-14, 74:24-75:4.

30.    Plaintiff believes he has not done anything contrary to the national interest of the Republic of Korea. Ex. 2, 49:10-14, 56:22-24.

31.    Plaintiff believes he was "helping the national interest" by driving the official car of the Mission. Ex. 2, 131:15-25.

### RULES GOVERNING PLAINTIFF'S EMPLOYMENT

32.    The guidelines on administrative employees govern the employment relationship between Defendant and its administrative employees, including Plaintiff. Ex. 31 (Declaration of Jinho Jo, dated Sept. 3, 2021), internal ex. A; Ex. 32 (Declaration of the Head of Administration of the Mission, dated Aug. 25, 2021), ¶ 3.

33.    The laws of the Republic of Korea apply to the employment relationship between Plaintiff and Defendant. Ex. 3, 76:8-20;[3] Ex. 2, 104:25-105:8,[4] Exs. 29-30, § 5(2),[5] Ex. 33 (Deposition of Second Secretary at the Mission, Apr. 4, 2022), 7:25-8:13.

34.    The hiring process is governed by the principles and the general practice of South Korea. Ex. 3, 33:16-24.

35.    Plaintiff's employment conditions are determined by South Korean law. Ex. 3, 12:4-25.

36.    Plaintiff's work schedule is determined by South Korean law. Ex. 3, 16:13-17.

---

[3] Plaintiff's counsel, Youngjin Bae, insisted that South Korean law relating to overtime "applies" here.
[4] Plaintiff purports a certain law of South Korea is applicable to him, specifically a law that applies to an employee signing yearly employment contract.
[5] Consistent with Plaintiff's counsel's argument, the parties' employment contract provides "[o]ff schedule wages shall be paid $13.29 but paid at a monthly maximum of 52 hours pursuant to Korea's Labor Standards Law."

37.   Plaintiff's employment benefits are determined by South Korean law. Ex. 3, 73:12-75:5.

38.   The yearly employment contracts between Plaintiff and Defendant provide – and Plaintiff agreed – that Plaintiff "shall be subject to punishment under the laws of the Republic of Korea" in the event Plaintiff breaches his confidentiality obligations. Ex. 2, 49, 15-22, 58:1-16, 67:4-9; Exs. 17-30, § 2(6).

39.    Under South Korean law, "long-term" (more than 2 years) employees are required to retire at the age of 60. Ex. 33, 35:9-15; Ex. 2, 126:2-6.

40.   Even a yearly-contract employee is considered a "long-term" employee under South Korean law if the total employment period exceeds two (2) years. Ex. 2, 127:20-128:8.

41.   Defendant had informed Plaintiff that he must retire at the age of 60 pursuant to the internal policy of the South Korean Ministry of Foreign Affairs. Ex. 2, 130:3-9.

42.   Due to his wife's job loss resulting from the COVID-19 pandemic, Plaintiff requested Defendant to extend his employment contract. Ex. 2, 100:10-21.

43.   Defendant had to seek approval from the ROK government to grant such extension of Plaintiff's employment beyond South Korea's retirement age of 60. Ex. 2, 100, 22-101:10.

44.   Defendant did obtain the ROK government's approval and extended Plaintiff's employment contract until he was 61 years old. Ex. 2, 101:11-102:14; Ex. 33, 35:12-36:13; Exs. 29-30.

45.   As a condition for said extension, Plaintiff was required to, and did, sign a settlement agreement. Ex. 2, 103:13-104:5.

46.   The settlement agreement provides:

> The above two sides execute this agreement because they have agreed not to assert civil and criminal claims in the future with

> respect to the termination of the employment relationship of the
> local employee (Hyun-Hee Nam) as of June 30, 2021

Ex. 31, internal exhibit A (Settlement Agreement dated Sept. 1, 2020).

47.   Plaintiff was provided a copy of the settlement agreement. Ex. 2, 104:11-18.

48.   The annual employment contracts between Plaintiff and Defendant further provide

that Defendant is exempt from U.S. laws concerning the payment of Social Security tax and payroll

tax for its employees, including Plaintiff. Exs. 17-22, § 5(6); Exs. 23-30, § 5(7).

49.   In fact, Defendant is "a foreign mission and, as such, is exempt from Federal, state,

and local tax." Ex. 32, internal exhibit 1 (U.S. Department of State, Office of Foreign Missions

letter dated June 2, 2002).

50.   The form of the parties' employment contract is a form provided by the Korean

government. Ex. 3, 68:3-7.

### PLAINTIFF'S ASSIGNMENTS AND DUTIES

51.   Plaintiff worked as part of a "team" with the Ministers and Counsellors at the

Mission in matters concerning political affairs. Ex. 3, 8:10-16, 21:2-22:9. Ex. 33, 5:21-7:3.

52.   Plaintiff was assigned the task of supporting the Minister in managing foreign

affairs matters. Ex. 3, 22:10-14.

53.   Plaintiff was required to work for the Minister. Ex. 3, 53:19-20.

54.   Plaintiff was the Ministers' designated chauffeur. Ex. 3, 23:25-24:10; Ex. 2, 44:23-

45:1, 96:1-3; but see Ex. 2, 45:15-17.

55.   Plaintiff was assigned a designated official car of the Mission, a 2015 Hyundai

Genesis. Ex. 2, 47:6-47:24, 95:20-25.

56.   No other drivers drove Plaintiff's designated official car of the Mission. Ex. 2,

47:25-48:3.

57.   The tasks assigned to Plaintiff as the designated chauffeur for the Minister were unlike those assigned to other chauffeurs at the Mission. Ex. 2, 96:8-17.

58.   The Ministers at the Mission are categorized as high-level officials of the South Korean government. Ex. 3, 10:21-24; see also Ex. 2, 20:7-22:7, 82:9-12.

59.   The work of the Ministers at the Mission required high-level security clearance. Ex. 3, 10:20-21, 53:20-21.

60.   Ministers are very important government officials in South Korea. Ex. 2, 81:8-10.

61.   The individuals the Ministers meet and the discussions the Minister has with them are top secret or classified information under South Korean law. Ex. 3, 53:21-54:3; see Ex. 2, 50:4-12, 64:7-13.

62.   As such, Plaintiff became privy to top secret and/or classified information. Ex. 3, 22:17-23:2, 53:19-54:3; see Ex. 2, 61:4-10, 83:16-24.

63.   The routes, destinations, and whereabouts of any high-level government officials are considered national secrets of South Korea. Ex. 3, 79:9-20.

64.   The routes, destinations, and whereabouts of any high-level government officials are relevant to their safety and other security issues. Ex. 3, 79:9-20.

65.   Notwithstanding, given Plaintiff's duties, the routes and schedules of these high-level government officials were shared with the Plaintiff. Ex. 3, 79:21-80-16.

66.   In fact, Plaintiff was the individual responsible for chauffeuring these high-level government officials. Ex. 2, 79:5-12; Ex. 3, 23:12-21, 80:17-81:4.

67.   At one time, Plaintiff chauffeured the secretary of U.N. secretary general. Ex. 2, 82:13-83:15.

68.   Even the list and identities of these high-level government officials who have visited the U.S. are confidential information. Ex. 3, 81:2-4.

69.   When a high-level government official, such as a national security advisor to the president of South Korea, visits the United States, Plaintiff would work as a team with local law enforcement in accordance with a certain security protocol. Ex. 3, 81:5-18; see Ex. 2, 85:4-24.

70.   Plaintiff was required to participate in motorcades when high-ranking government officials that visited the United States. Ex. 3, 81:13-20.

71.   Plaintiff was provided specific instructions as to how such motorcade would take place. Ex. 3, 81:19-25.

72.   Safety was a very important concern for Plaintiff when he drove for the Ministers. Ex. 2, 80:25-81:3.

73.   Plaintiff sometimes checked inside his designated vehicle to "make sure the car was in good condition" to ensure the safety of the Ministers. Ex. 2, 81:11-14.

74.   Plaintiff is always with somebody – government officials – in the car and while driving it. Ex. 2, 96:25-97:2.

75.   Moreover, other than just driving, Plaintiff was assigned other tasks involving the administration of "diplomatic protocol." Ex. 2, 77:14-78:6; Ex. 3, 24:2-6; Exs. 29-30-t, § 2(2).

76.   The term "diplomatic protocol," a term pronounced "Uei-Jeon," is a term of art in the Korean language and is defined as follows according to Naver.com®, a leading search engine in Korea akin to Google® in the U.S.:

> [This term] is a method of etiquette performed at various events hosted as courtesy and refers to "the standard and procedures to make peace in the relationship between individuals." When manners are applied in regulating the relationship between individuals, it is called "etiquette" and when applied to formal relationship between nations or in an international setting or between organizations, it is

called [this term] or protocol. Today, [this term] is used not only in
such events but its broad term also includes the Pledge of Allegiance
and flag raising.

Ex. 34 (Naver.com® search result for term "의전") (accessed Feb. 16, 2022).[6]

77.   A high-level week is a period during which an event takes place at the general

assembly of the United Nations. Ex. 3, 78:19-23.

78.   During the high-level week, high-level officials of each of the member states of the

United Nations, such as government cabinet officials, participate in the U.N. general assembly. Ex.

3, 78:19-79:11.

79.   The high-level week took place each year with the exception of 2020, due to the

COVID-19 pandemic. Ex. 3, 78:24-79:4.

80.   During this high-level week, the whole neighborhood around the United Nations

building in Manhattan is locked down for security reasons. Ex. 3, 46:14-16.

81.   Plaintiff was provided a security pass to the United Nations to be admitted through

the barricades. Ex. 2, 94:4-8; Ex. 3, 46:16-18, 47:13-18; Ex. 36.

