23-229
*Hyunhuy Nam v. Permanent Mission of the Republic of Korea to the United Nations*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

—————————

August Term 2023

(Submitted:  February 23, 2024  Decided:  September 11, 2024)

Docket No. 23-229

—————————

HYUNHUY NAM,

*Plaintiff-Appellee*,

*v.*

PERMANENT MISSION OF THE REPUBLIC OF KOREA TO THE UNITED NATIONS,

*Defendant-Appellant*.

—————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

—————————

Before:      LIVINGSTON, *Chief Judge*, and WESLEY and CHIN, *Circuit Judges*.

—————————

Appeal from an opinion and order of the United States District

Court for the Southern District of New York (Rochon, *J.*), holding, on summary

judgment, that wage-and-hour and employment discrimination claims against a

foreign state's mission to the United Nations brought by a former chauffeur were not barred by the Foreign Sovereign Immunities Act because the chauffeur's employment fell within the "commercial activity" exception to sovereign immunity.

        VACATED AND REMANDED.

---

        Yongjin Bae, Hang & Associates, PLLC, Flushing, NY, *for Plaintiff-Appellee.*

        Joshua S. Lim, Nicholas J. DuBois, Sean Kwak, Kim, Cho & Lim, LLC, Palisades Park, NJ, Joseph Barbiere, Cole Schotz, P.C., Hackensack, NJ, *and* Eric S. Latzer, Cole Schotz P.C., New York, NY, *for Defendant-Appellant.*

---

CHIN, *Circuit Judge*:

        In this case, plaintiff-appellee Hyunhuy Nam alleges that his rights under federal, state, and city wage-and-hour and anti-discrimination laws were violated by defendant-appellant Permanent Mission of the Republic of Korea to the United Nations (the "Mission").  Nam was formerly employed by the Mission as a chauffeur, and the principal issue presented on appeal is whether the district

court (Rochon, *J.*) erred by holding, on summary judgment, that the Mission was not protected by the Foreign Sovereign Immunities Act (the "FSIA"), 28 U.S.C. § 1602 *et seq.*, because Nam's employment fell within the "commercial activity" exception to sovereign immunity.

For the reasons that follow, we vacate the district court's decision and remand for further proceedings.

## BACKGROUND

### I.     The Facts[1]

In June 2016, Nam, a citizen of the Republic of Korea and permanent resident of the United States, began his job as a chauffeur with the Mission, South Korea's foreign consulate located in Manhattan. He found the job through an online job advertisement that the Mission posted on a website called "Hey Korean." App'x at 563. The website allows parties -- whether private or otherwise -- to post job openings. Nam was interviewed and hired by the

---

[1] We construe the evidence in the light most favorable to the Mission. As discussed further below, the parties filed cross-motions for summary judgment and the district court denied the Mission's motion and granted Nam's cross-motion, awarding Nam damages and interest. Accordingly, the Mission was the non-moving party on Nam's cross-motion. *See* pages 21-23 *infra*. Certain facts alleged by Nam with respect to the merits, and apparently not contested by the Mission for purposes of this appeal, are also set forth below.

Minister at the time as well as "the person who was in charge at the time." *Id*. at
339-40.  Nam became the assigned driver for four different Ministers at the
Mission.  He was "non-diplomatic staff," but his responsibilities included
"administration of 'diplomatic protocol'" as well.  *Id*. at 242.  Nam also promised
"not [to] engage in any act of any kind which may be contrary to the national
interest of the Republic of Korea."  *Id*. at 676.  In fact, Nam acknowledged that
when the Minister attended international events, Nam "faithfully complied with
every ceremonial order and protocols required for each event," and that it was
important for him to do so because he was "part of the Mission."  *Id*. at 310-11.

      As part of the hiring process, the Mission required Nam to obtain a
"security clearance," *id*. at 827, sign an agreement each year certifying that he
would not divulge classified information, and agree to submit to a polygraph test
if necessary.[2]  Nam pledged in his employment contract, for example, that any
knowledge he acquired in the course of his job as a driver for the Mission "is
deemed nationally classified information of the Republic of Korea" and that Nam
would "not divulge it to anyone in any manner."  *Id*. at 362.  Nam's contract
prohibited him from disclosing such information under penalty of "punishment

---

[2] Nam testified that in his four years of working for the Mission, he was never actually
subject to a polygraph test.

under the laws of the Republic of Korea." *Id*. at 408.  Nam was required to

submit to a "high level security clearance" rather than an ordinary background

check. *Id*. at 343-44.[3]  Nam was required to disclose detailed personal

information, such as his religious history, assets, history of overseas travels, his

post during his military service in Korea, and information about family members

and in-laws -- information not generally required of applicants for employment

during regular background checks.  And with the possible exception of a

designated driver for the Ambassador of the Mission who may have received a

similarly heightened background check, Nam was "the unique non-diplomatic

personnel who had to go through the security clearance as well as every year had

to submit the pledge to renew it." *Id*. at 346.