## PARTIES' SETTLEMENT AGREEMENT

82.   Plaintiff signed an agreement whereby Plaintiff "agreed not to assert any claims

with respect to [Plaintiff's] termination as [Plaintiff's] employment ends on June 2021. Ex. 2,

103:24-104:10, Ex. 31, internal Ex. 1; Ex. 31, internal exhibit B.[7]

83.   At the time of signing, Plaintiff intended that he "was not going to make any type

//

---

[6] A certified translated copy of internal Exhibit 34 is annexed hereto as Exhibit 35.
[7] A certified translated copy of internal exhibit B of Exhibit 31 is annexed hereto as Exhibit 37.

**A-244**

//

of claims" regarding the one-year extension to his employment. Ex. 2, 105:10-21.

Respectfully submitted,

Dated: July 28, 2022                      _/s/ Joshua S. Lim_____
                                          Joshua S. Lim, Esq.
                                          **Kim, Cho & Lim, LLC**
                                          460 Bergen Boulevard, Suite 305
                                          Palisades Park, New Jersey 07650
                                          T: 201-585-7400
                                          F: 201-585-7422
                                          joshualim@kcllawfirm.com
                                          *Attorneys for Defendant*

11

**A-245**

**CERTIFICATION OF SERVICE**

The undersigned hereby certifies that on July 28, 2022, a true and correct copy of Defendant's notice of motion for Summary Judgment pursuant to Fed. R. Civ. P. 56, together with the accompanying Memorandum of Law, Defendant's FRCP 56.1 Statement of Material Facts, Declaration of the Counsellor at the Mission, Declaration of Joshua S. Lim, Esq., and exhibits thereto, if any, were served on Plaintiff Hyunhuy Nam, in care of his attorneys, Youngjin Bae, Esq. and Shan Zhu, Esq. of Hang & Associates, PLLC, at the following address(es) via PACER, regular mail, and email:

> Hyunhuy Nam
> c/o Youngjin Bae, Esq.
> c/o Shan Zhu, Esq.
> Hang & Associates, PLLC
> 136-20 38th Avenue, Suite 10G
> Flushing, New York 11354
> ybae@hanglaw.com
> szhu@hanglaw.com

Dated: July 28, 2022

_/s/ Joshua S. Lim_____
Joshua S. Lim, Esq.
**Kim, Cho & Lim, LLC**
460 Bergen Boulevard, Suite 305
Palisades Park, New Jersey 07650
T: 201-585-7400
F: 201-585-7422
joshualim@kcllawfirm.com
*Attorneys for Defendant*

3

# EXHIBIT 1

Nam v. Permanent Mission of the ROK to UN
SDNY 1:21-cv-06165-AJN

Defendant's Motion for Summary Judgment

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Hyunhuy Nam,

                                Plaintiff,

           - against -

Permanent Mission of the Republic of Korea to the United
Nations; Hyun Cho; Jinho Jo; and Daeyong Chung,

                                Defendants.

Case No.

**COMPLAINT AND JURY**
**TRIAL DEMAND**

Plaintiff Hyunhuy Nam (hereafter, "Plaintiff") by and through his attorneys, Hang &
Associates, PLLC, upon his knowledge and belief, files this Complaint against Defendants
Permanent Mission of the Republic of Korea to the United Nations; Hyun Cho; Jinho Jo; and
Daeyong Chung (collectively referred to as "Defendants"), and states as follows: alleges as follows:

**PRELIMINARY STATEMENT**

1.        Plaintiff brings this action pursuant to Section 1605(a) of the Foreign Sovereign
Immunities Act (hereafter referred to as "FSIA") to obtain damages for having been subjected to
Defendants' unlawful employment practices arising out of commercial activity performed and
carried on by Defendants in the United States. The commercial activity includes Defendants'
employment of Plaintiff to work for Defendants as a Chauffeur.

2.        Plaintiff seeks overtime compensation, spread of hours premium, damages arising
out of the failure to provide pay stubs and wage notifications owed to Plaintiff for work performed
for Defendants under Fair Labor Standards Act (hereinafter referred to as "FLSA") and New York
Labor Law (hereafter referred to as "NYLL"). Plaintiff also seeks damages for Defendants'
discriminatory conduct based on Plaintiff's age in violation of New York State Human Rights Law

(hereafter referred to as "NYSHRL") and New York City Human Rights Law (hereafter referred to as "NYCHRL") during the course of Plaintiff's employment.

## THE PARTIES

3.      At all times herein mentioned, Plaintiff was and is an alien domiciled and residing in the County of Bergen, State of New Jersey.

4.      At all times material hereto, the Defendant Permanent Mission of the Republic of Korea to the United Nations (hereafter, the "Permanent Mission"), was at all time hereafter and still is foreign mission and/or consulate located at 335 East 45ᵗʰ Street, New York, NY 10017.

5.      Defendant Permanent Mission was and still is a foreign state as defined as in 28 U.S.C. §1603.

6.      Defendant Permanent Mission was and still is a political subdivision of foreign state or agency or instrumentally of a foreign state as defined in 28 U.S.C. §1603 (b).

7.      Defendant Permanent Mission was and still is an organ of a foreign state or subdivision thereof, or a majority of those shares or other ownership interest is owned by a foreign state or political subdivision thereof.

8.      Defendants Hyun Cho; Jinho Jo; and Daeyong Chung; (collectively, "Individual Defendants) are members of a mission as defined as in 28 U.S.C. §1351.

9.      Upon information and belief, Defendant Hyun Cho (hereafter, "Defendant Cho" or "Ambassador Cho") is a Korean national served and serves as Ambassador of Permanent Mission and resides in the County of New York within the 10021 zip code area.

10.     Throughout Plaintiff's employment with Defendant Permanent Mission, commenting on or around June 28, 2016 until approximately June 30, 2021, Defendant Cho was the highest-ranking supervisor at the Permanent Mission.

2

11.     Upon information and belief, Defendant Permanent Mission's former and current Ministers and Counselors, including Defendants Jinho Jo and Dayong Chung, reported directly to Ambassador Cho.

12.     Upon information and belief, Defendant Jinho Jo (hereafter, "Defendant Jo" or "Counselor Jo") is a Korean national served and serves as Counselor of Permanent and resides in the County of New York within the 10016 zip code area.

13.     Upon information and belief, Defendant Jo was and remains Counselor, supervisor, and employee of the Permanent Mission. Defendant Jo has reported directly to Defendant Daeyong Chung, and Ambassador Cho, and was an immediate supervisor of the Permanent Mission staff, including Chauffeur.

14.     Upon information and belief, Defendant Daeyong Chung (hereafter, "Defendant Chung" or "Minister Chung") is a Korean national served and serves as Minister of Permanent Mission and resides at 14 Homestead Road, Tenafly, New Jersey 07670.

15.     Upon information and belief, Defendant Chung was and remains Minister, supervisor, and employee of the Permanent Mission since approximately November 2020 through the present. Through this time, Defendant Chung has reported directly to Ambassador Cho, worked as Ambassador Cho's "right-hand man," and remains Defendant Jo's immediate supervisor.

## JURISDICTION AND VENUE

16.     Plaintiff, repeats, reintegrates and realleges each and every allegation herein above in Paragraphs number "1 though 15" inclusive, with the same force and effect as though more fully set forth herein at length.

17.     This action is brought against Defendants, a foreign state and member of a mission, as defined in 28 U.S.C. §§1603(a) and 1351 pursuant the exceptions to the Foreign Sovereign

Immunities Act (hereafter referred to as the "FSIA") contained within 28 U.S.C. §§ 1602 and 1605 (a), and the Fair Labor Standards Act (hereafter referred to as the "FLSA"), 29 U.S.C. § 201 *et seq*., 29 U.S.C. § 216(b), and 28 U.S.C. §§ 1331 and 1337.

18.     In addition, the Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, because those claims arise out of the same common nucleus of operative fact as the federal claim.

19.     Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b) and (f), because the events that give rise to this action occurred within this district.

20.     This action falls into one or more of the exceptions to the FSIA contained within 28 U.S.C. §§ 1602 and 1605(a).

21.     Defendants are not immune from the jurisdiction of the Courts of the United States in this action.

22.     Defendants are not immune from the jurisdiction of the Courts of the United States in this action pursuant to 28 U.S.C. §1602 as their commercial activities are concerned.

23.     Defendants are not immune from the jurisdiction of the Courts of the United States in this action pursuant to 28 U.S.C. 28 U.S.C. §1605 as this action is based upon commercial activity carried on in the United States by the foreign state or upon an act performed in the United Sates in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

24.     Defendants are not immune from the jurisdiction of the Courts of the United States in this action pursuant to 28 U.S.C. 28 U.S.C. §1605 as an employer of Plaintiff, who worked as

chauffeur to Defendants, was performing duties that were not governmental in nature and Defendants utilized Plaintiff's services to foster and/or to be engaged various commercial activities.

<u>**STATEMENT OF FACTS**</u>

25.    Plaintiff is a 61year-old male, who resides in the State of New Jersey as a Permanent Resident of the United States, and was a former employee of Defendants from around June 28, 2016 to June 30, 2021.

26.    Upon information and belief, Defendant Permanent Mission employed or employs approximately 65 employees.

27.    Upon information and belief, Defendant Permanent Mission's employees are comprised of approximately 28 "non-diplomatic staff," at least 6 of whom are Korean-American who are citizens or permanent residents of the United States.