> As Jinho Jo, Counselor for the Mission, testified at his deposition:

> So Mr. Nam was doing the task of supporting the foreign affairs
> Minister, such as Minister Chung, who required high level security,
> and since Minister Chung is someone who is categorized as a high

---

[3] The difference between a security clearance and a background check is significant.  A security clearance seeks to protect "interests of the national security," *Dep't of Navy v. Egan*, 484 U.S. 518, 528 (1988) (internal quotation marks and citation omitted), which includes "the protection of classified information," *id*. at 529.  A background check, however, is performed by most employers to "confirm that a[] [prospective employee] is who they say they are, uncover any potential conflicts or a combination of both." Kimberlee Leonard & Rob Watts, *What is a Background Check*, Forbes Advisor (July 9, 2024, 7:41am), https://www.forbes.com/advisor/business/background-check/.

level officer and Mr. Nam was the head.  Mr. Nam had no other
choice but to come to know where Minister Chung is going, with
whom he is meeting with and what kind of conversation he's having
with that other person, in what location.  Since that was what he was
doing and because Mr. Nam had this special characteristic of a job
that he would be able to find out information such as top secret
information, classified information in the process of working with
Minister Chung.  So therefore, Mr. Nam needed a separate security
clearance from us.  From the time of the employment, Mr. Nam was
required to [undergo] the background check, of course with his
agreement to that and every year that is why we required his
signature for renewed security, security pledges . . . .

*Id*. at 335-36.

As part of his duties, Nam learned the routes, destinations, and
whereabouts of the Ministers.[4]  From time to time, Nam was required to drive
high-level government officials who rode with the Mission's Minister, such as "a
cabinet level VIP . . . visiting from the Republic of Korea," *id*. at 336, as well as
"high government officials from other countries," *id*. at 311.  At one point, Nam
"directly drove [the] national security advisor to the president [of South Korea],"
*id*. at 336, and on another occasion he drove the U.N. Secretary General, *id*. at 312.

From time to time, Nam was required to work with local law
enforcement in accordance with security protocols, and to participate in

---

[4] At times, this information was sensitive because of the security concerns.  For high-
level officials, the routes they would travel for certain events would be kept secret.

6

motorcades when high-ranking government officials visited the United States. For "high level" events, such as meetings of the General Assembly of the United Nations when the area around the United Nations headquarters would be closed to the public, he would be provided a security pass to permit his admission through police barricades. *Id*. at 315, 352-53.

Nam frequently transported Ministers on personal errands, *e.g.*, "to purchase luxury handbags, play golf, and watch Broadway shows," *id*. at 20 ¶ 56, and was paid in cash, working 52 to 62 hours per week and earning around $5,000 to $6,500 a month.

Eventually, the Mission informed Nam that he would have to retire at age 60, consistent with South Korean law and the Mission's internal policy mandating that retirement age. Nam requested an extension of his employment contract beyond age 60, however, because his wife lost her job during the pandemic. The South Korean government approved this extension and the Mission extended Nam's contract until age 61 but set a termination date. On September 1, 2020, in exchange for the extension of his employment, Nam signed a settlement agreement in which he waived "civil and criminal claims" with

respect to his termination. Nam was ultimately discharged on June 30, 2021 (the date contemplated in his settlement agreement).

## II. *The Proceedings Below*

On July 19, 2021, Nam commenced this action against the Mission and three individual defendants (three of the Mission's diplomats), alleging that the Mission underpaid him and pressured him to retire, in violation of the Fair Labor Standards Act ("FLSA"), the New York Labor Law ("NYLL"), the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL").

The Mission moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, invoking the FSIA. On January 21, 2022, the district court (Nathan, *J.*) denied the motion as to the Mission.[5] The court determined, based on the allegations of the complaint and without a hearing, that the Mission's employment of Nam as a designated driver for the Mission's high-ranking government officials was inherently commercial conduct, and that Nam was performing a "commercial" function in his capacity

---

[5] The district court dismissed the claims against the three individual defendants. Nam does not challenge this ruling on appeal.

8

as a "chauffeur" for the Ministers, thereby triggering the commercial activity

exception to sovereign immunity under the FSIA.  Special App'x at 7.

   Nam and the Mission engaged in discovery.  At the close thereof,

although the district court had previously denied its motion to dismiss, the

Mission moved for summary judgment, again asserting that it was immune

under the FSIA.  Nam opposed the motion and cross-moved for partial summary

judgment, contending that the district court had subject matter jurisdiction under

the FSIA's commercial activity exception and seeking an award of damages and

other monetary relief on his FLSA and NYLL claims.

   The district court (Rochon, *J*.) denied the Mission's motion for

summary judgment, but it also held -- based solely on the summary judgment

record and without an evidentiary hearing -- that Nam's employment fell within

the commercial activity exception.  Moreover, the district court granted Nam's

cross-motion for partial summary judgment on his FLSA and NYLL claims,

awarding him $138,990.33 in damages and $51,852.91 in prejudgment interest on

these claims.  The court held that Nam's remaining claims -- those under the

NYSHRL and NYCHRL -- would proceed to trial.