28.    Upon information and belief, Permanent Mission is managed by a handful of Korean national "diplomatic staff."

29.    Upon information and belief, Defendants often hire a chauffer(s) as "non-diplomatic staff" to provide transportation for the "diplomatic staff" to perform their duties as a member of Permanent Mission and as a personal driver to assist the staff and/or their family members with their personal affairs such as shopping and even, driving a staff member and his female companion to a discreet rondeau at her apartment.

<u>**Defendants' Commercial Activity**</u>

30.    Upon information and belief, Hey Korean's Website[1] provides services to private

---

[1]Hey Korean is an online website that allows its users to post an advertisement under separate categories in the website (i.e., Job Openings, Real Estate, Buying/Selling, etc.) to a target the audience who click on the relevant categories(s) and type their needs in the website's search engine. (website:  https://www.heykorean.com., Last accessed July 2, 2021).

individuals and corporate entities to engage in various types of commercial activities such as sale of goods, real estate transactions, and hiring employees, just like a "K-pop version of Craigslist."

31.     Upon information and belief, Defendant Permanent Mission often utilizes Hey Korean's website to hire its employees such as chauffeur, bilingual research assistant, and administrative assistant.

32.     Upon information and belief, Defendant Permanent Mission posts its phone number (i.g., 1-212-439-4025) and email address(es) (i.g., Bandal2182@gmail.com and korea.mission.un2@gmail.com) to receive potential employees' resumes and inquiries relating to the job opportunities.

33.     Upon information and belief, Defendant Permanent Mission, through its diplomatic staff, conducts an interview of a potential employee inside Permanent Mission's building located at 335 East 45th Street, New York, NY 10017 once the potential employee reaches out to Defendant Permanent Mission via making a phone call or sending an email.

34.     Upon information and belief, Defendant Permanent Mission hires a chauffeur as a "non-diplomatic staff" to make deliveries and provide transportation on behalf of Permanent Mission and for certain diplomatic employee(s) who serves as a Minister at Permanent Mission.

35.     In around 2016, Plaintiff learned the Permanent Mission hiring advisement on Hey Korean's website to work as a chauffeur. Plaintiff reached out to Defendant Permanent Mission by telephone after learning of the job opportunity.

36.     Upon information and belief, Plaintiff had an interview with one of the Permanent Mission's diplomatic staff at the building and eventually employed by Defendants to work as a chauffeur.

37.   Although Plaintiff was hired as a chauffeur and performed his duties as a chauffeur, Defendants gave Plaintiff a job title as Chauffeur/Administrative Assistant.

38.   Defendants assigned Plaintiff to drive the Permanent Mission's vehicle, a Hyundai 2015 GN3 model sedan with Plate No. 0265WDD to provide transportation for its "diplomatic employees" including Individual Defendants.

39.   Upon information and belief, Permanent Mission owns/maintains/controls at least one residential property located at 14 Homestead Road, Tenafly, New Jersey 07670 also known as the "Official Residence."

40.   Upon information and belief, Permanent Mission provides the Official Residence to the staff who serves as a Minister.

41.   Throughout Plaintiff's employment, Plaintiff was primarily responsible for providing transportation for the Minister who resided in the Official Residence and Permanent Mission's Counselors, whenever Defendants required regardless of its/his/her/their purpose(s).

42.   Plaintiff regularly drove his own vehicle to the Official Residence, switched his car to the Permanent Mission's Hyundai sedan, and drove the Minister who resided in the Official Residence to the Permanent Mission.

43.   If no one requested for transportation upon arrival or any one of the Defendants requested Plaintiff to stand-by in the Permanent Mission's building, he had to temporarily stay in the Room 815 at the Permanent Mission, until any one of the Defendants gave him further instructions.

44.   At first, Permanent Mission requested Plaintiff primarily provide transportation for Bong-Woo Ko (hereafter, "Minister Ko") for his work performed on behalf of Permanent Mission as a Minister from approximately June 2016 to October 2017. During this period, Plaintiff's duties

7

included but were not limited to, driving Minister Ko from the Official Residence to Permanent Mission, providing transportation for him to attend meetings at restaurants, standing-by in the car near the meeting locations until he finished his business, and driving him back to Permanent Mission or his residence at the Official Residence.

45.　Upon information and belief, Minister Kyungyul Han (hereafter, "Minister Han") served as Minister at Permanent Mission and moved in to the Official Residence in or around October 2017, after Minister Ko returned back to Korea.

46.　Starting from around October 21, 2017, Permanent Mission required Plaintiff to primarily provide transportation for Minister Han until around May 22, 2018.

47.　Since Plaintiff started providing transportation for Minister Han, he utilized Plaintiff's service as a Permanent Mission's chauffeur and also his personal driver to run him and his family member(s)' personal errands, providing free transportation services for his daughters/spouse/ acquaintances and driving him and his female companion(s) to a discreet rondeau at her apartment.

48.　For instance, on or about October 21, 2017, Minister Han requested Plaintiff to drive him to Lynwood Plaza, a shopping mall located in Fort Lee and required him to stand by until he finished shopping at the mall and visiting a Lexus dealer on the way back to the Official Residence.

49.　For instance, on or about February 22, 2018, Minister Han requested Plaintiff to drive him to a restaurant, Casa Mono, and stand-by until he finished a meeting with a real-estate agent and requested Plaintiff to drop off the real-estate agent near the Chelsea Art building located in W. 25th Street.

50.     For instance, on or about March 27, 2018, Minister Han requested Plaintiff to drive him to a restaurant, Gaonnuri, located on 32nd street between 5th & Broadway in Manhattan and required Plaintiff to wait for him until he finished lunch with his female companion. After Minister Han finished lunch with the female companion, he directed Plaintiff to drive both of them to her apartment located on 11 Howard Street. While Plaintiff was driving them to her apartment, they were sitting in the back seat of the Hyundai sedan side-by-side and had continuous physical interaction until Plaintiff arrived at the location. Even after Plaintiff arrived at the location, Minister Han did not allow him to go home, but required Plaintiff to wait for him in the car until Minister Han returned back from his female companion's apartment because he needed to "check-out" her place.

51.     Additionally, on numerous occasions, Minister Han requested Plaintiff to pick-up/drop-off his daughters from/to her residence located at 867 Metropolitan Ave. Brooklyn, 11211 and a JFK airport terminal to/from the Official Residence to save his daughters' transportation expenses.

52.     Plaintiff complained to Permanent Mission and its staff members, including Ambassador Cho, regarding Minister Han's personal use of Plaintiff's service and the Permanent Mission's sedan requiring Plaintiff to work longer hours, despite that Minister Han personally owned an automobile and was able to drive. However, Defendants did not do anything to remedy the situation.

53.     Upon information and belief, Minister Han returned back to Korea on or around May 22, 2018. Since then, Plaintiff worked as a chauffeur for Permanent Mission and its other diplomatic staff members to perform his regular duties until a new Minister moved in to the Official Residence.

54.    Upon information and belief, Minister Jungjae Lee (hereafter, "Minister Lee") served as Minister at Permanent Mission and moved in to the Official Residence in or around July 2018, after Minister Han returned back to Korea.

55.    Starting from around July 30, 2018, Permanent Mission required Plaintiff to primarily provide transportation for Minister Lee until around April 27, 2020.

56.    Again, since Plaintiff started providing transportation for Minister Lee, he utilized Plaintiff's service as a Permanent Mission's chauffeur and also his personal driver to run his and his family member(s)'s personal errands, and providing free transportation services for his family members/friends/acquaintances to purchase luxury handbags, play golf, and watch Broadway shows.

57.    For instance, on or about August 1, 2018, Minister Lee requested Plaintiff to drive him and his family members to a Korean market located in Fort Lee to grocery shop and automobile dealers such as Lexus and Honda Dealers located in Englewood and Tenafly to purchase a private automobile.

58.    For instance, on or about October 16, 2018, Minister Lee requested Plaintiff to drive him and his wife to a hotel to meet their friends visiting the State from Los Angeles. Minister Lee required Plaintiff to drive to Roosevelt hotel to pick up their friends and drive them to a restaurant. Plaintiff was required to stand-by for 3-4 hours until they finished eating dinner and then, was required to drop-off Minister Lee's friends to the hotel before Plaintiff drove Minister Lee and his wife to the Official Residence at night after 11:00 pm on that day.

59.    For instance, on or about October 17, 2018 and October 22, 2018, Minister Lee requested Plaintiff to provide transportation for his acquaintances. On the way to work at Permanent Mission, Minister Lee requested Plaintiff to pick up his acquaintances near their hotel

or at a certain location. Then, Minister Lee directed Plaintiff to drop him off at Permanent Mission and required Plaintiff to provide transportation for his acquaintances to a golf course, restaurant, and grocery market by driving the Permanent Mission's Hyundai sedan. On those days, Minister Lee's acquaintances used Plaintiff's service as a personal driver/butler and the Permanent Mission's sedan as free transportation and required Plaintiff to stand-by in the sedan for hours while they were engaged in their personal business.

60.     On numerous occasions, Minister Lee requested Plaintiff to drive him along with his friends, sister-in-law, or acquiesces, to various hotels, restaurants, and shopping malls. Upon information and belief, the purpose for Minister Lee's use of Plaintiff's service and the Permanent Mission's sedan with his friends and acquiesces was to foster their commercial activities as well as for personal purposes .

61.     For instance, when Minister Lee requested Plaintiff to drive his wife and her friend, visiting him from Los Angeles, to a shopping mall and wait there until they finish shopping at the mall. After they returned back to the car with a luxury bag, Plaintiff was requested to drive to a location to pick up Minister Lee and his other friend. In the presence of Minister Lee and Plaintiff, Minister Lee's wife told the other friend that Minister Lee let he use tax exemption card to purchase the bag on behalf of his friend at a tax-free price to save her money.