On February 22, 2023, before the NYSHRL and NYCHRL claims could be tried, the Mission filed this interlocutory appeal on the sovereign immunity issue.[6]  The district court stayed the case as to the NYSHRL and NYCHRL claims pending this appeal.

## DISCUSSION

We review a district court's decision concerning subject matter jurisdiction under the FSIA for clear error as to factual findings and *de novo* as to legal conclusions.  *See Kensington Int'l Ltd. v. Itoua*, 505 F.3d 147, 153 (2d Cir. 2007).

Here, it is undisputed that the Mission is an "instrumentality of a foreign state" within the meaning of the FSIA and therefore it is presumptively immune from the jurisdiction of the United States courts.  28 U.S.C. § 1603(a)-(b). Hence, we consider only whether the district court correctly determined that the Mission's employment of Nam constituted "commercial activity" under the FSIA.

---

[6] We have appellate jurisdiction over decisions concerning subject matter jurisdiction under the collateral order doctrine, which "allows an immediate appeal from an order denying immunity under the FSIA."  *Kensington Int'l Ltd. v. Itoua*, 505 F.3d 147, 153 (2d Cir. 2007) (internal quotation marks and citation omitted).  In addition, we have jurisdiction over the district court's order denying the motion to dismiss because the summary judgment order relied extensively on the reasoning of the motion to dismiss decision and is "inextricably intertwined" with the issue under review.  *See Lamar Advert. of Penn, LLC v. Town of Orchard Park*, 356 F.3d 365, 372 (2d Cir. 2004).

10

We conclude the district court erred, both at the motion to dismiss stage, when it found that the Mission was not immune based solely on the allegations of the complaint, and again on summary judgment, when it held, despite the existence of factual issues, that the commercial activity exception to sovereign immunity applied.  Accordingly, we vacate the district court's decision and remand for further proceedings.

## I.    *Applicable Law*

### A.    *The FSIA*

The FSIA provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States," subject to several enumerated exceptions.  28 U.S.C. § 1604.  The commercial activity exception abrogates foreign sovereign immunity in any case "in which the action is based upon a commercial activity carried on in the United States by the foreign state." *Id.* § 1605(a)(2).  To trigger the exception, the commercial activity must also have "substantial contact with the United States."  *Id.* § 1603(e).[7]

---

[7] We do not reach the issue of whether the Mission's employment of Nam had substantial contact with the United States because we remand for the district court to further consider whether the Mission's employment of Nam constitutes commercial activity.

11

In determining whether a claim is "based upon" commercial activity for purposes of the FSIA, courts must identify the particular conduct on which the plaintiff's action is based. *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 33 (2015). The FSIA provides that commercial activity is "a regular course of commercial conduct or a particular commercial transaction or act" and that the commercial nature of an activity is "determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). A foreign state engages in commercial activity "where it exercises only those powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns." *Saudi Arabia v. Nelson*, 507 U.S. 349, 360 (1993) (internal quotation marks and citation omitted).

The FSIA expressly leaves for courts the discretion to define the contours of the commercial activity exception. H.R. Rep. No. 94-1487, at 16 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 6604, 6615 (leaving "courts . . . a great deal of latitude in determining what is a 'commercial activity' for purposes of [the FSIA]"). In the context of employment cases in particular, the courts have differed significantly in how they determine whether the commercial activity exception applies. *See* Andrew Hoy, Note, *The Ill-Fated Employee: Foreign*

12

*Sovereign Immunity in Employment Disputes and a Legislative History That Has Swallowed the Text of the Statute*, 73 RUTGERS U.L. REV. 821, 825 (2021) ("United States courts considering sovereign immunity in the context of an employment action have so far failed to find a consistent application of the commercial exception.").  Specifically with respect to chauffeurs, for example, courts in this Circuit have reached differing results.[8]

We have addressed the commercial activity exception on several occasions.  In *Kato v. Ishihara*, we considered whether the commercial activity exception applied to the employment by the Tokyo Metropolitan Government

---

[8] *Compare Mourmouni v. Permanent Mission of Republic of S. Sudan to United Nations*, No. 20-CV-3603 (JPO), 2021 WL 4461829, at *3 (S.D.N.Y. Sept. 28, 2021) (applying the commercial activity exception, and concluding that "work performed by a chauffeur for a permanent mission is an activity that could be, and in fact regularly is, performed by private-sector businesses, such as car services and corporations employing in-house executive chauffeurs") (internal quotation marks and citation omitted), *with Figueroa v. Ministry for Foreign Affs. of Swed.*, 222 F. Supp. 3d 304, 313-16 (S.D.N.Y. 2016) (concluding that the commercial activity exception did not apply, and noting that a chauffeur for the Swedish Mission was responsible for "the safe transport of Swedish dignitaries, an activity integral to effecting the governmental function of the Mission"), *Bardales v. Consulate Gen. of Peru in N.Y.*, 490 F. Supp. 3d 696, 702-05 (S.D.N.Y. 2020) (holding that the commercial activity exception did not apply where a consulate employee performed administrative tasks, including "chauffeuring"), *and Ayekaba v. Mba*, No. 18-cv-12040 (PGG) (SDA), 2019 WL 8989861 (S.D.N.Y. Nov. 25, 2019), *R. & R. adopted*, 2020 WL 1130731, at *1, *3 (S.D.N.Y. Mar. 6, 2020) (holding that the commercial activity exception did not apply to a "driver" employed by the Mission of Equatorial Guinea).