62.     On numerous occasions, Minister Lee requested Plaintiff to pick-up/drop-off his daughters from/to Penn Station and a JFK airport terminal to/from the Official Residence (sometimes to a dentist for his daughter's brace) to save the transportation cost.

63.     On a few occasions, Minister Lee requested Plaintiff to provide transportation for his daughter's boyfriend and their other friends using the same sedan free of charge.

64.     Again, Plaintiff complained to Permanent Mission and its staff members, including Ambassador Cho, regarding Minister Lee's personal use of Plaintiff's service and the Permanent Mission's sedan requiring Plaintiff to work longer hours, despite that Minister Lee personally owned an automobile and was able to drive. However, Defendants did not provide any meaningful responses to Plaintiff. Instead, Ambassador Cho stated to Plaintiff that he could not do anything to remedy the situation since the Permanent Mission's staff members were controlled by a foreign government entity in Korea and Plaintiff's compensation was also paid by the same entity. Defendants, again, failed to remedy the situation.

65.     Upon information and belief, Minister Lee returned back to Korea on or around April 27, 2020. Since then, Plaintiff worked as a chauffeur for Permanent Mission and its other diplomatic staff member primarily, Counselor Jo until a new minister moved in to the Official Residence in November 2020.

66.     Starting from around November 2020 to June 30, 2021, Permanent Mission required Plaintiff to primarily provide transportation for Minister Chung until the end Plaintiff's employment with Defendants.

**Plaintiff's Work Schedule and Pay**

67.     Throughout Plaintiff's employment with Defendants, he worked approximately for 52 hours to 62 hours per week and received around $5,020.00 - $6,550.00 per month (calculated weekly rate at $1,158.46 - $1,511.54) in cash, regardless of how many hours he actually worked.

68.     From around June 28, 2016 to June 30, 2017,  Plaintiff stared his work as early as 6:10 am until as late as 12:30 am on the next day for four (4) to six (6) days per week generally, but not always, from Monday to  Friday (sometimes, Monday to Thursday and any day(s) on the weekend) and worked sixty-two (62) hours per week on average. During this period, Plaintiff

received approximately $5,020.00 per month. Accordingly, he essentially received approximately $1,158.46 per week or $18.68 per hour, despite that his actual hourly rate was $28.96 during this period.

69.     From around July 1, 2017 to June 30, 2018,  Plaintiff stared his work as early as 6:40 am until as late as 12:30 am on the next day for three (3) to six (6) days per week generally, but not always, from Monday to  Friday (sometimes, Monday to Thursday and any day(s) on the weekend) and worked fifty-eight (58) hours per week on average. During this period, Plaintiff received approximately $5,227.00 per month. Accordingly, he essentially received approximately $1,206.23 per week or $20.80 per hour despite that his actual hourly rate was $30.16 during this period.

70.     From around July 1, 2018 to June 30, 2019,  Plaintiff stared his work as early as 4:00 am until as late as 12:45 am on the next day for three (3) to seven (7) days per week generally, but not always, from Monday to  Friday (sometimes, Monday to Thursday and any day(s) on the weekend) and worked fifty-six (56) hours per week on average. During this period, Plaintiff received approximately $6,550.00 per month. Accordingly, he essentially received approximately $1,511.54 per week or $26.99 per hour despite that his actual hourly rate was $37.79 during this period.

71.     From around July 1, 2019 to June 30, 2020,  Plaintiff stared his work as early as 6:40 am until as late as 12:00 am on the next day for two (2) to seven (7) days per week generally, but not always, from Monday to  Friday (sometimes, Monday to Thursday and any day(s) on the weekend) and worked fifty-two (52) hours per week on average. During this period, Plaintiff received approximately $5,300.00 per month. Accordingly, he essentially received approximately

$1,223.08 per week or $23.52 per hour despite that his actual hourly rate was $30.58 during this period.

72.    From around July 1, 2020 to June 30, 2021,  Plaintiff stared his work as early as 6:40 am until as late as 12:20 am on the next day for two (2) to six (6) days per week generally, but not always, from Monday to  Friday (sometimes, Monday to Thursday and Saturday on the weekend) and worked fifty-three (53) hours per week on average. During this period, Plaintiff received approximately $5,300.00 per month. Accordingly, he essentially received approximately $1,223.08 per week or $23.08 per hour despite that his actual hourly rate was $30.58 during this period.

73.    Upon information and belief, Defendants failed to keep any records reflecting Plaintiff's working hours and the amount of pay nor did they require Plaintiff to record his working hours such as requiring him to punch-in and/or punch-out.

74.    Defendants did not compensate Plaintiff for overtime compensation according to state and federal laws.

75.    Plaintiff was not compensated for New York's "spread of hours" premium for shift that lasted longer than ten (10) hours.

76.    Defendants did not provide Plaintiff with a wage notices at the time of his hiring. Instead, Permanent Mission, through its staff member(s), required Plaintiff to sign an agreement written in Korean labeled as "Contract for Employing a Chauffeur *[English translation]*" (hereafter, the "Agreement"), on yearly basis in every July (or April only in 2021) throughout Plaintiff's employment.

77.    Although Plaintiff actually started working for Permanent Mission as a chauffeur on or around June 28, 2016, Permanent Mission required Plaintiff to sign the 1st Agreement on

14

July 1, 2016 subject to an automatic renewal of his employment on yearly basis. Permanent Mission signed the Agreement through its diplomatic staff members: On July 1, 2016 and July 1, 2017, Permanent Mission signed the Agreement through Minister Ko, on July 1, 2018 and July 1, 2019, Permanent Mission signed the Agreement through Minister Lee; On July 1, 2020, Permanent Mission signed the Agreement through Counselor Jo; On April 1, 2021, Permanent Mission signed the Agreement through Minister Chung.

78.    The content in the Agreements specified Plaintiff regular working hours as from 9:00 am to 6:00 pm with a "base" monthly compensation in the amount $1,900.00 (from 2016 through 2019) or $1,710 (in 2020 and 2021), in addition to other compensations under the name of housing allowance, health insurance, bonus, and severance pay. However, none of the Agreements reflected Plaintiff's actual working hours nor did it reflect the accurate amount of compensation Plaintiff actually received. Moreover, Plaintiff never received any severance pay even after termination of Plaintiff's employment with Defendants in June 2021 despite that Defendants utilized Plaintiff's service for 5 years.

79.    Specifically when Permanent Mission, through Minister Chung, required Plaintiff to sign the Agreement in 2021, Minister Chung advised Plaintiff that the Agreement was a "Down Contract." It reflected further reduced and inaccurate amount of the "base" monthly compensation in the amount of $1,710.00 instead of $1,900.00 because Plaintiff passed the "retirement" age of 60, but Defendants could not find a younger alternative chauffeur immediately due to the Covid pandemic. Regardless of the type(s) and content(s) of the Agreement(s), none of the documents reflected Plaintiff's actual working schedules and accurate rate of pay. Additionally, all of the Agreements reflected the sort of practices which the FLSA and NYLL were intended to prohibit such as limiting the amount of employee's overtime compensation regardless of his actual regular

15

hourly rate and the total number of overtime hours the employee could be paid regardless of how many overtime hours the employee actually worked.

80.    Throughout Plaintiff's employment with Defendants, Defendants paid Plaintiff in cash and did not provide Plaintiff with any paystub.

81.    Upon information and belief, Defendants delivered Plaintiff's compensation in cash to a staff who served as a Second Secretary at Permanent Mission. Throughout Plaintiff's employment, Plaintiff picked up the cash in the Second Secretary's office at Permanent Mission.

82.    Defendants committed the following alleged acts knowingly, intentionally and willfully.

83.    Defendants knew that the nonpayment of overtime and the "spread of hours" premium would economically injure Plaintiff by their violation of federal and state laws.

84.    While employed by Defendants, Plaintiff was not exempt under federal and state laws requiring employers to pay employees overtime.

85.    Plaintiff's workdays frequently lasted longer than 10 hours.

86.    Defendants did not pay Plaintiff's "spread of hours" premium for every day in which he worked over 10 hours.

87.    Defendants did not provide Plaintiff with accurate written notice about the terms and conditions of his employment upon hire in relation to his actual rate of pay, regular pay cycle, and rate of overtime pay.

**Age Discrimination and Hostile Environment**

88.    Plaintiff is a 61-year-old male and was 56 years of age when Plaintiff first started working for Defendants on June 28, 2016.

89.     Before Plaintiff turned the age of 60 in or around April 2020, Permanent Mission, through Minister Lee, first informed to Plaintiff that **"he needed to retire when he reached the age of 60."**

90.     As soon as Plaintiff turned 60-year-old on April 9, 2020, Minister Lee told him that **"he should get out because his age reached the Korean retirement age of 60"** and asked Plaintiff to resign until the expiry of his term as to serve Permanent Mission as a minister and returned back to Korea.

91.     Since April 9, 2020, Defendants Counselor Jo and Minister Chung continuously asked Plaintiff to resign because of Plaintiff's age and told Plaintiff that Defendants were unwilling to continue (or renew) Plaintiff's employment because he reached the "retirement age."

92.     Plaintiff verbally objected to the Defendants' forced and discriminatory termination and pleaded to the Defendants, including Ambassador Cho, to allow Plaintiff remain his position as a chauffeur and the compensation he was to receive.

93.     On or around July 1, 2020, Counselor Jo told Plaintiff that Permanent Mission was having hard time finding an alternative younger chauffeur due to the Covid pandemic. Defendants permitted Plaintiff to temporality stay until the pandemic situation eased so that they could find a suitable younger chauffeur.  Around that time and again, in the beginning of October 2020, Defendants advised Plaintiff that if Defendants decided to keep Plaintiff until the following year 2021, Plaintiff would be required to sign a "Down Contract" reflecting 20% reduction in monthly "base" pay because he already passed the retirement age.