("TMG")[9] of a "marketing agent" who engaged in promotional activities on behalf of Japanese companies in New York, including working trade show booths and creating marketing reports.  360 F.3d 106, 109 (2d Cir. 2004).  The agent brought sexual harassment, retaliation, and discrimination claims against TMG.  In response to TMG's assertion of sovereign immunity, she relied on the commercial activity exception, asserting that as a marketing agent, her employment was commercial in nature.  We held that TMG's actions did not fall within the commercial activity exception.  We reasoned that while a private Japanese business might engage in promotional and business development activities, "such a business would not typically undertake the promotion of other Japanese businesses, or the promotion of Japanese business interests in general," and that "[t]he promotion abroad of the commerce of domestic firms is a basic -- even quintessential -- governmental function."  *Id*. at 112.  Because TMG's promotion of Japanese businesses abroad in the United States was governmental and not commercial activity, the plaintiff's involvement in those activities did not render her employment commercial in nature.  *Id*.

---

[9] TMG is the municipal government of the city of Tokyo.  *Kato*, 360 F.3d at 107.

Moreover, we noted that the plaintiff was subject to Japanese laws "governing local public servants," *id*. at 109 (internal quotation marks omitted), and that the House Report accompanying the bill that became the FSIA included civil servants in the list of workers who fell outside of the commercial activity exception, *see id*. at 110; s*ee also* H.R. Rep. No. 94-1487, at 16, *as reprinted in* 1976 U.S.C.C.A.N. 6604, 6615 (listing employment of "diplomatic, civil service, or military personnel" as governmental, and employment of "laborers, clerical staff or public relations or marketing agents" as commercial). We instructed that "the category of 'civil service' should be interpreted to include the broad range of civil service employment relationships used by countries other than the United States." *Kato*, 360 F.3d at 112. And we concluded that this was relevant to whether the commercial activity exception did not apply. *See Pablo Star Ltd. v. Welsh Gov't*, 961 F.3d 555, 563 (2d Cir. 2020). [10]

---

[10] We further explained in *Kato* that "[i]n determining whether a foreign government's employment of personnel in the United States is 'civil service,' and therefore 'governmental,' we do not look principally to whether that employment resembles the contemporary civil service of the American democracy, but we instead inquire whether 'the particular actions that the foreign state performs . . . are the *type* of actions by which a private party engages in 'trade and traffic or commerce.'" 360 F.3d at 114 (quoting *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992)).

In 2020, we once again addressed the commercial activity exception in *Pablo Star Limited v. Welsh Government*. 961 F.3d at 557. There, the Welsh government allegedly engaged in the unauthorized copying and distribution of copyrighted photos to promote Wales-related tourist activities in New York. While the purpose of this activity would seem similar to the promotion of a foreign government's commerce that was at issue in *Kato*, we reached a different result, holding that the activity in question fell within the commercial exception. We held that "[w]hether an activity is deemed 'commercial' under the FSIA depends on its 'nature' rather than its 'purpose,' . . . where 'purpose' is 'the *reason* why the foreign state engages in the activity' and 'nature' is 'the *outward form* of the conduct that the foreign state performs or agrees to perform.'" *Id.* at 561 (quoting *Nelson*, 507 U.S. at 361). In *Pablo Star*, the "means" by which the Welsh government acted was through the "publication, on-line and in print," of advertising materials, "an activity that could be, and in fact regularly is, performed by private-sector businesses." *Id.* at 562. We cautioned that determining the nature of the sovereign's conduct might "require a nuanced examination of the context of the acts involved." *Id.* at 561.

16

The Court distinguished the case from *Kato*, noting first that the Welsh government in *Pablo Star* was engaging in promotional activities on its own behalf and not on behalf of third parties (as in *Kato*). *Id.* at 563; *see id.* (observing that "TMG performed actions that were superficially similar to those typically undertaken by private parties," but that private parties would not typically undertake the promotion of other businesses or of business interests in general). Second, we observed that the plaintiff's claims in *Kato* arose out of TMG's civil-service-like personnel practices and not TMG's promotion of Japanese businesses abroad. *Id.* at 564. "Our inquiry in *Kato* was thus directed to assessing whether the plaintiff was a *bona fide* public servant," whereas our inquiry in *Pablo Star* focused on the Welsh government's advertising activities. *Id.* at 563; *see also id.* at 564 ("[I]n *Kato*, the plaintiff's alleged injuries were not based on TMG's promotion of Japanese business interests abroad but on TMG's alleged harassing and retaliatory conduct as an employer of civil servants. Indeed, the *Kato* Court based its decision in part on the fact that Kato was a civil servant and that the FSIA's legislative history identified employment of civil service personnel as an example of governmental activity.").