94.     On or around September 1, 2020, Counselor Jo, acting at the direction of Permanent Mission, prepared a one-page document written in Korean labeled as "Agreement [*English translation*]" to prevent Plaintiff from brining a civil or criminal claim action relating to

termination of Plaintiff's employment with Defendants on June 30, 2021.  Counselor Jo presented the document to Plaintiff and demanded him to sign. Under emotional and financial pressure, Plaintiff reluctantly capitulated to Counselor Jo's demand and signed the Agreement. At the moment Plaintiff signed the document, he felt that he had no choice but to agree with Counselor Jo to maintain his position as Plaintiff did not have any other financial resources specifically, during the pandemic.

95.     On or around April 1, 2021, Minister Chung, acting at the direction of Permanent Mission, presented the "Down Contract" reflecting the 20% reduction in monthly "base" pay to Plaintiff. Since none of the previous Agreements Defendants required Plaintiff annually to sign reflected Plaintiff's actual working schedule and his rate of pay, he signed the "Down Contract" reflecting the reduction, for the second time since July 1, 2020.

96.     Since Plaintiff turned 60 on April 9, 2020, Defendants Counselor Jo and Minister Chung continued to force Plaintiff to resign and his working conditions became intolerable even though Defendants forced Plaintiff to sign the "Down Contract(s)."

97.     For instance, starting from approximately the 4th day of Minister Chung's term as Minister at the Permanent Mission, he directly and indirectly forced Plaintiff to retire because of his age. Minister Chung frequently made negative and unreasonable comments to Plaintiff regarding his driving that Plaintiff drove too fast (although Plaintiff drove within the speed limit for the whole time) or Plaintiff changed the lane (although Plaintiff was required to change the lane to arrive at the location). On a few occasions, Minister Chung asked Plaintiff, "*where are you going after your retirement [with Defendants].*"

98.     Approximately in the beginning of May 2021, Ambassador Cho requested Plaintiff to come in to his office to investigate and penalize Plaintiff for reporting Ambassador Cho for

18

using the cook as his personal chef and mistreating his maid. The investigatory conversation lasted about 40 minutes. (i.g., who did Plaintiff tell, how did Plaintiff learn such facts, to whom did Plaintiff disclose such facts, etc.). Thereafter, Defendants did not give Plaintiff almost any work to do, but made him to just sit in the office at the Permanent Mission and do nothing.

99.     In or around June 2021, Plaintiff asked Minister Chung whether he could keep his position until the Permanent Mission found an alternative chauffeur. On the same day, Minister Chung responded to Plaintiff that he **"must leave"** by the end of June 2021 **"because he already passed the retirement age of 60"** and the Permanent Mission was not willing to keep a chauffeur over 60 years old.

100.    Since Plaintiff reached the Korean retirement age of 60, Defendants made it clear that they wanted Plaintiff to retire, and Plaintiff began feeling increasingly insecure, unappreciated, and unwelcome at work until Defendants actually terminated Plaintiff on June 30, 2021.

*Commercial Activity Exception Under 28 U.S.C. §1605*

101.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

102.    CPLR 1601 does not apply in the present case based upon the exception set forth in Section 1605 of the CPLR including but not limited to by reason of commercial activity that was not governmental in nature and the activity Plaintiff performed as a chauffeur, specifically for the Individual Defendants, is one which normally could be engaged in by any private party.

**STATEMENT OF CLAIM**

**COUNT I**
**[The Fair Labor Standard Act – Unpaid Overtime]**

19

103.     Plaintiff repeats and realleges all preceding paragraphs above as though fully set forth herein.

104.     Defendants willfully failed to pay Plaintiff overtime at a rate of at least one-and-a-half times her regular hourly rate for every hour Plaintiff worked above forty (40) hours in a work week. This failure violates the Fair Labor Standards Act, 29 U.S.C. § 207(a) and its implementing regulations.

105.     Defendants also violated the FLSA  by failing to properly keep records as required by statute,  29 U.S.C. § 211(c).

106.     Plaintiff is entitled to her unpaid wages, plus an additional equal amount in liquidated damages, as a consequence of Defendants' unlawful actions and omissions, in accordance with 29 U.S.C. § 216(b).

107.     Plaintiff is also entitled to costs of Court, pursuant to 29 U.S.C. § 216(b)

108.     Plaintiff seeks, and is entitled to, attorneys' fees incurred by his counsel, pursuant to 29 U.S.C. § 216(b).

## COUNT II
### [New York Labor Law – Unpaid Promised Wage]

109.     Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

110.     Defendants willfully failed to pay Plaintiff his wages weekly at the $28.96 – $37.79 hourly rates as he was promised, in violation of N.Y. Lab. Law § 191(a).

111.     Defendants' failure to pay the required wages as set forth above was willful within the meaning of NYLL §§ 198, 663, and 681.

112.    Plaintiff is entitled to his unpaid wages as mandated by NYLL, plus an additional 100 percent as liquidated damages, as a consequence of the Defendants' unlawful actions and omissions in accordance with NYLL §§ 198, 663, and 681.

113.    Plaintiff also seeks, and is entitled to, attorneys' fees incurred by his counsel, costs of Court, and interest.

### COUNT III
### [New York Labor Law – Unpaid Overtime]

114.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

115.    Defendants willfully failed to pay Plaintiff overtime at a rate of at least one-and-a-half times his regularly hourly rate for every hour he worked above forty (40) hours in a single work week.

116.    96. Defendants' failure to pay the required wages as set forth above was willful within the meaning of NYLL §§ 198, 663, and 681.

117.    97. Plaintiff is entitled to his unpaid wages mandated by NYLL, plus an additional 100 percent as liquidated damages, as a consequence of the Defendants' unlawful actions and omissions in accordance with NYLL §§ 198, 663, and 681.

118.    98. Plaintiff also seeks, and is entitled to, attorneys' fees incurred by his counsel, costs of Court, and interest.

### COUNT IV
### [New York Labor Law – Spread of Hours]

119.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

120.    Plaintiff regularly worked days in which the end of his work shift was more than ten (10) hours from the beginning of his work shift.

121.    Defendants, in violation of 12 N.Y.C.R.R. § 146-1.6, never paid Plaintiff an additional hour of pay at the minimum wage rate for every day in which the interval between the beginning and the end of Plaintiff's work day was more than ten (10) hours.

122.    Plaintiff is entitled to his unpaid spread of hour pay as mandated by NYLL, plus an additional 100 percent as liquidated damages, as a consequence of the Defendants' unlawful actions and omissions, in accordance with NYLL §§ 198, 663, and 681.

123.    Plaintiff also seeks, and is entitled to, attorneys' fees incurred by his counsel, costs of Court, and interest.

## COUNT V
### [New York Labor Law – Wage Notice and Wage Statement Violations]

124.    Plaintiff repeats and realleges all preceding paragraphs above as though fully set forth herein.

125.    Defendants failed to provide Plaintiff, at the time of his hiring or thereafter, accurate wage notices in English or Korean (Plaintiff's primary language) containing his rates of pay and other information as required by NYLL § 195(1).

126.    Defendants also failed to provide Plaintiff with accurate wage statements with every payment of wages which provided all of the information required under NYLL § 195(3).

127.    For Defendants' violation of NYLL § 195(1), Plaintiff is entitled to $50 for each work day in which this violation continued to occur, in an amount not to exceed $5,000, pursuant to NYLL §198(1-b).

128.     For Defendants' violation of NYLL § 195(3), Plaintiff is entitled to $250 for each

work day in which this violation continued to occur, in an amount not to exceed $5,000, pursuant

to NYLL §198(1-d).

129.     Plaintiff also seeks, and is entitled to, attorneys' fees incurred by her counsel, costs

of Court, and interest.

**COUNT VI**
**[Violation of the New York State Human Rights Law – Age Discrimination]**

130.     Plaintiff repeats and realleges all preceding paragraphs above as though fully set

forth herein.

131.     The NYSHRL provides that it shall be an unlawful discriminatory practice for an

employer to discharge or discriminate against an employee because of his age. See, N.Y. Executive

Law §296(1)(a).

132.     Plaintiff is qualified to work as an employee for Defendants and he has

satisfactorily performed the duties required by the position he held at the Permanent Mission.

133.     Plaintiff is a 61-year-old male and was 56 years of age when Plaintiff first started

working for Defendants on June 28, 2016.

134.     From June 28, 2016 to June 30, 2021, Plaintiff was employed by Defendant

Permanent Mission located at 335 East 45th Street, New York, NY 10017, through its diplomatic

staff to work as a chauffeur.

135.     Upon information and belief, individual Defendants Ambassador Cho, Counselor

Jo, and Minister Chung serve as diplomatic staff at the Permanent Mission.

136.    Before Plaintiff turned the age of 60 in or around April 2020, Permanent Mission, through Minister Lee, first informed to Plaintiff that **"he needed to retire when he reached the age of 60."**

137.    As soon as Plaintiff turned 60-year-old on April 9, 2020, Minister Lee told him that **"he should get out because his age reached the Korean retirement age of 60"** and asked Plaintiff to resign until the expiry of his term as to serve Permanent Mission as a minister and returned back to Korea.

138.    Since April 9, 2020, Defendants Counselor Jo and Minister Chung continuously asked Plaintiff to resign because of Plaintiff's age and told Plaintiff that Defendants were unwilling to continue (or renew) Plaintiff's employment because he reached the "retirement age."