17

In light of the caselaw, it is apparent that the issue of whether a sovereign's actions fit within the commercial activity exception is a fact-intensive one, and a court's inquiry should be guided by the following considerations:

- The particular conduct by the sovereign on which the action is based;

- The nature of that conduct, that is, its outward form, rather than its purpose;

- Whether the actions in question are similar to those that are typically taken by private citizens, or whether they are particular to sovereigns; and

- In the employment context, whether the plaintiff is a "civil servant," taking into account the broad range of civil service employment relationships existing in other countries.

## B.    *Procedural Issues*

"A defendant seeking sovereign immunity bears the burden of establishing a *prima facie* case that it is a foreign sovereign." *Pablo Star*, 961 F.3d at 559-60. "Once the defendant makes that showing, the burden shifts to the plaintiff to make an initial showing that an enumerated exception to sovereign immunity applies." *Id*. at 560. "Once the plaintiff has met its initial burden of production, the defendant bears the burden of proving, by a preponderance of the evidence, that the alleged exception does not apply." *Id*. "In other words, the

ultimate burden of persuasion remains on the party seeking sovereign

immunity." *Id.*

In addressing a claim of sovereign immunity, a court will start by

considering the allegations of the complaint, but it may, in appropriate

circumstances, consider matters outside the complaint as well. *See id.* at 560;

*Robinson v. Gov't of Malaysia*, 269 F.3d 133, 140-41 (2d Cir. 2001). A "defendant

may challenge either the legal or factual sufficiency of the plaintiff's assertion of

jurisdiction, or both." *Robinson*, 269 F.3d at 140. "If the defendant challenges only

the legal sufficiency of the plaintiff's jurisdictional allegations, the court must

take all facts alleged in the complaint as true and draw all reasonable inferences

in favor of plaintiff." *Id.* (internal quotation marks and citation omitted). But

where there is a factual challenge and "evidence relevant to the jurisdictional

question is before the court, the district court . . . may refer to [that] evidence." *Id.*

(internal quotation marks and citation omitted). Indeed, this Court has held that,

when factual disputes exist, "it [is] error for the district court to accept the mere

allegations of the complaint as a basis for finding subject matter jurisdiction." *See*

*Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922, 932 (2d Cir. 1998), *overruled on*

*other grounds by Lotes Co., Ltd. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395 (2d Cir.

2014); *Filetech*, 157 F.3d at 932 ("Our rule is that, on a challeng[e] [to] the district

court's subject matter jurisdiction, the court may resolve disputed jurisdictional

fact issues by reference to evidence outside the pleadings . . . .") (internal

quotation marks and citation omitted).

   If the court cannot resolve the jurisdictional question as a matter of

law because of the existence of conflicting evidence, the district court "may hold

an evidentiary hearing, if it considers that such a hearing is warranted." *Filetech*,

157 F.3d at 932. In that circumstance, the court essentially conducts a bench trial

on the issue of sovereign immunity. *See Clark v. Hanley*, 89 F.4th 78, 96 (2d Cir.

2023) (holding, in the context of equitable tolling, that an "evidentiary hearing . . .

functions . . . as a bifurcated bench trial"). Indeed, at such a hearing, the district

court must "make credibility findings, weigh evidence, and resolve factual

disputes that bear on [the issue]." *Id.*[11] At a minimum, the district court must

make findings of fact relevant to the issue. *Filetech*, 157 F.3d at 932.

---

[11] In *Filetech* we "identified a number of factual issues bearing on the question of subject matter jurisdiction that need[ed] to be resolved on remand." 157 F.3d at 932. Consequently, we ruled that on remand the district court "should consider all the submissions of the parties and may hold an evidentiary hearing, if it considers that such a hearing is warranted, in resolving the question of jurisdiction. Before arriving at its legal conclusion regarding the existence *vel non* of subject matter jurisdiction, the district court should resolve the disputed factual matters by means of findings of fact." *Id.*

II.    *Application*

A.    *The Motion to Dismiss*

Here, when the Mission moved to dismiss based on sovereign immunity, the district court did not merely deny the motion, but instead it held that the Mission was *not* immune because Nam's employment as a chauffeur was commercial activity.  Hence, the district court ruled on the merits of the immunity question, based on the "facts . . . taken from Plaintiff's complaint." Special App'x at 2.  As the district court acknowledged, however, factual issues existed with respect to the commercial activity exception, such as the scope of Nam's employment activities on behalf of the Mission.  But as we held in *Filetech*, "it [is] error for the district court to accept the mere allegations of the complaint as a basis for finding subject matter jurisdiction" when factual disputes exist.  157 F.3d at 932.

The district court also erred in holding that "[i]n resolving this jurisdictional dispute, the court may not construe disputed issues of fact in favor of one party or another."  Special App'x at 6 (citing *Pablo Star*, 961 F.3d at 559).  At the motion to dismiss stage, courts *may* decide disputed issues of fact to resolve a jurisdictional dispute.  And if an evidentiary hearing is warranted, courts should

hold a hearing, consider the extrinsic evidence, and make findings of fact. These

errors were not harmless because when the parties relitigated the issue of

sovereign immunity on summary judgment, the district court's summary

judgment decision relied heavily on the earlier decision on the motion to dismiss.