139.    On or around July 1, 2020 and again, in October 2020, Defendants Counselor Jo and Minister Chung advised Plaintiff that if Defendants decided to keep Plaintiff until the pandemic situation eased so that they could find a suitable younger chauffeur (i.e., until the following year 2021), Plaintiff would be required to sign a "Down Contract" reflecting 20% reduction in monthly "base" pay because he already passed the retirement age.

140.    On or around September 1, 2020, Counselor Jo, acting at the direction of Permanent Mission, prepared a one-page document written in Korean labeled as "Agreement [*English translation*]" to prevent Plaintiff from brining a civil or criminal claim action relating to termination of Plaintiff's employment with Defendants on June 30, 2021.   Counselor Jo presented the document to Plaintiff and demanded him to sign. Under emotional and financial pressure, Plaintiff reluctantly capitulated to Counselor Jo's demand and signed the Agreement. At the moment Plaintiff signed the document, he felt that he had no choice but to agree with Counselor

Jo to maintain his position as Plaintiff did not have any other financial resources specifically, during the pandemic.

141.    On or around April 1, 2021, Minister Chung, acting at the direction of Permanent Mission, presented the "Down Contract" reflecting the 20% reduction in monthly "base" pay to Plaintiff. Since none of the previous Agreements Defendants required Plaintiff annually to sign reflected Plaintiff's actual working schedule and his rate of pay, he signed the "Down Contract" reflecting the reduction, for the second time since July 1, 2020.

142.    Since Plaintiff turned 60 on April 9, 2020, Defendants Counselor Jo and Minister Chung continued to force Plaintiff to resign and his working conditions became intolerable even though Defendants forced Plaintiff to sign the "Down Contract(s)."

143.    For instance, starting from approximately the 4th day of Minister Chung's term as Minister at the Permanent Mission, he directly and indirectly forced Plaintiff to retire because of his age. Minister Chung frequently made negative and unreasonable comments to Plaintiff regarding his driving that Plaintiff drove too fast (although Plaintiff drove within the speed limit for the whole time) or Plaintiff changed the lane (although Plaintiff was required to change the lane to arrive at the location). On a few occasions, Minister Chung asked Plaintiff, "*where are you going after your retirement [with Defendants]*."

144.    Approximately in the beginning of May 2021, Ambassador Cho requested Plaintiff to come in to his office to investigate and penalize Plaintiff for reporting Ambassador Cho for using the cook as his personal chef and mistreating his maid. The investigatory conversation lasted about 40 minutes. (i.e., who did Plaintiff tell, how did Plaintiff learn such facts, to whom did Plaintiff disclose such facts, etc.). Thereafter, Defendants did not give Plaintiff almost any work to do, but made him to just sit in the office at the Permanent Mission and do nothing.

145.    In or around June 2021, Plaintiff asked Minister Chung whether he could keep his position until the Permanent Mission found an alternative chauffeur. On the same day, Minister Chung responded to Plaintiff that he **"must leave"** by the end of June 2021 **"because he already passed the retirement age of 60"** and the Permanent Mission was not willing to keep a chauffeur over 60 years old.

146.    Since Plaintiff reached the Korean retirement age of 60, Defendants made it clear that they wanted Plaintiff to retire, and Plaintiff began feeling increasingly insecure, unappreciated, and unwelcome at work until Defendants actually terminated Plaintiff on June 30, 2021.

147.    Plaintiff verbally objected to the Defendants' forced and discriminatory termination and pleaded to the Defendants, including Ambassador Cho, to allow Plaintiff remain his position as a chauffeur and the compensation he was to receive. However, Ambassador Cho failed to take adequate measure to remedy the discrimination and/or harassment suffered by Plaintiff.

148.    As Defendants Jo and Chung continuously pressured Plaintiff to retire, his stress about his situation grew. In almost every morning when Plaintiff got ready to go to work, he started feeling knots in his stomach in anticipating the start of his workday, and the sense of feeling unwanted, pushed aside, and on his way to being terminated.

149.    Defendants Jo and Chung's age-based discrimination and/or harassment caused Plaintiff substantial emotional distress and embarrassment.

150.    Defendants acted intentionally and with malice and/or reckless indifference to Plaintiff's legally protected rights, which supports an award of punitive damages.

151.    Moreover, Defendant Permanent Mission ratified and condoned the unlawful acts of its staff including, its Ministers and Counselors.

152.     But for Defendants' unlawful discriminatory actions herein alleged, Plaintiff would be employed as a chauffeur for the Permanent Mission.

153.     As a result of Defendants' unlawful employment practices Plaintiff has suffered extreme mental anguish, outrage severe anxiety, painful embarrassment among his friends and co-workers, and the loss of employment of the ordinary pleasures of everyday life.

154.     As a further result of Defendants' unlawful employment practices, Plaintiff has suffered and continue to suffer substantial damages, including back pay and reinstatement or front pay, other employment benefits, and damages for emotional pain and mental anguish in amounts to be determined at trial.

155.     By the acts and practices described above, including without limitation the disparate treatment, assignment of his duties to a younger employee, and the creation of a hostile work environment, Defendants discriminated against Plaintiff in the terms and conditions of his employment and terminated him in violation of the NYSHRL.

156.     Defendants' conduct was done in conscious disregard of and reckless indifference to Plaintiff's rights.

157.     Plaintiff therefore seeks compensatory damages, emotional and physical damages, reasonable attorneys' fees, the costs and disbursements of this action, punitive damages, interest, and any other damages permitted by law in an amount to be determined at trial.

**COUNT VII**
**[Violation of the New York State Human Rights Law - Hostile Work Environment]**

158.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein

159.     Plaintiff is qualified to work as an employee for Defendants and he has

satisfactorily performed the duties required by the position he held at the Permanent Mission.

160.    Plaintiff is a 61-year-old male and was 56 years of age when Plaintiff first started working for Defendants on June 28, 2016.

161.    From June 28, 2016 to June 30, 2021, Plaintiff was employed by Defendant Permanent Mission located at 335 East 45th Street, New York, NY 10017, through its diplomatic staff to work as a chauffeur.

162.    Upon information and belief, individual Defendants Ambassador Cho, Counselor Jo, and Minister Chung serve as diplomatic staff at the Permanent Mission.

163.    Before Plaintiff turned the age of 60 in or around April 2020, Permanent Mission, through Minister Lee, first informed to Plaintiff that **"he needed to retire when he reached the age of 60."**

164.    As soon as Plaintiff turned 60-year-old on April 9, 2020, Minister Lee told him that **"he should get out because his age reached the Korean retirement age of 60"** and asked Plaintiff to resign until the expiry of his term as to serve Permanent Mission as a minister and returned back to Korea.

165.    Since April 9, 2020, Defendants Counselor Jo and Minister Chung continuously asked Plaintiff to resign because of Plaintiff's age and told Plaintiff that Defendants were unwilling to continue (or renew) Plaintiff's employment because he reached the "retirement age."

166.    On or around July 1, 2020 and again, in October 2020, Defendants Counselor Jo and Minister Chung advised Plaintiff that if Defendants decided to keep Plaintiff until the pandemic situation eased so that they could find a suitable younger chauffeur (i.g., until the following year 2021), Plaintiff would be required to sign a "Down Contract" reflecting 20% reduction in monthly "base" pay because he already passed the retirement age.

167.    On or around September 1, 2020, Counselor Jo, acting at the direction of Permanent Mission, prepared a one-page document written in Korean labeled as "Agreement [*English translation*]" to prevent Plaintiff from brining a civil or criminal claim action relating to termination of Plaintiff's employment with Defendants on June 30, 2021.  Counselor Jo presented the document to Plaintiff and demanded him to sign. Under emotional and financial pressure, Plaintiff reluctantly capitulated to Counselor Jo's demand and signed the Agreement. At the moment Plaintiff signed the document, he felt that he had no choice but to agree with Counselor Jo to maintain his position as Plaintiff did not have any other financial resources specifically, during the pandemic.

168.    On or around April 1, 2021, Minister Chung, acting at the direction of Permanent Mission, presented the "Down Contract" reflecting the 20% reduction in monthly "base" pay to Plaintiff. Since none of the previous Agreements Defendants required Plaintiff annually to sign reflected Plaintiff's actual working schedule and his rate of pay, he signed the "Down Contract" reflecting the reduction, for the second time since July 1, 2020.

169.    Since Plaintiff turned 60 on April 9, 2020, Defendants Counselor Jo and Minister Chung continued to force Plaintiff to resign and his working conditions became intolerable even though Defendants forced Plaintiff to sign the "Down Contract(s)."

170.    For instance, starting from approximately the 4th day of Minister Chung's term as Minister at the Permanent Mission, he directly and indirectly forced Plaintiff to retire because of his age. Minister Chung frequently made negative and unreasonable comments to Plaintiff regarding his driving that Plaintiff drove too fast (although Plaintiff drove within the speed limit for the whole time) or Plaintiff changed the lane (although Plaintiff was required to change the

lane to arrive at the location). On a few occasions, Minister Chung asked Plaintiff, "*where are you going after your retirement [with Defendants].*"

171.    Approximately in the beginning of May 2021, Ambassador Cho requested Plaintiff to come in to his office to investigate and penalize Plaintiff for reporting Ambassador Cho for using the cook as his personal chef and mistreating his maid. The investigatory conversation lasted about 40 minutes. (i.g., who did Plaintiff tell, how did Plaintiff learn such facts, to whom did Plaintiff disclose such facts, etc.). Thereafter, Defendants did not give Plaintiff almost any work to do, but made him to just sit in the office at the Permanent Mission and do nothing.