B. *The Cross-Motions for Summary Judgment*

The Mission moved for summary judgment arguing that it was

immune. Nam opposed the motion, cross-moved on the applicability of the

commercial activity exception, and cross-moved for an award of damages and

other monetary relief on his wage-and-hour claims. The district court denied the

Mission's motion and granted Nam's cross-motion, holding as a matter of law

that the Mission was not immune because Nam's employment as a chauffeur fell

within the commercial activity exception. But it did so without a hearing, and, as

the district court noted, while drawing "all reasonable inferences against the

[Mission] and in favor of [Nam]." Special App'x at 32.

While drawing all reasonable inferences in favor of Nam and against

the Mission would be the proper application of the summary judgment standard

when considering the Mission's motion for summary judgment, the district court

erred by drawing inferences in Nam's favor when considering (and granting)

22

Nam's cross-motion and holding, as a matter of law, that the Mission was not

immune because the commercial activity exception did not apply.  Indeed, the

district court awarded Nam damages and interest on his wage-and-hour claims.

On cross-motions for summary judgment, "[w]e evaluate each

party's motion on its own merits, taking care in each instance to draw all

reasonable inferences against the party whose motion is under consideration."

*Jingrong v. Chinese Anti-Cult World Alliance Inc.*, 16 F. 4th 47, 56 (2d Cir. 2021);

*accord Byrne v. Rutledge*, 623 F.3d 46, 53 (2d Cir. 2010).[12]  In applying this standard

---

[12] We pause to note our skepticism that Federal Rule of Civil Procedure 56 was a proper vehicle for the Mission's jurisdictional challenge.  As explained above, on a motion challenging jurisdiction under the FSIA, the district court is empowered to weigh evidence and make findings of fact.  That task is inconsistent with the district court's role on a motion for summary judgment; the conclusion that a genuine and material factual dispute exists would ordinarily end the district court's inquiry and send the case to trial.  *See Baldwin v. EMI Feist Catalog, Inc.*, 805 F.3d 18, 25 (2d Cir. 2015).  Indeed, we have suggested that a Rule 12(b)(1) motion, as opposed to a Rule 56 motion, is more appropriate where, as is the case here, the defendant attacks the "discrete question" of subject matter jurisdiction without the issue being intertwined with the underlying merits of the plaintiff's claims.  *See London v. Polishook*, 189 F.3d 196, 198-99 (2d Cir. 1999).  And several of our sister Circuits have recognized that that Rule 12(b)(1) is the more appropriate mechanism for factual attacks to FSIA immunity.  *See, e.g., Kirkham v. Societe Air France*, 429 F.3d 288, 291 (D.C. Cir. 2005) (construing defendant's Rule 56 motion seeking FSIA immunity as a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction because summary judgment "represents a decision on the merits, which courts may render only after jurisdiction has been established"), *abrogation on other grounds recognized by Rosenkrantz v. Inter-Am. Dev. Bank*, 35 F.4th 854, 863 (D.C. Cir. 2022); *Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 172-73 (5th Cir. 1994) (rejecting contention that the summary judgment standard should have applied where disputed factual issues on the FSIA immunity existed); *see also Glencore Denrees Paris v. Dep't of*

23

to Nam's cross-motion for summary judgment, the district court should have viewed the evidence in the light most favorable to the Mission.  *See Baldwin*, 805 F.3d at 25 (summary judgment is appropriate only when, "viewing the evidence in the light most favorable to the *non-moving party*," there is no genuine dispute as to any material fact) (emphasis added)).

Here, there was sufficient evidence in the record, with all reasonable inferences drawn in the Mission's favor, to have warranted explicit fact finding and, if necessary, an evidentiary hearing.  At such a hearing, of course, the district court would have been free to weigh and resolve conflicts in the evidence and to make findings of fact to decide the immunity issue.

Based on the following evidence, for example, the district court could have reasonably concluded that the Mission's employment of Nam as a chauffeur was governmental and not commercial in nature:

- Nam was the driver for the Minister, a high-level government official;

- From time to time, Nam also drove other high-level officials, including a national security adviser and cabinet-level officials from

---

*Nat'l Store Branch 1*, No. 99 CIV. 8607, 2008 WL 4298609, at *3 n.4 (S.D.N.Y. Sept. 19, 2008) (Sullivan, *J.*) (drawing the same distinction regarding FSIA immunity).  However, because the parties did not raise this argument, we review the immunity decision pursuant to its existing procedural posture.

the Republic of Korea as well as high-level officials from other countries; he once drove the United Nations Secretary General;

- Nam was required to submit to a high-level security clearance, not just to an ordinary employment background check, and was subject to annual polygraph tests;

- From time to time, Nam was exposed to classified information, and had to agree that any knowledge acquired while driving for the Mission was considered nationally classified information;

- Nam had to renew annually a pledge not to divulge any classified information he acquired, under penalty of punishment pursuant to Korean law;

- From time to time Nam would learn other sensitive information, such as the routes that dignitaries would travel as well as their destinations and whereabouts;

- On occasion, Nam would have to work with local law enforcement regarding security protocols;

- Nam participated in motorcades involving high-ranking government officials;

- From time to time Nam would receive special security passes for events such as meetings of the United Nations General Assembly; and

- Nam was required to abide by diplomatic protocols and was subject to the requirements of South Korean law and the Mission's internal policies.