172.    In or around June 2021, Plaintiff asked Minister Chung whether he could keep his position until the Permanent Mission found an alternative chauffeur. On the same day, Minister Chung responded to Plaintiff that he **"must leave"** by the end of June 2021 **"because he already passed the retirement age of 60"** and the Permanent Mission was not willing to keep a chauffeur over 60 years old.

173.    Since Plaintiff reached the Korean retirement age of 60, Defendants made it clear that they wanted Plaintiff to retire, and Plaintiff began feeling increasingly insecure, unappreciated, and unwelcome at work until Defendants actually terminated Plaintiff on June 30, 2021.

174.    Plaintiff verbally objected to the Defendants' forced and discriminatory termination and pleaded to the Defendants, including Ambassador Cho, to allow Plaintiff remain his position as a chauffeur and the compensation he was to receive. However, Ambassador Cho failed to take adequate measure to remedy the discrimination and/or harassment suffered by Plaintiff.

175.    As Defendants Jo and Chung continuously pressured Plaintiff to retire, his stress about his situation grew. In almost every morning when Plaintiff got ready to go to work, he started feeling knots in his stomach in anticipating the start of his workday, and the sense of feeling

unwanted, pushed aside, and on his way to being terminated.

176.    As Defendants Jo and Chung continuously pressured Plaintiff to retire, his stress about his situation grew. In almost every morning when Plaintiff got ready to go to work, he started feeling knots in his stomach in anticipating the start of his workday, and the sense of feeling unwanted, pushed aside, and on his way to being terminated.

177.    Upon information and belief, the Ministers and Counselors of the Permanent Mission made their personnel and other decisions in consultation with Defendant Cho, who served Ambassador of Permanent Mission.

178.    Individual Defendants served as an Ambassador, Minister and Counselor of Permanent Mission and directly supervised Plaintiff as well as the Permanent Mission's other staff.

179.    Defendant Permanent Mission and failed to take adequate measures to remedy the discrimination and/or harassment suffered by Plaintiff. Instead, Defendant Permanent Mission further discriminated against Plaintiff by requiring Plaintiff to work as a butler/personal driver of its staff members and their family members for increased working hours to assist them with performing various types of commercial activities.

180.    Defendants engaged in a course of unlawful conduct, as stated above, which created a hostile work environment in violation of the NYSHRL.

181.    As a direct and proximate result of Defendants' unlawful employment practices, Plaintiff suffered the indignity of discrimination, the invasion of his rights to be free from discrimination which has manifested in physical and emotional distress.

182.    As a further direct proximate result of Defendants' unlawful employment practices, Plaintiff suffered extreme mental anguish, outrage severe anxiety, painful embarrassment among his friends and co-workers, and the loss of employment of the ordinary pleasures of everyday life.

183.    Defendants' conduct was done in conscious disregard of Plaintiff's rights.

184.    Plaintiff therefore seeks compensatory damages, emotional and physical damages, reasonable attorneys' fees, the costs and disbursements of this action, punitive damages, interest, and any other damages permitted by law in an amount to be determined at trial.

**COUNT VIII**
**[Violation of the New York City Human Rights Law – Age Discrimination]**

185.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

186.    The NYCHRL provides that it shall be an unlawful discriminatory practice for an employer or agent thereof to, because of the actual or perceived age of any person, discriminate against such person in the terms and conditions of employment or terminate such person. See, NYC Administrative Code §8-107(a).

187.    Plaintiff is a "person" under the New York City Human Rights Law, §8-102(1).

188.    Defendants are an "employer or an employee or agent thereof" under the New York City Human Rights Law, §8-102 and §8-107(1)(a).

189.    Plaintiff is a 61-year-old male and was 56 years of age when Plaintiff first started working for Defendants on June 28, 2016.

190.    Plaintiff is qualified to work as an employee for Defendants and he has satisfactorily performed the duties required by the position he held at the Permanent Mission.

191.    Plaintiff is a 61-year-old male and was 56 years of age when Plaintiff first started working for Defendants on June 28, 2016.

192.    From June 28, 2016 to June 30, 2021, Plaintiff was employed by Defendant Permanent Mission located at 335 East 45th Street, New York, NY 10017, through its diplomatic

staff to work as a chauffeur.

193.    Upon information and belief, individual Defendants Ambassador Cho, Counselor Jo, and Minister Chung serve as diplomatic staff at the Permanent Mission.

194.    Before Plaintiff turned the age of 60 in or around April 2020, Permanent Mission, through Minister Lee, first informed to Plaintiff that **"he needed to retire when he reached the age of 60."**

195.    As soon as Plaintiff turned 60-year-old on April 9, 2020, Minister Lee told him that **"he should get out because his age reached the Korean retirement age of 60"** and asked Plaintiff to resign until the expiry of his term as to serve Permanent Mission as a minister and returned back to Korea.

196.    Since April 9, 2020, Defendants Counselor Jo and Minister Chung continuously asked Plaintiff to resign because of Plaintiff's age and told Plaintiff that Defendants were unwilling to continue (or renew) Plaintiff's employment because he reached the "retirement age."

197.    On or around July 1, 2020 and again, in October 2020, Defendants Counselor Jo and Minister Chung advised Plaintiff that if Defendants decided to keep Plaintiff until the pandemic situation eased so that they could find a suitable younger chauffeur (i.g., until the following year 2021), Plaintiff would be required to sign a "Down Contract" reflecting 20% reduction in monthly "base" pay because he already passed the retirement age.

198.    On or around September 1, 2020, Counselor Jo, acting at the direction of Permanent Mission, prepared a one-page document written in Korean labeled as "Agreement [*English translation*]" to prevent Plaintiff from brining a civil or criminal claim action relating to termination of Plaintiff's employment with Defendants on June 30, 2021.  Counselor Jo presented the document to Plaintiff and demanded him to sign. Under emotional and financial pressure,

Plaintiff reluctantly capitulated to Counselor Jo's demand and signed the Agreement. At the moment Plaintiff signed the document, he felt that he had no choice but to agree with Counselor Jo to maintain his position as Plaintiff did not have any other financial resources specifically, during the pandemic.

199.    On or around April 1, 2021, Minister Chung, acting at the direction of Permanent Mission, presented the "Down Contract" reflecting the 20% reduction in monthly "base" pay to Plaintiff. Since none of the previous Agreements Defendants required Plaintiff annually to sign reflected Plaintiff's actual working schedule and his rate of pay, he signed the "Down Contract" reflecting the reduction, for the second time since July 1, 2020.

200.    Since Plaintiff turned 60 on April 9, 2020, Defendants Counselor Jo and Minister Chung continued to force Plaintiff to resign and his working conditions became intolerable even though Defendants forced Plaintiff to sign the "Down Contract(s)."

201.    For instance, starting from approximately the 4th day of Minister Chung's term as Minister at the Permanent Mission, he directly and indirectly forced Plaintiff to retire because of his age. Minister Chung frequently made negative and unreasonable comments to Plaintiff regarding his driving that Plaintiff drove too fast (although Plaintiff drove within the speed limit for the whole time) or Plaintiff changed the lane (although Plaintiff was required to change the lane to arrive at the location). On a few occasions, Minister Chung asked Plaintiff, "*where are you going after your retirement [with Defendants]*."

202.    Approximately in the beginning of May 2021, Ambassador Cho requested Plaintiff to come in to his office to investigate and penalize Plaintiff for reporting Ambassador Cho for using the cook as his personal chef and mistreating his maid. The investigatory conversation lasted about 40 minutes. (i.e., who did Plaintiff tell, how did Plaintiff learn such facts, to whom did

Plaintiff disclose such facts, etc.). Thereafter, Defendants did not give Plaintiff almost any work to do, but made him to just sit in the office at the Permanent Mission and do nothing.

203.    In or around June 2021, Plaintiff asked Minister Chung whether he could keep his position until the Permanent Mission found an alternative chauffeur. On the same day, Minister Chung responded to Plaintiff that he **"must leave"** by the end of June 2021 **"because he already passed the retirement age of 60"** and the Permanent Mission was not willing to keep a chauffeur over 60 years old.

204.    Since Plaintiff reached the Korean retirement age of 60, Defendants made it clear that they wanted Plaintiff to retire, and Plaintiff began feeling increasingly insecure, unappreciated, and unwelcome at work until Defendants actually terminated Plaintiff on June 30, 2021.

205.    Plaintiff verbally objected to the Defendants' forced and discriminatory termination and pleaded to the Defendants, including Ambassador Cho, to allow Plaintiff remain his position as a chauffeur and the compensation he was to receive. However, Ambassador Cho failed to take adequate measure to remedy the discrimination and/or harassment suffered by Plaintiff.

206.    As Defendants Jo and Chung continuously pressured Plaintiff to retire, his stress about his situation grew. In almost every morning when Plaintiff got ready to go to work, he started feeling knots in his stomach in anticipating the start of his workday, and the sense of feeling unwanted, pushed aside, and on his way to being terminated.

207.    Defendants Jo and Chung's age-based discrimination and/or harassment caused Plaintiff substantial emotional distress and embarrassment.

208.    Defendants acted intentionally and with malice and/or reckless indifference to Plaintiff's legally protected rights, which supports an award of punitive damages.

209.    Moreover, Defendant Permanent Mission ratified and condoned the unlawful acts of its staff including, its Ministers and Counselors.

210.    But for Defendants' unlawful discriminatory actions herein alleged, Plaintiff would be employed as a chauffeur for the Permanent Mission.

211.    As a result of Defendants' unlawful employment practices Plaintiff has suffered extreme mental anguish, outrage severe anxiety, painful embarrassment among his friends and co-workers, and the loss of employment of the ordinary pleasures of everyday life.