To be sure, Nam disputes some of these facts, contending, for example, that his work was limited to the task of driving, that he did not receive advance notice of events, that he "just drove when [he] was asked to drive," App'x at 315, and that he was never asked to take a polygraph test.  But on Nam's cross-motion for summary judgment, any conflicts in the evidence should have been resolved in favor of the Mission.

In concluding that Nam's employment was commercial, the district court drew a number of conclusions.  It held that "[b]ackground-checking employees and exposing them to confidential, and even classified, information is not enough to convert employment that is fundamentally commercial into non-commercial activity."  Special App'x at 33.  It further concluded that the fact Nam "was exposed to confidential information and was expected not to disclose it does not mean that he was performing a governmental function as opposed to a commercial function," as it reasoned that "dedicated drivers and car services in the commercial realm may also learn of confidential information in the course of their driving that they are expected to keep confidential."  *Id*. at 34.  Similarly, the district court was not persuaded that the "conduct of hiring a chauffeur, even with the purpose of ensuring the safety and security of high-level officials, is

26

conduct that is not commercial in nature." *Id*. at 35.  Finally, it observed that the fact that Nam "abided by cultural protocols while performing chauffeur duties for high level officials . . . is not sufficient to alter the commercial conduct of hiring a designated driver," noting that "[c]hauffeurs or designated drivers for private entities are expected to provide a pleasant professional experience and may be asked to abide by etiquette and protocols established by commercial companies." *Id*. at 36.

All of these observations may be true, but in reaching these conclusions, the district court was not drawing inferences *in favor of* the Mission as the non-movant on Nam's cross-motion.  Indeed, all of these facts could also reasonably indicate that the Mission's employment of Nam was a quintessentially government function not akin to hiring a private driver.  And in discussing Nam's job duties, we do so for the purpose of analyzing the *Mission's* conduct.

First, the record contains substantial evidence that the Mission hired Nam with the expectation that he might have access to classified information, a fact that would support a finding that his employment was governmental in nature.  Commercial entities do not as a general matter require their drivers to

obtain high-level security clearances or to submit to intensely detailed personal

background inquiries or to agree to annual polygraph tests or to pledge

confidentiality under penalty of law.  *See Stehney v. Perry*, 101 F.3d 925, 928 n.3

(3d Cir. 1996) (explaining that a polygraph interview can be used to protect

against the "deliberate disclosure of classified information").  Classified

information encompasses a government's state secrets, *see United States v. Aref*,

533 F.3d 72, 78 (2d Cir. 2008), and commercial drivers usually are not entrusted

with state secrets.  Commercial drivers may overhear passengers talking about

confidential business matters, *see Mohammad v. Gen. Consulate of State of Kuwait in*

*Los Angeles*, 28 F.4th 980, 988 (9th Cir. 2022) ("A person hired for a clerical

position does not become a diplomat or civil servant because the sovereign

chooses to expose that person to confidential matters."), but commercial drivers

generally are not exposed to conversations between high-level foreign

government officials in matters of sensitive foreign relations.  Indeed, the

protection of classified information implicates interests of national security.

*Egan*, 484 U.S. at 528-29.

Second, the safe transport of high-level government officials is

indeed a genuine sovereign concern.  *See Butters v. Vance Int'l, Inc.*, 225 F.3d 462,

465 (4th Cir. 2000) ("[A] foreign sovereign's decision as to how best to secure the safety of its leaders . . . is quintessentially an act 'peculiar to sovereigns.'" (quoting *Nelson*, 507 U.S. at 360)); *see Figueroa*, 222 F. Supp. 3d at 315 ("A sovereign's decisions on how best to address the safety concerns of government officials are peculiarly sovereign because the failure to protect or safeguard a sovereign representative, such as an ambassador or a titular head of state, can have extremely adverse consequences for the sovereign nation."). While commercial entities may hire designated drivers and engage car services with the expectation that safety standards will be met, drivers in the commercial and private context do not as a matter of course work with local law enforcement or provide rides to cabinet-level officials from multiple countries or participate in motorcades. *See Figueroa*, 222 F. Supp. 3d at 315 (holding that employment of chauffeur entrusted with "safe transport of Swedish dignitaries" was "an activity integral to effecting the governmental function of the Mission" and was therefore non-commercial); *accord Nelson*, 507 U.S. at 362 ("Exercise of the powers of police and penal officers is not the sort of action by which private parties can engage in commerce.").