212.    As a further result of Defendants' unlawful employment practices, Plaintiff has suffered and continue to suffer substantial damages, including back pay and reinstatement or front pay, other employment benefits, and damages for emotional pain and mental anguish in amounts to be determined at trial.

213.    Defendants' conduct was done in conscious disregard of and reckless indifference to Plaintiff's rights.

214.    Plaintiff therefore seeks compensatory damages, emotional and physical damages, reasonable attorneys' fees, the costs and disbursements of this action, punitive damages, interest, and any other damages permitted by law in an amount to be determined at trial.

## COUNT IX
**[Violation of the New York City Human Rights Law - Hostile Work Environment]**

215.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

216.    Defendants engaged in a course of unlawful conduct, as stated above, which created a hostile work environment in violation of the NYCHRL.

217.    Plaintiff is a 61-year-old male and was 56 years of age when Plaintiff first started working for Defendants on June 28, 2016.

218.    Plaintiff is qualified to work as an employee for Defendants and he has satisfactorily performed the duties required by the position he held at the Permanent Mission.

219.    Plaintiff is a 61-year-old male and was 56 years of age when Plaintiff first started working for Defendants on June 28, 2016.

220.    From June 28, 2016 to June 30, 2021, Plaintiff was employed by Defendant Permanent Mission located at 335 East 45th Street, New York, NY 10017, through its diplomatic staff to work as a chauffeur.

221.    Upon information and belief, individual Defendants Ambassador Cho, Counselor Jo, and Minister Chung serve as diplomatic staff at the Permanent Mission.

222.    Before Plaintiff turned the age of 60 in or around April 2020, Permanent Mission, through Minister Lee, first informed to Plaintiff that **"he needed to retire when he reached the age of 60."**

223.    As soon as Plaintiff turned 60-year-old on April 9, 2020, Minister Lee told him that **"he should get out because his age reached the Korean retirement age of 60"** and asked Plaintiff to resign until the expiry of his term as to serve Permanent Mission as a minister and returned back to Korea.

224.    Since April 9, 2020, Defendants Counselor Jo and Minister Chung continuously asked Plaintiff to resign because of Plaintiff's age and told Plaintiff that Defendants were unwilling to continue (or renew) Plaintiff's employment because he reached the "retirement age."

225.    On or around July 1, 2020 and again, in October 2020, Defendants Counselor Jo and Minister Chung advised Plaintiff that if Defendants decided to keep Plaintiff until the

pandemic situation eased so that they could find a suitable younger chauffeur (i.g., until the following year 2021), Plaintiff would be required to sign a "Down Contract" reflecting 20% reduction in monthly "base" pay because he already passed the retirement age.

226.    On or around September 1, 2020, Counselor Jo, acting at the direction of Permanent Mission, prepared a one-page document written in Korean labeled as "Agreement [*English translation*]" to prevent Plaintiff from brining a civil or criminal claim action relating to termination of Plaintiff's employment with Defendants on June 30, 2021.   Counselor Jo presented the document to Plaintiff and demanded him to sign. Under emotional and financial pressure, Plaintiff reluctantly capitulated to Counselor Jo's demand and signed the Agreement. At the moment Plaintiff signed the document, he felt that he had no choice but to agree with Counselor Jo to maintain his position as Plaintiff did not have any other financial resources specifically, during the pandemic.

227.    On or around April 1, 2021, Minister Chung, acting at the direction of Permanent Mission, presented the "Down Contract" reflecting the 20% reduction in monthly "base" pay to Plaintiff. Since none of the previous Agreements Defendants required Plaintiff annually to sign reflected Plaintiff's actual working schedule and his rate of pay, he signed the "Down Contract" reflecting the reduction, for the second time since July 1, 2020.

228.    Since Plaintiff turned 60 on April 9, 2020, Defendants Counselor Jo and Minister Chung continued to force Plaintiff to resign and his working conditions became intolerable even though Defendants forced Plaintiff to sign the "Down Contract(s)."

229.    For instance, starting from approximately the 4th day of Minister Chung's term as Minister at the Permanent Mission, he directly and indirectly forced Plaintiff to retire because of his age. Minister Chung frequently made negative and unreasonable comments to Plaintiff

38

regarding his driving that Plaintiff drove too fast (although Plaintiff drove within the speed limit for the whole time) or Plaintiff changed the lane (although Plaintiff was required to change the lane to arrive at the location). On a few occasions, Minister Chung asked Plaintiff, "*where are you going after your retirement [with Defendants]*."

230.    Approximately in the beginning of May 2021, Ambassador Cho requested Plaintiff to come in to his office to investigate and penalize Plaintiff for reporting Ambassador Cho for using the cook as his personal chef and mistreating his maid. The investigatory conversation lasted about 40 minutes. (i.e., who did Plaintiff tell, how did Plaintiff learn such facts, to whom did Plaintiff disclose such facts, etc.). Thereafter, Defendants did not give Plaintiff almost any work to do, but made him to just sit in the office at the Permanent Mission and do nothing.

231.    In or around June 2021, Plaintiff asked Minister Chung whether he could keep his position until the Permanent Mission found an alternative chauffeur. On the same day, Minister Chung responded to Plaintiff that he **"must leave"** by the end of June 2021 **"because he already passed the retirement age of 60"** and the Permanent Mission was not willing to keep a chauffeur over 60 years old.

232.    Since Plaintiff reached the Korean retirement age of 60, Defendants made it clear that they wanted Plaintiff to retire, and Plaintiff began feeling increasingly insecure, unappreciated, and unwelcome at work until Defendants actually terminated Plaintiff on June 30, 2021.

233.    Plaintiff verbally objected to the Defendants' forced and discriminatory termination and pleaded to the Defendants, including Ambassador Cho, to allow Plaintiff remain his position as a chauffeur and the compensation he was to receive. However, Ambassador Cho failed to take adequate measure to remedy the discrimination and/or harassment suffered by Plaintiff.

234.    As Defendants Jo and Chung continuously pressured Plaintiff to retire, his stress

about his situation grew. In almost every morning when Plaintiff got ready to go to work, he started feeling knots in his stomach in anticipating the start of his workday, and the sense of feeling unwanted, pushed aside, and on his way to being terminated.

235.    Upon information and belief, the Ministers and Counselors of the Permanent Mission made their personnel and other decisions in consultation with Defendant Cho, who served Ambassador of Permanent Mission.

236.    Individual Defendants served as an Ambassador, Minister and Counselor of Permanent Mission and directly supervised Plaintiff as well as the Permanent Mission's other staff.

237.    Defendant Permanent Mission and failed to take adequate measures to remedy the discrimination and/or harassment suffered by Plaintiff. Instead, Defendant Permanent Mission further discriminated against Plaintiff by requiring Plaintiff to work as a butler/personal driver of its staff members and their family members for increased working hours to assist them with performing various types of commercial activities.

238.    Defendants engaged in a course of unlawful conduct, as stated above, which created a hostile work environment in violation of the NYCHRL.

239.    As a direct and proximate result of Defendants' unlawful employment practices, Plaintiff suffered the indignity of discrimination, the invasion of his rights to be free from discrimination which has manifested in physical and emotional distress.

240.    As a further direct proximate result of Defendants' unlawful employment practices, Plaintiff suffered extreme mental anguish, outrage severe anxiety, painful embarrassment among his friends and co-workers, and the loss of employment of the ordinary pleasures of everyday life.

241.    Defendants' conduct was done in conscious disregard of Plaintiff's rights.

242.    Plaintiff therefore seeks compensatory damages, emotional and physical damages,

reasonable attorneys' fees, the costs and disbursements of this action, punitive damages, interest, and any other damages permitted by law in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendants, both jointly and severally as follows:

a) assuming jurisdiction over this action as this action falls into one or more of the exceptions to the FSIA;

b) declaring Defendants violated the FLSA, the NYLL, the New York Executive Law, and the New York City Human Rights Law;

c) permanently enjoining Defendants from further violations of the FLSA, NYLL, NYSHRL, and NYCHRL;

d) granting judgment to Plaintiff on his FLSA claims and awarding Plaintiff his unpaid wages and an equal amount in liquidated damages;

e) granting judgment to Plaintiff on his NYLL claims and awarding Plaintiff his unpaid wages, spread of hours compensation, applicable statutory damages, and liquidated damages as provided for by statute;

f) granting judgment to Plaintiff on his NYSHRL claims and awarding Plaintiff appropriate damages and fines and penalties as provided for by statute;

g) granting judgment to Plaintiff on his NYCHRL claims and awarding Plaintiff appropriate compensatory and punitive damages as provided for by statute;

h) awarding Plaintiff all damages sustained as a result of Defendants' conduct, including damages for emotional distress, embarrassment, and anguish;

i) awarding Plaintiff prejudgment and postjudgment interest as allowed by law;

j)   awarding Plaintiff his costs and reasonable attorneys' fees; and

k)   granting such further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues.

Dated:  July 19, 2021                                    HANG & ASSOCIATES, PLLC.

                                                         _/S/ DIANA SEO_____
                                                         Diana Y. Seo, Esq.
                                                         136-20 38th Ave., Suite 10G
                                                         Flushing, New York 11354
                                                         Tel: 718.353.8588
                                                         dseo@hanglaw.com
                                                         *Attorneys for Plaintiff*

## CONSENT TO SUE UNDER
## FEDERAL FAIR LABOR STANDARDS ACT

I am an employee currently or formerly employed by _permanent Mission of the Republic of Korea to the united Nations_ and/or related entities. I consent to be a plaintiff in an action to collect unpaid wages. I agree that I am bound by the terms of the Contingent Fee Retainer signed by the named plaintiff in this case.

_Hyunhuy Nam_
Full Legal Name (Print)

Signature

_06/05/2021_
Date