Third, the record contains evidence that the Mission required Nam to follow certain protocols expected of diplomatic officials. Nam acknowledged, for example, that when the Minister he was driving attended certain international events, he was expected to and did comply with "ceremonial orders or protocols" because he was "part of the Mission." App'x at 310-11. Commercial drivers will drive their passengers to events, but they are not expected to participate in them. Nam's contract also prohibited him from engaging in certain activities, including engaging in "any act of any kind which may be contrary to the national interest of the Republic of Korea," *id*. at 408, and he was even required to inform the Mission if he married a foreign national, *id*. at 481. Workers employed by private or commercial actors are not generally required to abide by national diplomatic protocols or pledge loyalty to their nation as a condition of employment or report their marriage to a foreign national. This is all evidence from which a factfinder could find that the Mission's employment of Nam fell outside "participation in the marketplace in the manner of a private citizen or corporation." *Weltover*, 504 U.S. at 614.

We note also that the district court may have overread this Court's decision in *Pablo Star* when it concluded that "none of the facts relied upon by

30

[the Mission] establish, per *Pablo Star*, that the outward form of the conduct -- the

employment of a driver -- is a governmental activity as opposed to a commercial

activity."  Special App'x at 37-38.  While the district court was correct in noting,

pursuant to *Pablo Star*, that the key is the *nature* of the foreign state's conduct and

not its *purpose*, *id*. at 38, it failed to acknowledge that in *Pablo Star* we cautioned

that "[s]eparating the 'nature' from the 'purpose' of an activity may require a

nuanced examination of the context of the acts involved."  961 F.3d at 561.  We

suggested that the context in which the acts occurred cannot be ignored.  *Id*. at

562.

The district court held that "the *conduct* of hiring a driver is a

commercial activity and not a power peculiar to sovereigns."  Special App'x at 38.

This may be superficially true, but as we noted in *Pablo Star* in the context of the

copying and distributing of photographs: "Literally anyone can do those things,

and such actions are regularly performed by private parties.  But without some

understanding of context, that is not much help in distinguishing sovereign from

commercial conduct."  961 F.3d at 562.  Here, a more nuanced examination of the

context -- the hiring not just of "a driver," but of a driver for high-level officials of

a foreign government amidst concerns of national security, the safety of foreign

dignitaries, and diplomatic protocol -- was required.

We do not hold, as a matter of law, that the Mission is entitled to

judgment in its favor. The record does, indeed, contain evidence to support

Nam's position that his employment was commercial in nature. The Mission

concedes, for example, that Nam was "non-diplomatic staff" and that his primary

responsibility was driving. Special App'x at 6. The Mission hired Nam through

an online ad, a fact that also supports a finding that the Mission was acting "in

the manner of a private player within the market." *Nelson*, 507 U.S. at 360

(internal quotation marks and citation omitted). Nam testified that he was just a

driver, and only drove where he was told to go. Moreover, Nam alleged that he

was paid in cash throughout his tenure with the Mission -- a method generally

associated with private employment -- and that he frequently transported

Ministers on personal errands, *e.g.*, "to purchase luxury handbags, play golf, and

watch Broadway shows." App'x at 20 ¶ 56.

Accordingly, on remand, the district court must weigh these factual

issues, outline explicitly its findings of fact, and, if necessary, conduct further fact

finding through a hearing. Factual questions exist, for example, as to whether

Nam was in fact exposed to confidential or classified information and, if so, to what extent; the extent to which, if at all, he worked with local law enforcement on security protocols; the extent to which he drove high-level government officials; the extent to which he provided transportation to Mission personnel for personal errands and the like; and the extent to which Nam had diplomatic or quasi-diplomatic responsibilities. We note also that the district court should, on remand, keep in mind that we look to whether Nam would be considered a civil servant in South Korea, not to whether his employment resembles that of an American civil servant. *See Kato*, 360 F.3d at 113 ("Other countries are free to structure employment relationships in ways that do not mimic civil service protections now common to the United States and many European states, without thereby sacrificing the immunity conferred by the FSIA, as long as the sovereign, by extending the employment, is engaging in 'government' rather than 'commercial' activity.")

Of course, on remand, the district court would be free to weigh the evidence, to resolve conflicts in the evidence and testimony, and to make findings of fact to resolve the immunity issue.[13]

## CONCLUSION

The district court erred in granting summary judgment to Nam and concluding, as a matter of law and without resolving outstanding factual issues, that his employment fell within the FSIA's commercial activity exception. Thus, we VACATE the district court's decision and REMAND for further proceedings consistent with this opinion.

---

[13] Finally, both the Mission and Nam demanded a jury trial; and the Civil Case Management Plan filed below states that "[t]his case is to be tried to a jury." App'x at 4. But the district court has jurisdiction over this case only under 28 U.S.C. § 1330(a), *see Ruggiero v. Compania Peruana de Vapores Inca Capac Yupanqui*, 639 F.2d 872, 875 (2d Cir. 1981), and that statute states that "district courts shall have original jurisdiction without regard to amount in controversy of any *nonjury civil action against a foreign state as defined in section 1603(a)* of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement," 28 U.S.C. § 1330(a) (emphasis added). Hence, the district court lacks jurisdiction to try the merits of this case to a jury.